UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA )
) DOCKET NO. 3:17-cr-182
vs. )
) VOLUME I
ALEXANDER SAMUEL SMITH, )
)
Defendant. )
)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
MARCH 19, 2019

APPEARANCES:

On Behalf of the Government:

MICHAEL E. SAVAGE, ESQ.
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina

On Behalf of the Defendant:

KEVIN TATE, ESQ.
MYRA CAUSE, ESQ.
Federal Public Defender's Office
129 West Trade Street, Suite 300
Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

# I N D E X


| GOVERNMENT'S WITNESSES | PAGE |
|---|---|
| BRUCE HOFFMAN | |
| Direct Examination By Mr. Savage | 50 |
| Voir Dire Examination By Mr. Tate | 58 |
| Direct Examination By Mr. Savage | 61 |
| Cross Examination By Mr. Tate | 96 |
| Redirect Examination By Mr. Savage | 119 |
| Recross Examination By Mr. Tate | 124 |
| RONALD GODFREY | |
| Direct Examination By Mr. Savage | 128 |
| Cross Examination By Mr. Tate | 183 |
| Voir Dire Examination By Mr. Savage | 231 |
| Cross Examination By Mr. Tate | 231 |
| Redirect Examination By Mr. Savage | 240 |
| DONNA WILLIAMS | |
| Direct Examination By Mr. Savage | 253 |
| Cross Examination By Ms. Cause | 268 |

# E X H I B I T S

## GOVERNMENT'S EXHIBITS


| NUMBER | ADMITTED |
| --- | --- |
| 1 | 142 |
| 2 | 142 |
| 11 | 168 |
| 12A-12G | 257 |
| 13 | 171 |
| 14 | 173 |
| 15 | 176 |
| 17 | 56 |
| 18 | 65 |
| 19 | 80 |
| 20 | 84 |
| 21 | 88 |


## DEFENDANT'S EXHIBITS


| NUMBER | ADMITTED |
| --- | --- |
| 2 | 235 |
| 3 | 195 |
| 4 | 223 |
| 5 | 224 |
| 6 | 228 |

P R O C E E D I N G S

TUESDAY MORNING, MARCH 19, 2019

(Court called to order at 9:01 a.m.)

THE COURT: Good morning.

MR. TATE: Good morning.

MR. SAVAGE: Good morning, Your Honor.

THE COURT: What do we have to deal with this morning?

MR. SAVAGE: Your Honor, the government believes that there are a number of motions. One is to strike surplusage from the indictment; a motion regarding multiplicity; a motion to strike the government's expert; a motion for -- to strike Count Two; and then the government wants to put on the record the plea offer that was made and refused by the defendant.

THE COURT: Okay. Let's deal with those one at a time.

In the way of information, we have a room set up on this floor --

MR. SAVAGE: Okay.

THE COURT: -- which will be down at -- it will be the future Ken Bell's office when he gets -- finally gets confirmed, which is Frank's old office right down here in the corner.

MR. SAVAGE: Yes, sir.

THE COURT: We have audio set up, audio only. We have plenty of chairs in there for anybody that wants to sit there and hear what's going on in the courtroom.

MR. SAVAGE: Okay.

THE COURT: So we've got that set up. It's only a few steps from the courtroom.

MR. SAVAGE: And I take it at the appropriate time that occurs, then the marshal or security can direct the gallery down to that room.

THE COURT: Correct.

MR. SAVAGE: Okay.

THE COURT: Correct.

Okay. Mr. Tate, let's hear your motions one at a time.

MR. TATE: Thank you, Your Honor.

We would rest on the submissions. But with respect to surplusage, it is a speaking indictment. The Court has already given them a capsule, a summary of the charges, which I think really moots the issue. It's not read to the jury. The only issue would be whether the indictment in its entirety would go back to the jury room, and customarily it would not.

So I think that resolves the motion for surplusage as long as the charges only are going back to the jury. The Court has already given a summary of the charge and did not go into what we describe as surplusage. So I think that's kind

of mooted itself unless the Court intends to send the entire indictment back. I don't know what the Court's thoughts are.

MR. SAVAGE: Why wouldn't the jury get the indictment? It was the indictment that the grand jury returned. I think it's not even a close call as to whether or not the information in there is surplusage. Plus, there is no prejudice because all of this is going to be covered in the evidence that's going to be offered at trial.

THE COURT: Well, let's see what the evidence is with regard to it. I think it's a little bit early to do that. Nobody is going to be showing the jury the indictment right now I don't think --

MR. SAVAGE: True.

THE COURT: -- is that right?

So why don't we see what the evidence shows. And if the government doesn't have something in there and there are prejudicial statements that there's no evidence on, then we can always talk about it then, Mr. Tate.

MR. TATE: Thank you, Your Honor.

With respect to our motion to strike surplusage, we filed a response, I believe, Sunday evening and basically outlined some Fourth Circuit authority. The government relies on a -- what I would say is an old unpublished Fourth Circuit decision cited in a Ninth Circuit case. There's more recent Fourth Circuit cases. It goes to Congressional intent of

1001.  This is the same interview, the same agents at the same time about the same topic.  Think of it this way, Your Honor. They could allege 20 separate counts from one interview and it can go on forever and ever.  There would be no protection against double jeopardy or anything else.  And I think that's really the threshold question.  Here it's one continuous conversation.  We believe it constitutes only one single count.

THE COURT:  Mr. Savage.

MR. SAVAGE:  Well, Your Honor, I checked that case, I think the case is *Jamison*, because after the defense filed its -- filed its motion, I went back and double checked to make sure I had the right authority and I found that that case has been cited, even though it's unpublished in the Fourth Circuit, and certainly cites good authority.  It's been cited by at least four cases since then in this district, including Judge Cayer in the *Rand* case, Judge Reidinger in another *Smith* case.  And in fact, the other *Smith* case is 2010.

So, you know, I don't -- there's no -- the test is *Blockburger*.  If there are facts or there are elements that aren't charged in one or the other, then they're two separate crimes.

In this particular case, one alleges that he lied about going to -- himself going -- in a plan to go to Syria, and the second one he lies about a material support charge in

that he was buying a ticket for another person who was going to go to Syria. They're in two separate parts of the interview. So the fact that they occurred on the same day is no different than two different bank robberies on the same day or the fact that they robbed the same person on the same day. There's still two separate incidents.

So for that reason, Your Honor, we'll sit on our brief, but we think that they're fair charges and that there are different elements to each as the Court will instruct and as submitted in the proposed jury instructions.

MR. TATE: Your Honor, one thing I think the Court should take a quick look at is this. The cases that -- the primary case Mr. Savage cites is juxtaposing 1001 violations and another charge under a different statute. The counts that they are charging is multiplicitous. And they said that there were distinct elements. There are no distinct elements here and so I think that's a distinction. And then you have to go back to look at the Congressional intent.

THE COURT: Well, I really see no prejudice from it. The Court, in looking at the facts of it and the fact this took place in the same interview, it's not going to impact sentencing in any way with the two 1001s in there. I mean, I agree with you, Mr. Tate, that this is one interview and one overall time period; but there are two separate lies that are told about it. I don't see how proving two lies for one

charge or proving two lies for two charges during the same activity in any way prejudices the defendant. If the defendant lied on one of those times, the sentence is going to be the same as if he told two lies that day. I mean, the sentencing exposure may be different, but the guidelines are going to come together with regard to that. So the sentence -- and the Court understands how that works with regard to that.

If I could see some kind of real prejudice to the defendant, I would think that there would be some difference here, but I don't. And I think -- I do appreciate there's only two charges. I mean, sometimes out of the same thing the government decides it's going to charge 20 charges on some -- every time somebody does a mailing and wire fraud. And I'm sitting here going, do you really -- do you really need to test my ability to speak -- continue to speak without losing my voice to have to read every one of these things? Mr. Bowne from Washington believes I do. He charges every single thing he can charge.

So I'm going to -- I'm going to deny the motion. I think we're okay. I cite the government's brief with regard to that and the fact that I really can see no prejudice. They're going to prove those two -- they're going to prove both of those. And if the jury believes they're lies, they'll convict him. And if he's convicted of two on the same day, it

has no real prejudicial effect on the defendant in any way.

MR. TATE: Thank you, Your Honor. Note our objection.

THE COURT: I do. I note your objection, Mr. Tate. Thank you.

Now, what's -- what next do we have?

MR. SAVAGE: The defense has moved to strike the government's expert witness, Dr. Hoffman.

THE COURT: Oh, yeah. Mr. Tate.

MR. TATE: Your Honor, again, the threshold of the notice for an expert under 702 is to provide the defense and the Court with a summary of the testimony. We don't have that. All we have is broad conclusions. He's going to talk about the nature and structure of ISIS during a certain time period, which it's our contention is irrelevant, but it doesn't say what he's going to say and what his conclusions are. What is -- what is the ultimate -- what are you going to say about the nature and structure? That's what's needed in order to challenge under *Daubert*.

So we say we don't have sufficient notice. That's what we're saying. And we asked for it again and the government supplied a pamphlet purportedly prepared by ISIS. We don't know what that has to do with his testimony. It's not authenticated as -- in support of his testimony. Unless he wrote the pamphlet, it's not relevant to his testimony that

he read a pamphlet and now he's going to testify to what he read in a pamphlet. I don't know what he's going to testify to other than those broad categories that were provided in the notice which really aren't notice because really we're supposed to have a summary of his conclusions.

THE COURT: Mr. Savage.

MR. SAVAGE: Your Honor, I don't know what Mr. Tate is reading, but I'm looking at Government 49. It says specifically, Dr. Hoffman will testify that ISIS is and was in 2014 to '17 an international terrorist organization. He'll explain the history and structure of ISIS as it existed in the relevant time frame. He'll discuss the relationship between ISIS, the United States, and other western countries. He'll explain the relationship between ISIS and the Syrian government, the Syrian civil population, the role ISIS played in the Syrian civil war. Dr. Hoffman will discuss ISIS's methods of communication used internally and externally, as well as the means by which ISIS recruited individuals internationally to participate in the armed conflict in Syria.

There's nothing in 702 that says that if an expert doesn't prepare a report, that the government has to provide one. But nevertheless, when I went to Washington, I interviewed the good professor. And as a result of that, he provided certain information. One of them will be exactly what he's going to testify to and the report would be -- it's

going to be Government's Exhibit 18, and it was a report that he prepared, actually, for another case in Australia. But in that particular one, which we provided to the defendant over a week ago, it discusses such things as how did ISIS emerge? It has text about that. How is ISIS different from other things? What are its goals? How is it structured? How is it funded? Basically, it's there to provide context to the jury.

And as the government said in its pleading, we anticipate that there's going to be a lot about ISIS in here that is discussed by the defendant and by the government's informant, including specific Arabic words. The fact that there is travel -- the fact that there's travel to and from the United States, that Westerners were going; that at that time ISIS was recruiting in the United States; that as it was alleged in the indictment, it is indeed a designated terrorist organization, what that is, and to provide context.

It's helpful to the jury because not every juror is going to know what Hijrah is or what the various phrases or who al-Baghdadi is, as the defendant knows, and what the significance of those things are.

As for the brochure, which will be Government's Exhibit 21, that's not something that the expert wrote. That is a published ISIS tract on how it is -- what you should bring. It's a travel guide of how to get to the Hijrah, which is the Syrian state. And it tells Westerners what to put in

their backpacks, how to go, how to fake their passports, what to say if they get to Turkey, all those sort of things. So that's certainly relevant.

And the other thing I think he'll talk about is the amount of territory that ISIS had at that time.

So we're not going to be profiling. We're not saying that defendant acted in a certain way. It's not an element of the offense. What he's going to do is explain the context for which these charges lie, and there are two specific elements to which this applies.

One, we've got to prove it's material. Why is it material? It's material because the defendant's false statements had the capacity to influence the FBI's investigation. To do that the FBI is investigating, in 2014 and 2016, ISIS. It's important for the jury to know what the government's investigating so it can make a materiality determination.

The second thing is that the government specifically charged the terrorism enhancement in this case. When the defense writes its objection, it puts the elements in, but leaves out completely the fact that there's an international enhancement and, indeed, if the jury finds the defendant guilty, it's going to have to find that this is a matter involving an international terrorist organization.

So for all those reasons, we believe that Dr.

Hoffman's testimony is proper under 702. There's no doubt that he's qualified. There's no doubt, as the government submitted in its brief, that there's a specific area of study involving international terrorism. One hundred and nineteen universities offer a program. And even one of the prospective jurors had studied international terrorism here at UNC Charlotte.

So for all those reasons, we think it fits the criteria of 702, it's helpful, and the Court should allow it.

MR. TATE: I was kind of surprised to hear Mr. Savage basically state that the expert wants to testify to the ultimate issue to be decided by the jury which is specifically prohibited by 702. He can't opine on the ultimate issue to be decided by the jury.

And to say that the government was investigating ISIS is a stretch. This is a made up script. This isn't real. They created the facts, the scenario, the background, and everything else. Without them there would be no ISIS. There was no real Mohamed Hilal. There was no real Abu Khalid. And at the end of the day, he never did travel or wanted to travel. That's why he's here facing a 1001 charge. So now they're trying to conflate this into a terrorism case.

THE COURT: Mr. Tate, if he did -- if he was ready, willing, and able to go over there, there's no other way the government can do -- it's just like a drug dealer --

drug-dealer setups. You've got to set up some of this. I mean, they're trying to entice and inflame these young men to go over there and fight, enticing them with religious principles, sometimes with the ability to take female slaves, essentially. And they're trying -- how are you going to catch these folks if they -- if there's not some ability to do that? So...

MR. TATE: You catch them doing it. You catch them doing it.

THE COURT: Yeah, but you -- yeah, but they're not -- but if Abu, whatever his name is, is right, you're not going to catch -- you may not catch them. And plenty of folks have gone over there. Some of them would like to come back. Some of them probably have come back.

But with regard -- let's just get to the issue of the expert testimony here. I don't see how this is not -- how this has not complied with that. They've given you -- they've given you a summary of the opinion. You can get an expert to testify that ISIS -- he's going to testify what ISIS is and what's going on. You can say that -- you can have an expert come in and say ISIS is not a terrorist organization. That they're not -- they don't have caliphate. That they -- that this -- that they're not enticing people to come over there and kill people over there and fight in the war. All these things you can bring an expert in, but they're entitled to

talk about the fact of what ISIS is. Some people with everything that's been in the news have some idea of that and the -- and others don't.

You heard this jury. Nobody -- nobody is talking about Islam as a religion is a problem. What they're talking about is whether or not -- the issue is going to be whether or not it has been perverted into a killing machine. That's really what it is, by a sect of people. And the -- the government is trying to see that those that go over or attempt to go over there or attempt to give aid and comfort are prosecuted.

Now, it may be this man has not done any of this stuff. It may be that they have -- that they've got it wrong, but I think they're entitled to bring that evidence in to court. And with the summary given, I think they've met the test. I've got a case from the Eleventh Circuit, *United States versus Batts*, which says that Federal Rule of Criminal Procedure 16a(1)(G) requires the government to furnish upon defendant's request a written summary of the expert testimony the government intends to use during its case in chief at trial. It has to describe the witness's opinions, the basis and reason for those opinions, and the witness's qualifications.

You'll be able to cross examine him about that at the appropriate time.

MR. TATE: Thank you, Your Honor. Note our objection.

THE COURT: Objection is noted. Thank you.

What other matters do we have?

MR. SAVAGE: Your Honor, I think that we have been amazingly efficient and that would be -- maybe Mr. Tate can correct me. I think that's all the pending motions at this time.

THE COURT: Okay. Now, here's what I want. I want this to be smooth when these folks testify here about how we handle that testimony so that the jury is never impacted and never believes that something occurred where people will be kept from the courtroom. I want it to look as normal as it can when that happens.

MR. SAVAGE: We will -- we will make sure that that occurs. That will be --

THE COURT: We can't just suddenly stop somewhere. I need a heads up about when it's going to happen.

Is anybody going to start off testifying?

MR. SAVAGE: Yes, Your Honor. And I'll give you the government's witness order in just a minute.

The one last motion is the government filed a motion in limine. I don't see the defense going there, but obviously we're going to object if there is some idea of jury nullification or argument regarding the government's

investigative techniques or charging decisions were improper. But I don't anticipate that happening and probably wouldn't need to deal with that now.

THE COURT: Yeah, I'm not going to -- I'm not going to -- I mean, I'm not going to go ahead and make any ruling on anything like that now.

MR. SAVAGE: The one last housekeeping matter I'd like to bring up is just for the sake of our record in the event that there is a conviction, I would put on the record -- as the Court knows, I was absent from the office for the last year and just came back in February. Before that my colleagues Craig Randall and Dana Washington were working on the case. I have a series of emails between Mr. Randall and Mr. Tate.

I would like to say that the government had previously offered Mr. Smith what would be considered a plea under Federal Rule 11(c)(1)(C) which would have given a cap of three years, not a binding sentence but a cap of three years if the Court had accepted it. We pointed out that the -- this was a generous plea offer because of the function of the federal sentencing guidelines and the potential application of the terrorist enhancement under the guidelines. Should the guidelines apply, they would increase the sentence by 14 levels and bring the defendant automatically to an offense level VI. We had estimated a sentence that could be in the

range --

THE COURT: You mean a criminal history category of VI.

MR. SAVAGE: Criminal history category VI, right.

So absent this agreement, and we're not saying this would be the case, but the Court -- the recommended or discretionary guideline could be between 262 months and 327 months. There, of course, would be a statutory cap and if the Court decided that they were multiplicitous counts, it could be capped by 60. So any of that could happen. We're not saying it would. We agreed to cap it at 36 months.

The defense declined that offer, as it is their right to do. I just wanted to make sure that in the event that there's any kind of 2255 appeal, whatever, that the Court inquire of the defendant whether or not he considered the charge and whether or not it's his decision to go to trial.

MR. TATE: Your Honor, first of all, it wasn't the defense that declined the offer, it was Mr. Smith.

THE COURT: Yes, the defendant.

MR. SAVAGE: Well, that would be my point, Your Honor.

THE COURT: Well, he's making everybody aware of it in open court so that the defendant understands that offer was made.

MR. SAVAGE: Yes, sir.

THE COURT: Mr. Smith, you had that offer; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you declined to take that offer.

THE DEFENDANT: Yes, sir.

THE COURT: Thank you.

MR. SAVAGE: That's all we have, Your Honor.

THE COURT: Yeah, those, well, are pretty high guidelines.

MR. SAVAGE: Yes, sir. I think we're jumping the gun there.

THE COURT: Yeah. If we get there, those are pretty high guidelines.

All right. Anything else for the Court?

MR. SAVAGE: No, Your Honor. I asked Ms. Neill to be over here at 9:30. We'll have our system hooked up in about 5 minutes. So if the jury arrives early and the Court wants to start early, we're ready.

THE COURT: Okay.

MR. SAVAGE: Just to give everyone a preview of the government's case, our first witness will be -- as I speak. Our first witness will be Dr. Hoffman. Our second witness will be Special Agent Godfrey. Our third witness will be Abu Khalid. I don't expect that we would get to him until the

afternoon. We've told him to be on standby. He's nearby. By starting at 11:00, he could be here probably in a short period of time. Asked him to be at the courthouse around 12:30, and we're going to keep him in a nonpublic place. Following that we're going to call Ms. Donna Williams, will be a short witness, who is a custodian but also a substantive witness from American Airlines. She was also with them with respect to when it was US Airways. And then at the end we're going to recall Agent Godfrey and have him introduce the tape of the video on this -- which is the basis for the charge on the 16th of February.

I'll tell the Court that we have a rolling transcript for the undercover tapes. Some of them are, like, in a car so there will be background noise. But we have provided those transcripts to the defendant last week.

We do not have a tape -- or a transcription of the FBI interview on the 16th. It's in an interview room and it's very crystal clear and we didn't think a transcript would be worth the time.

So that, in a nutshell, is the government's case.

THE COURT: All right. And you anticipate taking what, two days to put on your evidence or a day and a half?

MR. SAVAGE: Your Honor, it depends on the cross. I would say to you that we're going to play -- we're going to offer the entire tape of each of these -- each of these

interviews. There are -- you know, to the extent that the defense wants to play other parts, we're going to play what we think are the relevant parts. The jury is going to have the entire thing. So depending on how much of the tape -- for instance, the FBI interview is two hours. We plan to play 45 minutes of it. If the defense -- we have other segments the defense asked us to cue up. If they want us to play more, we'll play more.

THE COURT: When are you going to play the tapes? Today?

MR. SAVAGE: Well, the -- yeah, the tapes would come in through --

THE COURT: Okay.

MR. SAVAGE: -- I think, Abu Khalid. We're going to have the agent identify them to provide the evidentiary foundation.

THE COURT: Depending on how much of the tapes are played, I need to -- we'll decide how late we go tonight.

MR. SAVAGE: Yes, sir.

THE COURT: I want to make sure we try to get this in.

MR. SAVAGE: We'll have all of our witnesses here today so we can go as late as you want.

THE COURT: Okay. All right.

Anything from the defense, Mr. Tate?

MR. TATE: Not at this time, Your Honor. Thank you.
THE COURT: Okay. Yes, sir. Thank you.
We'll be in recess until we get a jury here.
MR. SAVAGE: Okay. Thank you, Your Honor.
(Brief recess at 9:27 a.m.)
(Court back in session at 10:02 a.m.)
THE COURT: All right. Anything for the Court before we bring the jury in?
MR. SAVAGE: Not from the government, Your Honor.
THE COURT: Okay. Mr. Tate, anything from the defense?
MR. TATE: No.
THE COURT: All right. How long are we going to need for opening statements?
MR. SAVAGE: I shouldn't take more than 10 minutes, Your Honor.
THE COURT: Mr. Tate.
MR. TATE: I need about -- I would ask the Court for between 12 and 15.
THE COURT: Okay. So we'll be able to move from opening statements into the first witness.
Let me just go ahead and make sure -- put on the record that although there's some discussion about whether this deals with the ultimate issue, this expert does not deal with the ultimate issue. The ultimate issue is whether the

defendant lied to the authorities. That's the ultimate issue in this case. What that deals with is the underlying reasons that someone may lie and what led to the investigation and that sort of thing as part of the -- part of that. But it has nothing to do with the ultimate issue which is, did you tell the truth when you had the shot? That's really what the case is about. Okay. So the expert will be allowed to testify.

Anything before I bring in the jury?

MR. SAVAGE: No, Your Honor.

MR. TATE: No, sir.

THE COURT: All right.

COURT SECURITY OFFICER: They're still coming together.

THE COURT: All right.

(Pause.)

COURT SECURITY OFFICER: They're all here now and headed this way.

THE COURT: Thank you.

Also, a reminder that opening statement is opening statement. It's to tell the jury where you expect the evidence to go and is not for heated closing argument in the -- in the initial. That's not what it's for. There's no evidence in front of the jury to argue about.

Also, just as a -- just as an aside so everybody knows, Mr. Davis yesterday very quickly in court was able to

pick up the name of the fact that there is a Dr. Alston Graham Warr and he does have a medical license and that his specialty is pediatrics.

MR. SAVAGE: Your Honor, I can report to the Court that we have been in contact with the Memphis FBI and they advise us that the witness requested by the defense will be in Charlotte sometime this evening and will be available at the court no later than 10:00 tomorrow.

THE COURT: It's good to know he'll not have to require spine surgery by his pediatrician.

MR. SAVAGE: Yes, sir.

THE COURT: Okay. Anything before I bring the jury in?

MR. SAVAGE: No, Your Honor.

THE COURT: Okay. I'm going to give the jury a little summary of what's going to happen, the order it's going to happen in, and then we'll move right into opening statements.

All right. Let's bring the jury in.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury. Glad you all got here safely.

We're going to proceed with the trial at this time. Let me just give you a little bit of an idea how we're going to go.

We'll start off with opening statements. Opening statements are where the attorneys tell you what they expect the evidence to show. This is not the time they're to argue the case to you because there is no evidence to argue to you at this point. They can only argue what has been presented to you in the form of evidence. They are allowed to tell you what they expect the evidence to show in the case.

Following these brief introductions, we will move into the evidence. The evidence will then take place over probably the next couple of days, followed by the opportunity, then, for the parties to then argue their contentions to you. Once that is done I will give you instructions on the law and you're to apply that law, whether you agree with it or not, to the evidence in the case. So that's sort of the way that it will go with regard to this.

One little bit of a warning to you. Nothing the attorneys say is evidence. Nothing they say is evidence. You're going to hear the evidence here in the courtroom. The attorneys certainly are allowed to tell you in their opening statements where they expect the evidence -- what they expect the evidence to show. They're also going to be allowed to argue to you what they say the evidence does, in fact, show. But nothing they say is evidence. Their contentions to you are to make you think about what the evidence is and then you make your own decision about how you apply that evidence in

this case in making your decision.

You will be the judges of the facts in the case. The Court will be the judge of the law. You will put the law together with the facts. Then you'll be able to deliberate and reach your opinion in the case. Once we have that, we'll have a verdict.

All right. The jury is with the government for opening statement.

MR. SAVAGE: Thank you, Your Honor.

Good morning, Your Honor, ladies and gentlemen, defense counsel. Thank you very much.

My name, again, is Michael Savage. I represent the United States in this matter. At my table is Brenda Neill who's going to help me with the electronics so that things go smoothly. And you've met Agent Godfrey and our intelligence specialist Chris Smith.

I think you're going to learn through the evidence in this case that in July of 2014, the FBI was conducting an investigation involving a family who had moved from North Carolina to Syria by the name of Kodaimati. The Kodaimatis were living in a city outside of Aleppo in Syria. And around 2014, as you will learn from our expert, Dr. Bruce Hoffman with Georgetown University, the war in -- the Syrian War had changed into a conflict involving various extremist terrorist organizations, including ISIS. You're going to learn that

ISIS is the Islamic State of Iraq and Syria. It goes by various names, Daesh, ISIL, various different names. But one thing it all has in common, it is recognized by the entire world as an extremist and brutal organization. Other organizations, some terrorists, some not, were also operating in Syria.

You're also going to hear around that time that one of the things that ISIS did is it recruited Western fighters or fighters from Western countries from all over the world, including the United States. It was very effective at using the internet and social media to spread its message of hate and intolerance. In that regard, it became really a threat to our country that ISIS was operating not just in Syria, but also in committing terrorist acts in other Western countries.

Around this time there was an ISIS propaganda person by the name of Adnani who exhorted ISIS followers that if you couldn't come to the war to commit atrocities there, use a gun, a knife, a car, whatever was at hand, to kill the nonbelievers, the kufars.

So the FBI was very concerned about the Kodaimatis and what their ties were to the United States. They had lived peacefully in our country for a long time. Had gone back at a time that the Arab uprising in the civil war with Assad began. And while they were living in Charlotte, North Carolina, they befriended the defendant in this case, Mr. Alexander Samuel

Smith. At some time during this time when he was friends with the Kodaimatis, he converted to Islam and took on the name Amir Alexander.

So flashing forward to July of 2014, the FBI received information that Amir Alexander had contacted a common source, a person known to the Kodaimatis, and was reaching out to this person for help in traveling to Syria to fight. At that time the investigation of the Kodaimatis was still going on, but a new threat or a new inquiry opened up. The FBI, who is responsible for protecting the United States inside our country from terrorist threats, was opening investigations all over the country to prevent people or to learn whether people were traveling to Syria for the purpose of fighting with ISIS. That would be a crime. It was against the law to fight with a designated terrorist organization, as you will learn ISIS was.

So the FBI opened its investigation. But in such an investigation, as you can imagine, if Agent Godfrey went over to someone he suspected to be an ISIS sympathizer, identified himself as an FBI agent and said, "Are you planning to travel to Syria," likely he would not learn the answer because ISIS used various means. It knew that Western governments were checking. It knew about the watch list, the no-fly list. It used encrypted means and was very secretive about how it conducted its operations until an atrocity occurred and then

it was very bold.

Now, you'll also learn that in July of 2014, the FBI could not conduct an investigation with the person that Mr. Smith initially contacted, so a plan was devised for the FBI to introduce a second source, someone who could operate and who was in North Carolina. Now, because the information is classified, you won't learn the real name of that person to protect both them and the FBI's program, but you will see him and he will testify in the courtroom and you can see him. And the defense will have an opportunity to cross examine him about all matters that are important to this case.

You'll learn that he'll go by the name of Abu Khalid. Abu Khalid was a name that was given to the defendant to see if he was serious about traveling to Syria. You're going to learn that the defendant took the name and phone number and called Abu Khalid and that he initiated the contact with the government source.

And then in July of 2014 he asked and they did, in fact, meet. And you're going to hear both the -- you're going to see the email exchange between the defendant and Abu Khalid that sets up that meeting and you're going to hear audiotape of the conversation between Abu Khalid and the defendant in Chapel Hill, North Carolina.

You're going to learn that the defendant -- that Abu Khalid was very specific about what he was about. He told the

defendant he was only working for ISIS. He was working for Daesh. He was there to help people travel to Syria on behalf of ISIS. He gave the defendant all the time in the world to say he wasn't interested, but he did not.

In fact, in August of 2014 another meeting occurs in a follow-up in which the defendant and Abu Khalid meet together again, this time in Matthews, and that conversation will be recorded. At that time the defendant agrees and says he is willing to go to Syria to not only fight for his friends, the Kodaimatis, but also to fight with ISIS.

Those conversations continue in November of 2014. In fact, in November of 2014, the FBI, wanting to make sure, wanting to differentiate is this just some guy talking, is this just internet talk, is it just craziness or is he really serious because we need to know. We need to know whether this guy is going to fight with ISIS. Is he going to leave? Are we going to prevent him from doing so? What's going to happen? And we can't wait. The FBI can't wait to see if a crime occurs. They can't wait to see what happens in this case because it involves a terrorist organization.

So they set up a meeting with the defendant, Abu Khalid, and another source they introduced, a person that you'll hear his name is Bilal. That's not his real name. But Bilal was introduced because Mr. Smith at that time didn't have a job. He didn't have an ability or a means to get to

Syria, but the FBI wasn't in a position and didn't want to simply give him $2,000 to go buy a ticket to Turkey. Instead, they wanted to see how serious he was. At one point he said he was going to earn some money and leave as soon as he could. Well, we wanted to know and the government wanted to know was he going to earn that money? If he earned the money, was he going to spend it on travel to Syria to fight with ISIS?

So for a period of time he worked with Bilal fixing cars or doing construction to see if there would be enough money. And every time he met with them, they would ask him, "Are you still serious about going? Do you want to go? Are you preparing to go?" And he would say yes.

In this meeting, which you'll see both video in a hotel -- in a hotel room in Charlotte, you'll hear both video and audio recordings of those conversations. And you'll hear the defendant say that, indeed, he was willing to go and to talk about atrocities such as the beheading of a journalist and say, "Well, I don't agree with the way they did it because they sawed his head off, but if they chopped it off mercifully, that would be fine." So those types of things were discussed. There was no doubt in anybody's mind at that time that this was a serious, serious matter.

In November of 2014 in a meeting with the defendant -- meeting with Khalid, Khalid is posing as a person who is traveling all over the world helping to recruit ISIS

fighters and he's saying that, "I'm traveling and I'm very tired."

The defendant at that time says, "Listen, if you're driving, I can help you. I have a person who can get you a buddy pass."

You're going to learn that a buddy pass is a discounted airline ticket that's available to people who work for airlines. The defendant's girlfriend, you'll hear, Palak Sheth, was at that time a US Airways employee and she was entitled to buddy passes and she got so many a year and that she could buy them for anybody.

So time goes by. I think you'll hear that the investigation turned back to the Kodaimatis for some time and nothing happens really over the holidays. Mr. Smith is working with Bilal and seeing if he can earn money. And then in March of 2015 he gets a Skype call from Abu Khalid saying, "You said you could get a buddy pass. We have a brother who really needs to travel."

At this point the FBI's investigation had expanded. Now it's not just the defendant, it's whether or not there's a person working for US Airways who has access to the secured airport areas, who has access to its travel system, is booking tickets for somebody who they may know is a terrorist. So with respect to this, we needed to know.

So they create a person by the name of Mohamed Hilal

and say that he's a computer specialist from Tampa, Florida, and that he wants to go and travel to ISIS and they have to get him a ticket right away. And you'll find that Abu Khalid gave very specific information about the date of birth, the name of this individual, and his travel plans. Not just that he was going to travel from Tampa to Buffalo, which is where the ticket was purchased, but then was going to cross into Canada and from Canada into Europe and from Europe into Syria.

You're going to hear from Dr. Hoffman that that's not an uncommon path for someone to take if, indeed, they're trying to evade Western authorities and go to Syria.

And then you're going to see that that ticket was booked a day later. You're going to see the evidence and the information from the actual American Airlines ticketing system. Ms. Donna Williams is going to testify and show you those tickets. And you're going to see emails between the defendant and Abu Khalid where he gives him the ticket information.

But of course, there was no Mohamed Hilal. Nobody -- the FBI wouldn't propose to have a person actually travel to help a terrorist organization. So when Abu -- when Mr. Mohamed Hilal did not show up at the airport, the defendant became very concerned. And at that point he sends an email eventually to Khalid saying, "I don't want anything to do with this." He suspects something is up and at that

point says, "You're trying to get me to do things I never wanted to do."

And you can hear Abu Khalid ask whether or not -- and you can see for yourself the recorded conversations and whether or not the government tried to get Mr. Smith to do something he didn't want to do.

At that point the investigation turned from a covert investigation to an overt investigation. Agent Godfrey is going to tell you about that there are -- because it's national security, there's a lot of time that's involved in coordinating with Washington, declassifying documents, creating and subpoenaing documents such as from US Airways.

Finally, in February of 2016 the grand jury here issues a subpoena for the appearance of Palak Sheth, and they don't hear from her right away. Who they hear from is the defendant. The defendant calls the FBI and says, "You've subpoenaed my girlfriend. What's it all about?"

And in that phone conversation he agrees to come down to the FBI to give a voluntary statement. He drives himself to the FBI. The FBI presents themselves. And you're going to see a -- the conversation is two hours. We're going to play about 45 minutes for you, but you're going to have the entire conversation. We invite you to look at the whole thing.

You're going to see that there was a number of

discussions in that and how many times Agent Godfrey gives the defendant a chance to tell the truth. He says first, "I don't know what you're talking about."

And then because the FBI knows some of the answers, they remind him of little pieces of it. "You didn't know Mohamed Hilal? You never heard about him, knew nothing about him?"

And eventually the defendant lies. He lies repeatedly, but there are two lies that are going to be important here, the ones in the indictment.

Count One says he falsely stated to FBI special agents then investigating a matter involving international terrorism that he had never discussed his desires or plans to travel to Syria. Now, we all forget things, and a year and a half is a long time. But if you've got a plan to go to Syria to fight with ISIS -- you can judge for yourself from the context of these conversations. Look for whether or not this was a forgetful or a deliberate statement.

The second statement that was charged separately in that interview is that he falsely stated to FBI agents then investigating a matter involving international terrorism he did not know individual A intended to use the buddy pass secured by Smith to travel and support ISIS.

Listen to the recording. We're not going to say that any investigation is perfect, and maybe certainly this

one had its flaws. At the end of the day, it doesn't make any difference who you believe. Just listen to the tape. The conversation is crystal clear.

You've got to decide a number of different elements in this case. So as the case unfolds, you may hear a lot of noise and there may be a lot of distraction; but at the end of the day, keep your eye on the ball. And the elements are this:

Did the defendant make certain statements? Look for those statements. They're here in the indictment.

Were those statements false?

Were they material?

Were they capable of influencing the FBI in its investigation? Agent Godfrey will tell you about that investigation and how even truthful and untruthful statements can affect it.

Did it pertain to a matter within the jurisdiction of the government? The Court will instruct you that the FBI is part of the executive branch of the government.

Were the statements made knowingly and willfully? You cannot commit this crime by accident. It can't be forgetful. The government has the burden of proving that and we intend to do that.

And finally, did the offense involve international terrorism?

Now, at the end of the case, the judge is going to give you exhaustive and extensive instructions about the law. Part of your oath here is that you agreed to follow the law. That's all we're asking. When you get done with this case and you look at this, you look at what led up to those statements and what the defendant said, there is not going to be any reasonable doubt that the defendant committed the offenses and that each and every one of these elements is proved beyond a reasonable doubt.

We're going to have four witnesses. It's going to be Dr. Hoffman, Agent Godfrey, Abu Khalid, and Donna Williams. We hope not to waste your time. We're going to be as efficient as we can. This is an important matter to the United States and to the defendant and we thank you for your time.

THE COURT: All right. Thank you.

Mr. Tate.

MR. TATE: Thank you, Your Honor.

May it please the Court, counsel, the Smith family, ladies and gentlemen of the jury:

I am so happy to stand here today and represent Alexander Smith, a man that is innocent of the charges for which he's been charged.

What this case is about really is a fictional movie script with fake names. The characters have fake names and

their aims and objectives toward Mr. Smith are fraudulent, rife with lies, trickery, and deceit.

Let's back up a little bit. One of the things that Mr. Savage said is that this case has some flaws. It has a lot, and here is why. This saga begins in around 2004. Mr. Smith at the time is a wayward youth. He's about 16 years old. He's a high school dropout. He has no job. So as what happens in a lot of communities, the Muslims took him in, a man by the name of Wael Kodaimati. And for the first time I've ever heard that they were under investigation. Mr. Kodaimati was a naturalized citizen. He had a son the same age as Mr. Smith. He took him in. He employed him at his job. He saved his life. He became a part of their family. And Mr. Smith got work through him.

So what happens next? Around 2011 the civil war breaks out in Syria and Mr. Kodaimati's wife and some of his family are there in Aleppo. At that time -- when Dr. Hoffman testifies, you'll learn in 2011 not only was the Syrian government using atrocities against their own people, including chemical weapons, the United States actually opposed Syria.

And what you'll hear from Mr. Smith in his words is that he opposed Assad. He opposed the atrocities. He was worried about his family, his brothers in Syria. He had empathy for them, and that is not a crime.

He was also out of work. He asked Wael, who was in Syria at the time, "Is there any way, anybody you know I can get some work in the Muslim community? I honestly would like to come out there and help you. I'd like to come out there." And I believe they were doing humanitarian work in that area. They were not a part of ISIS. You won't hear anybody saying the Kodaimatis were ISIS. You won't hear Mr. Smith saying ISIS.

What he did was he called a guy that he thought was a friend of Wael's in Memphis, Tennessee. We call him Kareem. He went by that name. And what he said to Kareem was, "Wael said get ahold of you. I'm looking for work. I'm also trying to go to Syria to check on them. They're trying to get out of there and get to Turkey. I want to do whatever I can to help this family." No mention of ISIS.

Unbeknownst to him, Kareem was a paid informant. So he contacts him and he says, "Brother, I have to give you a local brother there. His name is Abu Khalid." I don't know whether Kareem and Abu Khalid really knew each other, but Abu Khalid was a paid informant.

What this Abu Khalid does, he comes in with this false script, this false text. They create this movie where all the characters in there are paid government informants making hundreds of thousands of dollars to set people up. It's their movie. They're the casting agents. They're the

directors. They're the writers. The only one that doesn't know he's in the movie is Mr. Smith.

So what does Abu Khalid do? Well, the first thing he does is he gets him a job working with him on construction. One of the first things -- the first meeting was around -- contacts were around August of 2014. And when you listen to these recordings, listen to who's talking. Is it Mr. Smith or is it Abu Khalid trying to force feed words in his mouth? He's the one talking about ISIS. Mr. Smith never said, "I want to go travel for ISIS."

The very first conversation he says, "There is this family in Syria that I'm concerned about. I want to help them." That's not against the law. And he says this to him repeatedly, but this guy keeps over and over again talking about ISIS. And then he stops using the word "ISIS" because he knows it's going to throw him off so then he just starts using the general term "brothers." And brothers can mean anything. Everybody is a brother that's over there if they're Muslim.

So this goes on. This is August of 2014. He employs him. He employs him with construction jobs. He's giving him money. And one of the things you'll notice is every time Mr. Smith has contact with him, although they're playing him, he's really playing them because every time he has contact with them he needs something. He needs some

money. He needs some gas money. He needs a phone card. He needs a car. He needs a computer. "Can I borrow $20?" It's always -- that's the reason this guy is sticking around. He's talking, but what you won't ever hear is any plan to go to Syria.

Eventually they introduce a black Muslim -- purported black Muslim named Bilal. Smith tells Khalid, "I want to start a limo service. I want to start a resale business. I need a job. I've got a family."

So what do they do? In comes Bilal. Bilal helps him buy cars and physically is with him all day fixing up cars and reselling them. He's befriending him like he's his brother. They're going to the mosque together and praying. Abu Khalid is going to the mosque together and praying. And in one of the instances Abu Khalid is there in front of Emal [phonetic]. He takes -- Mr. Smith takes him to his mosque in Charlotte and Abu Khalid starts talking this rhetoric about ISIS and Emal checks him. And he says, "The problem with ISIS is anybody that disagrees with them is dead." And again, it was Abu Khalid bringing up ISIS, not Mr. Smith. The only thing he's saying is na'am, which is okay. If someone is talking, repeating, saying, uh-huh, uh-huh, yeah, okay, na'am, inshallah. "Are you going to travel to Syria?"

"Inshallah," if it's God's will. Well, God never willed it because he never went.

What's clear is that all the way through August, through October, through November, into January of 2015, all the way to March of 2015, even with having Abu Khalid with him all the time, even with having Bilal so-called in bed with him, praying with him and pretending to pray with him at the mosque, hanging out with him, refurbishing cars. They're running a business. Mr. Savage says he was just trying to get money. He got money plenty of times. But what he didn't do was ever get a passport. What he didn't do was ever get his own self a buddy pass. What he didn't do is ever say, "I'm going over there to fight for ISIS." He repeatedly talks about his hatred for the Assad regime, which was opposed by the United States, committing atrocities against their people, including his beloved friends the Kodaimatis.

So what happens? They finally realize that this is a mission creep. This investigation has failed. This guy is not going to travel. He never gets -- he never commits. A couple times he -- Mr. Smith admonishes Abu Khalid when he's talking because he -- he wants to show how smart he is about the Quran. And if you listen to the conversations, he's more or less getting an education. He's asking about rank and hierarchy and different passages in the Quran and what they mean.

And he referenced the -- they were watching the news and they were talking about, I believe it was a journalist

whose head was sawed off. This isn't something Smith said he wanted to do. Abu Khalid is talking about it and Smith is saying that's against the Quran because a person is not supposed to suffer in death. It should be one clean swoop if they were going to do it. That's not -- that does not comport with Islam if they're committing -- he's not saying he wants to do it. Again, who brought it up? It was Abu Khalid. He's trying to put his words in his mouth to fit his script because his job is to set people up and see if he's really going to travel. He never did.

At a certain point the FBI admonished Khalid and said, "Look, you can't keep giving him money. You can't keep doing all these things," because what he's doing is he's going back and submitting vouchers to the FBI to be reimbursed. Said, "You can't do that unless you get our approval."

So all of a sudden the resources and support he needed dries up, but he's still working with Bilal buying and selling cars, but never buys a ticket to Syria. Never gets a passport. Never asks his then fiancee for a buddy pass for him to travel.

So when they couldn't get him on the travel, they said, "Ah, we've got to get him on something else. You go and tell him you need a buddy pass."

So he contacts him in March of 2015. This is about seven months after they first met. And if he's going to

travel to Syria and is really intending to travel to Syria, it could have happened in that time, but it's clear he was not.

And what happened was he says, "Listen, Mr. Smith, I got a brother that wants to travel." He doesn't say ISIS. "I've got a brother that wants to travel. He needs to go from Tampa to Buffalo." And then he says, "And then we're going to have some brothers sneak him into Canada. From there maybe we can get to Europe, I'm not sure yet, but the people over there, I don't really know them, but they're going to get him over there. Then they're going to sneak him into Syria and they're going to go to Turkey first."

Mr. Smith says, "Listen, I -- you know, make sure that -- I don't want this thing linked to me whatever is going on with it." Of course, he doesn't know Mohamed Hilal doesn't exist. But this guy that has supplied him with everything, has been his lifeline, he said, "I'll get you a buddy pass."

And then eventually when Abu Khalid couldn't produce any more money, any more jobs for Mr. Smith, he sends him an email on April 11th. He said, Listen -- and again, remember, the only people who know the truth about this is right there and the informants. So this isn't contrived by him. He doesn't know he's in a movie. He said, "I can't have anything to do with you. I don't like your rhetoric. Don't contact me anymore." Because Abu Khalid was of no use anymore because he couldn't provide him with any resources, any jobs. He never

asked him to provide them to get to Syria. He wanted money. This is a guy who had a limited education. He has gone to the Muslim community for work and that's what he was there to get.

You know, what happened next, you'll see, can best be described as a campaign of harassment. This is March of 2015. April he sends this email. Let's fast forward to 2016. All of a sudden this hardened terrorist who's just out here on the streets for six, seven months, he's cut off contact with informants, he hasn't done anything, he still hasn't traveled to Syria, and all of a sudden they show up at his fiancee's job, not her house, asking her about this buddy pass and serving her with a subpoena. Of course, she eventually was fired. They show up at his mother's job, serve her a subpoena. Of course, if the FBI shows up at your job, that's going to be a problem. They don't go to their house.

So Smith is pissed. He calls the FBI and says, "Hey, man, what is going on here? What do you need to know? I'll come in and tell you whatever you need to know." He doesn't know that all these characters are fake. He doesn't know any of that. He hasn't talked to them. It's been now a year. It's been a year and a half from his first contact with Abu Khalid.

And they get him in there and they don't give him any specifics. They give him broad categories of information. And he tells them all that he knows.

He says, "I met this guy named Abu Khalid. I don't know anything else about him. He was real secretive. I cut him off. That's all I know. He was talking a lot of rhetoric stuff. I needed him for a job. I needed him for work and that's why I had him around. And then, you know, I told him I didn't want to hear from him anymore. I got rid of the computer he gave me and I haven't heard from him. He did introduce me to this guy named Mohamed Hilal, but the guy never flown, FBI. He never flew and I returned his money."

"Well, what was Hilal going to do?" As if he knew. How does he know the plot to their movie?

He said, "Look, all I know was the guy was an Egyptian. Our buddy pass went from Tampa to Buffalo."

What you'll learn is a buddy pass can't be used to fly internationally. And it's not clear what this guy is going to do when he gets to Buffalo because they didn't tell him.

He said, "I don't know the guy. All I know is his name and date of birth. We got the buddy pass. I did it as a favor for Khalid who had gotten me work." He tells them everything he knows.

"Did you have plans to travel to Syria on the basis -- for ISIS?"

"No." He truthfully answered no, he didn't because he did not and he never did.

Now, you're going to hear the recordings, but there is an old saying that says believe nothing you hear and only half of what you see, and that's what Mr. Smith should have done when he was dealing with these informants getting paid to set him up because a person can say anything, but how do you validate what they say? You validate that by their actions, by what you see.

And here's what you will see is that Mr. Smith on every occasion he said, "What are your plans, brother," he didn't have any. He just needed more money. What you will see is that he never traveled. What you will see is he never even had a passport. What you will see is a guy that was gaming them. He wasn't going to go over there and get killed. He's concerned about this family, but this guy is coming there as someone from the Muslim community that tries to help.

So the government says, although they know all the answers, "Hey, was there ever any discussions of ISIS?"

He says, "I talk to Muslims all the time with ISIS in the news. If you ask about ISIS, we talk about ISIS. We talk about Assad. This is what we talk about."

But you don't hear him saying he's going to travel to Syria. You hear the informant putting words in his mouth, and his actions show his intentions, which he never did, and he told the government that. "I would never travel to do that. I didn't agree with them. I'm not a martyr. I'm not

going to go and kill myself."

And what's clear is the only way ISIS even got into this equation is they put it in there. This is fake, fiction, and folly. There is no ISIS. There was no international terrorism investigation other than the one they created through their informants. Mr. Smith was never traveling to Syria to support ISIS. He was concerned about the family, the Kodaimati family. You'll hear that repeatedly.

This case has been hard on this young man. It's essentially taken his life from him for the past couple years. Based on the evidence you'll hear in this case, ladies and gentlemen of the jury, I'm going to ask you to give it back to him. I'm going to ask you to find him not guilty because this case is contrived. This case is fake. And it lacks -- it fails to show that he knowingly and intentionally lied about something that he didn't know about a year and a half earlier, that he didn't discuss somebody else saying, and he's supposed to remember the facts and details of that after all those conversations, every little piece of rhetoric he told him.

THE COURT: Mr. Tate, it's time to wrap it up. This is not for argument.

MR. TATE: I'm going to sit down. I'm out of time. I invite you to listen to the evidence and I'm going to ask you to find him not guilty at the end of this case.

THE COURT: All right. Members of the jury, we're

moving now into the evidence. This will be the evidence in the case. Again, what you've heard from the attorneys, although they can tell you what their contentions are, this is about evidence.

I do need to remind you at this point, having heard the opening statements, that what this case is about is two counts of essentially false statements to an agency of the United States. That's the two counts, false statements to an agency of the United States. I will instruct you as to the law on that and how you're to apply it, but those are the two charges that will be given to you at the end of the case.

All right. The government may call its first witness.

MR. SAVAGE: Yes, Your Honor. The government calls Dr. Bruce Hoffman to testify.

And let me -- can I move the podium, Your Honor?

THE COURT: Yes, sir, you may.

MR. SAVAGE: If you would be sworn or affirmed.

BRUCE HOFFMAN, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SAVAGE:

Q. Good morning, sir.

A. Good morning.

Q. Could you please state your name.

A. Bruce Hoffman.

Q. And, Mr. Hoffman, what city and state do you reside?
A. McLain, Virginia.
Q. And how are you employed?
A. I am a professor at Georgetown University and I am also a senior fellow at the Council on Foreign Relations.
Q. Okay. And just to begin, do you know the defendant in this case, Alexander Smith?
A. No, I do not.
Q. Have you ever met him?
A. No, I have not.
Q. Could you tell the jury a little bit about your formal education.
A. I was educated at Oxford University where I undertook the equivalent of a master's and a Ph.D. I began studying terrorism as a subject in 1976 and have been studying it ever since.
Q. And you mentioned the study of terrorism. Is that a recognized field of study academically and policy wise?
A. It is. It's a sub field of -- well, it's a sub field of security studies which is within the realm of international relations or political science. There are several scholarly journals devoted to the study of terrorism which I think establishes that as a bona fide academic field of inquiry. Journal articles are published in various learned publications about the subject. And certainly, one's expertise in terms of

influencing or advising on policy is attempting to make the linkage between theory and actual policy implementation.

Q. I did a simple Google search -- maybe not very scientific -- but it's something like 119 U.S. colleges and universities offer bachelor's programs in fields associated with national security and international terrorism.

A. Yes, that's not surprising. Going back to the early 1970s, universities routinely offered both undergraduate and graduate courses in the study of terrorism.

Q. Are there also advanced degree programs that are offered either by your university or other universities around the world?

A. Yes, there are. There are many that's focused specifically on terrorism studies, but there are others that focus, for instance, on security studies of which terrorism or sub-state violence would be an essential component.

Q. And you mentioned earlier that there were scholarly journals. Have you participated in submitting articles to those journals or on their editorial review?

A. I'm well published in all the leading scholarly journals on terrorism. I myself have edited one of the leading scholarly journals on terrorism. Since 1995 I've been editor in chief. I joined that journal as associate editor in 1990.

Q. Thank you.

Are practitioners in this field subject to peer review?

A. Yes, universally.

Q. And how would that be? As they publish articles, they're criticized? Can you explain how that happens.

A. Well, certainly the peer review in scholarly journals, it's a standard practice that every article that is submitted for publication is reviewed anonymously by two other experts in the field that critique that person's research, their arguments, the clarity of how they're expressing whatever theory and justifying it.

I would argue the identical process occurs with the publication of scholarly books, especially by university presses, but also by other presses, where the manuscripts are sent out for anonymous review by other experts in the field and critiqued. And only, in essence, when they sign off on it and say that the scholarship is sound, that the research methodology and the facts support the arguments, are these materials actually published.

Q. Other than your academic positions, have you held other positions relating to the study of terrorism and terrorist organizations?

A. I have founded one center for the study of terrorism and I've been its director. That's more in the academic realm.

For many years I worked for a leading United States think tank that undertook research on behalf of the U.S. government and there interacted with various government clients.

I myself served in the Coalition Provisional Authority in Iraq in 2004 as an adviser on counter-terrorism.

I subsequently served as an adviser on counter-insurgency to the Multi-National Force Headquarters to General George Casey in Baghdad.

I was also for two years, 2004 to 2006, a scholar in residence in the Central Intelligence Agency.

And for 15 months I was a commissioner appointed by the U.S. Congress on a commission that investigated the FBI's adaptation of -- well, the FBI's transition from a law enforcement agency to one capable of effectively countering terrorism radicalization and cyber crimes.

Q. What is the RAND Corporation?

A. The RAND Corporation is a private nonprofit research institution that was originally created during World War II to assist what was then the United States Army/Air Forces. Was then continued in 1948 by the U.S. Air Force, but rapidly expanded its research which is designed to enhance and support pol -- objective research and policy analysis to non-defense and non-national security issues. Unless RAND materials are classified because of U.S. government sources, everything that RAND publishes is available -- was always available in libraries and elsewhere, but is now freely disseminated through the internet.

Q. I think you mentioned this earlier, but were you employed

by the RAND Corporation?

A. I was employed full-time by the RAND Corporation for almost two decades.

Q. What is the Council on Foreign Relations?

A. The Council on Foreign Relations is the oldest private institution -- private nonprofit institution in the United States dedicated to the furtherance of discussion, debate, and dialogue on key foreign policy and national security policy issues concerning the United States and the international community.

Q. Are you familiar with the text published by Columbia University Press by the name of *Inside Terrorism*?

A. Yes. That's a book that I wrote.

Q. Okay. And when did you first write that book?

A. The first edition of the book was published in 1998. I think somewhat uniquely it has been continuously in print for the past 20 years. A second edition was published in 2006 and a third edition in September 2017. I will modestly say that is regarded as the standard textbook on terrorism and is used in university courses really throughout the world. It's also used in executive education and professional courses as being -- at least the Washington Post in 2006 described it as the single best volume on terrorism available.

Q. In addition to *Inside Terrorism*, you published nine other books?

A. Yes. I've published books, for instance, on the role that Jewish terrorism played in the end of British rule in Palestine and the creation of the Israeli State.

I've published another book that looks at the vast universe of al-Qaeda inspired or direct terrorist incidents from the immediate aftermath of the September 11th, 2001, attacks until Osama bin Laden's killing.

Among the other books, I've published critiques of U.S. policy in the war on terrorism.

Q. Let me show you and the Court and the counsel what has been marked as Exhibit 17.

Do you see that on your screen?

A. Yes, I do.

MR. SAVAGE: And I'll ask Ms. Neill, can you just scroll through that just briefly.

Q. And that document, we won't go through the whole thing, is 18 pages and it has a list of a number of titles and articles.

Are you familiar with that document?

A. I am. It's my curriculum vitae or resume.

MR. SAVAGE: Your Honor, we move for the admission of Government's Exhibit 17.

MR. TATE: No objection.

THE COURT: Let it be admitted.

(Government's Exhibit No. 17 was received into

evidence.)

MR. SAVAGE: Okay. And we're going to publish just the first page to the jury and give them just a minute to look at that, but this will be a document that will be in evidence and available to the jury in its deliberations. We'll just give them a minute and then we'll -- they'll have time to read it later on.

(Jury peruses document.)

MR. SAVAGE: Thank you.

Q. Dr. Hoffman, have you testified as an expert in any court in the field of international terrorism?

A. I have. I've provided expert testimony in the United States, in the United Kingdom, and Australia.

Q. And have you studied specifically an organization known as the Islamic State and various other names?

A. Yes, I have.

Q. Have you written anything or testified with regards -- as an expert with regards to the Islamic State?

A. I have written on the Islamic State in the third edition of my book *Inside Terrorism*, in various articles, policy position papers that I've written. And I also provided expert testimony on the Islamic State in a court case in Australia.

MR. SAVAGE: At this time, Your Honor, we wish to offer Dr. Hoffman as an expert in the field of international -- or national security, the study of terrorism,

and specifically ISIS as a terrorist organization.

MR. TATE: Your Honor, may I -- subject to objection, may I ask a brief voir dire question?

THE COURT: You may, yes, sir.

VOIR DIRE EXAMINATION

BY MR. TATE:

Q. Dr. Hoffman, have you ever been to Syria?

A. No, I have not.

Q. And you've never been on a battlefield there either, have you?

A. Not in Syria, no.

Q. And have you ever interviewed anybody from ISIS in Syria?

A. Not in Syria, no.

MR. TATE: We object, Your Honor.

Q. Well, basically, your articles -- you just write articles about it, right? Or books.

A. I'm sorry, about what?

Q. Well, all the publications that you've done, all these advisory -- the RAND Corporation is a private corporation, correct?

A. Nonprofit, yes, sir.

Q. And you just collect data from internet research or from other research that you get about it and you write a book about it, right?

A. No.

Q. Well, how would you be able to know about what's happening in Syria if you've never been there?

A. Well, I've certainly traveled around that region. I've been to Iraq a number of times. Syria is a war zone so it's not a place that I would necessarily have access to or be able to go there to conduct research.

Q. But Syria didn't become a war zone until 2011, right?

A. Yes, that's true.

Q. And before 2011 you never went to Syria.

A. I didn't have any reason to go to Syria.

MR. TATE: Okay. Thank you. No further questions.

THE COURT: Okay. Any objection?

MR. TATE: Objection, Your Honor.

THE COURT: Overruled.

Members of the jury, expert witnesses are allowed if the Court believes that they are helpful to the jury in its deliberation. Once again, with regard to -- in trying to decide any aspect of the case, the Court can allow -- if it finds it's helpful to the jury, can allow an expert to testify. Expert witnesses are someone who, by study or experience, has been -- made themselves an expert in a particular field. And the Court is going to find that this witness has made himself an expert in the field of terrorism as it has been offered by the government in this case.

MR. SAVAGE: May I proceed, Your Honor?

THE COURT: Huh?

MR. SAVAGE: May I proceed?

THE COURT: You may, but wait one moment. I'm trying to find something here with regard to this matter.

The reason, members of the jury, is the -- with regard to this case there are two counts, which Count One is that on or about February the 16th, 2016, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, Alexander Samuel Smith, also known as Amir Alexander, the defendant herein, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States by falsely stating to FBI special agents, then investigating a matter involving international terrorism, that he had never discussed his desire or plans to travel to Syria. It's alleged this statement was false because as Smith then and there knew, he had discussed his desire and plans to travel to Syria in support of ISIS with the source. All in violation of Title 18, United States Code, Section 1001(a)(2).

Count Two charges on that same date at that same location, that Alexander Samuel Smith, also known as Amir Alexander, the defendant herein, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the

executive branch of the government of the United States by falsely stating to FBI special agents, then investigating a matter involving international terrorism, that he did not know that individual A intended to use the buddy pass procured by Smith to travel and support ISIS. This statement was false because Smith then and there knew he had discussed with the source the travel plans of a person he believed to be a person who wanted to travel and assist ISIS. All in violation of Title 18, United States Code, Section 1001(a)(2).

So because of the way those two charges are laid out, the Court believes that this expert witness may aid -- may aid the jury in their deliberations. Whether or not you accept or believe all -- just like any other witness, you may accept everything the witness says, part of what the witness says, or none of what the witness says. The fact that they're an expert witness does not matter in terms of your -- you have to determine the credibility of the witness and the value that you give -- you give the testimony in helping you arrive at a decision with regard to these two counts in this case.

Now you may proceed, Mr. Savage.

MR. SAVAGE: Thank you.

DIRECT EXAMINATION (Cont'd.)

BY MR. SAVAGE:

Q. Just following up a little bit on that, Dr. Hoffman. I have on the screen page 2 of your CV.

A. Uh-huh.

Q. So in addition to being a professor and a scholar, you worked for the CIA, correct?

A. Well, I worked for the RAND Corporation. I was a scholar in residence at the CIA.

Q. You worked at the Multi-National Force Headquarters in Baghdad, Iraq. What is that?

A. Basically the nerve center of the coalition efforts during the war in Iraq.

Q. And in that time, does ISIS have its roots in that conflict?

A. It does.

Q. Okay. Now, during the time that -- you can take that down.

During the time that you've written all these scholarly articles, have you interviewed people who have been to and fought in Syria?

A. Certainly in Iraq. Whether they had fought in Syria or come from Syria, no. I have interviewed people, though, serving in the military or journalists, for example.

Q. Well, as a scholar you consider a number of different sources and those sources are subject to peer review. Do you think that your thesis and your information about ISIS is somehow diminished by the fact that you haven't personally gone there?

A. No, not at all. I think to study terrorism it's almost impossible to go to many of the venues where terrorists are active. I think one of the unique aspects of my 40-year career of studying terrorism is that I have been to most places when I was younger and probably was less risk-averse than I am now, dangerous places that -- where violence existed. But frankly, as I've gotten older, and having been to Iraq three times, my desire to go overseas to those types of places has diminished.

And also to make a point earlier, I once did have a visa to go to Syria, but the deputy chief in the Syrian embassy in Washington advised me not to go because of the nature of my research, and I took that as very sound reason not to go because an authoritarian government would indeed not welcome my visit there.

Q. So your book *Inside Terrorism* and its passages about ISIS are available in Syria or on the internet for anyone who wants to get them.

A. Well, I hope they're not available on the internet because then I wouldn't be getting any royalties from the book, but the book is freely available anywhere that you could order it from Columbia University Press or Amazon.

Q. Fair enough. We're going to talk about this a little later on, but is ISIS an extremist organization?

A. Beyond any doubt it is an extremist organization.

Q. Is it the kind of -- are they the kind of people you can approach and say, "I'm writing an article, can you give me an interview?"
A. Well, I think as a Westerner that they would infer as unsympathetic to them and certainly not of their faith, I think that would be impossible. When James Foley and Steven Sotloff, two American journalists, attempted to report on the battlefield in Syria, both of them were captured by ISIS and beheaded.
Q. Not a good idea to go to Syria.
A. No.
Q. Let me show you and just the Court, counsel, and the witness what's been marked as Government's Exhibit 18.
MR. SAVAGE: And you can scroll through that just so we can see it.
Q. This is a document that is 16 pages long. Do you recognize Government's Exhibit 18?
A. I do recognize it. I originally prepared it for the -- a trial in Australia.
Q. And about when was that?
A. This would have been August 2017, I believe.
Q. And is its thesis and its citations and the report, is it still accurate in 2019?
A. Yes, it is.
Q. Would this report assist you in describing ISIS and some

of the major questions it involved?

A. Yes. I had been asked by the New South Wales Senior Coroner in their inquest into the New South Wales Police to provide a brief history of ISIS. A series of questions were posed to me that they were particularly interested in learning and then I answered those questions in the order that they were posed. I had been advised to provide whatever scholarly evidence or sourcing that I could so that the prosecution and defense could check the sources, so I used readily available published works.

Q. Okay. So the text where it says the footnotes, that's the source of the facts and the information that you are citing in the paper.

A. Yes, that's correct.

Q. Okay.

MR. SAVAGE: Your Honor, we move for admission of Government's Exhibit Number 18.

MR. TATE: Objection. It's hearsay.

MR. SAVAGE: Your Honor, he's an expert witness. I don't think that he is required as long as it is helpful to him and I think that he prepared it. Opinion evidence is certainly admissible.

THE COURT: Overruled. Let it be admitted.

MR. SAVAGE: Thank you.

(Government's Exhibit No. 18 was received into

evidence.)

MR. SAVAGE: And we're not going to take the time -- the jury's time right now to read this. I will say that the report will be available and in evidence to the Court [sic] in its deliberation.

Q. Let's begin with ISIS. What is ISIS?

A. Well, ISIS goes under various names, but suffice it to say it is the Islamic State. It is also known as the Islamic State of Iraq and Syria. Also known as the Islamic State of Iraq and al-Sham, which is basically the Ottoman Empire before World War I. Turkey ruled that region. There were no independent countries as there exists today. It was one large province that was called al-Sham. It's also known as Daesh which is the Arabic acronym of the Islamic State.

Q. And can you give us, not in detail, but just a general overview of how did ISIS come to be?

A. I think the most direct line that one could trace to ISIS involves Osama bin Laden and al-Qaeda in 1999. A recently released individual Jordanian national who had served time in prison in Jordan named Abu Musab al-Zarqawi who had been radicalized in prison, in other words, he had gone from a life of criminality and licentiousness to a life of purity where he embraced his religion, also became politically active.

He presented himself in Kandahar, Afghanistan, to Osama bin Laden and Ayman al-Zawahiri who were then the two heads of

al-Qaeda and wanted to join. I think fascinatingly, he was judged as too extreme even for al-Qaeda back then. He was sort of overly tattooed. He had a very thuggish demeanor about him even for al-Qaeda's taste. He talked about waging war against the Shia.

There are two main sects in Islam, the Sunni and the Shia. The Sunni are the majority and al-Qaeda is a Sunni organization. They often regard the Sunni as heretics.

Osama bin Laden and Ayman al-Zawahiri were a bit put off by that. They didn't allow him to join al-Qaeda, but bin Laden thought he might be useful in the future so gave him roughly 10 to 12 thousand dollars and allowed Zarqawi to set up his own training camp in Herat, Afghanistan, under Al-Qaeda's agents.

A few years later Zarqawi left Afghanistan and went to the Kurdish controlled areas of Iraq where he established an organization, terrorist organization, Tawhid wal-Jihad, one of theism and Jihad. It wasn't really going anywhere until the United States invaded Iraq in 2003 and then it had a purpose to expel the infidel, to expel this attempt by the West to dominate a Muslim country. And he was then welcomed into the al-Qaeda fold more seriously than he had been before. He swore the oath of allegiance, the bay'at, to Osama bin Laden. Eventually that group, Tawhid wal-Jihad, became al-Qaeda in Iraq.

But even still, Abu Musab al-Zarqawi was viewed as almost too extreme for Al-Qaeda's taste. In August of 2005 Ayman al-Zawahiri sent him a letter and said, "Stop killing all these Muslims. Stop killing all these Shia individuals in suicide bombings and so on, because they are alienating popular support for us." Zarqawi toned it down a bit, but the following year he was killed in a U.S. air strike --

There were two successors who led the organization until in 2011 Abu Bakr al-Baghdadi, the current leader of ISIS, took over the organization. He turned it into the Islamic State in Iraq and then had wider ambitions of, in essence, dissolving the border that had been created after World War I by the victorious Western powers that had created Syria and Lebanon and Iraq and Palestine and Jordan. These were not individual countries before World War I. One of al-Baghdadi's goals was to dissolve that border and also to resurrect caliphate supra or transnational Muslim rule that would be governed under Shari'a, not by man-made laws but by God-given laws.

To cut a long story short, he once again came into conflict with Ayman al-Zawahiri who was then the leader of al-Qaeda, Osama bin Laden having been killed in 2011. Once again Abu Bakr al-Baghdadi, like Abu Musah al-Zarqawi, was regarded as too extreme, as unconstrained in his violence, and a dispute broke out, but more over control of a terrorist group that al-Qaeda believed was its own and al-Baghdadi was

trying to take over as part of ISIS, and subsequently Baghdadi and ISIS was expelled from al-Qaeda. This was in January 2014.

Q. And in about June of 2014, al-Baghdadi declared the Islamic State of Iraq and Syria; is that right?

A. That's correct. And also declared himself caliph or super national ruler with -- by divine authority.

Q. Now, we've used a couple words that might not be familiar to everybody. What is jihad?

A. Well, jihad in its most literal sense just means struggle. And it is the collective struggle to remain faithful to one's creed; to be a good practitioner of one's religion, in this case of Islam, under the ideology espoused by Osama bin Laden, by Ayman al-Zawahiri, and Abu Bakr al-Baghdadi. It also assumes an individual obligation or an individual responsibility where it's interpreted in that context as incumbent upon all individuals to defend Muslims wherever they are threatened, especially by the forces of infidel and, in essence, to wage war in defense of those people.

Q. And it would be the position of ISIS that that war would be waged against anybody who would be a non-believer or an apostate?

A. Yes, absolutely. Even what they would deem heretical sects of Islam, the Kurds for instance, the Shia, the Yazidis.

Q. You mentioned --
A. The Alawites as well.
Q. You mentioned an oath, bay'at. What is bay'at?
A. It's a swearing of personal allegiance of an active fealty or fidelity to a leader that's breakable only upon death.
Q. And does ISIS require that its followers swear bay'at and to whom?
A. Certainly to the leader Abu Bakr al-Baghdadi who is the ultimate authority, as it were.
Q. And you mentioned the caliphate. What's a caliphate?
A. Caliphate harkens back to the golden age of Islam when Islamic rule extended from the Middle East through South Asia, across the Caucasus, Turkey, the Balkans, North Africa, even into Europe to the southern half of Spain was a time of great learning and prosperity. Mathematics, astrology, the sciences that are in use today flowered.
And then, of course, during conflicts with -- particularly with Christianity, Islam was -- was defeated in Spain and on the border of France through a succession of wars over the centuries. This caliphate gradually receded until we have the end of the 1800s or so when the Ottoman Empire ruled from Constantinople, or what is today Istanbul, was the last Muslim caliphate, at least officially, existent where Muslim law reigned, where the caliph, or the sultan in this case, was

the supreme ruler.

Q. With respect to ISIS in 2014, how -- how big do they envision their caliphate territory-wise?

A. Well, in the grand scheme of things, they envisioned it as reigning over wherever lands Muslims inhabited; but more specifically, they described it in their propaganda and their various policy statements as extending on an axis from Sirte in Libya, across North Africa, through Raqqa in Syria, and to Mosul in Iraq.

Q. Now, ISIS's goals, I think you mentioned a couple of them. One was to establish this caliphate and eradicate the nation state borders; is that correct?

A. That is correct.

Q. You mentioned Islamic law, to impose what they would call as Shari'a law.

A. Yes.

Q. Which is a very strict law based on what would have occurred during the time of the prophet.

A. Well, Shari'a doesn't have to necessarily be that, but their interpretation -- their interpretation of Shari'a was harkening back to the time of the prophet to the most literal translation.

Q. And in that caliphate there would be no compromise or tolerance of other religions or people who didn't believe in what ISIS --

MR. TATE: Objection to the leading nature of his questions.

MR. SAVAGE: I'm sorry, Your Honor.

THE COURT: Overruled, but don't lead.

MR. SAVAGE: Thank you.

Q. What did ISIS believe with respect to other religions inside its caliphate?

A. Well, it was, I think, the embodiment of the totalitarian/authoritarian society where there could be no deviation from its interpretation, it's own idiosyncratic interpretation of Islam. So even Muslims who did not ascribe to ISIS's extreme interpretation or, one might say, fundamentalist interpretation harkening back to the 7th century would be considered equally apostate.

But as I said earlier, various practices of Islam that were outside their very strict interpretation would be outlawed, penalized, punishable by law across the board. And, of course, anyone who is not a believer, Chaldeans, for example, an ancient Christian sect, Yazidis which is a sect of Islam but is disparaged by the Salafi jihadis, by purists, would be either enslaved or eliminated.

Q. Let me show you page 6 of your report on ISIS.

And I'm going to ask you how -- in general terms, how was ISIS structured at the time -- let's say -- let's pick a time 2014 to 2016?

A. Well, we often wonder how, you know, in a regular force, a terrorist group could mass and could conquer, basically, a third of Iraq in only a matter of weeks. And I think the answer is very obvious, is that it had a tremendous infusion of expertise from former loyalists to Saddam Hussein, former individuals who served in the Iraqi security and intelligence services and in the military, and it was this fusion of their very practical expertise that had translated into enabling Saddam Hussein to remain in power for decades to --

MR. TATE: Your Honor, I'm going to object at this point. This case has nothing to do with Saddam Hussein or Iraq or any of this stuff.

THE COURT: Members of the jury, this -- the Court is going to allow this testimony. It deals with whether -- the materiality of the statements. It deals with what brought the case about and so the Court is going to allow the testimony.

Let's do move -- let's move through this with some dispatch.

MR. SAVAGE: Yes, Your Honor. I'm trying to be open and not lead.

Q. But let me focus your attention, Dr. Hoffman, on al-Baghdadi. Who's the -- who's the -- what's the structure, the reporting -- the command structure of the organization?

A. Well -- and this is the point I was trying to bring out.

It adopts the authoritarian and totalitarian system that existed in Iraq and imposes it on the people that were ruled by ISIS and by al-Baghdadi, but now with a religious rather than an ideological veneer.

Al-Baghdadi is revered as the -- he traces his personal family's lineage back to the -- back to the prophet. He is not a stupid man. He has a Ph.D. in theology which gives him enormous credibility in interpreting religious text for the masses and therefore that facilitates what I would argue is a totalitarian control over all the members of ISIS and that is a very hierarchical, top-down organization that is organized, as many governments are organized, as many militaries are organized.

Q. Did al-Baghdadi delegate his authority to various field commanders in different areas?

A. Yes. There is a specific commander that is in charge of intelligence, for example, one that is in charge of taxation, someone who's in charge of propaganda and information, in charge of military operations, in charge of external operations elsewhere, yes.

Q. And in addition to reforming and recruiting Ba'athists from the former Iraqi regime, did it recruite fighters from other countries and other areas?

A. This was absolutely a central pillar of what ISIS is or was about in the sense that from the very start, from Ramadan

2014 it published a video over the internet of then a smaller number of Western foreign fighters that had come to join it and then openly solicited Westerners to come fight with them. And, in fact, I think that's what makes ISIS unique as a terrorist organization. At its height it had over 40,000 foreign fighters from 120 countries throughout the world. That's about a third of the countries that are in the United Nations. And at least in my 40-plus years of studying terrorism, that is completely unique. No terrorist group had been able to achieve that broad sweep of recruits from so many different places.

Q. Did it create local governments and organizations for the territory it controlled?

A. Yes. ISIS, just like any entity, it requires a flow of funds into its coffers in order to pay its functionaries, in order to keep the lights on, and so on.

So in addition to a number of illicit activities, trading in stolen antiquities, for example, selling oil on the black market, it also imposed very heavy taxes on the populations under its rule and those taxes were used to fund the Islamic State.

Q. Let me show you what -- just counsel and everyone but the jury, the document marked Government's Exhibit 19.

Do you recognize that document?

A. Yes. This dates, I would think, from 2015 from the

height of the Islamic State's territorial control of Iraq and Syria.
Q. And would it be helpful in explaining the territories that ISIS controlled between 2014 and 2015?
A. Well, I mean, this is -- this is almost a bit modest because it also had a very strong presence in Libya at the time; but certainly it was controlling most of the oil producing areas of both Syria and Iraq which is, of course, the key --
Q. So this would assist you in explaining that to the jury?
A. Pardon me?
Q. Would this document assist you in explaining -- describing that control to the jury?
A. Yes. I mean --
Q. Thank you.
A. -- basically it was controlling -- when you look at that map, it's where the oil fields are and where the richest parts of both countries arguably are located.
MR. SAVAGE: Can we publish it -- move to admit and publish Government's Exhibit 19.
THE COURT: Let's have a -- let's just have a quick sidebar, though, as to where we're going with regard to the testimony.
(Sidebar conference as follows:)
THE COURT: Okay. I just want to see where we're

going. I want you to be able to show materiality -- and there's been a lot of materiality shown so far -- as to what's going on and why the government might be involved in wanting to know about this information. How much longer are we going to -- since it's not a pure case about --

MR. SAVAGE: I think we're at least two-thirds, about three-quarters of the way through. What I propose to show with this map is the area controlled, including an area adjacent to Aleppo which the defendant mentions in his statements. It's where the Kodaimatis were in a village called Kafr Hamrah outside of Aleppo.

MR. TATE: No objection.

THE COURT: Huh?

MR. TATE: No objection.

THE COURT: Okay.

MR. SAVAGE: Then we propose to show -- I'll have him identify what's been marked -- what's been universally identified as the flag of the Islamic State. And then we're going to, I think, wrap up at that point.

MR. TATE: We're going to object to the flag of the Islamic State.

THE COURT: And you want to show the flag for what reason?

MR. SAVAGE: I want to slow the flag to show it was an organized and recognized international terrorist

organization. It was designated by the State Department as a designated terrorist organization.

MR. TATE: The flag doesn't do that, that's the problem. The flag doesn't do that. The flag is inflammatory. If he got the flag from Smith's house or something like that, Smith had had a copy -- a tattoo of the flag, it might be relevant, but there was no flag in this case at all.

MR. SAVAGE: Well, it's an unusual terrorist organization in that it identifies itself by a flag as any nation state. And then it -- we're going to wrap up with was it an extremist organization and why, and we're going to cover some of the things he mentioned before like the beheadings and that, which was specifically discussed in the -- in the statements that are coming into evidence by the defendant.

MR. TATE: They were discussed by the government's informant, not Mr. Smith, the government's informant that was talking to Mr. Smith.

MR. SAVAGE: Your Honor, with regards to the opening, I gave a lot of leeway here, but counsel is deliberately -- I mean, maybe accidentally, but has misstated the evidence in this case. The case is not about whether or not who discussed what. The question is did they have a conversation about those things.

THE COURT: I understand. That's why I wanted to make sure the jury understood with all the stuff that was said

by both sides during the opening that the case is basically lying to the FBI.

MR. SAVAGE: Exactly. It's not about whether he intended to go. Whether he intended to go is not even an element.

MR. TATE: But the issue is they used the term conversation and discussed. Conversation and discussed is not one person talking and the other person saying uh-huh.

MR. SAVAGE: Why not?

MR. TATE: Just like right now if you're talking nonstop, I just say uh-huh, uh-huh, uh-huh. That's you talking. That's not a discussion.

THE COURT: I'll let you all argue that. I would tend to think that it's -- you can argue about it. I'll let you go ahead and do it, but let's try to move through it.

(End of sidebar conference.)

THE COURT: Okay. I'll overrule the objection.

MR. TATE: We didn't have an objection, Your Honor.

THE COURT: You didn't?

MR. TATE: No.

THE COURT: Let's move through it. Let's move through this.

MR. SAVAGE: Yes, Your Honor. We're going to publish Exhibit 19 to the jury and give them a minute to look at it.

THE COURT: Let it be admitted.

(Government's Exhibit No. 19 was received into evidence.)

MR. SAVAGE: Your Honor, if I could ask the Court's clerk to turn on the animation feature.

DIRECT EXAMINATION (Cont'd.)

BY MR. SAVAGE:

Q. Could you -- again, what is -- what does this exhibit, this map depict?

A. It is a depiction of areas under the control of the Islamic State or areas under the influence of the Islamic State.

Q. And it shows the areas, some of the cities under the control of the Islamic State are Mosul, Ramadi, and Fallujah in Iraq. Are those sizable cities?

MR. TATE: Objection to relevance to this case.

THE COURT: Overruled.

THE WITNESS: They are sizable cities. In particular, especially Fallujah and Ramadi were the scenes of repeated intense battles during the U.S. military presence in Iraq from 2003 to 2010.

Q. And you can see the area that says Raqqa, R-a-q-q-a. What is Raqqa?

A. Raqqa is a city in Northeastern Syria where ISIS established its capital.

Q. Okay. And Aleppo, what is Aleppo?
A. Aleppo is a city in Syria that has often been besieged and fought over between the forces loyal to the Syrian dictator Bashar al-Assad and a variety of other groups that have resisted them.
Q. And is there a line there that shows the border between Turkey and Syria in Iraq?
A. Yes. It goes from Kobane just north of --
Q. And I think you'll find that this will leave a mark. If you will just put your finger on the screen there and kind of maybe just draw over where that Turkish/Iraq border is.
(Witness complied.)
Q. Okay. Thank you.
Was this generally the apex of the control of ISIS?
A. Actually, looking at this map, ISIS's control extended further south to Palmyra, so this is probably a modest depiction. I think in total the Islamic State, as it were, basically was the size of England and Wales.
THE COURT: Let me ask this question of the jurors, did it work for you?
JUROR: No.
THE COURT: Yeah, it didn't work for me either.
MR. SAVAGE: Okay.
THE COURT: So I didn't -- that's what I wanted to check. Nothing happened on it.

MR. SAVAGE: I'm sorry, I don't know why that is.

THE COURT: It worked on his screen, it worked on your screen obviously, but they never got it and I didn't get it.

MR. SAVAGE: Let me see if I can...

Can you see that, Your Honor?

THE COURT: No. This screen has got a mark on it, but mine does not.

MR. SAVAGE: All right.

Q. Well, we can see the word "Turkey" there and you can see the word "Syria." Is there a green line that separates the two?

A. There is, but I would argue in the 2014 time period, it was largely meaningless.

MR. TATE: Objection. The witness can't argue, Your Honor. He can provide facts.

MR. SAVAGE: Your Honor, he's an expert. He can give an opinion. That's what experts do.

THE COURT: Just state what your -- state that you have an opinion rather than you would argue as to what you believe the line was.

THE WITNESS: Yes, Your Honor. It was the formal international boundary, but at that time it was rather porous.

Q. So Turkey is a NATO country?

A. It is.

Q. Travel by Westerners into Turkey, is that relatively easy if you have a visa?
A. Absolutely.
Q. What was the status of travel from Turkey into Syria during this time frame?
A. It was a known gateway to Syria.
Q. Okay. Known by whom?
A. Known by anybody who wanted to get to Syria, but certainly it was also publicized by ISIS as the most effective way of traveling from anywhere in the world to come to the Islamic State.
Q. How did ISIS recruit its followers, its Western followers?
A. This, I think, is what also, at least in the history of terrorism, has made ISIS so unique is that it was extraordinarily effective in mobilizing social media and various digital platforms, things that are ubiquitous, such as Facebook, Twitter, Instagram, Zello, WhatsApp. I mean, basically, all means of communications that many of us use on a daily basis provided the basis for its dissemination of propaganda, but also its clarion calls to other Muslims to come join the Islamic State and to come fight with them in this -- in this land that they ruled.
Q. Let me show you what's been marked as Government's Exhibit Number 20.

Do you recognize this document?

A. I do. It's a chart prepared by the *Wall Street Journal* based on information from the SITE Intelligence Group which is a private for-profit entity that monitors all terrorism communication on the internet whether it's Muslim or white supremacist, for example, or radical Jewish for that matter.

Q. And does this chart accurately summarize the various means by which ISIS would use to communicate and teach its followers outside of its --

A. Yes, absolutely. It's basically all the social media or communications -- digital communications platforms that it would have used at the time with also a kind of grading for which are the most safest, which are the greatest security or encryption and which are the least safe and thus most easily intercepted.

MR. SAVAGE: Your Honor, we move into evidence Government's Exhibit Number 20.

MR. TATE: No objection.

THE COURT: Let it be admitted.

(Government's Exhibit No. 20 was received into evidence.)

MR. SAVAGE: Give the jury just a minute to look at that.

(Jury peruses document.)

Q. In your studies, Dr. Hoffman, do these various social

media platforms and communications apply to certain demographics in our country or were they favored by certain demographics in our country?

A. Well, I mean, all terrorist groups attempt to recruit young men and young women increasingly. That was also a unique factor of ISIS.

Q. Did ISIS tutor its followers on encrypted and safe communications that could evade government control?

A. Absolutely. There's no doubt. Following the Edward Snowden revelations which described how the United States' National Security Agency monitored these types of communications, ISIS's security protocols went through three changes to adapt and adjust to the information that was released.

Q. So ISIS would use extensive use of the internet and social media to appeal to Westerners. Was it looking just for fighters or was it looking for other skills as well?

A. Well, it was primarily looking for fighters. I would argue, too, that it very much sought the prestige of having an international cadre. This gave meaning to its depiction of itself as a state, as a governing entity. It wanted people who could fight, people who were well versed in advertising and marketing, various technologies. Engineers, for example, to help keep the state running; people who were skilled propagandists; people who might have medical training.

Certainly there was a huge push to recruit women who would serve as basically people who give life, that would produce babies that would go into the Islamic State, but that would also support the -- support the fighters in a variety of ways.

So it was, at least to my knowledge, the most active and aggressive in attempting to recruit really a worldwide community to come to what it portrayed itself as, an Islamic State; that it was actually a government. And in their view they were the purest exemplar of Islam on earth.

Q. Who is Junaid Hussain?

A. Junaid Hussain is a British national of Pakistani ancestry who was highly skilled in computer sciences and engineering. He created something that he called the cyber jihad, basically, that reputedly hacked into the AOL email account of former Prime Minister Tony Blair. It purportedly hacked into the Twitter accounts of the United States Central Command.

But then Junaid Hussain not only swore allegiance to Abu Bakr al-Baghdadi and joined ISIS and went to Syria and was subsequently killed in a U.S. air strike, but he became, perhaps, at the time one of ISIS's most effective recruiters or mobilizers in the West. For instance, the attempted shooting at a conference on prophet -- the cartoons of the Prophet Muhammad in Garland, Texas, in 2015, Junaid Hussain played a leading role in --

MR. TATE: Your Honor, objection. This man has nothing to do with this case.

MR. SAVAGE: Well, I think he does, Your Honor. This is a man who was a computer specialist and who traveled from England while he was under investigation, went to Syria and became an important part of the Islamic State, much like Mohamed Hilal.

THE COURT: Overruled, but let's move through this --

MR. SAVAGE: Yes, Your Honor.

THE COURT: -- and get to the specifics about the statements.

MR. SAVAGE: We're done with this piece. Thank you.

Q. Let me show you what's been marked as Government's Exhibit Number 21 just to wrap this up.

Did the Islamic State specifically recruit Americans as well as other Westerners?

A. Well, they had a special place and a special desire to recruit Americans, not the least because of the propaganda purposes of having U.S. citizens fighting alongside them. And it produced and disseminated documents such as this one which was published in 2015 in English that basically provided a "how to" guide down to the most minute detail, to bring dental floss, for example, along with you when you came to fight in Syria; how to evade the prying questions of immigration

officials or customs authorities; how to say that you're going on vacation somewhere in Europe and then to buy a ticket to Turkey and then to cross from Turkey into Syria.

I would say, you know, its online magazine *Dabiq*, which was published only in the English language, served the same purpose, which was really to reach an English speaking, particularly an American crowd, in an attempt to rally them to come to the Islamic State.

Q. Okay. And this would be a book that was available to Americans published by the Islamic State on the internet that told you what to pack, who to go, where to go, and how to evade authorities on your way.

A. Yes, sir.

MR. SAVAGE: Your Honor, move for admission of Government's Exhibit 21.

MR. TATE: Objection. Relevance.

THE COURT: Overruled. Let it be admitted.

(Government's Exhibit No. 21 was received into evidence.)

MR. TATE: Your Honor, we have a motion at this time if we could approach sidebar.

THE COURT: You may.

(Sidebar conference as follows:)

MR. TATE: I understand the Court's ruling. I'm not quarreling with that ruling, but we're obligated to move for a

mistrial at this time and preserve the record based on the admission of Exhibit 21. If the Court allows the admission of the ISIS flag, we would -- so we don't have to do it again, we'd ask for a continuing objection and motion for mistrial based on that exhibit as well.

THE COURT: What is the basis of this exhibit being a motion for mistrial being it deals with the talk about travel to the Islamic State and how to prepare for that? So how does that --

MR. TATE: It has no connection to Smith or statements to the FBI that Smith ever read them, that Smith ever read this, that Smith even knew about it. It's overly prejudicial under 403.

THE COURT: Okay.

MR. TATE: And the fact that the government --

THE COURT: Let's take a break and put this on the record because we've been here about an hour and 45. We're going to go until about 1:00 and then take a lunch break, a longer break.

So how much longer is this witness going to be?

MR. SAVAGE: We're going to finish with this and then we were going to introduce the flag.

THE COURT: All right.

(End of sidebar conference.)

THE COURT: Members of the jury, we're going to take

our morning break until about noon. We may have to go a little bit beyond that. If we do -- I guess we could take an early lunch break. I'm trying to think. That might be the best thing to do to get this -- get this done rather than take two breaks.

So what we can do is take a break and come back at 1:00. And then we'll take another break in the afternoon. And then we will -- and then we'll end tonight sometime -- depending on how the evidence is going. I don't want to use up your time. I want to make sure if we can try this case in the three days that we think we can try it in, we can do it, and I'll sort of see how the evidence is going as we get to the end of the day.

All right. So I'm going to release you all for lunch. Don't talk about the case. You can either be together or not together. But remember, you've not heard all of the evidence in the case. You've only heard part of the first witness in the case. And so you can't talk about the case. You can't do anything about the case. Keep all of that away.

Also, people are going to need to stay away from you and if you see somebody you think is in the case, don't talk to anybody out there. Keep your own counsel.

You also can have lunch back here if you want to. So it's up to you as to what you do each day that we do it. Some people stay back here and eat lunch. Some go -- most go

out. But just be careful about seeing and talking to other people while you're on break.

All right. Thank you. Everyone will remain in the courtroom while the jury leaves the courtroom.

(Jury exited the courtroom.)

THE COURT: Okay. Let's hear the arguments with regard --

MR. SAVAGE: Your Honor, I think we can -- we can do this. We've only published the first page of this particular exhibit. We're prepared at this time to say that based on the testimony that we've had before, we would publish just the first page, offer the first page. We would cut out the rest of it. And we'll withdraw our offer of the Islamic flag.

THE COURT: Mr. Tate.

MR. TATE: No objection.

THE COURT: Huh?

MR. TATE: No objection.

THE COURT: Okay. That takes care of that. We won't have to worry about that, then.

MR. SAVAGE: Just to let the Court know when we're going to finish, I think we're almost at the end here. And I note the witness is here and that's not a problem.

That the -- we would finish by asking Dr. Hoffman what makes ISIS an extremist organization and did ISIS limit its terrorist attacks to Iraq and Syria? Those are the last

two questions.

THE COURT: Any comment, Mr. Tate?

MR. TATE: If this was a case about terrorist attacks or plotting one, I would say it's relevant. It doesn't appear to be relevant. We can object at that time. We just object now as to relevance, Your Honor.

MR. SAVAGE: The relevance would be, Your Honor, is that the FBI conducted its investigation. We're going to tie this in with later evidence.

THE COURT: Yeah, I think it -- I think there's a materiality issue as to what the FBI is doing. And during opening statement defense counsel called it a story, a movie, a lot of different things that are fake. I think they're entitled to show that ISIS is a terrorist organization and protection of the people of the United States from ISIS is a legitimate concern of the United States government and that the investigation was founded on a -- for a material reason. Defense can certainly argue otherwise, but I think they're entitled to show that.

MR. SAVAGE: One other thing. We were going to ask if the common route for Westerners from America used Canada.

THE COURT: You can -- yeah, you can do that as to how the travel would go if it's part of the discussions and those kinds of things. You certainly can do that.

MR. SAVAGE: Okay. Thank you.

THE COURT: All right. Let's be back and ready to go about 1:00. And if anything comes up, let me know.

MR. SAVAGE: Okay.

THE COURT: All right. Thank you very much.

Thank you, sir. You may come down. Be back after lunch.

(Witness stepped down.)

(Lunch recess at 11:53 a.m.)

TUESDAY AFTERNOON, MARCH 19, 2019

(Court back in session at 1:03 p.m.)

(Jury not present.)

THE COURT: Anything for the Court --

MR. SAVAGE: No, Your Honor.

THE COURT: -- before the jury gets here?

MR. SAVAGE: I'm just trying to remember what I said I was going to do.

(Pause.)

THE COURT: All right. The jury is in here. Anything from the defense --

MR. TATE: No, Your Honor.

THE COURT: -- before I bring them in?

MR. TATE: No, Your Honor.

THE COURT: Anything from the government?

MR. SAVAGE: No, Your Honor.

THE COURT: Okay. Everybody is ready for the jury.

You can bring them in.

MR. SAVAGE: Your Honor, should I call the witness up?

THE COURT: Yes. Thank you.

(Witness resumed the witness stand.)

(Jury entered the courtroom.)

THE COURT: Okay. Thank you for being so prompt, members of the jury.

You may proceed, Mr. Savage.

MR. SAVAGE: Thank you.

BRUCE HOFFMAN

DIRECT EXAMINATION (Cont'd.)

BY MR. SAVAGE:

Q. Dr. Hoffman, what -- excuse me. Is Canada a transit country for Americans traveling to Syria, or was it?

A. It has been. Canada has very different authorities than we do for tracking people so it was viewed as a more easier route. During the period of the Islamic State, even though Canada has about a tenth of the United States' population, more Canadians, for instance, were able to leave.

Q. Thank you.

What makes ISIS an extremist organization?

A. The short answer would be because it believes in the use of violence to achieve its ends.

Q. Does it use violence? Does it use violence?

A. Yes, it does use violence. It has institutionalized the use of violence.
Q. Did ISIS limit its terrorist acts to Iraq and Syria?
A. No, it did not. ISIS had at least 16 branches, as it puts it, across North Africa, West Africa, East Africa, the Middle East, and South Asia. It had networks or cells certainly scattered throughout Europe, Australia.
Q. Did ISIS have a spokesman by the name of Adnani?
A. Yes, Mohammad al-Adnani.
Q. And who was that?
A. He was ISIS's chief spokesperson until he was killed in a U.S. airstrike, I believe in 2015, maybe 2016.
Q. Before that airstrike, is there a famous speech that -- or speech that Adnani gave that was broadcast to the world?
A. Yes. In September 2014 he called on ISIS followers, would-be sympathizers, supporters of foreign fighters, to either come to the caliphate and participate in building the state and fighting for it or else if they were unable to travel, to carry out attacks in their adopted countries or the countires of their birth on ISIS's behalf. This is the lone wolf terrorism phenomenon.
Q. Subsequently, did ISIS sympathizers follow through with that request?
A. Yes, in a variety of places they did.
Q. And, for example, where?

A. New York on Halloween Eve 2017, an individual, for instance, plowed a vehicle into a crowd of pedestrians.

In Barcelona the previous August, for example, there was a similar type of attack.

There were, of course, lone wolf attacks that were more consequential. People using suicide vests, for example, at the Ariana Grande concert in Manchester, England, in May 2017.

MR. SAVAGE: Thank you.

No further questions, Your Honor

THE COURT: Cross examination.

MR. TATE: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. TATE:

Q. Good afternoon, Dr. Hoffman. My name is Kevin Tate. I represent Alex Smith.

We've never spoken before, have we?

A. No, we have not, sir.

MR. TATE: Can I have the government pull back up Exhibit 19, please.

Q. Can you see that, Doctor?

A. Yes.

Q. Now, you said this depiction showed ISIS control during what period of time?

A. Looking at it, it looks like probably -- probably towards the end of its -- of the Islamic State after coalition

operations had begun. My guess this is probably late 2016 or early 2017 perhaps.

Q. And you on direct when Mr. Savage asked you questions, didn't you say that this was between the period of 2014 and 2017?

A. I don't recall actually.

Q. So are you saying that this is the period -- that this map depicts ISIS control in 2017?

A. Well, ISIS's control extended down to Palmyra and that's why when I looked at this map, that's -- I tried to put a date on it. Certainly there's no doubt it's between the 2014 and 2017 period. As I said earlier, I think it's a modest depiction of ISIS's territorial expanse.

Q. And the reason you think it's modest is because it at some point extended down to Palmyra.

A. Yes, certainly, because it looted the antiquities of Palmyra.

Q. Now, did you prepare this?

A. I didn't prepare it. It was one of several maps I sent to the prosecution.

Q. You sent it. And where did you get this map from?

A. I downloaded it from the internet.

Q. Okay. So it's not something that you prepared. You just downloaded something from the internet and sent it to him.

A. I'm not a cartographer so I wouldn't have been able to.

Q. What was the source you used on the internet for this map?
A. This, I believe, was from the *Financial Times* perhaps.
Q. A newspaper?
A. A newspaper.
Q. Now, do you see off to the left there it says Aleppo?
A. I do.
Q. Aleppo was not under ISIS control, correct?
A. No.
Q. So during the period of 2014 through 2015, if a person was traveling to see friends in Aleppo, they weren't going into ISIS controlled territory, correct?
A. They were not, although Aleppo was besieged by ISIS amongst other factors.
Q. When you say besieged, ISIS was trying to invade Aleppo, correct?
A. Yes.
Q. And the people of Aleppo were resisting ISIS, correct?
A. Some were, yes.
Q. And those that were resisting ISIS were not in support of ISIS. They were actually against ISIS, correct?
A. Not necessarily. There were a variety of factions fighting in and around Aleppo.
Q. But who were those factions?
A. Jabhat al-Nusra which was the al-Qaeda arm; the Kurdish

forces, the YPF; forces loyal to Bashar al-Assad; probably forces loyal to or deployed by Iran.
Q. And all of those forces were combined to fight against ISIS?
A. I wouldn't necessarily say so. I think they were fighting over to control the territory, to control the city.
Q. But for certain at that time, between 2014 and 2015, ISIS didn't have control.
A. No, it did not.
Q. Now, based on your studies, were there people in Aleppo when the civil war broke out that were trying to flee to Turkey?
A. That I couldn't tell you.
Q. Do you know Turkey to be a nation that took refugees from Syria?
A. Reluctantly, yes.
Q. They didn't want to, but they fled over to Syria -- the Turkish border, correct?
A. Into Jordan and other places, yes.
Q. And the Syrian civil war started approximately around 2011?
A. Yes.
Q. And that was rebellion or revolution against Bashar al-Assad who was the leader or dictator in Syria, correct?
A. Yes.

Q. And during that time frame, Bashar al-Assad was using chemical weapons against people that -- the people of Syria who resisted him.

A. Yes, although this is -- ISIS also used chemical weapons.

Q. But I didn't ask you about ISIS. I asked you about Bashar al-Assad.

A. Yes, he did.

Q. Did ISIS ever use chemical weapons against the people of Aleppo?

A. ISIS has used chemical weapons on at least 70 occasions. I do not know whether it was ever deployed in Aleppo; but I can say that where ISIS fought, it used any weapon at its disposal.

Q. Right. But you don't have -- in all the studies that you've done and reports that you read, you don't have any information that it was ISIS using chemical weapons against the civilians in Aleppo, do you?

A. I haven't done any specific studies on Aleppo. That's why I can't answer that.

Q. On top of that, did you know whether Syrian Dictator Bashar al-Assad used chemical weapons against the Syrian people?

A. Absolutely. I don't think that's contested.

Q. Now, are you familiar with an organization called the Free Syrian Army?

A. Yes, I am.
Q. And if you know, was it the Free Syrian Army that was in control of Aleppo during 2014 and 2015?
A. As I said, I did not study Aleppo specifically. I couldn't answer that with any kind of accuracy.
Q. All right. In December of 2012 during the Obama administration, wasn't it recognized that the United States was opposed to Bashar al-Assad?
A. Yes, sir.
Q. And in fact, they supported a group called the Syrian Opposition Coalition, correct?
A. Yes, sir.
Q. And they financed them.
A. I couldn't tell you to what extent they were financed. They were certainly supported.
Q. And support included finance.
A. Supported that I know with a provision of weapons and perhaps at that stage some clandestine training assistance.
Q. And the Syrian Opposition Coalition was opposed to ISIS as well, correct?
A. This is outside of my expertise. I don't know.
Q. You don't know that?
A. No, I don't.
Q. Isn't it true that Aleppo was under the control of the Syrian Opposition Coalition during 2014 and 2015?

A. As I said, I haven't studied the situation in Aleppo closely enough to answer that with any authority.
Q. But certainly the United States government was opposed to the dictator at the time in Syria, Bashar al-Assad.
A. Yes.
Q. And so anybody that was also opposed to Bashar al-Assad was on the same side as the U.S. government.
A. I would not say so.
Q. Well, they at least agreed with them in their opposition to Bashar al-Assad.
A. I wouldn't even go that far because there were entities like ISIS and like Jabhat al-Nusra that were not on the same side as the United States.
Q. But were they also opposed to Bashar al-Assad?
A. Yes, they were.
Q. Okay. Because they wanted to creep in and take control during the chaos.
A. I would say that's probably an accurate depiction of what happens in a civil war.
Q. During your studies, sir -- and you mentioned several people affiliated with ISIS. Have you ever heard of a person named Wael Kodaimati being affiliated with ISIS?
A. I'm not familiar with that person's name.
Q. Have you ever heard of a person called Saeed Kodaimati being affiliated with ISIS?

A. I'm not familiar with that person's name.
Q. Have you ever heard the name Alexander Smith being affiliated with ISIS?
A. No, I have not.
Q. During the period of 2013 through 2017, which includes the time of 2014 and 2015 depicted on this map, the United States government armed Syrian rebels who were opposed to Bashar, correct?
A. Correct.
Q. They financed them with money and weapons, correct?
A. Correct.
Q. And between 2013 and 2017, wasn't it the CIA that directed what was called as the Timber Sycamore? Are you familiar with that?
A. I am not.
Q. Okay. You've never heard the term Timber Sycamore?
A. No, I haven't.
Q. Do you know whether the U.S. armed rebels and trained nearly 10,000 rebel fighters to oppose the Bashar al-Assad regime?
A. I don't know the exact number.
Q. Okay. You don't know the exact number, but you know they trained a lot of rebels.
A. I would say they trained selected groups of rebels whose interests coincided with the United States'.

Q. Including the Free Syrian Army.
A. Elements of the Free Syrian Army.
Q. Do you recall, sir, in your studies in April of 2014 where it was played on news channels throughout the United States videos that showed armed Syrian rebels using U.S. made anti-tank rockets?
A. I don't recall seeing that.
Q. Have you ever interviewed anyone that was an ISIS member?
A. No.
Q. And we've already discussed the fact that you've never been to Syria, right?
A. That's correct.
Q. But you did mention you had a passport, right?
A. I had a visa.
Q. And in order for you -- what was the time frame that you had this passport?
A. That I had the visa for Syria, it was in September 2000.
Q. So September 2000, that's some 14, 15 years before this conflict is even -- that's depicted is even talked about, correct?
A. That's true.
Q. That's some 11 years before the civil war in Syria, right?
A. That's true.
Q. So how do you become an expert?

A. I didn't say I was an expert on Syria. I never made that claim.
Q. Okay. If you know, sir, in order -- during the time frame of 2014 and 2015, could a person with a passport, a visa, possibly fly into Syria?
A. I can't answer that question.
Q. Do you know whether Syria's airports had been destroyed during the civil war in 2014?
A. I don't believe so.
Q. If there were no airports in Syria, one of the ways to get in would be to fly to Turkey, correct?
A. I didn't say there were no airports in Syria.
Q. Okay. Do you know if there's airports in Syria?
A. I assume that Damascus International Airport was open throughout this period. I have no reason to believe that it wasn't.
Q. Do you know?
A. I don't know.
Q. So you're assuming.
A. I'm assuming, yes.
Q. In all your studies, you never learned about the destruction of commercial airports in Syria in 2014?
A. I told you I don't study Syria. I study terrorist groups.
Q. And when you say study, you mean do research. You look

on the internet, download maps, and you read books.
A. Well, I'd be a bad scholar if I based my research solely on the internet. No, I do field -- field studies where it's possible. So I've been to conflict zones. I interview people who are involved in these organizations and those who are knowledgeable of them, both government and non-governmental organizations. I study their documents and I study government documents. I study scholarly reports. So it goes beyond, obviously, just downloading things from the internet.
Q. You read reports written by somebody else.
A. No, I write my own reports as well, but I use primary source documentation.
Q. And the primary source documentation is prepared by somebody else.
A. Yes. In some cases it's prepared by ISIS, for example. In some cases it's reports from the field as well. And also, I conduct my own interviews.
Q. But you've never been in the field.
A. I haven't been in the field in Syria. I've been in the field in plenty of other places and I've certainly been in the field in surrounding countries. And I told you the Syrian government told me I was not welcome to come to do research there.
Q. But there was no travel ban to go to Syria, was there?
A. Not for an American citizen. But when I told the deputy

chief of admission what the purpose of my research was, it was made very clear that I wasn't welcome.

Q. You told the deputy chief of admission in Syria?

A. The deputy chief of admission at the Syrian embassy in Washington, DC.

Q. But you didn't talk to anybody in Syria, though.

A. Well, I was told by him that I wasn't welcome. And given that Syria is a police state and given that I don't have diplomatic immunity, I took that warning very seriously, especially because I was going to do research on terrorist organizations that Syria was supporting.

Q. But that was back in 2000, right?

A. Yes, but unfortunately the Assads are still in power and the government was -- I would argue was undifferentiated whether it was 2000 or whether it's 2019. And they have never been a friend or ally of the United States.

Q. But there was no civil war in Syria at that time, correct?

A. No, but it was a police state. So when I was told not to go, I took that warning very seriously from a senior Syrian government official.

Q. What do you mean by a police state?

A. A police state. It's a dictatorship.

Q. And in 2006 if a person was visiting Syria, it wouldn't have been during the civil war, correct?

A. No, not the civil war in Syria.
Q. And there was no travel ban preventing an American with a passport from flying to Syria if they wanted to.
A. I couldn't tell you that.
Q. Well, all the things that you do know and all the things that you've studied, you don't know when there was travel bans to Syria?
A. Is there a reason I should?
Q. Yeah, you're testifying here.
A. I'm not testifying about Syria.
THE COURT: He's an expert in terrorism.
Q. Are you an expert at all on the Quran?
A. No, I'm not a theologian.
Q. So you don't know -- you can't interpret what's meant by theological terms used in the Quran, correct?
A. I think I can interpret them within the context of when they have been used to justify or legitimize violence because that I have studied. But if you're asking me if I'm a theology professor, I am not.
Q. Is Shari'a law mentioned in the Quran?
A. I don't believe so.
Q. Do you believe or do you know?
A. I haven't looked at the Quran recently so I'll have to say no.
Q. When was the last time you looked at it?

A. In the course of research. I can't recall actually.
Q. Have you ever read it?
A. I have read it.
Q. Have you ever had it interpreted to you by the Islamic scholars?
A. I have spoken with Islamic scholars about the Quran on many occasions.
Q. My answer to you -- my question to you was have you ever had the Quran interpreted to you by an Islamic scholar?
A. I would say yes.
Q. And who was that?
A. Ed Husain in the United Kingdom, for example; other Islamic theologians that I've either worked with or known.
Q. Ed Husain, when was the last time you talked to him?
A. Last June.
Q. And he interpreted the Quran for you?
A. We had discussions about the Quran's justifications for peace and that it was a document of inclusivity rather than of exclusion and violence and that it only mattered who was interpreting it.
Q. And the Quran also talks about killing too, doesn't it?
A. Yes, it does.
Q. It speaks of violence.
A. As in some interpretations, yes.
Q. And in terms of the word Jihad, that is a word that's

used and written of in the Quran, correct?
A. It is.
Q. And the strict literal meaning is a struggle in religion, correct?
A. That's what I said earlier, yes.
Q. It's a religious edict.
A. It is.
Q. And the term bay'at, is that used in the Quran?
A. That I can't recall.
Q. Do you know what bay'at means?
A. I do.
Q. It means allegiance, right?
A. Yes, it does.
Q. Are you aware of whether this person you mentioned, al-Baghdadi, the head of ISIS, whether he ever resided or had a stronghold in Aleppo?
A. I don't know all of his movements. I have never, that I can recall off the top of my head, seen reports of him being present in Aleppo.
Q. Of course, you've never met him, right?
A. No, I have not.
Q. You've never -- you talked about ranks. You've never met anybody that said that they were affiliated or ranked in his organization, have you?
A. No, I have not.

Q. One of the things that Mr. Savage asked you and you discussed was the recruitment of Westerners to assist ISIS in their strongholds, and you mentioned a number of things, like people with advanced degrees in technology and things like that, correct?
A. Yes.
Q. And what other type of learned people would they look for?
A. Well, they were looking for all kinds. I think first and foremost they were looking for people, as they would advertise, to come help them build the state.
Q. To come what?
A. Help them build the state.
Q. And build the state where they were?
A. Build -- their state was the territory that they controlled.
Q. Right. Which didn't include Aleppo.
A. Did not include Aleppo.
Q. One of the things that you mentioned too is that people -- in addition to people with specialized skills, they were looking for financial -- people with money that can contribute money, correct?
A. That's correct, yes.
Q. And so if you had no money, you can't contribute money to them, can you?

A. No.
Q. Are you a Muslim?
A. I am not.
Q. You don't speak Arabic.
A. I speak Arabic. I wouldn't say I'm fluent in it, but I've studied Arabic intensively on two occasions.
Q. Did you get a degree?
A. No, I did not.
Q. Could you hold a conversation in Arabic with somebody?
A. When my Arabic was sharp, yes, I could. It hasn't been in some time.
Q. But it's not sharp now.
A. I haven't been in the Middle East in a long time.
Q. And how long is a long time?
A. The last time I was in Iraq was 2008.
Q. And when you were in Iraq, you took -- studied and you took courses on Arabic?
A. No, I took courses on Arabic in Jerusalem in Al-Quds and also in Washington, DC.
Q. So you took -- in Jerusalem. But do the people of Jerusalem speak Arabic?
A. Yes, of course they do.
Q. And in Washington, DC -- what years was that when you studied Arabic in Jerusalem and Washington, DC?
A. I studied Arabic in Jerusalem in 1979 and 1980

intensively with a private tutor and I studied Arabic intensively with a private tutor in Washington, DC, in the fall of 2015.
Q. So 1979 and '80. That was almost 40 years ago. And then in 2015 you took a tutor -- you had a tutor in Washington, DC. Was that person Arabic?
A. Yes, of course.
MR. TATE: Can I have you bring up Exhibit 20.
Q. Dr. Hoffman, your testimony was that this was something that you got from a newspaper.
A. That's correct.
Q. What paper was that?
A. The *Wall Street Journal*.
Q. Do you know what their source of this was?
A. Yes, I do.
Q. What was their source?
A. The SITE Intelligence Group.
Q. The what?
A. SITE Intelligence Group.
Q. And who -- and which group was that?
A. SITE Intelligence Group stands for Search for International Terrorist Entities. It's a private intelligence group that collects information exclusively that any kind of terrorist group disseminates and posts on the internet and seeks to provide it to government journalists, nonprofits,

businesses, and scholars as well.
Q. This is a private organization; it's not a government entity, right?
A. Correct.
Q. And do you know what their source of information is?
A. The terrorist groups themselves.
Q. So you're saying that this organization interviews terrorist groups?
A. No, I'm saying that this organization is particularly adept at mining both the internet and the dark web for all kinds of terrorist messaging, posting, communications, discussions on chat rooms and so on.
Q. Okay. Now, looking at this Exhibit 20, there's a range of different mediums: Safest, safe, moderately safe, and unsafe, right?
A. Yes.
Q. Do you see Skype on any of these?
A. No, I don't.
Q. It's not in the safest or the safe, right?
A. No.
Q. It's not in the moderately safe.
A. Not that I can see.
Q. In fact, it's not mentioned at all.
A. No.
Q. When you were discussing with Mr. Savage the various

cells of ISIS throughout the world, you mentioned all these other countries, but you didn't mention the United States. That's because there is no recognized cell in the United States, correct?

A. Well, I would -- no. There's a difference between a branch and a cell. A cell can be one person. It can be a collection of individuals that have no formal allegiance to ISIS in the way that a branch does where they've sworn the bay'at when they're -- to Baghdadi when they're part of the -- formally part of the ISIS network. So there certainly is no ISIS branch in the United States. I couldn't tell you if there were ISIS cells or not.

Q. And so when you say an ISIS branch, those are people that have sworn bay'at to al-Baghdadi, correct?

A. These are -- no. These are entities where the leaders of those entities have on behalf of their followers sworn the oath of allegiance or the bay'at to al-Baghdadi. So Boko Haram, Nigeria, for example, the leader of that organization, which would be a branch -- a formal branch of ISIS of which there are currently eight, has on behalf of his organization given that commitment and sworn that allegiance. It's not necessarily that individual members would have.

Q. But there's no such branch in the United States.

A. ISIS does not have a branch in the United States. That is different from whether it has cells or not.

Q. And that's even today.
A. I would say that ISIS does not have a branch in the United States.
Q. And you used -- a term came up during your direct, the term khalifa. Is that a religious term?
A. Yes, it's the caliph. It's someone who has both religious as well as moral authority in a community. The leader.
Q. The khalifa is mentioned throughout the Quran, correct?
A. Having not seen -- read the Quran recently, I cannot answer that.
Q. But you do know it as a religious term.
A. It is a religious term.
Q. And isn't it true that in the Muslim world and in religion, there has not been a recognized khalifa since World War I?
A. It depends. Recognized by whom? There have certainly been people who have styled themselves as the caliph, yes. But recognized by whom?
Q. But universally recognized by the Muslim world as a khalifa, there has been nobody since World War I; is that correct?
A. I don't see how you would get the universal recognition. I mean, it -- there have been people who have styled themselves as the caliph, as the khalifa, but I don't know who

would -- who would provide that universal recognition. Abu Bakr al-Baghdadi named himself the caliph and claimed that authority and he had followers that supported him.

Q. Right. And -- but although you identify or style yourself as the caliph doesn't mean that you are that, correct?

A. In your followers' eyes you certainly are. But, I mean, I'm not sure it necessarily matters. Propaganda doesn't have to be true. It just has to be believed.

Q. Right. And so he may be the caliph to his followers.

A. Certainly to his followers, but Muslims elsewhere would doubtless object to that appellation.

Q. Muslims elsewhere may see the caliph as somebody else.

A. Well, it's not a term that's been used very commonly since the end of World War I.

Q. That's the point I'm trying to make. Since World War I there has been no caliph, just people like Baghdadi that may declare themselves the caliph, correct?

A. Yes.

Q. And they're only the caliph to the people that follow them.

A. Yes. In the absence -- I'm not sure there is anyone who could name a caliph or that it would be universally accepted.

Q. Were you aware, if you know this, during the period of 2014 through 2015, were there humanitarian efforts going on

with people from the United States and around the world who traveled to Syria for humanitarian efforts?
A. Yes, sir, absolutely.
Q. And they would enter Syria through Turkey, correct?
A. Among other places, yes.
Q. There are other places you can go -- enter Syria through too. Where else would you enter it through?
A. You could enter certainly through Iraq. You could enter through Jordan.
Q. And the people that went over there, they could be there to provide transportation for food and during the ration period, correct?
A. Well, you know, it depends who they were working for and what they were doing and who they were providing food for.
Q. In fact, Americans traveled to Syria during that time for humanitarian efforts.
A. I couldn't tell you.
Q. Are you familiar with an organization called Doctors Beyond Borders?
A. Yes, I am.
Q. And that's where doctors and people who were providing medical relief to people in the civil war would go over there for that purpose, correct?
A. Correct.
Q. And that would include going into Syria from Turkey.

A. Correct.
Q. And not only did the doctors, they had to have people who could drive them around to various sites. They had people like drivers too, correct?
A. I would assume so, yes.
MR. TATE: No further questions.
THE COURT: Any redirect?
MR. SAVAGE: Just briefly, Your Honor.
Could we pull up the map again, which was 19.
THE COURT: It's not showing up on my screen. It's showing up down here, but not up here.
MR. SAVAGE: It should be on all.
THE COURT: Not on mine. I can get the sametime, but I can't get a picture.
It's not a big deal. I'll be fine. Go ahead.
MR. SAVAGE: It shows "all" on ours. I'm sorry, Your Honor.

REDIRECT EXAMINATION

BY MR. SAVAGE:
Q. Going back to the map and the whole conversation about Aleppo, certainly on this map it shows ISIS infiltration in the suburbs of Aleppo or very close to it, does it not?
A. Oh, absolutely. ISIS is one of the forces contesting Aleppo.
Q. Right. And you mentioned that this, if anything, was a

very conservative map. That their territory would have extended down as far south as Palmyra and maybe even further west.
A. Yes.
Q. So certainly if there were villages in the suburbs of Aleppo, ISIS very well could have been in control of those.
A. Absolutely.
Q. Thank you.
Also, not very far away is Raqqa and Raqqa was the headquarters for the entire operation.
A. Yes, it was.
Q. Thank you.
You mentioned this whole business about airports and Syria. Let me show just counsel and the Court, I'm going to show you page 5 and 6 of what has been marked as Government's Exhibit 21.
For purposes of the record, I'm going to now mark this as Exhibit 21A.
I'm going to ask you, do you recognize that as pages from the "How to get to Syria" pamphlet that was put out by the Islamic State?
A. Yes, I do.
Q. And what is -- why don't you just look at that to yourself for a minute. I don't want to jump ahead.
A. Uh-huh.

Q. Okay. It has a map there and it has a circled area, Sanfiurfa, S-a-n-f-i-u-r-f-a. Is that an airport in Turkey?
A. I don't know for a fact.
Q. Okay. Well, what is -- what is the Islamic State advising people about how to get in and out of Syria?
A. Well, generally, especially in that period since the border was rather porous, that it would be easier to just cross the border on foot or on vehicle and probably head to the largest Turkish town or city where there was an airport and where there were connections further afield.

MR. SAVAGE: Your Honor, at this time we would like to move for admission of pages 5 and 6 of the pamphlet as Government's Exhibit 21A and publish those to the jury.

MR. TATE: Your Honor, we're going to object as to relevance. He said he didn't know.

MR. SAVAGE: Well, Your Honor, I think the second question was how do Islamic members get in and out of Syria and I think that was the issue. The issue was brought up by the defense counsel which is --

THE COURT: Let me take a look at the two pages and see.

MR. SAVAGE: May I approach, Your Honor?

THE COURT: Yes.

(Documents tendered to the Court.)

THE COURT: I'm going to -- I'm going to sustain the

objection for this reason. Although there's been a lot of testimony which does go to the question of whether or not this was an important matter involving the government, these questions were made. The real case comes down to did -- can the government prove that the defendant lied about his contact and discussions about this?

Whether he could get in and out of Syria, I assume that people could, is really not the center of this question. The question is, having had conversations and then being questioned about them, did he lie? So I'm going to sustain the objection for that reason.

I don't see -- I think we can sit here and talk about terrorism all day from the government's side and cross examine from the defense side, but at its heart this is a false statement case.

MR. SAVAGE: Thank you, Your Honor. In that case I'll move on. One last question.

Q. Dr. Hoffman, was ISIS a designated terrorist organization by the United States?

A. Yes, it was.

Q. And what is a designated terrorist organization?

A. A terrorist organization that is in violation of U.S. code that lays out a criteria of what an international terrorist organization is. Basically, an organization that commits acts of violence or acts that are harmful to human

life that would be considered criminal either in the United States or the state in which they occurred; that involves efforts to intimidate or coerce a civilian population; that involves efforts to influence through violence or acts of violence policies of government; and then I think finally, that attempts to affect a government's policies through assassination, kidnapping, and mass destruction.

Q. In addition, it would be a violation of U.S. law to provide material support to a designated terrorist organization.

MR. TATE: Objection. Relevance and requests a legal conclusion.

MR. SAVAGE: Certainly it's part of the definition, Your Honor.

THE COURT: Overruled. Overruled.

Q. Would it be a violation of U.S. law to provide material support to a designated terrorist organization?

A. Absolutely it is.

Q. And material support would include giving oneself as well as money to the fight.

A. It's a very broad definition --

THE COURT: Sustained. He can't answer that.

MR. SAVAGE: Thank you. No further questions, Your Honor.

THE COURT: You all can argue.

Okay. Any recross?

MR. TATE: Yeah, a brief question.

RECROSS EXAMINATION

BY MR. TATE:

Q. Dr. Hoffman, is an undercover FBI agent a foreign terrorist organization?

A. No, of course not.

Q. Is the FBI a foreign terrorist organization?

A. No, of course not.

Q. Are you being paid to testify here today?

A. Yes, I am.

Q. Who's paying you?

A. The United States government.

MR. TATE: No further questions.

THE COURT: Any re-redirect?

MR. SAVAGE: Nothing further, Your Honor.

THE COURT: Thank you, sir. You may come down.

THE WITNESS: Thank you.

(Witness stepped down.)

THE COURT: Let's have a sidebar for just a moment.

MR. SAVAGE: Your Honor, is the witness finally excused?

THE COURT: Any objection, Mr. Tate?

MR. TATE: No objection.

THE COURT: Okay. He may be excused.

MR. SAVAGE: Thank you, Doctor.

(Sidebar conference as follows:)

MR. TATE: In the past when I've been in this courtroom with Judge Conrad, oftentimes we just go back in the back room.

THE COURT: We can do that. We've got white noise now, though, so they can't hear us --

MR. TATE: Okay.

THE COURT: -- rather than go back there. What happens when we go back there is everybody -- the defendant and the jury just have to look at each other.

MR. TATE: Okay.

THE COURT: With us over here, they're looking at us --

MR. TATE: Yeah.

THE COURT: -- and what we're doing. If it's going to be real long or is going to get emotional, we go back there.

All right. The next witness is going to be the agent; is that right?

MR. SAVAGE: Yes.

THE COURT: So we don't have to do anything.

MR. SAVAGE: No.

THE COURT: We have to be very, very careful when that comes up.

Anything I need to know while I'm over here for me to decide?

MR. TATE: No.

MR. SAVAGE: No.

(End of sidebar conference.)

MR. TATE: Your Honor, we do need to have a quick sidebar for just a second, Your Honor.

THE COURT: Yes, sir, Mr. Tate.

Sorry, members of the jury. Just trying to make sure you get the information that you're supposed to have as opposed to something that would not be right.

(Sidebar conference as follows:)

MR. TATE: As I got back to the defense table, I noticed Mr. Smith's wife sitting -- or fiancee sitting in the front row. I know the government wanted her sequestered. Do you still plan to call her?

MR. SAVAGE: I very well may. It depends on what comes up, yes.

MR. TATE: She's not a material -- she bought the buddy pass.

MR. SAVAGE: She's still going to need to be sequestered. We agreed ahead of time.

MR. TATE: I'll find a way --

THE COURT: Find a way to do it that it's not --

MR. SAVAGE: This testimony in particular is going

to touch directly on her, so...

MR. TATE: Okay.

THE COURT: Okay.

MR. TATE: Tell them to go over -- tell Yvette or someone to walk out with her like they're going to the -- going into that back door. Just have them go into that back door over there.

MS. CAUSE: Yes.

MR. SAVAGE: We're going to call this witness and we're going to bring him up to the point where the covert investigation ends. We're then going to call the informant. And then afterwards, when that's done in chronological order, we're going to recall the agent to talk about the interview. So I just want to make it clear that we're not going to --

THE COURT: No problem there. You can do two crosses or one cross.

MR. TATE: No problem. He told me about that ahead of time.

(End of sidebar conference.)

THE COURT: Call your next witness.

MR. SAVAGE: Your Honor, the United States calls Special Agent Ronald Godfrey.

RONALD GODFREY, GOVERNMENT WITNESS, SWORN,

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. SAVAGE:
Q. Good afternoon. Please state your full name.
A. Good afternoon. My name is Ron Godfrey.
Q. Okay. In what city and state do you reside?
A. I live in Ft. Mill, South Carolina.
Q. And how are you employed?
A. I am a special agent of the FBI and I'm assigned to the terrorism -- Joint Terrorism Task Force of the Charlotte FBI field office.
Q. Could you tell the ladies and gentlemen of the jury a little bit about your formal education.
A. Sure. I graduated from the University of North Carolina at Charlotte in 1997 with a Bachelor of Science Degree in Management Information Systems.
Q. And how about training, what sort of training have you received just generally as an FBI agent, specifically in the area of counter-terrorism?
A. Okay. Well, initially I went through the FBI academy starting in September 2004 and international terrorism training is part of our entire curriculum at the academy, along with legal instruction, firearms training, defensive tactics, everything else that we go through to learn how to be an agent.
But I've also been to several in-service courses since I've been in the field after graduating the academy and some

of those have been specific to investigating international terrorism.

Q. Thank you.

And were you employed prior to joining the FBI?

A. Prior to the FBI I was a software engineer. I -- after college I worked for IBM basically preparing for the Y2K problem. Converting mainframe applications into more modern Windows applications that included the four-year date. And then after Y2K I was a software contractor. Basically, my job was to design and develop Microsoft Windows applications.

Q. So again, how long have you been an FBI agent?

A. I started at the FBI academy in September 2004. Graduated in January of 2005. Reported to my first office in Memphis in February of 2005.

Q. Okay. Agent Godfrey, do you know the defendant in this case, Alexander Smith, also known as Amir Alexander?

A. I do.

Q. And can you identify him in the courtroom today by pointing to or describing his clothing.

A. Mr. Smith is seated at the defendant's table to my left in the middle. He's wearing a gray suit and glasses.

Q. Thank you.

MR. SAVAGE: Your Honor, the record would reflect an identification.

THE COURT: Let it so reflect.

MR. SAVAGE: Thank you.

Q. How do you know the defendant in this case?

A. He was the subject of an investigation that I was the case agent for.

Q. Okay. And when did Amir Alexander first come to your attention?

A. June of 2014, late June.

Q. And how did he come to your attention?

A. I received information from the Memphis FBI field office in reference to the defendant.

Q. And what was that information?

A. The initial reporting from Memphis was that an individual using the name --

MR. TATE: I'm going to object as to hearsay.

MR. SAVAGE: Your Honor, it's not offered for the truth of the matter asserted. It's merely offered for the fact to show what happened next and how the investigation got started.

THE COURT: All right. I'll allow it for that purpose.

Members of the jury, you're not to take the information that is stated by what another agent said as necessarily the truth, but only as to the effect that it had on this agent in beginning the investigation.

Thank you.

Q. You may proceed.

A. Okay. So in June of 2014 I received information from the Memphis FBI field office in reference to the defendant. The initial reporting was in reference to an individual using the name Amir who had contacted an FBI source that resided in the Memphis area and asked for assistance to travel to Syria for Jihad to participate in the Syrian revolution.

Q. And what did you -- in your understanding -- what was your understanding of Jihad?

A. Well, as we've heard already, there are two concepts of Jihad. We didn't really know at that point; but based on the background information that we had regarding other investigations that the defendant was connected to, we thought that it was possibly the violent concept of Jihad.

Q. But you didn't know at that time --

MR. TATE: Objection. Vague. Move to strike.

THE COURT: All right. Let me look at that. Just a second.

Yeah, sustained.

Members of the jury, don't consider the last statement.

Q. Well, did you open an investigation?

A. We did open an investigation. Basically, the information that we had from Memphis was that he wanted to participate in the Syrian revolution. So I guess there are various ways to

do that, but the FBI is directed to have a forward leaning posture regarding terrorism. And basically, at that time it wasn't information that we could ignore in that regard, so we opened an investigation to try to figure out exactly what we were dealing with, what the issue really was.

Q. Around that same time, did the FBI have an open investigation of a person by the name of Wael Kodaimati?

A. Yes.

Q. And also Saeed Kodaimati who was the son of Wael?

A. That's correct.

Q. And what was the subject of that investigation?

A. The -- I wasn't directly involved in those investigations at that time, but the underlying intelligence for those investigations was that those individuals were involved in supporting ISIS.

Q. Okay.

MR. TATE: Objection and move to strike. And it's hearsay.

THE COURT: Yeah, yeah. I'm going to -- I'm going to sustain that.

Let's move on. We understand what's brought him to this particular point and understand why he's investigating.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Let's now move to the actual investigation.

Members of the jury, don't consider the last statement.

Q. Did you -- in your investigation did you learn whether or not there was a connection or communication between the defendant and the Kodaimatis?

A. Yes, there was.

Q. And what was the connection between the defendant and the Kodaimatis?

A. The Kodaimatis had previously lived in Charlotte and had known the defendant from the time they lived in Charlotte. He worked for them, I believe.

Q. Did you ever have any -- did you have any information as to whether or not the defendant had ever visited Syria with the Kodaimatis?

A. The defendant visited Syria with the Kodaimatis in 2006.

Q. And in 2014 was there any information that the defendant was in communication with the Kodaimatis?

A. Yes.

Q. What name -- with regards to the source in Memphis, what name was that source using?

A. He used the name Kareem.

Q. With regards to the information you received, when you opened the investigation in Charlotte, how did you proceed?

A. We initially needed some more information from Memphis to first understand -- we couldn't open an investigation in

Charlotte without there being a Charlotte nexus. So the information from Memphis was that the defendant was using a 704 area code phone number. And in subsequent reporting we learned that Smith had told this individual in Memphis that he did, in fact, live in Charlotte. He provided also his passport name. Because he was talking about traveling, Kareem asked for his -- asked if he had a passport. He said he did. He said, "What is the name on your passport?" He provided his name as Alexander Samuel Smith.

So at that point we had enough information to open an investigation in Charlotte on Alexander Smith. Um --

Q. Wait a minute. And did you -- did you independently verify that the defendant was indeed issued a passport that was valid?

A. Yes. We have information that indicates he had a passport, that it was valid through April of 2015.

Q. Thank you. So how -- how did you approach the Charlotte investigation?

A. Kareem in Memphis, the source in Memphis, was not someone who was going to be completely at our disposal for an investigation. And so that we could have better control over the investigation, we asked Kareem if he could pass to Smith an email address of someone else who could possibly help him in North Carolina, and we gave him the email address. He did pass the email address to Mr. Smith, and from there Smith

contacted our source here in North Carolina.
Q. Okay. When you say a source, is the source also -- could he be known as an undercover informant?
A. That's right.
Q. Let me talk about -- ask you some questions about undercover investigations.
First of all, what is an undercover source?
A. Well, it's someone that we ask to -- a member of the public, not an FBI employee, but it's someone who has agreed to cooperate with us, first of all. And typically, we ask them to play a role that's not their -- not their true self to help us get to the truth of a matter in an investigation.
Q. Well, why does the FBI use undercover informants or sources?
A. Well, it would be rather difficult for me as an agent to just go directly and ask someone what I need to know, especially early in an investigation, you know, in my overt capacity as an FBI agent. If they are involved in some sort of illegal activity, they're probably not going to be honest with me at that point.
So the concept of using an undercover agent would mean that we would be able to take someone who has agreed to cooperate with us and who may more readily fit into a role that I can't play, to report back to us so we can begin to discern the actual truth of the matter.

Q. And does the FBI exercise a certain amount of control or direction over such sources?

A. Yes. There's various levels of approval that have to be obtained before we can engage in such an operation. We have to take care in educating the sources about what entrapment is and why they have to avoid it and how to avoid it. And just general principles about their security because in many cases they are engaging in something that could be dangerous on our behalf. They're engaging in something through an assumed persona that could divulge their true identity which could be problematic for them. So there's a number of things. It's somewhat of a complex endeavor to get the necessary approvals and actually send this person forth to participate in an investigation on our behalf.

Q. Does the FBI compensate its undercover sources?

A. We do. There's -- they're paid a couple of different ways. One way is it's inevitable that if sources are doing things on our behalf, they're going to incur expenses that they normally wouldn't incur, so we reimburse them for those expenses. But we also compensate them for their time, their services, and the information that they provide.

Q. Is any of that dependent upon whether or not there's actually a conviction or an arrest or anything occurs?

A. No, it's not. We're just -- our job is to seek the facts, the information.

Q. Now, you mentioned before that sometimes the undercover sources are assigned a persona. What do you mean by a persona?
A. Basically, I mean, a fictitious role that they would play. Something that's not their actual identity or personality or station in life.
Q. What was the persona that was used by the North Carolina source introduced or offered through Kareem?
A. We asked him to play the role of someone who would be a travel facilitator or recruiter for ISIS.
Q. Okay. And why that role?
A. Because Smith had expressed that he wanted to travel to Syria and we were very concerned that he may be going there to join ISIS and we needed to get to the heart of that matter pretty quickly.
Q. Okay. Well, you heard Dr. Hoffman testify here in the courtroom and the questions from the defense counsel. Would it have been a concern to you if the defendant was traveling to Syria to join al-Nusra, another organization?
A. Yes, it would. Al-Nusra is also a designated foreign terrorist organization.
Q. And would it have been of concern to you if he was traveling to join, say, the Free Syrian Army?
A. It would have been a concern. We still would have wanted to maybe speak with him, try to find out exactly what the

circumstances were. We have had situations where we've come across individuals who wanted to go to Syria and fight against ISIS, but -- first of all, we would like to approach those individuals before they go to let them know -- make sure they understand exactly how dangerous the environment that they're going into. But also, you know, because of their nexus to such a situation, they may be able to provide us information that could help us.

Q. So Free Syrian Army was not a designated terrorist organization and it wouldn't be illegal to help them.

A. Would not be illegal, no.

Q. Would it have been illegal at that time to help or provide support to ISIS?

A. Yes, it would, because they were a designated foreign terrorist organization.

Q. And you've heard the -- I'm not going to repeat all of Dr. Hoffman's testimony, but what was the FBI's concern about ISIS in 2014?

A. Well, ISIS had declared itself the caliphate in June of 2014 and they were disseminating propaganda throughout the world, including the western world. They were encouraging people to come there to fight. But even more alarming, they were saying if you -- you know, come if you can get here. But if you can't get here, then, you know, carry out attacks or do whatever you can to support us from wherever you are.

Q. Either of those circumstances the FBI was conducting investigations all over the country, not just in Charlotte, into that issue.

A. That's correct.

Q. Who was the person in charge of the FBI's investigation concerning the defendant?

A. I was the primary case agent for this case.

Q. Did other agents participate?

A. Yes.

Q. How would they have participated?

A. There was a lot to do, I mean, throughout the investigation. There's records to go through. There's surveillance operations. There's just, you know, interviews, a variety of things that need to be done that one agent cannot possibly see to.

Q. Was this investigation supervised?

A. Yes.

Q. How was it supervised?

A. I report to a supervisory special agent who reports to an administrative -- or I'm sorry, an assistant special agent in charge, and then -- the head of the Charlotte field office is a special agent in charge, and then, you know, it goes up the chain from there to headquarters. My SAC reports to headquarters. Our -- even though I have a chain of command in the field office that I report to, there's a counter-terrorism

division at headquarters whose job is to manage the counter-terrorism program for all the divisions, so we have a unit at headquarters that we are in touch with on a regular basis regarding our investigations.

Q. So even though you were the agent in charge, were you authorized to act on your own initiative?

A. No, I was not.

Q. Did you coordinate various parts of the investigation with the United States attorney here in Charlotte?

A. Yes, we did, right from the very outset.

Q. In an FBI investigation such as this, who makes the charging decisions in the case?

A. It's completely up to the U.S. Attorney's Office.

Q. Now, we mentioned earlier -- let me show you, just the witness and the counsel and the judge, what's been marked as Government's Exhibits 1 and 2. We'll start with 1.

MR. SAVAGE: Can you see that, Your Honor?

THE COURT: No.

THE CLERK: They're working on it.

THE COURT: I'm told they're working on it.

MR. SAVAGE: Okay. I can do this.

May I approach, Your Honor?

THE COURT: Yes, sir.

(Documents tendered to the Court.)

THE COURT: Okay.

Q. Agent Godfrey, looking at the screen, that's an enlargement of Government's Exhibit Number 1. Let me ask you, what is that? What are those documents?
A. This is an email message dated July 14, 2014, shortly after the beginning of our investigation from the defendant to our source in Raleigh who used the pseudonym Abu Khalid.
Q. And I note that in that -- if we can go back to the bigger screen. There are a number of black marks on that exhibit.
MR. SAVAGE: And if we can scroll through to page 2 -- or on the next one.
Q. Let me show you Exhibit 2.
Is that also an email from the defendant?
A. Yes, it is. It was sent the same day and is also to our source in Raleigh, Abu Khalid.
Q. Okay. Now, there's a number of black marks on there. What are those black marks?
A. There's information in the header of an email message such as IP addresses and that sort of thing that could be used by someone who understands those things and knows what they're doing with that information, it could be used to potentially identify our source Abu Khalid, so it's redacted so that we can have the documents declassified to use for this case.
Q. So the information behind that is, for various reasons, classified information that can't be publicly shown.

A. That's correct.
Q. Do you know whether or not this -- to which address -- whether this was sent to an email address associated with the informant that we know as Abu Khalid?
A. Right. In fact, we received these email messages from Abu Khalid. He put -- he gave them to us, the FBI, as evidence during the investigation. But he received the emails from the defendant.
Q. And are they the same -- other than the redactions, are they the same today in court as they were at the time you received them?
A. Yes.
MR. SAVAGE: Your Honor, we would move for admission of Government's Exhibits 1 and 2, and we would ask maybe the Court could instruct the jury with respect to the redactions.
THE COURT: Any objection?
MR. TATE: No objection.
THE COURT: All right. I'm going to allow these to be admitted.
(Government's Exhibits Nos. 1 and 2 were received into evidence.)
THE COURT: Members of the jury, there are substantial redactions on these papers that will be showing up on your screen. I'm going to let them be admitted. This is done because it contains classified information. The Court

has ordered that that be done, that this classified information is going to be kept from the parties.

You may continue.

MR. SAVAGE: And we may publish, Your Honor?

THE COURT: You may.

MR. SAVAGE: And I'm going to ask -- you can see the whole document, but so that it will be easier for the jury, if we can enlarge the text at the bottom.

Q. And Agent Godfrey, can you see Exhibit 1?

A. Yes, I can.

Q. You mentioned earlier that the FBI gave a phone number or email address to Kareem. Did the defendant initiate a contact with the source, the new source, in Charlotte -- or in North Carolina, rather?

A. That's correct. We provided an email address to Kareem and asked him to pass that email address to Alexander Smith. Alexander Smith sent this email to the email address that he was provided through Kareem.

Q. And what name was the confidential informant using in North Carolina?

A. Abu Khalid.

Q. Okay. And that is not Abu Khalid's real name, is it?

A. Correct.

Q. And just to go ahead and reading that, if you can just read the text that begins with "sallam."

A. Okay. "Sallam I just spoke with kareem and he asked me to email you. I gave him another email address that I could email you from. But I just decided to use the email thats attached to my smart phone so I can check the emails quicker. So you can respond to thos email address or asmith99.noble@gmail.com either one of them are fine brother. Insha'Allah I look forward to hearing from you."

Q. And going to Exhibit Number 2 and enlarging the bottom of Exhibit Number 2, did Abu Khalid reply?

Well, first of all, what is this?

A. This is the second email from the defendant to Abu Khalid. The defendant sent two email addresses to Abu Khalid before there was any reply.

Q. Okay. What happened next? What happened after this email?

A. Abu Khalid sent an email message back to Smith and basically said, "What is it that you want to talk to me about," or "how can I help you," or something of that nature. I don't recall without seeing the actual text.

Q. And was there a telephone call made?

A. Yes, they later spoke by phone. In a subsequent email message Smith said, "It would be better for us to talk in person."

And so they spoke on the phone to arrange an in-person meeting, to work out the logistics of an in-person meeting.

Q. And was that phone call recorded?
A. Yes, they were. There were -- there were multiple phone calls. Sometimes -- the first couple of calls were unanswered and so a voicemail message was left and that kind of thing. But they were all recorded.
They did actually finally speak on the phone on August 3rd, I believe, and August 6th.
Q. Okay. And Exhibit Number 3, let me show you -- can we just show the transcript to the judge and to the counsel.
(Mr. Savage and Ms. Neill conferred.)
MR. SAVAGE: Excuse me, Your Honor. Let me move on.
Q. So on August 6th there was a recorded telephone call between the defendant and Abu Khalid, correct?
A. That's correct.
Q. And when you say they, is that who you're referring to?
A. Correct.
Q. What was the purpose of the call on August 6th?
A. They were working out the logistics of a meeting to be -- they were going to meet the next day in Cary and they were working out the logistics of that meeting, the time and the exact place and how Smith was going to get there.
Q. And just to save a little time, before coming to court today, did I ask you to review a disk with a copy of -- recording of that conversation and a verbatim transcription of the conversation?

A. Yes.
Q. Thank you. And that would be marked as Exhibit 3 in our evidence, correct?
A. Correct.
Q. When did this meeting take place?
A. It was August 7th at 2:30 in the afternoon. August 7th, 2014.
Q. And where was this meeting?
A. It was at a mall in Cary. They actually met in a car that Abu Khalid was driving. Smith got in the car with him and they spoke in the car for a while.
Q. And was this -- who else was present during this meeting?
A. Just those two.
Q. And was this recorded?
A. Yes.
Q. And how was it recorded?
A. The -- Abu Khalid has -- we would give him a recorder. He knows how to function the recorder. And just before Smith got in the car, he turned on the recorder.
Q. And before coming today, did you review what has been marked as Government's Exhibit Number 4 which is an excerpt or -- or actually, the entire trans -- oral -- audio of that conversation plus a verbatim transcript?
A. Yes, I did review it.
Q. And is that -- was that transcript accurate?

A. Yes.
Q. And this was made just with an audio recording, not a video recording.
A. That's correct.
Q. And what was the purpose of this meeting?
A. I think when you hear the call later, you'll see that Abu Khalid, our source, asked Smith, "So tell me, what do you want?"
That was essentially the purpose of the meeting, for us to find out what Smith wanted. What kind of help was he seeking.
Q. What happened after that?
A. Smith explained to Abu Khalid that there was a family in Syria that he had visited Syria with before and he wanted to return to Syria to help defend this family.
Q. Did Abu Khalid say whether or not he would help him?
A. He did. He said he -- you know, he would help him. He wanted to know more information about what Smith wanted to do, though.
Q. Did Abu Khalid identify himself with any particular group in Syria?
A. He did. He said that he was -- well, he asked Smith where this family was living, and Smith told him the village where they lived. And ultimately --
Q. And what was that village?

A. The name of the village is Kafr Hamrah. It's a suburb of Aleppo.

Q. And did Smith indicate whether or not -- to the undercover source whether or not Kafr Hamrah was under the control of ISIS?

A. The source actually asked him that explicitly and Smith said that there was sort of a divided -- that the power was kind of divided in the area. He said it's a three-way split between the Syrian government, which would be the Assad regime, the Free Syrian Army, and then he made reference to the third part in the split as the brothers.

Q. And by brothers in that context, what did you understand that to mean?

MR. TATE: Objection as to --

THE COURT: Sustained.

MR. TATE: -- what he understood.

THE COURT: Sustained right now. Sustained right now. We're going to listen to the --

MR. SAVAGE: All right.

THE COURT: We're going to listen to the tape --

MR. SAVAGE: Thank you.

THE COURT: -- since we have a transcript specifically.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Once that's said, I'll let you...

MR. SAVAGE: All right.

THE COURT: We'll see where -- we'll see where the evidence goes.

MR. SAVAGE: We'll move along, Your Honor.

Q. What happened after that?

A. Well, Abu Khalid told Smith that he was helping brothers go to Syria to join ISIS, and he went through all of the various different names of ISIS, whether Dawla Islam or Daesh or the Islamic State. And he asked Smith in particular did he want to go to Syria to join ISIS.

MR. TATE: Objection, Your Honor. This is hearsay. There is a recording and the agent cannot testify and put his own spin on the conversation.

THE COURT: I'll sustain it. Let's hear the...

MR. SAVAGE: We're setting up the foundation, Your Honor, for what happened next.

Q. What happened as a result of that conversation?

A. They agreed to meet again, basically, at the end of that -- end of that conversation.

Q. And was there a subsequent meeting in Charlotte, North Carolina, on about the 20th of August 2014?

A. Correct. They met in person a second time. It was actually in Pineville.

Q. Okay. And where did that take place?

A. At the Carolina Place Mall in Pineville.

Q. And was it in a car or...
A. Yes.
Q. And who was present?
A. Again, just Abu Khalid and the defendant.
Q. And before coming to court today, did you review the recording of that meeting and a transcript marked as Government's Exhibit Number 5?
A. I did, yes.
Q. And is that -- how did you receive that recording?
A. From Abu Khalid. Abu Khalid would provide the recording device that he used to the FBI and then it would enter our chain of custody for evidence.
Q. And like all the other recordings we're talking about, did you review that recording at or near the time that you received it?
A. Shortly after, yes.
Q. And is that recording that's Exhibit 5, is that the same as the recording that you reviewed at that time?
A. Yes.
Q. And did you look at a transcript also of that meeting?
A. I did.
Q. And the transcript which is marked Government's Exhibit 5A, is that substantially the same -- is that a verbatim transcript of the recording that you listened to?
A. Yes.

Q. What was the purpose of that meeting?
A. To follow up with Smith to see if he had changed his mind or if he still wanted to travel. I think that was one of the first questions that they discussed when they met.
Q. Okay. And without saying what happened, did he indicate that he wanted to go further?
A. Yes, he did.
Q. Was there another meeting planned?
A. They agreed to meet later, but they didn't set a specific time on it. But ultimately they met again a few months later, actually, in November.
Q. Okay. And that would be on or about November 11th, 2014?
A. That's correct.
Q. And where did they meet?
A. That meeting occurred at a hotel in Charlotte.
Q. And who was present?
A. Initially Abu Khalid was present. Then Smith arrived. And a short time later another source that we introduced who used the pseudonym Bilal arrived.
Q. Okay. And who is Bilal or who did Bilal purport to be?
A. He was -- one of the common themes was Smith needed money to travel, so Bilal was a source that we had Abu Khalid to introduce that was basically someone that Smith could work with. He -- we basically asked him to mirror Smith. He was a Muslim convert. That was the role he was playing. And we

asked him to basically work with Smith. The two of them could find work together to make some money.
Q. Okay. Why not just give the defendant money and see what he's going to do with it?
A. Well, we couldn't be sure what he was going to do with it, basically. And if he did use that money to travel to support a designated foreign terrorist organization, then the FBI would have supported terrorism, basically, if we did that, so we could not just give him the money.
Q. So what were the instructions for Bilal?
A. Bilal's instructions were to find work that he could do with Smith. They did a variety of odd jobs together. They started out doing some construction projects such as flooring, tile or wooden floors. They sought some work doing drywall or sheetrock work. Ultimately, they spent most of their time working together on cars. They would buy a car that either didn't run or didn't run well and they would fix the car up and get it running and then sell it at a profit.
Q. Was this hotel meeting recorded?
A. Yes, it was.
Q. How was it recorded?
A. It was recorded through an audio video device that we placed in the room earlier in the day before anyone arrived.
Q. And before coming today, did you review what has been marked as Government's Exhibit Number 6?

A. I did, yes.
Q. And is that a copy of the video and audio recording that was made of the hotel meeting of the defendant, Bilal, and Abu Khalid on the 11th of November 2014?
A. That's correct.
Q. And did you review that shortly after the recording was made?
A. Yes.
Q. And is it the same -- Exhibit 6 the same as that recording?
A. Essentially the -- Abu Khalid's facial image has been obscured in the video to protect his identity. But other than that, it's the exact audio and video.
Q. So if we look at the video, we're going to see there is a blur over what would be Abu Khalid's face.
A. That's correct.
Q. Does Bilal ever appear actually in the video?
A. No, he's just off the camera view to the left, I believe. We hear his voice, but he's never actually seen in the video because of where he was sitting in the room.
Q. Okay. Have you been personally in a room with Bilal and have you heard him speak?
A. Yes, I have.
Q. Was the voice that's on Government's Exhibit Number 6 the same as the voice that you heard when you were personally with

Bilal?
A. Yes, same voice.
Q. How long was this meeting?
A. I believe it was about two and a half hours total.
Q. Okay. And how long is the recording actually?
A. The recording is very long. Probably 10 or 12 hours because I placed the recorder in the room much earlier in the day before anyone arrived. And then after everyone left the room for the day, we just let the recorder run until the battery died and we retrieved the equipment the next day.
Q. Okay. What was the purpose of this meeting?
A. Basically we wanted to -- the reason we had this meeting at a hotel is we wanted to give -- we wanted to create an environment where Smith could talk about what he was planning to do for a while longer. Until this the other meetings had been for 15 or 20 minutes in a car and so we still had a lot of unanswered questions. This would be a meeting where they could sit down, relax together, and have a long talk.
And basically, we instructed our sources to ask him open-ended questions at this meeting. In other words, don't ask him things that he can simply respond with yes or no, but ask him, you know, what his plans are and let him articulate in his own words what it was that he had in his mind.
Q. And did you receive -- were the defendant's responses -- the -- did the defendant's responses in that meeting cause you

to continue your investigation?
A. Yes. We were very concerned at that point about the things that he said in the meeting.
Q. And they're going to be on the tape.
A. That's correct.
Q. Was there another meeting by -- with the defendant on November 19th, 2014?
A. Yes, there was.
Q. And where was that?
A. This meeting occurred at a shopping center in Matthews in a parking lot. Again, the source -- or Abu Khalid arrived in a car. Smith got in the car with him and they spoke for a while.
Q. And was that meeting recorded?
A. Yes, it was.
Q. By audio only?
A. This was audio only, correct.
Q. And did you review a copy of that -- or that recording soon after the event?
A. Yes.
Q. And is the Exhibit 7 an exact copy of that recording?
A. Yes.
Q. And did you review a transcript of that recording?
A. I did.
Q. And is it a verbatim transcript of what occurred in that

meeting?
A. Yes.
Q. What was the purpose of this meeting?
A. So at the previous meeting at the hotel on November 11th, Smith referenced an individual that he was friends with by the name of Shawn al-Baghdadi. And he said that although this individual wasn't willing to travel, that he would do anything that was needed for ISIS here in the US.
MR. TATE: Objection. Move to strike. Mischaracterizes the evidence.
THE COURT: Members of the jury, I'm going to allow this. Is this person going to testify?
MR. SAVAGE: No.
THE COURT: Okay. Then I'm going to -- then let's go ahead and strike it, then.
MR. SAVAGE: Okay.
Q. Did you continue the investigation for reasons that were beyond that of just Mr. Smith?
A. I'm sorry, can you repeat the question.
Q. Did you continue the investigation as a result of information that you had received from Mr. Smith?
A. Yes, we did.
Q. Okay. During that meeting, did anything significant happen with respect to -- that caused you to expand your investigation?

A. We're still talking about the November 19th meeting; is that correct?
A. That's correct.
Q. Okay. So the defendant during this meeting offered a buddy pass to our source.
Q. And what is a buddy pass?
A. It's a discount airline ticket that's available to -- as sort of provided by commercial airlines as a fringe benefit to their employees. They can use the tickets for themselves or they can give them to friends or family members or other people they know.
Q. Did your investigation show how the defendant would have access to such a discounted airline ticket?
A. We believed that his girlfriend would be the source of the buddy pass. We knew that she worked for a commercial airline and that was the only connection that we knew he had to an airline.
Q. Specifically which airline?
A. It is American Airlines. At that time it was USAir.
Q. And did she work here at the Charlotte Douglas International Airport?
A. That's correct.
Q. Did this concern you?
A. Yes, it did.
Q. Why?

A. Well, we saw that it was possible that the buddy pass feature that is, you know, something that's provided by virtually every airline to their employees could possibly be and was possibly being exploited for nefarious use and --

MR. TATE: Objection. Move to strike exploited for nefarious use.

MR. SAVAGE: Your Honor, at this point the defendant -- this is the -- this is the FBI's investigation. It goes to materiality. And it certainly, if the FBI was investigating whether or not the -- it could be exploited for nefarious use, they should be able to testify to that.

THE COURT: Yeah, I don't have any problem with allowing that one. I'll overrule that objection. What I want to avoid is hearsay statements from people --

MR. SAVAGE: Yes, Your Honor.

THE COURT: -- who are not going to testify.

MR. SAVAGE: Yes, Your Honor.

THE COURT: That's what I want to avoid. I understand that may be part of an investigation, but it cannot be part of the trial.

MR. SAVAGE: Certainly, Your Honor.

And I might say that with respect to the previous ruling, I think it's important to note that even if that person is not going to testify, these are things that the defendant said. And certainly admissions of a -- or

statements of a party opponent are admissible.

THE COURT: But it has to be made to him -- it has to be made to somebody that can testify about it.

MR. SAVAGE: Certainly.

THE COURT: In other words, you can't just testify that somebody told me the defendant said that.

MR. SAVAGE: Absolutely, Your Honor. But the purpose of this testimony -- we're certainly going to offer that. And the purpose of this testimony -- in running through this testimony is to lay a foundation for the exhibits that are going to be offered through the next witness. So this witness -- this testimony --

THE COURT: I've already said I don't have a problem with this. What I want to avoid is what happened earlier. If somebody -- this witness testifying what somebody else said that the defendant said. If the defendant said it to this witness, he can tell it all day long.

MR. SAVAGE: Right. But, Your Honor, with respect to the materiality of the investigation --

THE COURT: I understand. There's been plenty of testimony about the materiality --

MR. SAVAGE: Thank you.

THE COURT: -- of the investigation.

MR. TATE: Your Honor, just so we're clear, with respect to the buddy pass, the tape recording is the evidence.

He offers a buddy pass. He doesn't offer a buddy pass to circumvent the airline for nefarious use. That's not in the recording at all.

THE COURT: What I'm letting it in for is because that is the reason that they are interested in these things. That's allowed for the materiality. But we've gotten plenty of materiality testimony --

MR. SAVAGE: Thank you, Your Honor.

THE COURT: -- in here, so let's --

MR. SAVAGE: Yes, Your Honor.

THE COURT: I'm more interested in what these tapes say.

Q. During the winter -- or holiday months of 2014 into 2015, did your investigation continue with Bilal?

A. Yes.

Q. Was the defendant [sic] still monitoring the defendant at this time?

A. Yes.

Q. When did the defendant next communicate with Abu Khalid?

A. They communicated over email and text and Skype on a regular basis. They didn't meet in person again until -- they had a Skype conversation on March 18th and then they met in person on March 20th.

Q. 19th.

A. 19th.

Q. So with respect to the Skype conversation on March 18th, 2015, who was party to that conversation?
A. It was a Skype conversation between Smith and Abu Khalid.
Q. And was that -- to your knowledge, was that conversation recorded both by video and audio?
A. Yes.
Q. Who recorded it?
A. Abu Khalid recorded it as he was participating in the conversation.
Q. And did you review a copy of that recording shortly after it was made?
A. I did, yes.
Q. And did you review the recording that has been marked as Government's Exhibit Number 8?
A. Yes.
Q. And is it in substantially -- is it actually the same as the recording that was made by the source back in March of 2015?
A. Again, the -- Abu Khalid's facial image has been obscured, but other than that it's the same.
Q. Anything happen -- what was the significant event in this conversation?
A. Based on the previous offer of a buddy pass from Smith to Abu Khalid, Abu Khalid asked if Smith remembered that offer and if he could still get him some cheap tickets, and Smith

said yes.

Q. Was it for him or for someone else?

A. It was for someone else.

Q. Did he describe who that person was?

A. Not in great detail. He just said that "this is a brother that we need a lot and I need him -- he's in Tampa. I need him to fly from Tampa to Buffalo so I can get him you know where."

Q. Let me show you and just the counsel and the witness what has been marked as Government's Exhibit Number 9.

MR. SAVAGE: And, Your Honor, I'll approach. I have a hard copy.

(Document tendered to the Court.)

THE COURT: Is this going to be a phone call?

MR. SAVAGE: These are texts, Your Honor.

THE COURT: Thank you.

MR. SAVAGE: And I think it will explain.

BY MR. SAVAGE:

Q. What is Exhibit 9, Agent Godfrey?

A. This is a spreadsheet of text messages exchanged between Smith and Abu Khalid between March 18th and March 20th.

Q. Okay. And how is -- who prepared this document?

A. I did.

Q. Okay. And it has a number of columns across the top. It says "Date." What does the date refer to?

A. The date would be the time that the message was either sent or received on Abu Khalid's phone.
Q. And then it has the word "From." What would that refer to?
A. "From" is the sender of the text message.
Q. Okay. And "To"?
A. "To" was who -- the recipient of the text message.
Q. And what is -- what did you put in the subject or message?
A. It's the exact text of the text message.
Q. Okay. Now, there's a number of redactions in there. What would that refer to? What's redacted out, the black boxes?
A. Yeah.
Q. Would that be classified information?
A. Those are -- well, it's basically the phone number that Abu Khalid was using. I see that there's one instance where it's not redacted, but --
Q. Okay.
A. -- in any case it was the phone number that Abu Khalid was using and he only used that phone for this investigation.
Q. Okay. So from what -- how did you prepare this document? Where did you get the information?
A. We were unable to figure out -- we actually collected the phone from Abu Khalid that he used in this investigation. As

I said, he only used it for the purpose of this investigation. We were unable to figure out how to download the content from the phone, so we basically had a video of the phone that you could scroll through every aspect of the messages and things on the phone, and we used that to take the messages that were sent to and from the phone and to compile them into this spreadsheet.

Q. Okay. And before coming here to court today, did you review the video of the actual texts as they appeared on Abu Khalid's phone?

A. Yes, I did.

Q. And are they exactly verbatim what appears in the chart that you prepared for Government's Exhibit Number 9?

A. Yes.

THE COURT: All right. Let's hold on a minute. If there's -- if there's a number that should be redacted and it's not redacted, we're going to stop and redact it.

MR. SAVAGE: Yeah, we'll redact it, Your Honor, yes, sir.

THE COURT: I want it -- before we go into it with this jury or anybody else, we're going to redact it.

MR. SAVAGE: Your Honor, I'm just going to offer a foundation for that at this point.

THE COURT: That's fine.

MR. SAVAGE: And I'll tie up the relevance with the

next witness and fix that at that time.

MS. NEILL: It's done.

MR. SAVAGE: Oh, it's done. It's redacted. So that's Exhibit Number 9.

Q. What happened after this -- after these text messages?

A. So the text messages began on March 18th. Basically, the subject, Mr. Smith, and Abu Khalid met in person again on the 20th of March 2015.

Q. And was that -- where was that meeting?

A. It was in a parking lot in Matthews. They talked again in a car that Abu Khalid was driving.

Q. And what was the purpose of this meeting?

A. The purpose of the meeting was for -- basically, the defendant had agreed that he could help Abu Khalid with a buddy pass as they discussed over Skype on March 18th. So the purpose of this meeting was for Abu Khalid to provide to Smith the information that he said he needed to obtain a buddy pass, which was essentially a name and a date of birth, and also for Abu Khalid to provide the money that Smith would need to purchase the buddy pass, which was essentially $80.

Q. And did Abu Khalid provide a name?

A. He did.

Q. What was the name?

A. The name was Mohamed Hilal.

Q. Was there actually such a person named Mohamed Hilal?

A. No, it was a fictitious identity.
Q. Did you review what's been marked as Government's Exhibit Number 10 before coming to court today? Government's Exhibit Number 10, a recording from the meeting.
A. The meeting from March 20th?
Q. Yes.
A. Yes, I did.
Q. And did you review a recording of that meeting shortly thereafter, shortly after it happened?
A. Yes, I did.
Q. And is Government's Exhibit Number 10 substantially or exactly the same as the recording that was made after the meeting in Charlotte on March 20th, 2015?
A. Yes.
Q. And did you review the transcript that went with that?
A. Yes, I did.
Q. And is that transcript verbatim?
A. Yes.
Q. What happened after that?
A. So the -- Smith had agreed to -- he took the -- he accepted the name and the date of birth and the money. He said that he would work on getting the buddy pass that afternoon. He later emailed Abu Khalid and provided to him the information regarding the buddy pass reservation.
Q. Let me show you what's been marked as Government's

Exhibit Number 11.

MR. SAVAGE: May I approach, Your Honor?

THE COURT: You may.

(Document tendered to the Court.)

Q. Can you see Government's Exhibit Number 11?

A. Yes.

Q. What is -- what is that?

A. This is -- I can only see the first page right now, but it appears to be the email that Smith sent to Abu Khalid that contains the details about the reservation for the buddy pass.

Q. Okay. And we're going to go to page 2.

Can you see those details on that page?

A. Yes.

Q. Okay. And did you receive this -- how did you -- where did you receive this from?

A. We received this from Abu Khalid in the course of our investigation. He provided it to the FBI and from there it entered into our chain of -- I guess it wouldn't be chain of custody. He provided the documents and we put them in our case file.

Q. You put them in your evidence file.

A. Right.

MR. SAVAGE: If we could go to the last page.

Q. And is that the entire email?

A. Yes.

Q. And is it -- other than the redactions that appear on the very front, is it the same email that was provided to you as evidence by Abu Khalid?
A. Yes.
MR. SAVAGE: Your Honor, we'd move for admission of Government's Exhibit Number 11.
MR. TATE: No objection.
THE COURT: Let it be admitted.
(Government's Exhibit No. 11 was received into evidence.)
THE COURT: Once again, members of the jury, this is going to be a heavily redacted document, at least on the first page.
MR. SAVAGE: Request permission to publish Government's Exhibit 11.
THE COURT: You may.
MR. SAVAGE: And if we could enlarge the dates on just the very front part.
Q. Again, this is Friday, March 20th, 2015, correct?
A. That's right.
Q. And the time -- actually, it says Pacific Daylight Time. The date is accurate. The time came off a different server?
A. Correct.
MR. SAVAGE: If we could go to page 2.
If we can enlarge just the -- where it says

"Forwarded message" and the flight information.

There we go.

Q. And the email, this forwards another email; is that correct?

A. That's right.

Q. And it forwards an email from who?

A. The original email was from US Airways.

Q. And who is that email -- who's the email from? Who's the -- what's the address? The email -- I mean, sorry, the US Airways email was addressed to whom?

A. To amiralexander99@gmail.com. It's an email address that we knew to be associated with the defendant.

Q. And it refers to a reservation with the locator code EMHH53; is that correct?

A. That's correct.

Q. And later do you see the name of the passenger on that particular flight?

A. Yes. Near the bottom it shows listed passengers and underneath is Mohamed Hilal.

Q. And is that the fictitious name that you made of the purported ISIS traveler?

A. Yes.

MR. TATE: Objection to -- it states a fact not in evidence, purported ISIS traveler.

MR. SAVAGE: I think it is in evidence.

THE COURT: Overruled. Overruled.

Q. Did anybody by the name of Mohamed Hilal actually travel on March 22nd, 2015?

A. No.

Q. Did the defendant reply after this date to Khalid?

A. Yes. He was concerned. I think the day the buddy pass was supposed to be used, which I believe was March 22nd, he sent an email to Abu Khalid to let him know that the pass was not used. I don't recall the exact text, but he was basically concerned that the pass hadn't been used and he was trying to find out what was going on.

Q. Let me show you what's been marked as Government's Exhibit 13.

What is Government's Exhibit 13?

A. I still see the same exhibit, I think. Sorry.

I can only see the first page.

Q. If we can go to the second page, I'm sorry.

A. Okay. Yes.

Q. Do you see the area highlighted on that exhibit?

A. Yes.

Q. Was this the email you just referred to?

A. That's right, yes.

Q. And where did you receive the original of this email?

A. We -- like the others, we collected this from Abu Khalid in the course of our investigation.

Q. Okay. And is Government's Exhibit 13 the same entire email that was -- that you received from the defendant?

MR. SAVAGE: If we can go one more page.

Is there one more after that?

Nope, that's it.

THE WITNESS: That's it, yes.

Q. Is that the entire email?

A. Yes.

MR. SAVAGE: Your Honor, we'd offer into evidence what's been marked as Government's Exhibit Number 13.

MR. TATE: No objection.

THE COURT: Let it be admitted and published.

(Government's Exhibit No. 13 was received into evidence.)

THE COURT: Again, members of the jury, the front page is very much redacted.

Q. And with regard to the redacted information, does that include the email address that was being used by Abu Khalid?

A. Yes, it does.

MR. SAVAGE: And if we could go to the second page.

The highlighted -- if we could enlarge the highlighted part there.

And I'm not going to -- the jury can read so we're going to just wait a minute.

(Jury peruses document.)

Q. Did Abu Khalid respond to that email right away?
A. Not right away, no.
Q. About how long did it take for him to respond?
A. We asked him to respond on March 31st. This original email, I believe, was sent on March 22nd. We asked him to respond on March 31st.
Q. And let me show you what's been marked as Government's Exhibit Number 14 and I'll ask if you recognize that exhibit.
And I'm going to -- I'm going to bring up 15 at the same time, save a step.
(Documents tendered to the Court.)
THE WITNESS: I do recognize the exhibit.
Q. Okay. And what is Government's Exhibit Number 14?
A. This is an email that we asked Abu Khalid to reply back to Smith on the 31st of March 2015 in reference to the buddy pass not being used.
Q. And did you receive a copy of that email from Abu Khalid shortly after the -- after this email was typed --
A. Yes.
Q. -- and sent?
And is this Government's Exhibit Number 14, other than the highlight and the redaction, substantially the same -- or exactly the same as it was when you first introduced it?
A. Yes, that's correct.
MR. SAVAGE: Your Honor, we move for admission of

Government's Exhibit 14.

MR. TATE: No objection.

THE COURT: Let it be admitted.

(Government's Exhibit No. 14 was received into evidence.)

MR. SAVAGE: Request permission to publish.

THE COURT: You may.

Again, members of the jury, any redactions are done for identifying information.

MR. SAVAGE: And if we could enlarge just the top part.

There we go.

Q. Again, this was, you said, the 31st of March; is that right?

A. Correct.

MR. TATE: Well, Your Honor, we object. At the top it says March 30th.

Q. What is the date that appears in the date column there?

A. Yeah, the date -- the date that the email was sent was March 31st. I'm not sure what the -- knowing a little bit about email and how it goes through servers, the times may be off by a few hours because of where -- in what time zone each server lies in that an email passes through, but we believe the email was sent on March 31st.

Q. Right. So the email that would be -- that would pass --

if it passed through service on the Pacific coast, it would be three hours earlier than the 1:00 a.m. email or several hours earlier than the 1:00 a.m. email that occurs on the 31st of March.
A. That's correct.
MR. SAVAGE: And we'll redact out the top part if that's the objection.
Q. So what -- I'm not going to ask you to read this, but what is the subject matter of that?
A. Basically, we knew that --
Q. First of all, the subject says -- what does it say, the subject?
A. The subject says, "Asalamu alaikome."
Q. What does that mean?
A. It's basically a common greeting among Muslims. It just means peace be unto you.
Q. And I'm not going to ask you to -- did you have -- are you familiar with basic Arabic terms?
A. Somewhat, yes.
Q. Okay. And we'll be able to have an Arabic speaker translate that later, but I'll have the jury just read it for a minute.
(Jury peruses document.)
Q. In that particular email it says that "he made it to Buffalo and from there he made it to Canada and he is saf

now." What does that refer to?
A. So we knew that the buddy pass -- we knew that it would be apparent to Smith that the buddy pass was not used and so we asked Abu Khalid to send a message to sort of explain that. And so he explained that there was some confusion. The brother thought he was supposed to go on a different day, but nonetheless he made it to where he was going and he's there and safe now.
Q. Sometime after that did Abu Khalid receive a response from Amir Alexander?
A. Several days later on April 11th he received a reply from Smith.
Q. Let me show you what's been marked as Government's Exhibit 15.
Do you recognize Government's Exhibit 15? We'll flip to the second page.
A. Yes.
Q. Okay. What is Government's Exhibit 15?
A. This is an email reply to the previous message that we just saw. Smith sent this message to Abu Khalid on or about April 11th of 2015 and -- I don't know, did you want me to explain the content?
Q. No. Before you -- before you do that --
A. Okay.
Q. -- did you receive a copy of this shortly after the email

was sent?
A. Yes.
Q. And was that placed into your evidence?
A. Yes.
Q. Evidence file.
A. Right. We received it from Abu Khalid, again, in the course of our investigation and placed it in our case file.
Q. And is Exhibit 15 exactly the same as that email that you placed in your evidence file?
A. Yes, notwithstanding the redactions and the highlight, correct.
MR. SAVAGE: Your Honor, move for admission of Government's Exhibit 15.
THE COURT: Do you have a hard copy of it?
MR. SAVAGE: Pardon me?
THE COURT: Do you have a hard copy?
THE CLERK: You have it.
THE COURT: I do have it.
MR. SAVAGE: You have it, Your Honor.
THE COURT: I do, thank you. Sorry.
Members of the jury, again, this is going to be heavily redacted.
Let it be admitted and let it be published.
(Government's Exhibit No. 15 was received into evidence.)

MR. SAVAGE: And if we can just show the dates.

(Jury peruses document.)

THE COURT: After this exhibit we're going to take our afternoon break.

MR. SAVAGE: Your Honor, I have, like, three questions after this, if you can bear with me. I'm very close to the end.

THE COURT: That would be fine.

MR. SAVAGE: Okay. And the next page. And just highlight the top.

Q. Was this the defendant's response to Abu Khalid?
A. Yes, that's correct.
Q. I'm going to just leave that there for a minute. We'll be showing it again, but I'll let the jury review it.

(Jury peruses document.)

Q. Did Abu Khalid or Bilal have any further contact with the defendant after this point?
A. No, sir.
Q. Did your investigation, however, continue after that point?
A. Yes, it did.
Q. How did it continue?
A. We -- this investigation was connected to some other investigations so we were sort of working them in conjunction. But we were obtaining subpoenas to issue to the airline to get

information about this buddy pass. We conducted some interviews, various things to continue our investigation.

Q. Did you also work with the U.S. Attorney's Office to subpoena Palak Sheth to the grand jury?

A. Yes.

Q. Did there come a time after that when the defendant contacted you?

A. Yes, that's right.

Q. When was that?

A. It was the day that on the face of Ms. Sheth's subpoena that it stated that she was to appear, which was February 16, 2016.

Q. And he contacted you. How did he contact you?

A. He contacted us by phone. I was actually at home that morning. I had taken sick leave. But ultimately, his call was forwarded to my work cell phone, I believe, and I spoke to him on the phone.

Q. Did you speak -- did you recognize his voice from the previous recordings?

A. I did. And other coworkers that I worked with, I think, had given me a heads up that he was trying to reach us. I wasn't in the office that day, like I said, so -- but basically, he -- we spoke on the phone on that day, February 16th, that morning.

Q. What did the defendant tell you?

A. He wanted to know if he could come to our office and explain the circumstances about this buddy pass.
Q. And did you agree to do that?
A. Yes, we did.
Q. And did that interview take place?
A. Yes, it did, on that afternoon, February 16, 2016.
Q. Thank you. And I understand you'll be coming back to testify about that later in the case.
MR. SAVAGE: But at this point, Your Honor, we're going to pass the witness for this part of the testimony and call another witness before we recall Agent Godfrey.
THE COURT: Okay. Members of the jury, we're going to take our afternoon break. Don't talk about the case. Relax a little bit. I would suggest you get a little bit of coffee. It's getting late in the afternoon. And we'll see you in just a few minutes.
(Jury exited the courtroom.)
THE COURT: Okay. Anything -- you can come down.
THE WITNESS: Thank you, sir.
(Witness stepped down.)
THE COURT: Anything for the Court right now?
MR. SAVAGE: No, Your Honor.
THE COURT: How many more witnesses do you have?
MR. SAVAGE: We have two more witnesses and then we're going to recall Agent Godfrey, so three altogether.

THE COURT: Okay.

MR. SAVAGE: The next witness is Abu Khalid so I would imagine that would take some time.

THE COURT: Who's the last witness?

MR. SAVAGE: It's going to be Agent Godfrey.

THE COURT: Who's going to be the second?

MR. SAVAGE: It would be Donna Williams from US Airways.

THE COURT: Oh, very good. That will be a short witness, then.

MR. SAVAGE: Should be.

THE COURT: Okay. All right. We'll see if we can get as much of this as we can get today --

MR. SAVAGE: Yes, Your Honor.

THE COURT: -- to try and get this down the road.

MR. SAVAGE: Yes, Your Honor.

Can I possibly retrieve the exhibits from you?

THE COURT: Pardon me?

MR. SAVAGE: Can I retrieve the exhibits?

THE COURT: Yes, you may.

Hopefully we can get my screen fixed.

MR. TATE: Your Honor, if the government is not going to call Ms. Palak, can she come in the courtroom? She's been sequestered.

MR. SAVAGE: Your Honor, I don't know if we're going

to do that or not. It depends on what comes out on the cross.

THE COURT: Leave her out of the courtroom right now.

I don't -- also, I mean -- I really don't like having children come into the courtroom. I mean, I know sometimes they parade around with defendants outside, but I prefer young children not be in the courtroom.

But for the purposes of this, she was ordered out of here as a witness. If at some point they don't call her, you can bring her back in, but not right now. I don't know how they would figure out who's here with all the crowd that's behind you anyway. They don't have any idea who works for the office and who's a spectator.

MR. SAVAGE: Your Honor, just one last housekeeping matter. So after this cross I don't know if we're going to have a redirect; but if we don't, then we would go directly into the next witness and the next witness would require the court's protocol.

THE COURT: Yeah, I'll come up with some reason to take a recess, that I've gotten information that I -- you know, almost like divorce court on TV.

MR. SAVAGE: Yes, Your Honor.

THE COURT: You know, the judge will be taking care of -- we'll pause while the judge takes care of another matter. We'll probably do something. I'll come up with some

reason that I need to take a break.

MR. SAVAGE: Okay. Thank you, Your Honor.

THE COURT: So we can do that. And then everybody will be gone.

All right. Anything further before we take a break?

MR. SAVAGE: No, sir.

THE COURT: All right. Thank you.

(Brief recess at 3:07 p.m.)

(Court back in session at 3:34 p.m.)

MR. SAVAGE: Your Honor, should we bring the witness back to the stand?

THE COURT: Yes.

(Witness resumed the witness stand.)

THE COURT: Okay. Let the jury -- let the jury know that they are -- they can bring coffee, anything they need to be comfortable this afternoon when you call them in.

Any reason to not call them in yet?

MR. SAVAGE: We're ready, Your Honor.

THE COURT: Defense ready?

MR. TATE: Yes, Your Honor.

THE COURT: Okay. Bring them on in.

(Jury entered the courtroom.)

THE COURT: I meant to tell you earlier, we've got access to water and stuff like that, and coffee, so I want you all to be comfortable too and to be able to do that. So feel

free to bring something out if you want to when you come back out in the courtroom.

Okay. We're ready for cross examination, Mr. Tate.

MR. TATE: Thank you, Your Honor.

RONALD GODFREY

CROSS EXAMINATION

BY MR. TATE:

Q. Good afternoon, Agent Godfrey.
A. Good afternoon.
Q. We've met before. We know each other, correct?
A. Yes, sir.
Q. Okay. I'm going to ask you a couple questions.
Prior to your testimony today, you knew -- understood you'd be under oath, correct?
A. Yes, sir.
Q. And be required to provide truthful testimony.
A. Yes, sir.
Q. And one of the things you testified to was prior to testifying here, you were able to review a number of transcripts and reports.
A. That's correct.
Q. And those are transcripts of the things you were asked questions about on direct examination.
A. Yes, sir.
Q. And those reports you reviewed are reports that you made

contemporaneously or shortly after events are reported to you, correct?
A. Yes. I'm not sure that I reviewed any reports in direct that I wrote, though.
Q. You didn't review any of your reports?
A. I don't -- I think -- I don't recall -- I mean, maybe I'm mistaken, but I don't recall seeing an exhibit that was a report that I wrote yet.
Q. Okay. But you did --
A. I could be mistaken.
Q. But you did review transcripts.
A. I helped with the transcripts, yes, sir.
Q. And you reviewed them for accuracy as Mr. Savage asked you, right?
A. That's correct.
Q. Because you're going to testify about them, right?
A. You're asking is that why we made the transcripts?
Q. No, I'm asking is that why you reviewed them?
A. Oh, yes, sir.
Q. Because you wanted to make sure what you were testifying to here under oath was true so you wouldn't commit perjury, correct?
A. That's correct.
Q. And in order to make sure you were testifying and answering questions correctly, you reviewed the contents ahead

of time so you made sure that you understood what you were being asked and you understood what was truthful in terms of an answer, correct?
A. That is correct.
Q. Now, one of the first things you -- if we can -- one of the first thing Mr. Savage asked you about was a contact from the Memphis office, correct?
A. Yes, sir.
Q. And one of the things you were told is that the subject here, Mr. Alexander Smith, they wanted to be traveling for what you described as the Syrian Revolution.
A. Right, that's the way the information was related to me, sir.
Q. And the Syrian Revolution was essentially the citizens of Syria rebelling against the Assad regime; is that correct?
A. I think that's one part of it.
Q. And as part of that, they were basically defending themselves against chemical warfare.
A. Yes, I believe that's part of it.
Q. And part of the Syrian Revolution was the Free Syrian Army; is that correct?
A. That's true.
Q. And the United States government supported the opposition in the Syrian Revolution; is that correct?
A. That's my understanding.

Q. And that revolution was against Bashar al-Assad.
A. That's correct.
Q. Let me show you what's been admitted as Exhibit 19.
You've been in the courtroom as the evidence has come in, right?
A. Yes.
MR. TATE: Can we bring that up?
MR. SAVAGE: Sure. 22.
Q. Can you see that, Agent?
A. Yes, the map, right.
MR. TATE: Is that visible to the jury?
MS. NEILL: Yes.
Q. Now, one of the things you discussed was Mr. Smith's affiliation with the Kodaimatis and his stated intention to travel to Syria, that he was concerned about the family in Kafr Hamrah; is that right?
A. That's correct.
Q. And is Kafr Hamrah in Aleppo?
A. My understanding is that it's a suburb of Aleppo to the northwest.
Q. When you say suburb, it's still considered Aleppo, though, correct?
A. I really don't know. I mean, I don't know how the -- I don't know how the municipalities are divided up there. Obviously, I've never been there. But just from my

understanding from reading about Kafr Hamrah is that it's -- the way -- the way I read it is it is a suburb of -- to the northwest of Aleppo.

Q. But they don't even use the term suburb there, do they?

A. Well, right, but I don't know what the equivalent Arabic term would be. I mean, I don't know.

Q. But if you were sending something to Kafr Hamrah, you would -- it's called Kafr Hamrah, Aleppo, right?

A. I mean, I don't know that. All I know about Kafr Hamrah is basically what I've said.

Q. But you don't see Kafr Hamrah on this map, do you?

A. No, sir.

Q. In that area that Dr. Hoffman testified was controlled by ISIS, correct?

A. No. I think my understanding is Kafr Hamrah is a smaller place than these places that are mentioned on there. For example, I believe Baghdad and Mosul are large cities. Kafr Hamrah, to my understanding, is not a large city. So it's smaller than the other entities on the map, is my understanding.

Q. Do you recall in your review of transcripts Mr. Smith using the term Kafr Hamrah, Aleppo?

A. I recall him using both terms. I don't recall him using them in conjunction that way, but maybe. I mean, I could be wrong. I don't have the transcript memorized. But I know he

used both terms.
A. Right. He said -- he said, in fact, friends or brothers, family, in Aleppo sometimes. Sometimes he said Kafr Hamrah.
Q. That's possible. I don't know without seeing the text of the transcript exactly what he said.
Q. Because it's hard to remember things exactly without reviewing it first, right?
A. Well, yeah. I mean -- I mean, I -- it's generally easier to know what he -- I've listened to the recordings numerous times. Like I said, I don't have them memorized. I know that he's mentioned both Kafr Hamrah and Aleppo, but I don't remember him saying the two as Kafr Hamrah, Aleppo, as you just said it like you would say a city and state together, like Charlotte, North Carolina. I don't recall that ever occurring.
Q. But Aleppo is not one of those covered areas there that he described as being controlled by ISIS, correct?
A. No, but my understanding, sort of similar to what Dr. Hoffman testified to, is that there are pockets -- you know, there was a lot of struggle between different groups for power in relation to the areas on this map. And although the map may show the sort of -- the overall gist of that, I mean, I think it's -- there's pockets here and there where there may be struggles that don't appear on this map. I mean, I don't know. I've never been there.

Q. You don't know, do you?
A. I don't know.
Q. Okay. Thank you.
One of the things you do know is in his very first contact with Abu Khalid -- and, of course, you didn't -- he didn't know Abu Khalid was an undercover FBI informant, did he?
A. I don't believe he did, no, sir.
Q. And in his first conversation he said, "There's this family in Syria I'm concerned about," correct?
A. I believe that's right.
Q. And he said Aleppo.
A. Like I said, I don't remember if he said Aleppo at that point. He may have said Aleppo at that point. But I know that he said Kafr Hamrah later when -- later in the conversation when Abu Khalid had asked him, he said, "Where is this family," he said, "Kafr Hamrah."
THE COURT: Are we going to be playing this tape?
MR. TATE: Yes.
THE COURT: Okay. The only reason I ask that is we can get all that settled when we play the tape rather than argue about whether he said one, the other, or both of them together.
MR. TATE: Thank you, Your Honor.
THE COURT: Yes, sir.

Q. There was some testimony about whether Mr. Smith had a passport, correct?
A. Yes, sir.
Q. And that passport, based on your investigation, expired sometime in April of 2015.
A. That's right.
Q. And based on your investigation, was there ever any attempt to renew that passport?
A. There was discussion of it, but never, that we were aware of, an actual attempt to renew it; that there was discussion about that.
Q. And of course, if he had renewed the passport to be valid past April of 2015, that's something as an FBI agent you could discover, correct?
A. That's right.
Q. Now, with respect to Mr. Abu Khalid, are you aware of whether the FBI played a role in him not being deported from the country?
A. I -- my understanding is that they obtained a -- I believe it's called a significant public benefit parole for him sometime -- this is before I had any contact with him so this is kind of hearsay from what I know from the agents who are involved with him now. But basically, they got him a parole because he was a visa overstay and that allowed him to stay in the country for a while longer without anybody giving

him problems about it. But that beyond that, he became a -- first a legal permanent resident and then a citizen on his own. We didn't provide any further assistance to him after getting the significant public benefit parole.

Q. And the significant public benefit parole that the FBI assisted him with was only good for one year.

A. I'm not intimately familiar with it. Like I say, he's been open as an informant for quite a while and I was not involved with him. My involvement with Abu Khalid is really specific to this case. I believe that the SPBP was issued back in maybe 2008 or 2009, and that was well before I even came to Charlotte.

Q. Right.

A. So I don't know about the details of it, is what I'm -- basically the point I'm making.

Q. Thank you.

And from -- based on -- and he got that benefit because he was an informant, correct?

A. It was in conjunction with him becoming an informant, right. I don't know what the order was, whether they opened him as a source and then got that benefit for him or if they got the benefit for him and then he became a source; but they were definitely in conjunction with each other, I believe.

Q. I'm going to show you what's been marked for defense purposes as Defendant's Exhibit 3.

A. Okay.
Q. Ms. Ottens is going to pull that up on your screen.
Do you see that on your monitor?
A. Yes, sir.
Q. And what's the date on that?
A. July 18th, 2018.
Q. And who is it signed by?
A. It's signed by our special agent in charge of the Charlotte field office.
Q. Is that John Strong?
A. Yes, sir.
Q. Do you report to him?
A. Indirectly, but yes.
Q. And who is the letter to?
A. It's to Mr. Andrew Murray who's the United States attorney in this district.
MR. SAVAGE: Your Honor, before we go any further, this document, before it's published, needs to be redacted.
(Counsel conferred.)
MR. TATE: With the Court's indulgence, we're going to take the informant's real name out of the document.
THE COURT: Let's do a quick sidebar.
(Sidebar conference as follows:)
THE COURT: How is this happening that we're getting a document with an informant's name on it? I mean, this guy

is in danger. How does that happen?

MR. SAVAGE: Well, I didn't provide it so I can't -- what I'm saying to you is that it was provided to the defense in response to their -- because they know who he is.

THE COURT: Right.

MR. SAVAGE: So it was provided to the defense in response to the motion to compel.

THE COURT: Who gave it to them without redacting it?

MR. SAVAGE: The FBI.

THE COURT: Okay.

MR. SAVAGE: But they couldn't have done it without it because that was before the protection order.

THE COURT: Okay.

MR. SAVAGE: So it will only take us a minute to redact it.

MR. TATE: Take his name and date of birth out.

MR. SAVAGE: Yeah. Do you have anything else you want me to look at? I'm happy to do it.

THE COURT: If anything like that is going to come up, let's get it done.

MR. TATE: We don't have anything else like that.

MR. SAVAGE: I apologize for that. We'll take responsibility.

THE COURT: I just wanted to make sure -- I'm not

blaming anybody. I'm just saying let's don't have it happen again. Once I figure out how it happened, we can stop it from happening again.

(End of sidebar conference.)

THE COURT: We need to get something redacted, members of the jury.

CROSS EXAMINATION (Cont'd.)

BY MR. TATE:

Q. Okay. Agent Godfrey, do you see this document I just recently asked you about?
A. Yes, sir.
Q. Is it the same document?
A. Yes.
Q. But it has redacted the confidential informant's true name and date of birth, correct?
A. That's right.
Q. Okay. Now, going on from here, that significant public benefit parole that you testified about was granted for a maximum period of one year, correct?
A. Yes, I see that.
Q. Is this an FBI document?
A. Yes, it is.
Q. Have you seen it before?
A. Yes.

MR. TATE: Your Honor, at this time we move

admission of Defendant's Exhibit 3.

MR. SAVAGE: No objection, Your Honor.

THE COURT: Let it be admitted.

(Defendant's Exhibit No. 3 was received into evidence.)

Q. All right. On here you said that -- you see that it says for a maximum period of one year.

A. Correct.

Q. And this occurred in June of 2008, correct?

A. Yeah, that's what it says.

Q. So it should have expired in June of 2009.

A. Is that a question?

Q. Is that correct?

A. Yes, I believe so.

Q. But he didn't leave the country. He continued working for the FBI, correct?

A. Right. This is before my time here, though. As I said, I wasn't involved with this source except for this case, so I was not involved in this significant public benefit. I wasn't even assigned to Charlotte at that time.

Q. But if he had been deported, you couldn't have used him as an informant, correct?

A. If he were deported, no, that's right.

Q. But then it shows that he became, like he testified to, a lawful permanent resident in 2009, then somehow became a

naturalized citizen in 2012.
A. Right, I see that.
Q. Then it says that the special benefit parole was terminated after his LPR status, correct?
A. Right.
Q. But -- so that means if it was just terminated in 2012, then it was more than one year, correct?
A. Well, my understanding of the way the significant public benefit parole works is he had -- he had legal status here as a permanent resident on May 12th, 2009.
Q. Right.
A. So the S -- S -- I can't hardly say this, but significant public benefit parole would have expired, according to this letter, on or about June 4th, 2009, but he secured his legal permanent resident status in May of 2009.
Q. And he was able to do that because he got the significant public benefit parole through the FBI.
A. Well, we got the SPBP for him, from what I understand, but then he took care of his own immigration matters. We didn't have a hand in it beyond that. We just tried to give him some time to work out his own immigration issues, is my understanding. That's the way it was related to me.
Q. Okay. Thank you.
A. Yes, sir.
Q. Do you know whether or not his family members, his

immediate family, was able to become citizens as well as a result of that?

A. I really don't know anything about his family, Your Honor -- I mean Mr. Tate.

Q. Not yet, but thank you.

A. I've never met anyone in his family. I just don't know anything about them.

Q. Okay. Fair enough.

One of the things that you -- when you were asked about what the concern was of the FBI, you testified that even if someone was traveling to Syria legally, you would want to maybe know about it and approach that person and say, "Hey, this is a dangerous thing you're doing. You might not want to do that." Was that a fair rendition of what you said regarding that?

A. Yeah, that's correct.

Q. But you never approached Mr. Smith and warned him about traveling to Syria, saying, "You might not want to go help this family. You could be in danger." You never told him that, did you?

A. No, we didn't. The circumstances were a little different.

Q. But despite those circumstances, you never told him that.

A. Told him what?

Q. That "you might not consider traveling to Syria. It

might be too dangerous for you."

A. No, we didn't tell him that.

Q. Government's Exhibit 3 is a recorded conversation, one of the initial conversations on August 6, 2014, between a person known as Abu Khalid and Mr. Smith, correct?

A. That's right.

Q. And during that conversation that we'll hear, Mr. Smith discussed with the informant the family in Syria and wanting to help the family in Syria, in Aleppo. He mentioned that during the very first conversation, correct?

A. Not the very first conversation. The first time they met in person.

Q. He mentioned it that time, the first time he met him personally, right?

A. August 7th, correct.

Q. And prior to that there had been, what, some email exchanges?

A. Some email exchanges and a few phone calls, basically, to work out the logistics of their meeting.

Q. Now, prior to this first meeting on August 6, 2014, and prior to that in those earlier text messages and communications between -- that were turned over to you, correct?

A. Right. But the first meeting was on August 7th.

Q. The first meeting was on August 7th.

A. Right. There was a phone call on August 6th to plan for the meeting the next day on August 7th.
Q. That's correct. Thank you.
But in none of those communications with Abu Khalid did Mr. Smith say, "I want to travel to Syria to fight for ISIS," did he?
A. I believe he did. He didn't say it in one single statement like you just did, but I believe if you look at the context of what was said, I believe that was the context of the conversation.
Q. He said he wanted to travel to fight for ISIS?
A. Like I said, he didn't say it as one straightforward sentence as you just said that.
THE COURT: Are we going to hear these tapes?
THE WITNESS: Yes, sir, I believe so.
THE COURT: We'll hear the tapes.
Q. Let me ask you this. Did he ever say the word ISIS at all?
A. I believe he referred to it by a different name.
Q. Okay. We'll listen to it, but, okay, if that's your memory.
Then the -- there's a meeting which has been marked and admitted as Exhibit 4. That was a face-to-face meeting, correct?
A. Could you tell me more about the exhibit? I don't

recognize it just by the number.
Q. Right. Exhibit 4 is the meeting, a recording and transcript from August 7, 2014.
A. Right.
Q. And during that meeting with Abu Khalid, you testified on direct that he asked Mr. Smith about this family he was visiting in Syria and who it was controlled by, correct?
A. Who the -- the place where they lived -- where -- he asked him -- he asked Mr. Smith about the area where the family lived and were they under control of Dawla Islam, which is basically the Islamic State.
Q. And his response to that was it was split between factions, the Free Syrian Army, correct?
A. Right. I believe Mr. Smith responded -- he said, "He said" -- and we don't know who exactly he is. He's referring to someone. He said, "He said it is split up like three ways," and he -- the three entities he named were the Free Syrian Army, the Syrian government, and other brothers."
Q. And the other brothers, he didn't define who those were, did he?
A. No, he didn't, not at that time.
Q. And when you said that he said the government, I think you testified on direct you believed that to be the Assad regime.
A. That's my understanding, correct.

Q. That the Syrian revolutionaries were fighting against, correct?
A. That is correct.
Q. And the Free Syrian Army, correct?
A. That's correct.
Q. And all those entities were supported and backed by the United States, correct?
A. All of those entities?
Q. Free Syrian Army and -- the Free Syrian Army at least.
A. To my understanding, the only -- of those entities, the only one of those entities that was supported by the United States was the Free Syrian Army, not Assad's regime.
Q. Yeah, because the government opposed the Assad regime, correct?
A. That's my understanding.
Q. Yes. And then when he said other brothers, we don't know what he meant by that. He just said other brothers, correct?
A. I think we can infer what he meant from the context of our investigation. But you're right, he didn't say at that point that the brothers are ISIS.
Q. He didn't say the word ISIS at all, correct?
A. I don't believe he called them ISIS. I believe he called them a different name.
Q. What name do you believe he called them on August 7th, 2014? Him, Mr. Smith.

THE COURT: Why don't we wait and hear. We're talking an awful lot about what's on that tape and we're going to hear the tape.

MR. TATE: All right.

Q. You testified that Exhibit 9 was a collection of text messages; is that correct?

A. That's right.

Q. And those text messages, we looked at them, were -- if we can bring it up, Government's Exhibit 9.

MR. SAVAGE: Your Honor, excuse me, can we pull it up? We have a redacted version of this.

MR. TATE: Take it down, Lisa.

MR. SAVAGE: Yeah, we'll pull it up.

MR. TATE: They look the same.

MR. SAVAGE: There's a phone number that's redacted.

THE COURT: Okay. We're good. Very good. Thank you.

MR. SAVAGE: We'll fix that by tomorrow.

Q. All right. So we're looking at this transcript that's been -- this is -- this is compiled by you, correct?

A. Yes, sir, because we could not figure out how to download the phone.

Q. And that was a phone you provided to Abu Khalid?

A. I didn't personally provide it to him. It was the phone that he was using for this investigation. I didn't actually

give him the phone. I'm not sure exactly how that occurred. Other agents were handling Abu Khalid at the beginning of this investigation and they arranged for him to have the phone some way. I don't know how.

But basically, after our investigation -- or not after our investigation, but when this part of our investigation was complete and his contact with Mr. Smith ceased, we obtained that phone from Abu Khalid and it is logged into evidence.

Q. And that's a phone provided to him by the FBI.

A. Right.

Q. Okay. Now, this collection of text messages that you say runs between 3/18 and 3/20 of 2015, anywhere in these text messages does Mr. Smith mention ISIS or wanting to travel for ISIS?

A. No. I think he was a little more careful about that in something like text messages that were being sent over a telephone network.

Q. In all due respect, Agent Godfrey, I'm not asking for ad lib on what you thought he was comfortable about.

MR. SAVAGE: Objection, Your Honor. He answered the question. He asked it.

THE COURT: Sustained. Let's just -- let's get -- let's try to get back and forth with regard to these -- to the -- let's get -- let's see if we can get to the point of the -- of the charges in this case at some point, which is --

Q. Well, the charges are that he had discussions. And so what I'm asking you is in Government's Exhibit 9, these text messages that you said you collected after your investigation, does Mr. Smith mention traveling or wanting to travel in support of ISIS?

A. Well, I see at least one instance where he refers to brothers.

Q. Okay.

A. Or a brother.

THE COURT: He doesn't -- he doesn't use the word ISIS on here --

THE WITNESS: Correct.

THE COURT: -- Mr. Tate. That's the question.

MR. TATE: Yeah.

THE COURT: Does he use the term ISIS?

The jury will hear the tapes and they'll decide what the tapes say and then the question is when the interview happens, what happens there.

MR. TATE: Yes.

Q. Agent Godfrey, as part of your investigation in reviewing conversations involving Mr. Smith, including with the informant Bilal and with other people, Mr. Smith used the term brothers frequently, right?

A. Yes.

Q. And he used the term brothers in connection with people

that he deals with in the Charlotte community, correct?
A. He may have used it in that context, but I think the meaning of it can be different depending on the context.
Q. And he used it when he was talking about Bilal. He called him his brother, correct?
A. That's right.
MR. TATE: Let's pull up Exhibit 14, Government's Exhibit 14.
Q. Now, let's go to page -- well, first of all, this highlighted part on Government's Exhibit 14 on the first page, who's speaking there?
A. The highlighted part is Abu Khalid's text -- or email to Mr. Smith.
MR. TATE: Can the jury see it?
THE JURY: (Affirmative nods.)
MR. TATE: Okay.
Q. That is -- that is him talking -- that is something that Abu Khalid wrote to Mr. Smith and the date here was March 31st of 2015.
A. That's correct.
MR. TATE: Is there a second page to this?
MR. SAVAGE: No.
Q. And in this text message to Mr. Smith, this is after the purchase of the buddy pass, correct?
A. Correct. It's actually after the buddy pass would have

been used on March 22nd.
Q. And what he says in here is that -- can we blow that highlighted part up.
This is after it wasn't used, but he tells Mr. Smith that he -- he doesn't define he, but he says, "He made it to Buffalo and from there he made it to Canada and he is saf now."
But he doesn't say anything about him going to Syria, does he?
A. Can I have just a minute to read it?
Q. Sure.
(Witness peruses document.)
THE WITNESS: Okay. So no, he doesn't specifically -- he doesn't mention Syria.
Q. And he doesn't mention him being snuck into Europe or Turkey, does he?
A. No, he doesn't.
Q. He doesn't mention ISIS at all in this, does he?
A. No.
Q. He doesn't say he's safe now and working for ISIS, does he?
A. No, it just says he's safe now.
Q. And the original buddy pass that he purchased was from Tampa to Buffalo, New York, correct?
A. That's correct.

Q. Wasn't to anywhere across seas or anything like that, right?

A. That's correct.

Q. At this point Mr. Smith knows that the guy didn't use the buddy pass, correct?

A. That's right.

MR. TATE: Thank you. You can take that down.

Q. And after Mr. Smith -- can we bring up Government's Exhibit -- the April 21st, 2015. Bring up Government's Exhibit 15.

All right. You testified about this on direct. Is this the last communication between Mr. Smith and Abu Khalid?

A. That we know of. Like I said, we collected the phone. The phone was turned off, so if there were other communications after that, we don't have that information. This is the last communication that we are aware of.

Q. So you think it's possible that Abu Khalid had more communications with him?

A. No, I meant we don't know if it's possible that Smith reached back out to him because his phone was turned off at that time. He gave it to us and stopped using the email addresses.

We directed Abu Khalid not to have any further contact with Mr. Smith after this.

Q. And what he says is, "I can't have anything to do with

this. All I wanted to do was go visit my friend to make sure his family is okay. Then you started asking me to do things I had no intention on doing. I can't have anything to do with this period."

That's on actually April 11th, although it says March 11th under there, correct?

A. Right. I believe the date is on the previous page.

Q. Right, because he's responding on April 11th to an email that was sent on March 31st.

A. That's correct.

Q. Where he was told that this Mohamed Hilal had made it safely to Buffalo.

A. That's right. He doesn't refer to him as Mohamed Hilal in the email. He just says the brother.

Q. And that was without using the buddy pass that Smith had provided.

A. Well, right, but there was -- no one actually went anywhere.

Q. Yeah, because it was a fake person. Mohamed Hilal didn't exist.

A. Right.

Q. But Mr. Smith didn't know that, did he?

A. No, I don't believe he did.

Q. After -- you introduced a number of recordings and transcripts, but in between August 6th and August 7th of those

transcripts, there were other recorded communications and contacts between Mr. Smith and Abu Khalid and a second informant that was introduced as Bilal, correct?
A. You said between August 6th and August 7th?
Q. No. We introduced Exhibit 3 which is August 6th, Exhibit 4 which is August 7th where they had the in-person -- the first in-person meeting.
A. Right.
Q. And then after that there were meetings where Abu Khalid and Bilal both in undercover roles would attend the mosque with Mr. Smith, correct?
A. Just Bilal, correct. Abu Khalid never went to the masjid with him.
Q. You're saying Abu Khalid never attended the mosque?
A. Not with Smith.
Q. Are you certain about that?
A. Yeah. I mean, part of his role as the character was that -- and he even explains to Smith in one of the recordings is that he doesn't go to the masjid. He doesn't talk to the brothers at the masjid because he's trying to stay on the low.
Q. And you're correct, he uses the term the brothers at the mosque, right?
A. Who does?
Q. Abu Khalid.
A. He may have said that, yes.

Q. You just testified to that.

A. I'm sorry, I'm not -- I don't understand what you're asking me, sir.

Q. You just testified that Abu Khalid as part of his role told him he doesn't deal with the brothers at the mosque.

A. He doesn't go to the masjid, is basically -- I recall that in some of the conversations that he has, he says, you know, "I don't even -- I don't even go to the masjid" because he doesn't want to call attention to himself. That's part of the role that we asked him to play.

Q. But he used the term brothers too, right?

A. He talked about brothers, yes, he did.

Q. And in that message he was referring not to ISIS, he was referring to people at the mosque in Charlotte.

A. I'm not aware of which instance you're referring to.

Q. Well, I'm talking about the instance you just testified to.

A. What I testified to, sir, was that part of Abu Khalid's role that we asked him to play involved him not going to the masjid because he didn't in any way want to call attention to himself.

Q. Okay.

A. That's what I testified to, I believe.

Q. Okay. Do you recall a time in September of 2014 where Abu Khalid, in response to Smith's need for work and

constantly saying he's been unemployed, hired him to work on a construction site with him in Greensboro?
A. I believe it was Bilal, not Abu Khalid.
Q. So the person that worked on construction in Greensboro was Bilal, not Abu Khalid?
A. That's right.
Q. And Bilal was introduced to Mr. Smith by Abu Khalid.
A. In a manner of speaking. Basically, Abu Khalid provided to Smith a phone number to reach Bilal.
Q. As a person who could help him get work, right?
A. That's correct.
Q. Not to help him travel to Syria to fight ISIS, right?
A. That's right. We asked Bilal -- our role that we asked Bilal to play was to mirror Smith. He was to be a Muslim convert who, like Smith, needed to make some money to get by. We just asked him to mirror Smith. We didn't ask him to bring up anything about Syria because we wanted -- if that was going to come up, we wanted it to come from the defendant.
Q. But it didn't come from him, did it?
A. Not at that time. They discussed elements of Smith traveling to Syria in later conversations, but not at that time.
Q. But he was traveling to Syria about this family in Aleppo, correct?
A. That's part of it.

Q. And as part of his working in construction in Greensboro, Khalid paid -- I mean, Bilal paid him some money.
A. That's my understanding, yes.
Q. And that money was reimbursed to Bilal by the FBI?
A. Not dollar for dollar. Basically, we paid Bilal for his service to us and that was, to my understanding, somewhat based on the amount of time that he spent working on stuff for us involving, you know, his commute, how much time he spent with Smith.
But yes, he was paid for his service ultimately, is the answer to that question.
Q. He spent a lot of time with Smith because they rebuilt cars together, correct?
A. That's right.
Q. They went out to dinner together, right?
A. Yes.
Q. They went out -- they went to the mosque and he pretended to pray with him at the mosque, correct?
A. That's right.
Q. Do you recall a discussion where Bilal or Abu Khalid is told not to give any more money to Smith?
A. Yes. Well, I think it was specifically in reference to covering the cost of Smith's phone, not for work that Smith was doing. But there were occasions that we asked the sources to front him the money to pay for his phone because given the

nature of the circumstances that we had in front of us, we needed to make sure that we had some way for those guys to contact him.
Q. And the reason they didn't have a way was because his phone was disconnected.
A. That happened a few times during our investigation, right, because we believed that he didn't have the money at that time to pay to turn his phone back on.
Q. And so you all arranged for his phone to get on.
A. Yes, we did.
Q. Did you ever provide him a phone?
A. No.
Q. How many months would you say you had Bilal mirror Mr. Smith?
A. So if I'm not mistaken, I believe that the first day that they met and worked together was September 25th of 2014 and the last time that they saw each other, I believe, would be in -- I'm sorry, did I say -- I'm not sure -- the date I meant to say is September 25th, 2014. Okay. That's the first time that they -- that they worked together and met. The last time that they saw each other, I believe, was in February of 2015. They spoke on the phone some after that, I know, into March of 2015, but they -- I don't believe they saw each other after sometime in February of 2015.
Q. Were all of those contacts recorded?

A. No.
Q. And why not?
A. Well, a couple of things that come into play. Bilal, we'd furnished him with a recorder that he knew how to operate. He could turn it off and on, and we gave him the discretion to do that. Part of the reason for that is that after being around Smith and Ms. Sheth, he discerned fairly early that Smith wasn't going to talk about anything nefarious in his -- if Ms. Sheth was around, so at his discretion he wouldn't record anything then because it would just waste the battery and the space on the recorder.
In reference to phone calls, Bilal never recorded any phone calls. There was never substantive information about our case that was discussed on the phone. Basically, their discussions on the phone pertained to, as we understand it from Bilal, the work that they were doing and the logistics of, you know, where they were going to meet and what they were going to work on today and what time and that kind of thing, but nothing substantive.
Q. But the reason you -- I'm sorry.
A. Go ahead, I'm sorry.
Q. But the reason you had Bilal in an undercover capacity around Smith was to discover whether he had plans to travel to Syria to support ISIS, correct?
A. Well, at the point we introduced Bilal, we had already

established that.
Q. But he never mentioned traveling to Syria to support ISIS at all in any of those contacts with Bilal, did he?
A. They talked about it in context, not explicitly, but it came up in their conversations.
Q. Him traveling to Syria about this family, the Kodaimati family.
A. Yeah, I think that was part of it. I think there was more suggested than that, but...
Q. Well, I hate to beat a dead horse, but he never said he wanted to go there to support ISIS, did he?
A. I don't believe he ever said that directly to Bilal, no.
Q. And that's four or five months of mirroring him.
A. Right.
Q. You mentioned a Skype and -- that you reviewed on 3/18 of -- March 18th of 2015 discussing the buddy pass, correct?
A. That's right.
MR. TATE: Which exhibit is that?
MR. SAVAGE: 8.
MR. TATE: Can we pull up Government's Exhibit 8.
MR. SAVAGE: 8 is not in evidence.
MR. TATE: It's not?
MR. SAVAGE: No.
MR. TATE: You marked it. Do you intend to put it in?

MR. SAVAGE: Well, yeah, because we --

MR. TATE: You're going to put it in later?

MR. SAVAGE: Your Honor, we intend to put it in through the witness based on the objections.

MR. TATE: Okay. We'll pass on that, then.

THE COURT: Okay.

Q. Have you reviewed the transcript in preparation for your testimony today of the March 18, 2015, Skype between Abu Khalid and Mr. Smith?

A. Yes, sir.

Q. And in that Skype where the buddy pass is discussed, the word ISIS is never mentioned, is it?

A. No, sir.

Q. Had either Bilal or Abu Khalid provided Smith with gas money?

A. I think that Bilal did. So that it seems like the second time that they were going to work together, Smith needed some gas money to get to Greensboro where they were doing the work. That sounds familiar.

Q. And one of the things that Mr. Smith was in need of from the very beginning in July of 2014 was work, correct?

A. That's correct.

Q. And Bilal supplied him with a lot of work.

A. Right, they worked together.

Q. And at some point in time, Mr. Smith's car was in

disrepair and he needed a car.
A. I believe he did. I mean, I know -- I remember there were instances where his car wasn't working and he needed a ride or something like that, yeah.
Q. And Abu Khalid made sure he had transportation.
A. I don't recall Abu Khalid giving him transportation.
Q. Did he assist him with money to buy a car?
A. No, Abu Khalid never gave him money except for the -- to cover the cost of the buddy pass. I don't think Abu Khalid ever gave him any money other than that.
Q. What about to buy a Walmart card to activate his phone?
A. I know that Bilal helped him turn on his phone, and Abu Khalid may have, I'd have to look at the records, but they -- I mean, that would have been the only thing that we gave him money for other than the work that he was actually doing that Bilal was paying him for, like actually paying him for the work that he did. The only other thing that we helped him with was if he -- that one time that he needed gas money and then we needed to make sure that his phone stayed on. We paid for that to cover the cost of his phone.
Q. Well, the FBI provided him with a laptop as well, right?
A. That's right. That didn't -- I mean, we -- in other words, Abu Khalid didn't pay for that. We had -- we had Abu Khalid to give him the laptop.
Q. The FBI paid for the laptop.

A. That's right.
Q. And was that laptop monitored in some way?
MR. SAVAGE: Objection, Your Honor. We need a sidebar for that.
THE COURT: Okay.
(Sidebar conference as follows:)
THE COURT: Okay.
MR. SAVAGE: The witness can't answer that question without revealing information that would be classified.
MR. TATE: Okay.
THE COURT: Okay.
MR. TATE: The way I'll deal with that, then, is -- I know we didn't receive anything on it being monitored. The way I'll deal with that is to just say Abu Khalid provided him with a laptop and then I'll move on.
MR. SAVAGE: Okay.
THE COURT: How much longer on cross?
MR. TATE: Probably 5 minutes.
THE COURT: Five minutes. Okay. All right. Thank you.
(End of sidebar conference.)
THE COURT: Proceed as we discussed at sidebar.
CROSS EXAMINATION (Cont'd.)
BY MR. TATE:
Q. So just to recap, Agent Godfrey, it was the FBI that

provided him with that laptop, right?
A. That's correct. Through Abu Khalid, correct.
Q. Yeah, and have you ever gotten it back?
A. No, sir.
Q. Do you recall whether Abu Khalid or Bilal in November of 2014 -- or on November 6 of 2014 traveled with Mr. Smith to a car auction?
A. That would have most likely been Bilal, not Abu Khalid, right.
Q. And do you know whether Abu Khalid -- excuse me, Bilal assisted him with purchasing a car at the auction?
A. Right, they would -- well, they would purchase a car -- they would agree depending on, you know -- in other words, we don't -- we don't know if sometimes Smith bought parts or bought the car, sometimes Bilal bought parts or bought the car; but their agreement was that they would split the cost. They would work on the car together. They would get it running. They would sell it. Then they would split the profits.
So, you know, who paid for what at what time was kind of between them; but their gentlemen's agreement was that they would split the cost and they would split the profits.
Q. So Bilal was doing a good job of mirroring and befriending Mr. Smith.
A. Yeah, I would say he did. I mean, that's what we asked

him to do.
Q. And the money that Bilal was spending on getting these cars, was that reimbursed by the FBI?
A. Again, we didn't pay him dollar for dollar like that. We paid Bilal for his time, his service, basically. In other words -- I don't...
THE COURT: Don't make any statements you're not asked.
THE WITNESS: Yeah, I just wanted to clarify.
Q. Go ahead if you -- I don't mind if you've got something to clarify, Agent.
A. So basically, this -- Bilal does this kind of work. In other words, we didn't -- we didn't ask Bilal to seek a specific kind of work with Smith. In other words, Bilal does this kind of work, odd jobs and things. That's what he does anyway. So we just asked him, "Look, do what you do and let Smith -- you know, the two of you work together." In other words, we didn't ask him to seek a specific type of employment with Smith. This is what he does anyway, was what I was getting at.
Q. And Mr. Smith was in need of a job, correct, at all times?
A. Right. The way I understand it, he lost his job just before our investigation began.
Q. And then this Bilal, in addition to being -- of course,

he didn't know he was an informant. He was giving him on-the-job training how to do different type of work, right?
A. I wouldn't necessarily say it was training. I never -- I never heard it described that way. I think that it's possible that some things Smith knew more about how to work on them than Bilal did and vice versa, but basically they worked together. They may have taught each other skills or may have had a variance in skills between them, but I wouldn't say it was training.
Q. Well, for instance, one of the jobs that you described that they did was some type of -- not asphalt, but some kind of wall work that deals with -- what do you call it?
A. Sheetrock.
Q. Sheetrock.
A. Right.
Q. It was Bilal that showed him how to do the sheetrock work, correct?
A. I don't know about that. What I know about that is what came up in the November 11th conversation. They had basically been trying to -- they had basically been trying to bid on a job to do some drywall sheetrock work at a mosque in Ft. Mill, is my understanding, and they talked about that a little bit in the meeting at the hotel on November 11th. But who actually did the sheetrock work and who actually knew how to do it between the two of them, we didn't really get into that.

We just asked them -- we just asked Bilal to work with Smith.
Q. Mr. Abu Khalid, we talked about his role as an informant. Isn't it true he's been paid over a hundred and ninety thousand dollars by the U.S. government?
A. That's probably somewhere in the ballpark. Like I say, my only -- my only dealings with Abu Khalid are for the limited scope of this case. I know that he's been involved with the FBI for a long time and he's worked on a lot of things, and I don't know the nature of all of those or the payments that have been involved in them.
Q. Have you reviewed prior to today or have you actually prepared for Mr. Savage a summary of the payments received by Abu Khalid?
A. Yes.
MR. TATE: I want to have this marked as Defendant's Exhibit 4.
MR. SAVAGE: Can I see it?
MR. TATE: Sure.
Let's pull up Defendant's Exhibit 4.
MR. SAVAGE: No objection to 4, Your Honor.
Q. Is this a document or spreadsheet you prepared for Mr. Savage about Mr. Abu Khalid's payments by the FBI?
A. Yes.
MR. TATE: Move for admission of Defendant's Exhibit Number 4.

MR. SAVAGE: No objection.

THE COURT: Let it be admitted.

(Defendant's Exhibit No. 4 was received into evidence.)

THE WITNESS: I'm sorry, I thought you had -- I thought that was a question for me I didn't hear, I'm sorry.

Q. Do you see that?

A. I see the document, yes, sir.

MR. TATE: And let's see if we can blow that up to make it easier to see.

Q. So confidential human source one is Abu Khalid, correct?

A. That's right.

Q. So it shows that from June of 2009 around the time he got that -- his immigration assistance from the FBI through September of 2017, he's been paid $190,000 -- $190,866, correct?

A. That's correct.

Q. And he has expenses reimbursed of 140,603.

A. 147,603, yes.

Q. Thank you.

And Bilal was paid as well; isn't that true?

A. That's right.

Q. And did you prepare a summary of his payments?

A. Yes.

MR. TATE: Go ahead and pull that up. We'll mark it

as Defendant's Exhibit 5.

Q. Can you see that, Agent Godfrey?

A. Yes, sir.

Q. Is that a document you prepared?

A. Yes, sir.

MR. TATE: Move for the admission of Defendant's Exhibit 5.

MR. SAVAGE: No objection.

THE COURT: Okay. Let it be admitted.

(Defendant's Exhibit No. 5 was received into evidence.)

Q. Here it shows that Mr. Bilal has been paid a total of $253,081 for his time, correct?

A. That's correct.

Q. And he's been reimbursed another 23,000.

A. That's correct.

Q. And that includes the time he spent working on cars with Mr. Smith.

A. Right, the service payments for his time in the Smith investigation are included in those numbers.

Q. Thank you.

After Mr. Smith cut off contact with Abu Khalid in April of 2015 -- or before that time, were you aware of a recording occurring on December 19th, 2014, that captured you speaking on it, like kind of what I would describe as a hot mike?

A. Yes, sir.
Q. And have you reviewed a transcript of that?
A. Yes, sir.
MR. TATE: Let's bring up the -- just the -- just for us, the prosecutor, and Agent Godfrey, bring up the transcript for that.
Q. Is this the transcript? It's 15 pages in length, Agent Godfrey.
A. I've never seen this particular transcript, but...
THE COURT: Why don't you just ask him a question about it if it's not coming into evidence.
MR. TATE: Huh?
THE COURT: If it's not coming into evidence --
MR. TATE: It's coming in, but I need to lay a foundation first.
THE COURT: Are you going to play the tape?
MR. TATE: Yes.
THE COURT: So are we going to play the tape now?
MR. TATE: It's a transcript and a tape that runs together.
THE COURT: Okay.
Q. And I want to direct your attention to page 7 of this transcript.
What's identified on this transcript as male one, do you recall whether that's you?

A. Yes, I believe male one is me.
Q. And who is male two?
A. Male two is another agent, Special Agent James Fallon.
Q. And do you know who was recording this conversation?
A. Well, the recorder was with us and was switched on accidentally. It was a recorder that was in our presence.

MR. TATE: We move for the admission of Defendant's Exhibit 6 at this time.

MR. SAVAGE: Your Honor, we don't have an objection to the parts of this exhibit that relate to this case, but there's conversation that relate to other matters that we think is irrelevant.

THE COURT: All right.

MR. TATE: And I agree, so it's basically pages 7 and the top of page 8.

MR. SAVAGE: Well, I've never seen this before so I don't know what's on those pages.

I'm familiar with the issue in the transcript, but...

THE COURT: I thought -- yeah, I thought we were going to be done in about five minutes, but -- I'm not sure how we're going to be able to do this unless you just play this part of it.

MR. TATE: We are. We can play it --

THE COURT: Have you got it set up to play just this

part?

MR. TATE: Yes.

THE COURT: Just this from here on.

MR. TATE: Yes.

THE COURT: Okay.

MR. SAVAGE: Can I see page 6?

MR. TATE: Sure.

(Counsel conferred.)

THE COURT: There's a lot of time being spent by both sides about things -- I'll be happy when I get to hear what happened at the actual interview.

MR. TATE: Your Honor, I'd move for the admission of pages 4 through 8. Mr. Savage has reviewed it. The middle of page 8, line 14 is the relevant portion. That's the part of the transcript we would be playing and choosing to admit.

MR. SAVAGE: That's fine. Just to be clear, we're going to have the recording and the transcript.

MR. TATE: Right.

MR. SAVAGE: No objection.

THE COURT: All right. Members of the jury, there's going to be -- the Court has been informed that this is a recording with a proposed transcript that's there. The words on the recording are what are important. The transcript is allowed as an aid to you. The Court didn't prepare the transcript. The Court cannot vouch for the transcript,

however, there has been an effort made to accurately transcribe what is being said.

With that said, therefore, if you hear something and it's different than what the transcript says, you take what you hear, not what's on the transcript. The recording is the evidence. You're going to have this happen again later on, I'm sure. That's sort of the way these things are being done. It used to be we would do recordings and hand the jury a transcript of the recording. Now with the electronics, everybody is putting their transcript on the screen with the audio recording. You don't see anything on those usually, but -- unless there's a video with it, but you hear the words. And so just remember, the recording is the evidence. The transcript is the aid.

All right. Let it be admitted, those pages that have been agreed to as dealing with information in this case, and you may play the transcript.

(Defendant's Exhibit No. 6 was received into evidence.)

MR. SAVAGE: Your Honor, just to be clear --

THE COURT: Play the recording.

MR. SAVAGE: -- the clerk is also going to record it for purposes of the record?

THE COURT: Yes.

MR. SAVAGE: Thank you.

THE COURT: Let's be sure we don't put on -- anything on here that's not been agreed to.

MR. TATE: Right.

THE COURT: Due to the fact there may be other information about other things that would -- might impact something else.

MR. TATE: Go ahead.

(Defendant's Exhibit Number 6 was attempted to be played.)

THE COURT: We'll just have to try to get it fixed and play this one tomorrow, Mr. Tate. We'll let you play this one tomorrow.

MR. TATE: Okay.

THE COURT: This witness is going to come back to the stand and we can play this out of order.

MR. TATE: All right. Thank you.

THE COURT: We're going to try to get the audio fixed. We're not going to -- we're not going to sit around and worry about that right now. We've got other places to go.

MR. TATE: I agree.

THE COURT: We are not going to -- we are not going to fool with it right now. We're going to move on, Angela.

BY MR. TATE:

Q. Agent Godfrey, you reviewed the transcript ahead of testifying today, right?

A. I reviewed a transcript, but, again, not the one you just showed me.

And I actually noticed, as I was reading here on the screen, that some of the things that were attributed to male one are not -- somewhere in the transcript things got out of track and not all of the things that are attributed to male one are me talking. It's like they got out of order somehow.

Q. Okay. Well, let me add, do you have that at the counter with you?

A. No, sir, I don't -- up here you mean?

Q. Yes.

A. I don't have it.

MR. SAVAGE: Your Honor, may I approach the witness?

THE COURT: You may, although I don't know we ought to get testimony about something we don't know who is who.

MR. TATE: But he can say if it's him right now. I'm asking him a question.

THE COURT: He can say it, yeah.

MR. SAVAGE: If I can approach, Your Honor, I think this might refresh his recollection and speed things up. May I approach the witness?

THE COURT: You may approach the witness.

I want to try to get the testimony if we can, but we're not going to play the audio today. We'll play it tomorrow if you have it ready to go.

MR. SAVAGE: May I ask a qestion?
THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. SAVAGE:
Q. Agent Godfrey, what is the document I just handed you?
A. This is a transcript that I made of this recording that Mr. Tate is referring to that occurred on December 19th, 2014.
Q. Okay. And just to be clear, that may not be verbatim. That's your, like, basically summary.
A. That's correct.
Q. Okay. Does it indicate on that transcript who's speaking? And you, of course, were there; is that right?
A. Yes.
Q. Would that help you in answering the defense counsel's questions?
A. Yes.
MR. SAVAGE: Thank you.

CROSS EXAMINATION

BY MR. TATE:
Q. Let me just ask you straightforward, Agent Godfrey, do you recall saying, "Yeah, you're -- you're going to tell us everything or you're going to jail and you're never getting out and your mother is going to die while you're in jail"?
A. I recall saying that to Special Agent Fallon, yes.
Q. And who were you talking about?

A. We were talking about Ms. Sheth.
Q. And that's Mr. Smith's fiancee or girlfriend.
A. That's correct.
Q. And do you recall saying, "Because if we could somehow -- here's the thing of it. If she does know, she's definitely going to be the weakest link"?
A. Yes, sir.
Q. And you talked about putting pressure on her in order to get to Mr. Smith.
A. That's correct. I'm not happy with the way I phrased it, but, yes, that's essentially what we were talking about.
Q. And in fact, you did put some pressure on her.
A. I wouldn't say that. We went and interviewed her. Now, whether she felt pressure may have been more from her perception than us applying any pressure. We had a friendly conversation with her at her job.
Q. But you didn't go to her house to interview her. You went to her job.
A. The matter we were interviewing her about was directly related to her employment.
Q. I understand that. But you could have went to her house instead of her job, correct?
A. We could.
Q. But you went to her job.
A. But I mean, some people -- some people are very disturbed

about us coming to their home. So often -- you know, there's no -- there's no right way in most people's minds for how the FBI is going to approach them. If we go to their house, they're going to be upset about that. If we go to their work, they're going to be upset about that. So I mean, sometimes there's just not a way that we can approach people that it's not going to be somewhat disruptive to them. It's just the nature of what we do. We have to try to talk to folks and if it happens to be at their job, especially because it pertains to their employment, I mean, I don't know another way around that.

Q. But you went to her supervisor before her, right?

A. I don't even know who her supervisor is. We have security contacts at the airport and with the airline and that's typically -- it's like a liaison relationship. That's typically who we deal with at the airport from a law enforcement perspective, and I believe that's what we did in this case. We reached out to our security contacts. We said, "Hey, we would like to try to interview this person and could you help us with that," and they did.

Q. And they took her off her duty station and brought her to another room.

A. That probably is true. I don't know exactly what her duty station was or anything like that.

Q. But she was at work.

A.    She was at work.
Q.    So she had to stop working and come interview with you, right?
A.    That's right.
Q.    And did you talk to her supervisor at all?
A.    I don't know her supervisor.
Q.    Did you explain to the security person why you were there?
A.    We just told him that we would like to interview her.  We didn't -- we didn't provide any really context to the security person.  They weren't a part of our investigation, so...
Q.    And of course, you learned she was later fired; is that correct?
A.    I believe she was fired in conjunction with Mr. Smith's arrest, not as a result of our interview.
Q.    And then you recall some text messages between yourself that -- you recall a text message in February of 2016 that you sent to Palak Sheth?
A.    I believe in reference to serving the subpoena?
Q.    Yes.
A.    Is that what you're referring to?
Q.    Right.
A.    That's right.
Q.    Do you recall -- I want to mark and put up on the screen what's been identified as Defendant's Exhibit 2.  This is no

recording. This is just a text message.

Do you see that?

A. Yes, sir.

Q. Is this something you prepared?

A. Yes, it is.

MR. TATE: Move for the admission of Defendant's Exhibit 2.

MR. SAVAGE: No objection.

THE COURT: Let it be admitted.

(Defendant's Exhibit No. 2 was received into evidence.)

MR. TATE: If we can -- let's blow up the text on December 11th of 2016 at 17:37:37. I'm sorry, February 11th.

Q. Is that you texting her?

A. That's correct.

Q. And you're telling her that you left a copy of a subpoena at your mother's house?

A. At her mother's house, correct.

Q. Why didn't you go to her house?

A. We didn't know where she was, sir. That was her house as far as we knew.

Q. Her mother's house?

A. That was her address of record on her drivers license, and I believe it still is.

Q. Well, you knew that she lived with Mr. Smith at that

time.
A. Not at that time we did not.
Q. In February of 2016 you didn't know she lived with Mr. Smith?
A. No, I didn't -- she was not the subject of our investigation so we didn't, like, keep track of where she was and where she lived. I mean, this was her address of record, and it still appears that way on her drivers license. If I were to try to find her today -- in fact, we went back to her house to serve the subpoena for her to testify for this trial because that's still her address of record.
THE COURT: All right. I think we can move on to something else. Maybe we can get a little closer to the -- to the FBI interviews at some point here.
Q. And shortly after this text and subpoena of --
THE COURT: We're not going to -- let me just say this. We're not going to -- let's have a -- let's have a -- let's have a sidebar.
(Sidebar conference as follows:)
THE COURT: All right. Of course -- this is a lot your fault too, Mr. Savage. We spent a long time slowly going through ISIS. I know everywhere ISIS is and everything. I'm convinced it's really material. We've been on materiality. This case is about whether on that day he lied. If they asked him -- I don't care if he went to fight for the Alawites, the

doodle wites, or whatever he went to fight for. When the FBI says, "Did you talk to him about going over to Syria," and he goes "No," that's a question as to whether the jury is going to find that is material and whether he's guilty of that. It's not about whether they bullied his girlfriend. I realize you want to make this guy look bad and I've let you make it for a while, but we're not going to spend all afternoon about the girlfriend.

MR. TATE: This is the last question.

THE COURT: Well, it was five minutes last time we stopped a half hour ago. We're bleeding through the day and we're not going to get anywhere near this guy, and I don't know why we're not going to be able to put him on. We spent all day on this stuff.

But part of this is your fault in the length of time you're taking, Mr. Savage.

And, Mr. Tate, of course, you're following and I don't blame you. This is where I would want to spend my time too, but I'm getting to the point where I've said a million times let's get to the gist of this.

MR. TATE: I would love to. What I'm going to say is the date in question, the date these false statements were allegedly made, February 16, 2016, was five days after she was served when he called him and said he was coming in. That's the last question.

THE COURT: Okay. I'm going to let you do that. But I'm getting frustrated with the time being spent --

MR. TATE: All right.

THE COURT: -- not regarding the statements that are false. If this was a terrorist case where the guy was being charged with terrorism, all this -- we'd be going all through this kind of stuff, but this is whether -- whether when confronted he told the FBI the truth or he lied to them. I mean, you can do -- you know, that's a problem when they call you. I mean, we see all that in the news.

MR. SAVAGE: Right. Your Honor, I don't want to try the Court's patience, but he's done -- I've got to clear up at least the part about the payments and there's a couple of points about Bilal. I mean, if we take it out of context, it will be ready, but I'm ready to play the tapes. We called this witness in order to lay a foundation because we had to lay a foundation.

THE COURT: I understand. I understand. But most of -- most of the stuff dealt with nothing about this -- about the interview but about ISIS and this stuff and all that kind of stuff. And of course, Mr. Tate has gone after that. But at this point we've gone after it to the enth degree that my patience is being tried.

MR. SAVAGE: I know.

THE COURT: It's because it's like what the case is

about is here and it's buried in a heap of all this other stuff.

MR. SAVAGE: I think when we get going with the tapes -- I mean, I think this is all background.

THE COURT: Well, we're at 4:57. We're three minutes to 5:00.

MR. SAVAGE: I know. If we start with this guy, I think we're going to go straight through. I think they're going to have a lot of cross on it. I think the next two witnesses are going to be -- the tapes are going to be the end of it. This is really a setup -- a foundation to show the context of it. Honestly, Your Honor, the defense opened with an attack on the government's investigation as a setup.

THE COURT: And I let you go through a lot of stuff even more -- more than I think was needed.

MR. SAVAGE: Okay.

THE COURT: I think the lily was gilded in the thing. So I've let Mr. Tate go on and on on his attacks on that. And I'm satisfied that both sides have got plenty to talk about about the -- about this guy's -- about what the government was worried about and about maybe they got the wrong guy. But then the question is going to be what happened on the truth telling day? That's what the case is about.

MR. SAVAGE: Okay. Yes, Your Honor.

THE COURT: Okay.

(End of sidebar conference.)

THE COURT: Okay. Let's proceed as we discussed at sidebar.

MR. TATE: Do we still have Defense Exhibit 5 -- Exhibit 2, is it up?

THE COURT: It's up.

CROSS EXAMINATION (Cont'd.)

BY MR. TATE:

Q. The date of this text is February 11th, 2016, correct?

A. That's correct.

Q. And it was just five days after this text and subpoena to Ms. Sheth that Mr. Smith called you and said I want to come in and talk to you, correct?

A. That's right.

MR. TATE: Thank you. No further questions.

THE COURT: All right. Brief redirect.

MR. SAVAGE: Your Honor, I'll be as fast as I can.

REDIRECT EXAMINATION

BY MR. SAVAGE:

Q. Agent Godfrey, do you recall the questions that the defense counsel asked you regarding whether or not the defendant ever spoke with Bilal about his plans for Syria and whether or not he ever -- the connection with ISIS was ever mentioned? Do you recall those questions?

A. Yes.

Q. There is, in fact, a recording the jury is going to hear in which Bilal was present and was very specific that ISIS was going to be the reason for going to Syria; is that correct?
A. Yes.
THE COURT: Once again --
Q. In addition --
THE COURT: Once again, we'll hear the tape.
MR. SAVAGE: Yes.
THE COURT: Members of the jury, apparently we're going to be hearing some tapes and they'll tell us what they tell us. I don't know what they --
Q. In addition -- I'm sorry.
THE COURT: I don't know what they're going to say, but we're going to find out.
Q. In addition here, in addition, there were conversations that occurred in December and February of -- December of 2015 and another date in which the defendant would comment on various news about ISIS in the presence of Bilal; is that correct?
A. That's right.
Q. And he expressed sympathy for ISIS and --
MR. TATE: Objection. Move to strike and leading.
THE COURT: Yeah, I'll -- I'll sustain --
MR. SAVAGE: All right.
THE COURT: I'll sustain it. If there's anything --

we're going to have tapes about this --

MR. SAVAGE: Not this one.

THE COURT: Okay. All right. This is -- and this person is not going to --

MR. SAVAGE: Not in the government's case.

THE COURT: Not going to testify. Okay. Let's go ahead and -- sustained.

MR. SAVAGE: Okay.

THE COURT: We're not going to go into it right now.

MR. SAVAGE: Okay.

THE COURT: We're not going into that.

Q. The defense showed you a number of exhibits in which the government turned over how much money in payments had been paid to both Abu Khalid and Bilal. Do you recall those exhibits?

A. Yes, I do.

Q. In fact, those were a number of years which were very much before the time of this investigation; is that correct?

A. Yes, both of them are longtime sources.

Q. I'm not going to go back through and waste time pulling those up. But if you added up the payments that were paid to Bilal over a period of 8 years, that would -- that would amount to somewhere around $23,000 a year, is that about right?

A. Yeah, that sounds right. I can't do that math in my head

right here, but yes.
Q. And you don't know in those other cases and we can't say how much time he spent, whether or not he quit his job, all those others things.
A. That's right. I wasn't involved in those at all.
Q. And a lot of that money would go to pay for things like car, transportation, gas, apartments, other things that are needed to support the informant as he's working in the field.
A. Right, expenses he incurred on our behalf.
Q. The same thing with Bilal, it wouldn't have been -- it would have been somewhere around the area of $31,000 a year, only of which 16,000 would have been paid during the time in which Bilal was working in this particular case; is that right?
A. That's correct.
Q. With regards to Ms. Palak, who found the accidental recording? Who discovered that in the case?
A. That would be me, sir.
Q. Okay. And you didn't hide it. You didn't throw it out. You turned it over, didn't you?
A. No, immediately.
Q. Okay. And the defense has that here today to cross examine you with it.
A. Yes.
Q. You said you regret the statements you made about

Ms. Palak. Did you ever approach her and threaten her or her mother in any way?
A. No, not at all.
Q. Okay.
A. We approached them, didn't threaten them.
Q. And when you approached her initially, she wasn't exactly forthcoming, was she?
A. No, sir, she wasn't.
Q. Well, in fact, it wasn't until she appeared in the grand jury that she actually told the truth.
A. That's correct.
MR. SAVAGE: Okay. No further questions, Your Honor.
THE COURT: Any recross?
MR. TATE: Nothing further.
THE COURT: Okay. Thank you, sir. You may come down.
THE WITNESS: Thank you.
(Witness stepped down.)
MR. SAVAGE: We're at that point, Your Honor.
THE COURT: Okay. I've got something I've got to take up here, members of the jury. I don't know how late we're going to go today. We're going to talk about that right now. I've got to figure out what we've got left to come in and how long it's going to take because I'd like to try to get

everything in tomorrow at the latest, all the evidence, and then that would give you all another day to work on the case before we get to Friday. You have as much time as you want with regard to this.

So go back there, folks, and just take a break. We'll get you back out and we'll figure this thing out while you're back there. Thank you very much.

(Jury exited the courtroom.)

THE COURT: Okay. All right. What we've got left is -- I think probably the airline person is not going to be a long time, but this next witness is going to be a long witness.

MR. SAVAGE: Right. So we have the tapes that the Court has been talking about, maybe the government and the defense a little too much now. But the actual tapes will be played. We have trimmed those. We're going to offer the entire tape, but we have segments that we prepared that we're going to play to the jury.

THE COURT: How long is the total tape playing time?

MR. SAVAGE: If we were to play every single minute without any redaction, it would be well over eight to ten hours. We would have -- if we played just the recordings without the -- obviously, the empty hotel room for six hours, we would have probably somewhere around three to four hours of recordings. We have arranged those in a way in which we are

going to offer the entire document. But for the purposes of asking questions of this witness, we have created clips of those to publish to the jury, but we're going to offer the entire thing. We've also at the defense request, they've requested other clips. We've prepared those as well. So if they want to play additional amounts, we can do that.

THE COURT: How long will your other direct of this next witness take?

MR. SAVAGE: I would say with the tapes, it's going to be two hours.

THE COURT: Okay.

MR. SAVAGE: And that's assuming everything goes --

THE COURT: There's going to be significant cross of this particular witness.

MR. SAVAGE: Right. This is the witness. This is 70 percent of the case.

THE COURT: And then when are you putting the agent back on?

MR. SAVAGE: I'm going to put him on after the airline witness who's going to introduce how the ticket was done. That should probably take about 30 minutes with cross, if there's any, maybe even shorter.

I think that -- that tape is an hour and a half long, that interview. We plan to play 45 minutes of it. If the defense wants more on the cross, we'll have that ready as

well.

I mean, I think we can finish tomorrow. It's going to be a long day. But we're prepared to start right now.

And if you want, Your Honor, what we could do that would be nice and short, it would be taken out of order, is we could call the American Airlines witness right now and do that.

THE COURT: Yeah, that shouldn't take very long.

MR. SAVAGE: Probably 30 minutes. It kind of messes up our strategy a little bit, but we're anxious to not waste time. I'm sure she doesn't want to come back.

THE COURT: Yeah, that way we can start in the morning.

MR. SAVAGE: Yeah.

THE COURT: Why is it going to take 30 minutes? What is she going to testify about?

MR. SAVAGE: Well, she's going to lay the foundation for how the ticket was made, who did it, what the different records show as far as how it was, what the rules were for the buddy pass. So, I mean, assuming that that comes in --

THE COURT: How does that take -- how does that take 30 minutes?

MR. SAVAGE: I'll try to do it faster.

THE COURT: It does if you have her go into great detail and come up with a scientific way a ticket is printed

or something like that.

MR. SAVAGE: No, Your Honor. I just have to have --

THE COURT: You can go bam, bam, bam, bam, bam --

MR. SAVAGE: Yes, sir.

THE COURT: -- and have that done.

MR. SAVAGE: I'll do --

THE COURT: Mr. Tate, any comments?

MR. TATE: None, Your Honor. I think that if we have the clips of the transcripts that we have that the government has provided us, we don't -- it doesn't appear any of these are excerpts that are out of context, and I appreciate that. And so based on our review of the transcripts here, we don't see a need to play anything else. There is something during the interview with Agent Godfrey, I asked him to include the extra portion. He said he did that already.

MR. SAVAGE: Right. We're not going to include that in ours. What we did is we created an extra clip of that because we're going to play 45 minutes of it. They wanted another 20. We're happy to have them play that in their case if they want to. But honestly, I think that -- we have it ready, so...

MR. TATE: We can play it.

We have a transcript, a running transcript of it, right?

MR. SAVAGE: We don't have a transcript. We're just going to play the --

MR. TATE: We have a transcript of that portion we wanted added to the interview of Mr. Smith. We have it.

MR. SAVAGE: Here's the thing, Your Honor. This is an hour and a half long. I turned over my transcripts over a week ago. I have nothing from the defense, not a single thing.

THE COURT: They -- I mean, they were really counting on you adding it to yours, I think.

So, Mr. Tate, at some point can you get a transcript to the government about the 20 minutes. If not tonight, first thing in the morning.

Can you all get over here a little early?

MR. SAVAGE: Yep, we can do that. That's fine with me.

THE COURT: That way you'll have it, compare it, and see if it's -- the jury is -- the jury is going to listen. They're pretty good about listening to this stuff.

MR. SAVAGE: I think so.

THE COURT: They understand if there's a word here or a word there that's missed, they don't have -- if the transcript is really wrong, it would not be a good thing to do. If the government presents it, it would go against you. If Mr. Tate did it, it would go against him.

MR. SAVAGE: Right.

THE COURT: People are going to try to be accurate because the jury is not dumb. They're going to sit there and listen to this stuff.

MR. SAVAGE: Can I just let the jury know that --

THE COURT: Let's wait a minute as to what we're going to do. I'm not even sure he's going to call anyone. If Mr. Tate is not going to put anything in other than the 20 minutes -- I'm talking about the tapes.

MR. TATE: Yeah.

THE COURT: Are you going to have witnesses to testify or do you know?

MR. TATE: We may call the Memphis witness. We're waiting to see if he's here. We're trying to see how the testimony comes out --

THE COURT: Okay.

MR. TATE: -- and make that decision.

THE COURT: All right. Here's what we're going to do. We're going to take about a five-minute recess and then after -- then -- maybe a couple minutes more than that, and then we're going to do the airline lady today.

MR. SAVAGE: Okay.

THE COURT: And we'll get that done today.

MR. SAVAGE: Can I just let the jury know --

THE COURT: I think that's as close as we can do to

getting it done.

MR. SAVAGE: Yes, Your Honor. Can I just let the jury know I'm calling her out of order?

THE COURT: Yeah.

MR. SAVAGE: Okay.

THE COURT: Yeah, you sure can. Yeah. Although I really don't know -- I mean, you know, it's nice to have as many witnesses that you can that are not part of it, that are nonpartisan, but -- and as late as you can have them. I mean, this is just one of those things I think we just need to keep moving and get this case -- I'd love to have this case -- the evidence, at least, in this case over with. Then we can have a charge conference if we need to. It's a pretty short charge. And then we can go to the jury on Thursday.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Argue and go to the jury Thursday. Okay.

MR. SAVAGE: We're ready.

THE COURT: Brief recess.

(Brief recess at 5:13 p.m.)

(Court back in session at 5:21 p.m.)

(Jury not present.)

THE COURT: Okay. I think what we're going to try and do is bring the jury in tomorrow and have them here at 9:00. So if there's anything for the Court, you need to be

here before 9:00.

Can you all think of anything right now?

MR. SAVAGE: Not for the government, Your Honor. We're trying to just make sure we are in agreement on what segments of the -- we're just trying to make sure that we're in sync on the tapes that we play tomorrow.

THE COURT: Tomorrow, yeah. We can do that -- we can do that in a little bit. We can probably get that taken care of.

MR. SAVAGE: Okay. Meanwhile, I have information. Our information is that the Memphis witness will arrive this evening a little later on, so it will probably be too late to talk to him this evening. But he'll be here tonight.

THE COURT: Okay. Very good.

MR. SAVAGE: I'll probably -- what I'd like to do is probably have him -- we'll have him nearby. If we have -- rather than have him wait here, we'll have him nearby. If the defense gives me an hour's notice, I can have him in the courthouse.

THE COURT: Does that sound pretty good, Mr. Tate?

MR. TATE: Yes, Your Honor.

THE COURT: Thank you.

All right. Well, let's bring the folks in and we'll tell them we're going to do that, and then come at 9:00 and I think we can get through the evidence tomorrow.

(Jury entered the courtroom.)

THE COURT: Okay. Members of the jury, this is what we're going to do. We're going to take one short witness out of turn in order to get that witness finished today and then we're going to come in at 9:00 tomorrow. And I'm feeling good about -- I mean, you never know how these things go, but I'm feeling very good that we can complete the evidence tomorrow.

So let's go ahead and call your next witness, Mr. Savage.

MR. SAVAGE: Your Honor, the United States calls Ms. Donna Williams.

DONNA WILLIAMS, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SAVAGE:

Q. Good afternoon, ma'am.
A. Hi.
Q. Please state your name.
A. I'm Donna Williams.
Q. And in what city and state do you reside?
A. I live in East Bend, North Carolina.
Q. And how are you employed?
A. I work at American Airlines.
Q. And before that, did you work for a company called US Airways?
A. Yes, I did.

Q. And is it the same company? Has it been called many things?
A. Yes, it is.
Q. How long have you worked for American and its predecessor companies?
A. For 37 years.
Q. So way back to Piedmont?
A. That's right.
Q. Okay. Let me ask you, ma'am, do you know the defendant in this case?
A. I do not.
Q. Let me show you what has been marked as Government's Exhibits 12A through G. And we're going to show those just to you and the Court and we're going to go through those one at a time and I'm going to ask you as you look at each of these if these are records that are records of the American Airlines company.
A. Okay.
Q. 12A.
A. Yes.
Q. 12B.
A. Yes.
Q. 12C.
A. Yes.
Q. 12D.

A. Yes.
Q. 12E.
A. Yes.
Q. 12F.
A. Yes.
Q. And 12G.
A. Yes.
Q. Okay. And to be clear, let's scroll through 12G. 12G is a -- what is 12G?
A. That's the US Airways Employee Travel Guide.
Q. And was that from the time period of 2014 to 2015?
A. Yes.
Q. And it's not the entire guide. It's two particular sections; is that correct?
A. Yes.
MR. SAVAGE: And if we could just scroll to the next page.
Q. There's a table of contents.
A. Right.
Q. Section 01-05.
A. Right.
Q. And Section 02-06; is that correct?
A. Yes.
Q. Otherwise, that's a very long document. Those are the two important parts.

A.    It is.
Q.    Have you reviewed these documents before coming here to court today?
A.    I have.
Q.    Were these records prepared by someone employed by US Airways?
A.    Yes.
Q.    Are they prepared at or about the time of the matter to which they pertain?
A.    Yes.
Q.    In other words, near the --
A.    Yes.
Q.    Would they have been prepared by someone with knowledge of those matters?
A.    Yes.
Q.    Were these records kept in the ordinary course of US Airways' business?
A.    Yes.
Q.    Did US Airways make such records as a regular practice in its business?
A.    Yes.
Q.    And are these documents exact copies of the originals, whether they be papers or copies of -- from your database?
A.    Yes.
MR. SAVAGE:  Your Honor, at this time we would move

for admission of Government's Exhibits 12A through G.

MS. CAUSE: No objection, Your Honor.

THE COURT: Let them be admitted.

(Government's Exhibits Nos. 12A-12G were received into evidence.)

MR. SAVAGE: Okay. And if we can publish, please.

THE COURT: Let them be published to the jury.

MR. SAVAGE: We'll go through these quickly.

THE COURT: Yes.

Q. Okay. We won't spend too much time on 12A, but is that an affidavit that you prepared back in 2015?

A. It is.

Q. And that's when those records -- these very same records were submitted to the grand jury by your company; is that right?

A. Yes.

MR. SAVAGE: If we could go to the next page, Exhibit 12B.

Q. What is Exhibit 12B?

A. 12B is a passenger reservation.

MR. SAVAGE: Okay. And if I can ask Ms. Neill if she can expand the very top part.

Q. Now, this seems like gobbledegook, but what -- does this mean something to somebody at Americans Airlines?

A. It does.

Q. Okay. And what do you call this record?
A. A reservation.
MR. SAVAGE: Okay. And if we can highlight the very top letters EMHH53. Very top.
There we go.
Q. What is that?
A. So that's the confirmation code for this reservation.
Q. Okay. Would it also be known as something called a locator code?
A. It is.
Q. Because that's how you can locate the reservation.
A. That's right.
Q. In whose name was this reservation made?
A. It was made for Mohamed Hilal.
Q. Okay. And that name appears in a number of places; is that right?
A. That's right.
Q. In fact, if we go to line 3, there is a date, the name Mohamed Hilal. Would that be a date of birth?
A. That's correct.
Q. Now, who made this reservation, can you tell?
A. This reservation was made using an employee's pass privileges, and that employee was 245461.
MR. SAVAGE: Okay. And if we can show -- that number appears on -- where it says "Ticket" right here, if we

can highlight that.

Yep, there we go.

Q. And in fact, it says -- number 2, it says "SSREMPNUS," right? So what is that a code for?

A. Well, that's just your special service remark and the employee number, which was 245461.

Q. Okay. And if you notice on line 2, there's an email address on there. What is that for?

A. So that would be the email address that was entered at the time the reservation was made.

Q. Okay. And that email address is palak23@yahoo.com.

A. Correct.

Q. Or palaks; is that right?

A. It's palaks23@yahoo.com.

Q. If we go down to remarks number 1, the cardholder, who's the cardholder in this case?

A. So that cardholder was Yahya Assad.

Q. Okay. And what does it mean cardholder?

A. So that is supposed to be the owner of the credit card that was used to purchase the ticket.

MR. SAVAGE: Okay. If we can scroll down. It actually shows what the reservation is, what day of travel and where the person was going to travel. We'll scroll down just a minute.

So right in here.

Q. And can you see it says -- where it says 22 March?
A. Yes.
MR. SAVAGE: Okay. If we can highlight that area down here where actually the reservation is right here.
There we go. Perfect.
Q. Do you see the area that's highlighted?
A. I do.
Q. So it says, "852Y 22MAR SU TPACLT." What does that mean?
A. So this information was originally booked for the passenger to fly on March the 22nd from Tampa with a connection through Charlotte to Buffalo, New York.
Q. Okay.
A. It's on flight 852, connecting with flight 1942.
MR. SAVAGE: Okay. If we can bring the document back to full view.
Q. If we look down there, there are also dates on 23 March, and if we go to the second page, on 24 March with some of the same codes or reservation codes. What does it mean that there are different dates on this document --
A. So --
Q. -- after that?
A. -- if you go back to the previous page, on March the 22nd out to the right-hand side of that, you're going to see the code MM/NS, that means the passenger was a no-show in Tampa, so that routing canceled. But on the morning of -- or

actually, it was late evening on the 22nd, the employee travel portal was used to rebook the passenger to fly on March 23rd.

Q. Okay. So somebody actually had to go in there and physically change the reservation.

A. That's correct.

Q. And who would have done that?

A. It should have been the employee.

Q. Okay. And on this record the employee is the one that had access to it.

A. That's correct.

Q. Okay. And then on the 23rd of March, it shows different times, 0147 and 1050Z. What does that mean, the Z? Is that Zulu Time?

A. It is Zulu Time, yes.

Q. And what's Zulu Time?

A. So Zulu Time, as best as I can explain it, is it's Greenwich Time.

Q. Okay.

A. Depending upon the time of the year, on the East Coast it's usually a five- to six-hour difference.

Q. Okay. But because American flies all over the world, you have to use a standard time.

A. That's correct.

Q. Okay. So what ultimately does this document tell you what ultimately happened with this ticket?

A. Yes, this reservation canceled due to no-show.
Q. Okay. And that's shown on the second page; is that right?
A. Well, it's also shown up there at the top under the remarks line, item numbers 4 and 5.
Q. Okay.
A. The XXNS.
Q. Okay. And if you -- can you just use your finger and -- I guess the animation is not working.
THE CLERK: It's not.
Q. Okay. I can't find it, but we'll move on.
Okay. You mentioned the employee with the number 245461. Let me show you what's been admitted as Government's Exhibit 12C.
Do you recognize -- what kind of record is that?
A. So that's essentially like a page of the employee's HR data.
Q. HR, human resources?
A. Human resources, yeah.
MR. SAVAGE: And if we can make the top part enlarged.
Q. And do you see the 24 -- 245461 number on there?
A. Yes.
Q. And who -- which employee does that pertain to?
A. It's Palak Sheth.

Q. Okay. And do you know Palak Sheth?
A. No.
Q. He or she is a customer service agent in Charlotte; is that right?
A. Yes.
Q. Hired in May of 2008.
A. Correct.
Q. What does a customer service agent do?
A. So the way we explain at the airline what a customer service agent does is essentially work above the wings. So they would work at the ticket counter out on the non -- on the side that's nonsecure. They also have the ability to work down in the secure side at the gate, boarding passengers and doing that type of work.
Q. So if you actually go into the secured area, go through security and you go down to your gate, that's the person who might be, like, scanning your ticket?
A. Yes.
Q. They also have access to go down to the jetway and approach the aircraft?
A. Yes.
Q. Okay. So they would have access to the entire secured area of the airport.
A. Yes.
MR. SAVAGE: If we can go to Exhibit 12D.

And if we can make that a little larger so everybody can see it.

Q. What is this record?

A. That's just a copy of the employee's pass profile; and when I say pass profile, that is anybody that could fly using her privileges on American at a reduced rate or free.

Q. Okay. So if -- sometimes it might include, like, family or other members on there.

A. Yes.

Q. In this particular case it's just this employee; is that right?

A. That's correct.

MR. SAVAGE: And if we could go to the next exhibit which is Exhibit -- well, let me stop there just one second.

Q. In addition to having pass privileges -- that employee having their own pass privileges, is there also a program where they can buy discounted airline tickets for family and friends?

A. Yes. And those -- we call that -- at US Airways they were called guest passes. So each employee got 16 one-way tickets per year and those can be purchased at a very reduced rate for friends and family to fly anywhere that we flew throughout the country.

Q. Okay. Would that -- throughout the country, that would be for not international but for domestic flights?

A. Oh, it could be international too. Anywhere that US Airways flew.

Q. All right. In that regard, were there certain rules about the buddy pass that the employees were supposed to -- were there rules that went with how you used the buddy pass?

A. Yes.

Q. Okay. And I'm using the word buddy pass. Have you heard that phrase before?

A. It's buddy passes, guest passes. And now at American we call them D3. All the same thing.

Q. All the same thing.

A. Yes.

Q. They're discounted tickets American employees can buy for other people.

A. Yes.

Q. Were there rules about who they could buy the tickets for?

A. Not specifically.

Q. Okay.

A. But they were supposed to know the person or be acquainted with them.

Q. Right. So let me show you -- let's go to Exhibit 12G.

And that's the US Airways Travel Guide; is that right?

A. Yes.

MR. SAVAGE: And let's go to page -- hang on a

second -- 7. Let's go to page 7. And if we could stay under the guest pass program and we can see that.

THE WITNESS: Yes.

Q. So the guest pass program, that's also another name for buddy pass; is that right?

A. Yes.

MR. SAVAGE: And if we can highlight that first paragraph.

Q. That says who the employee can share those passes with, right?

A. That's correct.

Q. Just read that out loud.

A. "The guest pass program allows for additional space-available travel privileges for employees. Employees may give guest passes to family members or friends who do not otherwise qualify for travel privileges. Under no circumstances should guest passes be given to anyone the employee does not know well enough to trust with the keys to his/her home or car."

Q. And there are some other rules that are in this handbook; is that right?

A. Yes.

Q. For instance, if we go back to page 5 and highlight the bullet where it says "Free or Reduced Passes."

MS. CAUSE: Your Honor, we object. This person is

not on trial for buddy passes. At this point it's irrelevant.

THE COURT: I'm going to overrule it without comment, but I'm going to overrule it.

Q. Now, it says here that "free reduced-rate passes or privileges, guest passes," which are buddy passes, right?

A. Yes.

Q. "May not be sold, exchanged, or transferred for money, goods, or services."

A. Correct.

Q. So you can't sell a buddy pass to just anybody, right?

A. That's correct.

Q. And you've got to know who it is.

A. Correct.

Q. So --

THE COURT: I think we understand the rules.

MR. SAVAGE: Yes, Your Honor.

And then we're going to go to Exhibit 12E.

Q. What is Exhibit 12E?

A. That is a ticket.

Q. Okay. And what do you mean by a ticket?

A. So it is a buddy pass ticket that was issued using the employee pass privileges for Mohamed Hilal.

Q. Okay. And that would be the same employee number, meaning Palak Sheth would have bought that ticket.

A. Correct.

Q. And then if we go to 12F, is that a different ticket? As we mentioned, there was more than one particular ticket purchased here; is that right?
A. It is.
MR. SAVAGE: Okay. No further questions, Your Honor.
THE COURT: Yes, ma'am.

CROSS EXAMINATION

BY MS. CAUSE:
Q. What is your -- good evening.
A. Hi.
Q. I'm Myra Cause. I'm representing Mr. Smith, helping to represent him.
I have not met you before, correct?
A. That's correct.
Q. Could you clarify for us, what is your specific position with the airline?
A. So at American Airlines I work in the corporate security department as a fraud analyst.
Q. And you said you've been working with the airlines for approximately 37 years?
A. Correct.
Q. You originally had answered on direct examination with Mr. Savage that there are no specific rules on who the guest passes were given to, and it was only after he showed you the

documents that he put before you that you clarified; is that correct?
A. That's correct.
Q. Is that because you know in your 37 years of experience that employees do regularly sell guest passes to people?
A. I know that employees sell guest passes to people, but it is against company policy and they are likely to be terminated if that is found out or identified.
Q. But you're aware that employees do regularly do it.
A. Employees do it, not regularly, but on occasion.
Q. When you reviewed the documents or provided the documents to the government regarding the exhibits that were submitted by the government, you only looked at a time period for Ms. Sheth that they requested you to look at; is that correct?
A. You know, at this time I couldn't tell you for sure. I'd have to look back at the subpoena.
Q. You would not have looked at any time period outside of what was on the subpoena.
A. No.
Q. You cannot tell from any of the documents that you've reviewed the purpose for why someone has booked travel.
A. No.
Q. You don't know any of the people who were listed on the travel documents.
A. I do not.

Q. You're not able to infer why those individuals are trying to travel.
A. I cannot.
Q. You noted on direct examination that American Airlines, or previously US Airways --
A. Yes.
Q. -- traveled around the world.
A. Yes.
Q. However, in 2015 they did not travel to Syria, correct?
A. No.
Q. And they did not travel to Turkey.
A. No.

MS. CAUSE: May I have a moment, Your Honor?

THE COURT: Yes.

(Defense counsel conferred.)

BY MS. CAUSE:

Q. And to clarify, ma'am, you cannot use a buddy pass or a guest pass to travel, for example, to Syria or Turkey.
A. No, you can't. Not on US Airways.
Q. Also to clarify, ma'am, a guest pass is simply a standby ticket, meaning a person is not guaranteed passage on an air flight for that pass.
A. That's right. You book a ticket and there has to be an empty seat; and if there is an empty seat, then the list of people on standby get cleared based on their ranking on that

list.

Q. In other words, it's not guaranteed any person on that list will take that flight.

A. That's correct.

MS. CAUSE: No further questions, Your Honor.

THE COURT: Okay. Any redirect?

MR. SAVAGE: Nothing further, Your Honor.

THE COURT: All right. Thank you, ma'am. You may come down.

MR. SAVAGE: May this witness be fully and finally released?

THE COURT: Any objection?

MS. CAUSE: No objection, Your Honor.

THE COURT: You are excused.

MR. SAVAGE: Thank you for coming. You need not come back tomorrow.

THE WITNESS: Thank you.

(Witness stepped down.)

THE COURT: Members of the jury, we're going to take our evening recess at this time and we'll come back at 9:00 in the morning and resume the evidence at that time. Try to be here on time, but we'll try to be ready for you -- try to get these folks here a little bit early so we'll be ready. I apologize for the delay. I do not want to misuse any of your valuable time.

I do have to tell you, don't be doing any of the -- don't be looking on social media. I can never get all those -- anything like Twitter, the computer, Snapchat, anything -- there's so many out there that I don't use and don't really know about. If there's anything out there, don't use it to try to find out anything about the case. You're hearing all the evidence you need to hear right here in the courtroom, so don't do that.

Also, be careful about the good folks at home because they're wondering what this case is about; and if they know anything about it, they're going to ask you some questions and they will know the answers to everything they've not heard and they'll give you their opinion, and that might infect your mind and get in the way of your deliberations. It's a short trial. Tell them you'll let them know everything at the end of the week.

Okay. So travel safe going and coming and I'll see you tomorrow at 9:00.

Everybody remain in the courtroom while the jury leaves the building.

(Jury exited the courtroom.)

THE COURT: All right. You've got the first rough copy of the instructions -- first copy of the instructions, so take a look at those. Let us know what you think. We'll have some time to talk about it tommorow, I think.

Is there going to be anything for the Court for us to be here early? Does anybody know?

MR. SAVAGE: Not that I can think of, Your Honor.

THE COURT: Okay. If any -- Mr. Tate, anything you can think of?

MR. TATE: No, Your Honor. We -- I'm pretty confident -- I have transcripts and things from the government. The only snag that can happen is if we've got a transcript and they play a clip that distorts the conversation and then there's going to be a big fight about what we need to add. But as long as they play the portions that I have transcripts that they provided for, we're okay.

THE COURT: What the rules are is if you want anything -- if they play part of it and there's a part you want played, then we'll get it played. And if you want it played right next to it, that should be -- well, of course, you've just got clips, so you've cut clips out of there.

MR. SAVAGE: Your Honor, there are really two, I think, of the longest ones are going to be the hotel, number 6. And I'm tempted to give the defense counsel the time hacks on the transcript we provided. I tell you, the problem was is that the transcript that we provided has different time hacks than the one that's in the computer, so we're going to work that out tonight because they are different when you load them than when you print them. But they've had the transcripts for

a while now.

THE COURT: Right, but the only issue is going to be --

MR. SAVAGE: Right.

THE COURT: -- once it's played, then they go, "Wait a minute, we've got to play" --

MR. SAVAGE: Right.

THE COURT: It needs to go about three or four more lines down the way or if there should have been three or four lines to start the conversation.

MR. SAVAGE: Well, if we can have a few minutes before we get chased out --

THE COURT: Yes.

MR. SAVAGE: -- we will settle that tonight.

THE COURT: You can do that. If you all can get that done, that would be great.

If anything comes up tonight, let's be here about 8:45, 15 minutes ahead.

MR. SAVAGE: Okay.

THE COURT: I don't mind keeping the jury waiting a couple of minutes, but I really don't want -- if they are all here at 9:00, that would be --

MR. TATE: Your Honor, I'm going to tell you, this morning -- you just never know what you're going to get, and I don't know what time the jurors had to come in. At 9:00

they're coming in smack dab during the middle of rush hour and there's no parking around here. Mr. Smith barely made it here by 9:00. You know, I was -- my objective was to get to the office by 8:30, 8:45 because you just never know what's going to be -- so I think 9:00 --

THE COURT: Maybe we can open the courtroom up at 8:00 and if anybody gets here at 8:00, they can come sit down in here and get that done.

COURT SECURITY OFFICER: Yes, sir.

MR. SAVAGE: When the courthouse opens at 8:00?

COURT SECURITY OFFICER: Yes, sir, the doors for public entry starts at 8:00.

THE COURT: Then you all can come in and get in here in this courtroom and be out of the way and maybe beat everybody to parking by getting here at 8:00.

MR. SAVAGE: Yeah.

THE COURT: So that also avoids any problems coming in the door with the jurors, which is a problem.

MR. SAVAGE: I left at 7:00. I didn't have any trouble.

THE COURT: You left what? You mean home?

MR. SAVAGE: My home, yes.

THE COURT: You left home at 7:00?

MR. SAVAGE: Yes.

THE COURT: Well, yeah, if you do that. Of course,

if you're on 85, you've got trouble even at 7:00 a.m. There's your parking lot. You can't get anywhere.

MR. SAVAGE: True, parking is a problem.

THE COURT: It is. It is difficult. Now, I'm very sympathetic to that. If something happens, we'll understand.

Now, one good thing about the way this has occurred is that we can start out the day with everybody back in the room listening to the tapes. And as far as the jury is concerned, these people are coming later to the courthouse than they would otherwise have come, so...

MR. SAVAGE: One thing, Your Honor. This is going to be the witness where we're going to need the security procedures.

THE COURT: That's what I mean.

MR. SAVAGE: Yeah.

THE COURT: By doing this, the folks have to go down there to that room and then it will just appear, since it's the start of the day, that they had problems parking and getting in here and that sort of thing.

MR. SAVAGE: Yep.

THE COURT: People come at different times during the trial. People sometimes show up late. In fact, a lot of times they do.

Okay. And we've got -- we have a room down there. What I don't want to happen is until we get to the point where

the jury is back here or in a place where they're not going to see the front hall, I do not want any security measures in front until we get the jury somewhere downstairs.

MR. SAVAGE: We made arrangements, I think, by the Court's order. The marshals and the security guards have been very good about letting witnesses in through a nonpublic entrance.

THE COURT: So if you folks get here at 8:00, you come right in and we'll have this courtroom open and everybody can just come up here and come in rather than just have to stand around.

Okay.

(Evening recess at 5:52 p.m.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of July 2019.

s/Cheryl A. Nuccio

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter