UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:17-cr-182 |
| | ) | |
| vs. | ) | VOLUME II |
| | ) | |
| ALEXANDER SAMUEL SMITH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
MARCH 20, 2019

APPEARANCES:

On Behalf of the Government:

MICHAEL E. SAVAGE, ESQ.
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina

On Behalf of the Defendant:

KEVIN TATE, ESQ.
MYRA CAUSE, ESQ.
Federal Public Defender's Office
129 West Trade Street, Suite 300
Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

## I N D E X


| GOVERNMENT'S WITNESSES | PAGE |
|---|---|
| ABU KHALID | |
| Direct Examination By Mr. Savage | 290 |
| Cross Examination By Mr. Tate | 363 |
| RONALD GODFREY | |
| Direct Examination By Mr. Savage | 432 |
| Cross Examination By Mr. Tate | 446 |
| Redirect Examination By Mr. Savage | 488 |
| Recross Examination By Mr. Tate | 493 |
| Redirect Examination By Mr. Savage | 498 |


## E X H I B I T S

GOVERNMENT'S EXHIBITS


| NUMBER | ADMITTED |
|---|---|
| 3 | 300 |
| 4 | 305 |
| 5 | 315 |
| 6 | 331 |
| 6A | 331 |
| 6B | 331 |
| 6C | 331 |
| 7 | 341 |
| 7A | 341 |
| 7B | 341 |
| 8 | 346 |
| 9 | 352 |
| 10 | 355 |
| 10A | 355 |
| 16 | 435 |
| 24 | 492 |

P R O C E E D I N G S

WEDNESDAY MORNING, MARCH 20, 2019

(Court called to order at 9:02 a.m.)

(Jury not present.)

THE COURT: All right. I want to put a few things on the record.

Okay. The next witness is going to testify. The Court has had to balance the need of the public to have these hearings held in a public forum together with the witness's -- the protection of the witness's identity and the danger that the witness might suffer.

Several things were talked about. One was putting up a screen in order to block the public's seeing of the person testifying. That was objected to, and I think quite rightly, that it would create a situation in the jury's mind that there was some threat that was absolutely there and would go to the detriment of the defendant's having a fair trial.

The Court has decided that the best way to do this is to have this courtroom closed to all but the parties here in a way that the jury doesn't realize that is going on. By doing that, the finder of fact will not be infected with improper concerns so that we have -- the witness -- it's worked out in the timing of this that we are able to have the witness testify first this morning and it will not appear -- it will just appear some are late to the party today. That

some folks had other things that they had to do. That there were other requirements that they had to do before they could come here today.

So we're putting everyone in a room where this proceeding is being streamed on audio. Everyone will know what is there. We'll have a transcript of the entire testimony. The only thing that will not be there is the actual viewing of the witness so that those who might have some bad purpose in finding out the -- seeing who the person exactly is will not be able to do this -- add the knowledge of the appearance of the witness to any information they have in their efforts to do that person harm.

I think we all know the international security area of these types of cases, that there are those who really have no idea of the value of human life and under some odd idea of religion will think hurting somebody is a good idea. It has been said that men seldom do evil so cheerfully as in the name of religion, and that's all the religions of the world have done it at one time or another.

All right. So that's what we're going to do. I believe the Constitution is protected. I think our local rules are protected by doing it this way. And so that's the way we're going to proceed.

Any comment from either party?

MR. SAVAGE: No, Your Honor. I'd just make a record

that all the persons who are present in the courtroom are part of the defense staff, is that correct, the Federal Defender's Office?

MR. TATE: Yes.

MR. SAVAGE: And, of course, on the government side we'll have -- there may be some spectators that will be FBI agents that are associated with the case.

THE COURT: I want to make -- yeah, I want to make certain that everybody here is on -- is a part of one of these two offices and there's no independent person out there that may...

MR. SAVAGE: Right. And then as I talked to the defense earlier, they're all aware of the witness protection order so if anyone --

THE COURT: Yeah, I'm not -- I'm really not worried about the defender's office.

MR. SAVAGE: Neither are we. We're not.

THE COURT: Yeah, I don't think there's -- that they have any interest in seeing anything wrong going on.

MR. SAVAGE: And so the witness is here ready to proceed whenever the jury is ready.

THE COURT: Okay. All right. What we'll do is let's just do it the way we do it. We're going to bring the jury in. We're going to let them be seated. I'm going to say, "Call your next witness." You're going to call them.

That witness is going to come down. Where is that witness coming from? Back here or up there?

MR. SAVAGE: He's in the witness room.

THE COURT: So it's going to appear to be completely normal just like every other witness has been done.

MR. SAVAGE: Okay.

THE COURT: Okay. Very good.

All right. Anything before we bring in the jury?

(No response.)

THE COURT: We do need -- before we do it, we need to make sure the audio is working down there.

MR. SAVAGE: We've tested it.

THE COURT: Okay.

MR. SAVAGE: We tested at least a couple of the tapes and they seem to be working.

THE COURT: Okay. So those -- if for some reason that is -- if something happens in that room, I want somebody to come from that room to -- at least outside here so that we can know it stopped.

MR. SAVAGE: Okay.

THE COURT: Until that gets taken care of. If there's a failure of audio, a technical difficulty that occurs.

MR. SAVAGE: Would you want somebody from the government's office there?

MR. TATE: Your Honor --

THE COURT: Yes.

MR. TATE: -- one thing. We have -- some of the family is here. We need to know where that room is so they can be --

THE COURT: They should have been ushered to it.

MR. TATE: No, they're in the back room.

THE COURT: Okay. They need to be taken to that room, then.

MR. TATE: She's going to take her, but she doesn't know which room to take her to.

THE COURT: Okay. It's the room -- the room on the very end down here. I thought the CSOs were going to direct all public to come through this door.

Hold on a minute.

Angela, tell me what's going on.

THE CLERK: The CSO is on his way right now to do that.

THE COURT: All right. We're going to need somebody to do that. That's one of the most important things that I want done today because this whole thing blows up if that's not done.

Once this starts, really -- I mean, unless there's somebody that we know that's been cleared -- we're not going to have people walk in and then have them cleared.

MR. SAVAGE: No, Your Honor. We should be good.

THE COURT: I don't want anybody walking in unless they've been cleared to come in this courtroom. Any agents that are going to come in probably need to come in through that door unless the CSOs know who they are.

MR. SAVAGE: Yes, Your Honor.

THE COURT: AUSAs, they know who they are.

MR. SAVAGE: We don't anticipate any AUSAs. I don't want anybody watching me. We told them they weren't allowed.

THE COURT: I think we need someone -- I think anybody that wants to go down there can come down there, but we -- I think what we need here is somebody either from both sides or one side that sits down there. Inevitably if you think something can go wrong, it will go wrong. Somebody is going to claim they couldn't hear, and I want to make sure there's somebody down there that goes, "Oh, that's a lie." Somebody needs to be there and listen to the whole thing. They need to listen to the whole part of this so that anyone who decides they're not a truth teller can be identified as a nontruth teller about it. And if it does happen, we want to know that it happens and we can deal with it.

MR. DAVIS: A CSO.

THE COURT: Somebody needs to be there. I do not want any mischief in this matter.

MR. SAVAGE: Can I have one minute, Your Honor?

THE COURT: Yes, sir.

COURT SECURITY OFFICER: Our last CSO is going to be in the hallway.

MR. SAVAGE: Your Honor, we have two agents from Raleigh here. One is going to be with the witness here. I've asked the other to go down to the audio room. He's going to let us know if anything happens.

THE COURT: That's fine. And anybody from the defender's office if they want to be down there.

I want to know if it really cannot be heard. What I'm trying to avoid is that after the fact someone, for whatever purpose, to stir the pot or whatever, claims it was not discernible when it actually was discernible. So that's what I want to know. And the -- because there are folks who don't want to do things the right way and I don't know if any of them are in the courthouse now or not.

Okay. Do we have -- I want to know is everybody kind of in position at this time? Do you have everybody -- someone down there?

MR. SAVAGE: Yes, sir.

THE COURT: Okay.

Yes, ma'am.

UNIDENTIFIED SPEAKER: Is the audio on now while you were speaking?

MS. CAUSE: We're wondering if the audio is on right

now.

THE COURT: The audio should be on right now.

UNIDENTIFIED SPEAKER: They can't hear anything.

THE COURT: They're not hearing anything?

UNIDENTIFIED SPEAKER: They're not.

THE COURT: All right. We can't move until we hear.

MR. DAVIS: We might want to have an IT person in there.

THE COURT: We just ought to have IT around all the time. I mean, they've got -- there's a lot of important things that they are doing, but nothing more important than this. They're the IT of the Court. The Court is having an important trial and needs the IT here now. Helping one of us judges with our phones or something like that can wait just a little while. They tested it yesterday. They tested it this morning. Looks like somebody may have to baby-sit this from IT.

(Pause.)

THE COURT: Eric, we've got a problem. We set up the audio, Haj had it set up. Apparently it was working earlier this morning. They cannot hear us down there. We've got to have that -- probably going to need to keep somebody from IT here as long as this witness is on the stand and we're doing this procedure because whatever happened, we've lost the audio in the five minutes between when you guys left and I

came on the bench. So it is absolutely critical that we -- to this trial that that room hear what's going on here.

MR. HOWARD: Absolutely. Let me run down the problem. It's probably on the other side. Let me run down there. I'll IM you in just a second and let you know when it's back up.

THE COURT: Could you get somebody to stay there while this witness is on the stand?

MR. HOWARD: Yes, sir, we will.

THE COURT: Thank you.

(Pause.)

MR. SAVAGE: The government is ready, Your Honor.

MS. CAUSE: Your Honor, can we also test the witness stand microphone just to be sure.

THE COURT: Yeah, let's do. Let's test the witness stand microphone.

So can everybody hear everything so far?

MR. SAVAGE: Yes, Your Honor.

THE COURT: All right. So are we ready now for the jury?

MR. SAVAGE: Yes, Your Honor.

THE COURT: All right. How about the defense, Mr. Tate?

MR. TATE: Yes, Your Honor. Thank you.

THE COURT: Yes, sir. Thank you.

All right. Let's bring in the jury.

(Jury entered the courtroom.)

THE COURT: Thank you, members of the jury, for being here so prompt. We've been working. We were here working while you were out there. We were taking care of matters that needed to be taken care of outside your presence. So thank you for your attention and we'll resume the evidence.

The government may call its next witness.

MR. SAVAGE: Your Honor, the government calls Abu Khalid.

ABU KHALID, GOVERNMENT WITNESS, SWORN ON QURAN,

DIRECT EXAMINATION

BY MR. SAVAGE:

Q. Good morning, sir.
A. Good morning, sir.
Q. Sir, you are testifying here today at the request of the government; is that correct?
A. Yes, sir.
Q. Do you know the defendant in this case?
A. Yes, sir.
Q. Do you know what his name is?
A. Amir.
Q. And do you know him as Amir Alexander?
A. When I meet him first time, I know him by Amir Alexander; but after that I found out his name is Alexander Smith.

Q. Okay. So the person that you know as Alexander Smith, is he present in the courtroom today?
A. Yes, sir.
Q. Could you please identify him, where he's sitting and by a piece of his clothing.
A. Right there at that table (indicating).
MR. SAVAGE: Your Honor, the record will reflect an identification.
THE COURT: Let the record so reflect.
Q. When did you meet the defendant?
A. Sometime in July 2014.
Q. And who initiated your first contact with the defendant?
A. He sent me an email.
Q. And what name were you using when you were meeting or communicating with the defendant in 2014?
A. Abu Khalid.
Q. And that's not your true name, is it?
A. No, sir.
Q. With regards to your true name, when you were working for the FBI, did you have concerns for your safety?
A. Yes, sir, all the time.
Q. And is that why you're not using your true name?
A. Yes, sir.
Q. And you understand for the purposes of this trial, the Court has allowed that you can be testifying using the name

Khalid. So if we refer to you as Khalid, you understand we're talking about you.
A. Yes, sir.
Q. Thank you.
Were you born in the United States?
A. No, sir.
Q. What country are you from?
A. I was born in North Africa.
Q. And are you now a legal resident of the United States?
A. Yes, sir.
Q. Do you speak any languages other than English?
A. Yes, sir.
Q. What other languages do you speak?
A. I speak Arabic, French, and some Spanish.
Q. And how long have you been working with the FBI?
A. Since 2005.
Q. 2005. And why did you agree to work with the FBI?
A. To be honest with you, the first time I was forced; but after that, when I become American citizen, I planned on working for my country.
Q. Okay.
A. I'm protecting my nation.
Q. Okay. Now, with regards to your immigration status, you received some help from the FBI at the time that you first arrived in the country; is that right?

A. Maybe the first time they help me to stay because they needed me.
Q. Okay.
A. But after that I received no -- nothing from them.
Q. They extended your residence -- or visa in the U.S. initially.
A. Yes, sir.
Q. After that you became a lawful permanent resident; is that correct?
A. Yes, sir.
Q. Did the FBI help you at all with that?
A. No.
Q. And then later you became an American citizen.
A. Yes, sir.
Q. And did the FBI help you with that at all?
A. No.
Q. Are you -- have you been compensated by the FBI for your time and expenses?
A. They pay for the expenses, yes.
Q. Nevertheless, do you have other employment outside the FBI?
A. Yes, sir.
Q. Can I ask you, are you a practicing Muslim?
A. I pray. I make Ramadan, but I'm a Muslim.
Q. Okay. You're a Muslim.

A. Yeah.
Q. Are you familiar with Muslim beliefs and practices?
A. Yes, sir.
Q. Are you also familiar with an extremist group known as ISIS and by various other names?
A. Yes, sir.
Q. How are you familiar with that group?
A. You know about news.
Q. Do you think that that group represents the values of most Muslims?
A. No, sir.
Q. Have you been or have you -- are you now or have you ever been a supporter of ISIS?
A. No, sir.
Q. Nevertheless -- and have you ever been or are you a citizen of Syria or Iraq?
A. No, sir.
Q. Let me get back to -- get right down to the investigation in this case.

You became involved in the summer of 2014 with Mr. Smith; is that right?
A. Yes, sir.
Q. What information did the FBI give you before you became -- met Mr. Smith?
A. They told me there is a guy, they have concern about him

and he going to contact me and I have to see what's going on with him.
Q. Okay.
A. And he send me an email. We start contact from there.
MR. SAVAGE: Okay. And I just want to make sure, can all the jurors hear the witness clearly?
THE JURY: (Affirmative nods.)
MR. SAVAGE: Very good.
Q. Well, what instructions did you receive from the FBI about how you should interact with the defendant?
A. I was acting as ISIS recruiter.
Q. Okay.
A. And we start from there.
Q. Okay. Let me show you what's been admitted as Government's Exhibit Number 1, and it's an email.
And can you see that on the screen?
A. Yes, sir.
Q. Now, there's a number of passages that are redacted from that, and we're going to make the bottom part larger so it will be easier to read.
First of all, the subject -- the to-line, the person that it's sent to is redacted, but did you receive that email?
A. Yes, sir.
Q. And did you receive that at an email address that you were -- the FBI asked you to use at that time?

A. Yes, sir.
Q. Okay. And who is this email from?
A. It's from Amir.
Q. Okay. And did you later -- did you know Amir at the time this email was sent?
A. No.
MR. SAVAGE: Okay. If we can scroll down just a little bit.
And the date on this, just to be -- so we can see it is -- there we go. That's better.
Q. So the date on this is the 14th of July.
A. Yes, sir.
Q. Okay. Does that fit with your recollection about when you first --
A. Yes, sir.
THE COURT: When you say it's from Amir, are you talking about the defendant?
THE WITNESS: Yes, sir.
Q. You knew the defendant as Amir.
A. Yes, sir.
Q. And that's the name he was using.
A. Yes, sir.
Q. Okay. Could you just go ahead and read the email, just the couple lines on the top there where it says "Sallam."
A. "Sallam I just spoke with kareem and he asked me to email

you. I gave him another email address that I could email you from. But I just decided to use the email thats attached to my smart phone so I can check the emails quicker. So you can respond to thos email address or," and he send me another email address.

Q. Okay. And then what does the word sallam mean?

A. Sallam is like -- that's how in Islam we start a conversation. When you see another person, you say sallam. That means peace on you.

Q. Okay. And as we go forward, we're going to be talking about a number of -- and that's an Arabic word; is that right?

A. Yes, sir.

Q. And inshallah, what does that mean?

A. God will.

Q. And that's also an Arabic phrase.

A. Yes, sir.

Q. Are you fluent in Arabic?

A. Yes, sir.

Q. And you're fluent in English, obviously.

A. Yes, sir.

Q. Have you interpreted between those two languages before today?

A. Yes, sir.

Q. Do you feel comfortable and confident that your interpretations are correct?

A. Yes, sir.
Q. Thank you.
Well, what does the -- after you received this email, did you hear from the defendant again?
A. Yes.
Q. Let me show you what's been marked as -- admitted as Government's Exhibit Number 2.
MR. SAVAGE: And we're going to ask Ms. Neill to enlarge the bottom of that.
Thank you.
Q. So this is the same day. Who is this email from?
A. It's from the same person, from Amir.
Q. And did you also receive this email?
A. Yes, sir.
Q. And this simply says if you -- "here is my number if you would like to give me a call," and then there's a 704 area code number which is Charlotte; is that right?
A. Yes, sir.
Q. Did you -- did you call that number?
A. Yes, sir.
Q. Okay. And what about did you call that number?
A. What you mean, sir?
Q. When did you call it?
A. I can't remember exactly when, but I did call him.
Q. Okay. Well, let me show you what's been marked but not

admitted as Government's Exhibit Number 3, and there's a transcript.

Let me ask you with respect to the call that you made to Amir, was it recorded?

A. Yes, sir.

Q. Okay. And before coming here today, did you review a recording that was marked as Government's Exhibit Number 3, a disk?

A. Yes, sir.

Q. Okay. And in fact, if I showed you the disk, you actually initialed that disk to verify that you had reviewed it.

A. Uh-huh.

Q. Okay. And was that recording that you reviewed the same as you remember the conversation that you had with Amir on the -- on or about the 7th of August 2014?

A. Yes, sir.

Q. Okay. You also looked at a transcript of that; is that correct?

A. Yes, sir.

Q. In fact, there's a transcript that has -- August 6th, I'm sorry.

And in that transcript it had some Arabic phrases and you were able to interpret those for the FBI; is that right?

A. Yes, sir.

Q. Would it assist your testimony in playing the transcript if we also had -- the video -- or the audio if we also had the transcript playing?
A. Yes, sir.

MR. SAVAGE: Okay. Your Honor, we move for the admission of Government's Exhibit 3.

THE COURT: Is that a -- that is a -- an audio recording?

MR. SAVAGE: Yes, Your Honor.

THE COURT: With a transcript --

MR. SAVAGE: Yes, Your Honor.

THE COURT: -- as part of it?

MR. SAVAGE: Yes, Your Honor.

THE COURT: Okay.

MR. SAVAGE: And request permission to publish.

I'm sorry, is there an objection?

THE COURT: Any objection?

MR. TATE: No objection.

THE COURT: Okay. Let it be admitted and let it be published.

(Government's Exhibit No. 3 was received into evidence.)

THE COURT: Again, members of the jury, as I said earlier, the audio is the evidence. That is the actual evidence. The transcript may or may not accurately state what

the words were. If at any time you hear a different word than is on the transcript, you take your hearing. That's what's important there. This is -- the transcript is merely an aid. The actual evidence is the audio recording.

All right.

MR. SAVAGE: Permission to publish, Your Honor.

THE COURT: You may.

(Government's Exhibit Number 3 was played.)

BY MR. SAVAGE:

Q. Let me just go back over some of these Arabic words. Salam alaykum.

A. Peace upon you.

Q. Okay. And I'm going to be very bad at the translation on some of these -- or the pronunciation. The word wa antum, inshallah.

A. That means and you. Peace upon you too. Inshallah mean God willing.

Q. And walaykum salam allah.

A. Walaykum salam, that's when somebody tell you salam alaykum, you respond walaykum salam. That mean peace upon you. He tell you upon you too.

Q. And why was the defendant trying to get a ride to Cary?

A. Because we -- before we got -- he need to come to see me.

Q. Okay. And whose idea was it for him to come to see you?

A. Because he want something.

Q. Okay. And were you going to talk to him about that over the phone?
A. No.
Q. And did you agree -- did you set the meeting in Cary if he wanted to find something -- get something from you?
A. Yes.
Q. And what did you understand the defendant wanted to get from you?
A. At that time I had no idea.
Q. Okay.
A. But when he got there, yes.
Q. When he got there he told you.
A. Yes.
Q. So you used the -- he asked you, "Did you cut your phone on?" What does that mean, cut your phone on?
A. Because I'm working with the FBI. I don't have only one phone. So I told him I cut my phone because of security reasons.
Q. Okay.
A. So he can't catch the phone any time.
Q. So you didn't tell him you cut your phone off because you worked for the FBI.
A. No.
Q. But you at that time were posing as an ISIS recruiter.
A. Yes, sir, for security reasons, yes.

Q. And would that be consistent with that cover?
A. Yes, sir.
Q. Why?
A. Because I want to know who's that guy. What's his -- what he want. What he's doing. Because if he was tricked or not. So you have to play the game that you are ISIS recruiter so you have to make him believe on you to see if he's real or not.
Q. Okay. Thank you.
And you mentioned the name Wael Kodaimati. You said you didn't know Wael. Do you know --
A. At that time -- at that time I didn't know, but after that I did find out his --
Q. And what did you find out later about Wael?
A. He friend of -- father friend of family living in Syria.
Q. A friend of Amir?
A. Yes.
Q. And Kareem, did you ever -- did you know Kareem?
A. No.
Q. Okay. Did you know who Kareem was?
A. No.
Q. Thank you.
Well, did the meeting happen at the mall in Cary the next day, which was the 7th of August? Did the meeting -- did you have the meeting?

A. Yes, sir.
Q. And where was the meeting?
A. In the parking lot of the mall.
Q. Okay. And who else was present at that meeting?
A. Just me and him.
Q. And was that -- did that meeting take place in your car?
A. Yes, sir.
Q. And did the FBI give you a recording device to record that meeting?
A. Yes, sir.
Q. And was it recorded by audio?
A. Yes, sir.
Q. And before coming here today, did you review a disk that I marked as Government's Exhibit Number 4 with an audio transcription of that meeting?
A. Yes, sir.
Q. And was that recording the same as it is -- the same as you remember it from back in August of 2014?
A. Yes, sir.
Q. Did you also review a transcript of that meeting?
A. Yes, sir.
Q. And in that there were a number of Arabic words and you provided translation for those words as well; is that correct?
A. Yes, sir.
Q. Was that transcript an accurate verbatim transcript of

the recording?
A. Yes, sir.
Q. And I mentioned -- let me go back before. The voice on there, your voice is clearly marked, right?
A. Yes, sir.
Q. Okay. The other voice of Amir, did you later meet Amir in person?
A. Yes, sir.
Q. And did you hear him speak to you in person?
A. Yes, sir.
Q. And was the voice that we just heard on the telephone recording the same as the voice that you heard Amir use when he was face-to-face with you?
A. Absolutely.
Q. Any doubt that that was Amir on the phone?
A. No doubt.

MR. SAVAGE: Okay. Your Honor, at this time the government moves for admission of Government's Exhibit Number 4.

MR. TATE: No objection.

THE COURT: Let it be admitted.

(Government's Exhibit No. 4 was received into evidence.)

MR. SAVAGE: Request permission to publish number 4.

THE COURT: You may publish it.

Again, members of the jury, always remember with recordings and transcripts, the recording is the evidence.

(Government's Exhibit Number 4 was played.)

BY MR. SAVAGE:

Q. Mr. Khalid, could you hear that recording clearly?
A. Yes, sir.
Q. And you actually were present in talking with the defendant. You're one of the voices on there.
A. Yes, sir.
Q. And the other voice is the defendant, Amir, correct?
A. Yes, sir.
Q. Now, early in the recording, I'm not going to go back and play it, but I'm going to direct your attention, you asked him about the family in Syria and he told you that they were in Kafr Hamrah. Did you know where that city was?
A. Kafr Hamrah is a city -- is a small city in Syria.
Q. And what major city is it near?
A. I'm sorry?
Q. Do you know where in Syria it is, about where?
A. I think it's about south. I'm not sure.
Q. Okay. But you asked him whether it was under the control of the brothers. What did you mean by that?
A. By the ISIS.
Q. Okay. And he said, "It's split three ways, the government, Free Syrian Army, and other brothers." Did you

clarify with him what exactly you -- who you were working for?
A. Yes.
Q. Okay. Who were the brothers that you were talking about?
A. The ISIS.
Q. Okay. And you specifically told him it was ISIS and you used the word Dawla Islam. What is that?
A. ISIS is Islamic State in Syria and Iraq. In Arabic it is Daesh. Dawla al-Islam fi al-Iraq wa al-sham. You call Syria in Arabic al-sham.
Q. And those were the Arabic words for those -- for ISIS.
A. Yes, sir.
Q. And you asked the defendant if he wanted to be with the khalifa. What is the khalifa?
A. The caliph is the leader of ISIS.
Q. And he responded inshallah. What does that mean?
A. God will.
Q. Is that an agreement?
A. Yes, sir.
Q. And that phrase would be used as yes or yes, I do --
A. Yes.
Q. -- in Arabic, correct?
A. Yes, sir.
Q. Now, you didn't leave it there. You went on to explain and to test his knowledge of the khalifa. Did he know who the caliphate was?

A. Yes, sir.
Q. Did he -- he told you who the leader was in his own words.
A. Yes.
Q. And what -- who did he tell you the leader was?
A. Baghdadi.
Q. And who is Baghdadi?
A. That is the leader of ISIS.
Q. And was -- okay.
And then you asked him if he went and you helped him to go, that he would have to swear bay'at. What is bay'at?
A. Bay'at is to pledge allegiance to the khalifa, that he going to fight for the khalifa.
Q. And then you said, "This means you're going to be in the power of Dawla al-Islam. You're going to fight for Allah," and used an Arabic word subhanahu wa ta'alah.
A. Subhanahu.
Q. And what does that mean?
A. Praise to God.
Q. And his response was na'am. What does that mean in Arabic?
A. Na'am mean yes.
Q. And you asked him -- you asked him to be sure, right? You said, "And that is good with you?"
A. Yes, sir.

Q. And did he respond again?
A. Yes, sir.
Q. And what did he say?
A. He said yes.
Q. But you then asked him if you are prepared to fight for ISIS. And you went on and said, "So as I said, where you're going you're not going for tourism, you're going to fight fi sabilillah." What does that mean?
A. For sake of God.
Q. And he also said yes.
A. Yes, sir.
Q. And then he said, "I have one concern. I've been there. I've been to Halab," H-a-l-a-b, "one time in 2006." And what does that translate into?
A. Halab is Aleppo. It is a city in Syria.
Q. And he said he had been there and he had trouble getting back, meaning -- what did you understand him to mean by that?
A. You know, that's normal for -- American government when somebody come from somewhere where there is trouble, they get suspicious about that person so they have to know what's going on with that person.
Q. Well, and you -- you specifically asked him, "Do you have a passport?"
A. Yes, sir.
Q. And what did he say?

A. He said yes.
Q. And you said, "Ready?" What did you mean by that?
A. Passport ready. That's mean it's not expired. It's not...
Q. And his response was verbatim, "Yeah, I have a passport."
A. Uh-huh.
Q. And then you made a big deal about turning your phone off and calling and security. Why -- why keep this a big secret?
A. I'm working for the FBI.
Q. Okay.
A. And I don't know who I'm dealing with.
Q. Okay.
A. I have to make sure that person believe in me, trust me.
Q. Okay.
A. And I don't want to put people in trouble, just like I have to make sure that's -- this person is something.
Q. Right. But you're playing the role as an ISIS recruiter. If you had done that -- if you truly were an ISIS recruiter and you did that openly in the United States, you would be arrested.
A. You would be arrested. You would be in jail.
Q. So is it also part of your cover that you employed telephone security?
A. Yes, sir.
Q. Did you tell that to the defendant?

A. Yes, sir.
Q. And did he seem to understand that there was a need to keep this secret?
A. Uh-huh.
Q. In fact, you asked him if he had come to the meeting with another person.
A. Yes, sir.
Q. And he said -- what did he say?
A. He said yes.
Q. And you asked him, "Do you trust this person?"
A. Uh-huh.
Q. "I only want to meet people you trust."
A. Yes, sir.
Q. Why did you ask him that?
A. Because as I said, you have to make sure that's -- you doing that thing the right way.
Q. Okay.
A. He has to believe in you. He has to trust you.
Q. Was part of the information that the FBI wanted you to get is whether or not there were other people that the defendant was willing to travel with?
A. Yes, we -- well, we were worried about if he's by himself or there's some other people behind him or there's a group or -- we don't know what's going on.
Q. And the defendant wanted to know if you had been there

and what it was like.
A. Yes.
Q. So it wasn't just -- I mean, he -- and you told him that "the brothers are doing very good. It is not easy to make Shari'a." What does that mean?
A. Shari'a is Islamic law.
Q. And you say, "Somewhere where for centuries was Jahiliyyah." And what does that?
A. Jahiliyyah.
Q. And what does it mean?
A. Jahiliyyah was a time before Islam. There was no laws, no morals, nothing.
Q. And you then said, "What these people are doing, it's crazy killing people, but yeah, they have to. They have to do that. It's like you're reborning the Islam there. It's very tough but" -- and then there's an Arabic word. I'm going to -- it translates into praise God. What is that word?
A. Alhamdulillah. Praise to Allah.
Q. "The brothers are getting more land and cities."
So you specifically told the defendant that what you were proposing is that he go to fight and that he was going to be fighting with ISIS and that they were killing people in the name of Shari'a.
A. Yeah.
Q. And then he said, "Inshallah, the way it would be is

going to Turkey, more or less, to get there."
A. Uh-huh.
Q. He didn't say no, he didn't want to do it, did he?
A. Yes, sir.
Q. And then you said, "Well, we'll talk about it when we get to that stage."
And then he said okay. He agreed.
A. (Affirmative nod.)
Q. Did you set up another meeting with the defendant after this initial meeting?
A. Yes, sir.
Q. Well, why another meeting? What was the purpose of this next meeting?
A. Because we -- we want to know what's going on with this person.
Q. Okay.
A. If there is other people behind him. If there is -- if he's serious about this thing. I don't want just put somebody in trouble. I want to make sure that person -- what he's doing is against the law, and that's how we proceed.
Q. So you want to know is he just talking or is he really going to go.
A. Yes, because there are a lot of people they are just talk.
Q. Well, he said his time frame was two or three weeks if he

could get the money.
A. Yes, sir.
Q. So that was pretty soon.
A. (Affirmative nod.)
Q. Yes?
A. Yes, sir.
Q. So let me talk to you about -- you then had the next meeting in Charlotte on or about August the 20th, 2014; is that right?
A. Yes, sir.
Q. And before coming here to court today, did I ask you to review a recording that we have marked as Government's Exhibit Number 5?
A. Yes, sir.
Q. And was that recording the same as you remember the conversation to be?
A. Yes, sir.
Q. Who made that recording?
A. Me.
Q. Okay. And did you make it with equipment that the FBI provided to you?
A. Yes, sir.
Q. And was the equipment performing correctly that day?
A. Yes, sir.
Q. And later on did you also review at the government's

request before coming to trial a transcript of that conversation?
A. Yes, sir.
Q. And was that transcript an accurate transcription or verbatim transcription of the words that were spoken?
A. Yes, sir.
Q. Now, there are a number of Arabic words in that transcript as well, and did you help the government to translate those?
A. Yes, sir.
Q. Okay. Now, where exactly did you meet on the 20th?
A. In a mall somewhere in Charlotte.
Q. Okay. And was anyone else present at this meeting?
A. No.
MR. SAVAGE: Your Honor, at this time the government would move for admission of Government's Exhibit Number 5.
MR. TATE: No objection.
THE COURT: Let it be admitted.
(Government's Exhibit No. 5 was received into evidence.)
MR. SAVAGE: And request permission to publish.
THE COURT: You may publish.
(Government's Exhibit Number 5 was played.)
BY MR. SAVAGE:
Q. Again, Mr. Khalid, was that your voice and the defendant

in that tape?

A. Yes, sir.

Q. Now, at the very beginning of the conversation, you asked was the defendant still planning on traveling to Syria.

A. Yes, sir.

Q. You said, "Okay. We're getting serious now. The first time when I meet you I just wanted to meet you and know what's going on, what you got in your mind. But now we're getting -- you still want to travel?" And what was his response?

A. Yes.

Q. Now, he said, "Inshallah, inshallah." Does that mean yeah, yeah, yeah, whatever? Or under the context did it mean yes?

MR. TATE: Objection to asking about the context of the word he was using.

MR. SAVAGE: Your Honor, he was there.

MR. TATE: But he can't say what's in his mind. He can say what inshallah means.

MR. SAVAGE: He can say what he understood.

THE COURT: He can say what he understood. Overruled. What his understanding of it was. He can say what it means and what he understood his part of the conversation was. Overruled.

Q. Let me rephrase. Did you understand him to mean I'm just going to go along with this or did you think he was serious?

A. He was serious.
Q. In fact, you followed up with a dozen different questions to make sure he understood.
A. Yes, sir.
Q. Including you asked him -- you told him --
MR. TATE: Your Honor, can we have a brief sidebar?
(Sidebar conference as follows:)
MR. TATE: My objection is to the leading form of the questions and suggesting answers. He cannot testify as to what was in the defendant's mind. He can say what the word means.
THE COURT: And what he understood.
MR. TATE: What he understood.
MR. SAVAGE: Right, understood.
THE COURT: He can't say what's on the defendant's mind, right. He can say what's in his mind as to how he took it.
MR. TATE: Right.
THE COURT: The jury may not take it that way.
MR. TATE: He said, "You didn't take that to mean yeah, yeah, yeah." I mean, that's leading.
THE COURT: Yeah, don't ask you didn't do something. Ask him --
MR. SAVAGE: Right. With respect to the leading, Judge, I mean, this tape is 23 minutes long. I don't plan to

go over the whole thing.

THE COURT: No, I don't believe you do because I'll stop you without an objection.

MR. SAVAGE: Exactly. But I need to be able to have a little latitude to point him to the right place.

THE COURT: Point him to the right place. But for instance, saying you didn't mean --

MR. SAVAGE: No, I won't. I understand.

THE COURT: Don't do that again.

MR. SAVAGE: Yes, Your Honor.

MR. TATE: Your Honor, the real reason for the sidebar is my client was telling me he was about to urinate on himself and needed a break, but I see that he's run to the restroom and so maybe we can just kind of...

THE COURT: We'll have to stop for a minute. Let me just take a break. We'll take a break. If somebody needs a break, just stand up and let me know that we need a break at our table. I like to go an hour and 45 sometimes, but an hour and a half is okay too. So we're at almost an hour and 45 so we'll take our morning break.

MR. TATE: He could be walking back in.

THE COURT: That's okay. I still think we need to take a morning break.

MR. SAVAGE: I'm almost done with this. The next one I'm going to play is about 40 -- I'm going to play pieces

of it, but the next one is the hotel meeting and it's two hours long. I'm not doing the whole thing, but it's going to be a long segment.

THE COURT: Okay. We knew it was coming, so let's go ahead and take a break.

(End of sidebar conference.)

THE COURT: Okay. Members of the jury, we're going to go ahead and take our morning break. Don't talk about the case and we'll get you back in here in about 15 or 20 minutes. Thank you very much.

(Jury exited the courtroom.)

THE COURT: Okay. We'll be in recess for at least 15 minutes, maybe 20. No more than 20.

MR. SAVAGE: Thank you, Your Honor.

(Brief recess at 10:42 a.m.)

(Court back in session at 11:03 a.m.)

(Jury not present.)

MR. SAVAGE: Your Honor, one bit of housekeeping.

THE COURT: Okay.

MR. SAVAGE: I just wanted to -- as I let the Court know during the break, there is a -- the Memphis witness is here as ordered. Happy to say that he was here at 9:45 in advance of the 10:00 deadline. He's present in the courthouse. The defense tells me they don't anticipate they would call him until the end of the day at the earliest.

Would it be permissible to release him to a hotel with the condition that he be back here on an hour's notice?

THE COURT: I don't know. We've had a little bit of recalcitrance there, I mean a little bit. I don't know what to --

MR. SAVAGE: Well, he'll be with the FBI agent from Memphis.

THE COURT: Okay. With that -- yes.

MR. SAVAGE: Okay. Is that correct?

AGENT GODFREY: Yes.

MR. SAVAGE: We'll let him know and then we'll give him the option.

THE COURT: All right. Anything before we bring in the jury?

MR. SAVAGE: No, Your Honor.

THE COURT: All right. Let's bring them in.

(Jury entered the courtroom.)

THE COURT: You may proceed.

MR. SAVAGE: Thank you.

ABU KHALID

DIRECT EXAMINATION (Cont'd.)

BY MR. SAVAGE:

Q. Mr. Khalid, did you discuss with the defendant that ISIS was in direct combat or conflict with the United States?

A. Yes, sir.

Q. How did you do that?
A. I told him that we were hit by the American air force and they hit maybe 84 or 94 places.
Q. And when you say we, in what context was we used in that conversation?
A. Because I was planning to be an ISIS -- ISIS recruiter, so...
Q. Did the defendant say whether or not he was still in contact with his friends in Kafr Hamrah, in Syria?
A. Yes, sir.
Q. Did you ask him whether or not they were sympathizers of ISIS?
A. Yes, sir.
MR. TATE: Objection. The word sympathizer of ISIS is nowhere in the transcript.
MR. SAVAGE: Well --
THE COURT: Yeah, I'll sustain the word sympathizers.
Q. Okay. Did you ask them if they were with Dawla Islam?
A. Yes, sir, that's correct.
Q. And by with, what was your meaning?
A. ISIS.
Q. And with them meaning what? Were they with them or just --
A. Yes, are you with the Dawla or not? Dawla is ISIS.

Q. What did you mean by the word with?
A. That's mean --
Q. Were they friends or what did you mean?
A. No, they are under the command of the Dawla. They are with the Dawla. They are fighting with the Dawla. Because when you enter the Dawla, that means you are fighting with Dawla. You doing everything with ISIS.
Q. Under their command.
A. Yes, sir.
Q. Did the defendant tell you whether or not he knew about other Americans who were willing to travel to Syria to fight with ISIS?
A. Yes, sir.
Q. And what did he say about that?
A. He said there is a guy, he was marines, and he want to travel too.
Q. Did you ask the defendant if he would agree to fight for ISIS even if his friends in Syria did not?
A. Yes, sir.
Q. And what did he say?
A. He said no problem.
Q. Did you tell him that even if -- that they could -- he could be commanded to go elsewhere to fight?
A. Yes, sir.
Q. Was he agreeable to that?

A. Yes, sir.

Q. And then finally, I'm going to play you just a tract because it has a lot of Arabic words in it, replay just a few minutes of -- seconds of this. Beginning in my transcript it is about 15:55 just through 16:44.

(A portion of Government's Exhibit Number 5 was played.)

BY MR. SAVAGE:

Q. A couple things. The defendant -- you say, "We're not fighting only the Syrian army."

And the defendant responds, "Free Syrian Army and Jabhat al-Nusra." What does Jabhat al-Nusra mean?

A. Jabhat al-Nusra is a group of extremists in Syria.

Q. And do you know at that time whether or not they were designated as a terrorist organization?

A. Yes, sir.

Q. But not the Free Syrian Army.

A. No.

Q. And then he -- he discusses that with you and he says, "Well, how do you reconcile that?"

And then you answered him in this paragraph and you say, They are -- "what they are doing is bid'aa."

A. To explain bid'aa is not easy, but I'm going to do my best. Bid'aa is -- in Islam we have a way. We're following a way.

Q. Okay.
A. And some people, they go out of that way and start dividing and stuff. Like if the prophet was doing, let's say, the prior certain way, they divide that way and they are doing different way. That's bid'aa. We call it in Islam bid'aa. Bid'aa mean something people come up with, is not coming from Islam.
Q. Would it also mean something like a heretic or heretical?
A. Yes.
Q. So in the context of that, did you -- did you mean that they could fight against al-Nusra even though they're against Assad because they're viewed by ISIS as heretics?
A. Yes.
Q. Therefore they can be killed.
A. Yes, sir.
Q. And then what is the word k-h-a-w-a-r-i-j?

MR. TATE: I'm going to move to -- I want to stop. I'm going to object and move to strike "then they can be killed." That's not in -- that's his -- he's leading him, number one. And it's not in the tape.

THE COURT: I'll overrule it, but let's stick with -- stick with what the words are and what he interprets -- his interpretation. The defendant's -- he can't say what the defendant's interpretation of the words were.

MR. SAVAGE: No, but, Your Honor, these are Arabic

concepts and we're trying to translate so the jury understands what was said in the transcript in Arabic.

THE COURT: Right. And if he says -- and if he says the words to be killed. But you said -- you asked the question, "And then they could be killed," and he says yes. If he uses the term in the translation, that's fine.

MR. SAVAGE: All right.

THE COURT: But not for you to -- not for you to ask him to translate it in any particular way.

MR. SAVAGE: Sure.

THE COURT: That's what I'm talking about.

MR. SAVAGE: Okay.

Q. So the word --

THE COURT: Sustained partially. Overruled partially.

MR. SAVAGE: I'm sorry. May I proceed, Your Honor?

THE COURT: Yes, sir.

MR. SAVAGE: Okay.

Q. The word k-a-h -- k-h-a-w-a-r-i-j, how is that pronounced?

A. Khawarij.

Q. And what does that mean?

A. Khawarij, it mean -- it start when the prophet died long time ago. There is some people, they came out from Islam. They said we are not following Islam anymore. That's in time

of the prophet. That was 1400 years ago. And they keep using that word now. When you are not following the same way that group is following, you are khawarij.
Q. And who uses that word? How is that word used?
A. To be honest with you, everybody use that word.
Q. Okay.
A. If you're not following my way, you are khawarij. Everybody think his way is right way.
Q. Okay. And what is the ulama?
A. Ulama, it's a scholar, Islamic scholar.
Q. Thank you.
Now, during that meeting the defendant, if you recall, points out the security guard a number of times. What was -- were you driving at that point? During the conversation were you driving the car or was the car moving from place to place?
A. Yeah.
Q. Okay. And where were you -- where were you driving that the security guard kept coming to your attention?
A. We left that place because we don't want no trouble and it wasn't like security purpose, so we just left.
Q. Okay. And then there's -- there's an interruption in the middle. Did some lady ask you to jump her car?
A. Yes. We were sitting talking and the lady come, she needed a jump for her car or something. And I don't -- I can't risk that and so we left.

Q. Okay.
A. Sorry I couldn't help her because I was recording and I didn't want her voice to be in all that recording.
Q. Okay. And then she was just left there with the jumper cables?
A. I'm sorry. It was a big matter.
Q. Okay. And then finally, the -- when the conversation ends, the defendant gets out and that was the end of that conversation.
A. Yes, sir.
Q. So did you meet again after that in Charlotte?
A. Yes, sir.
Q. And let me show you what -- before coming to court today, did you review a transcript of -- a video and audio recording that was made in a hotel in Charlotte?
A. Yes, sir.
Q. Okay. And that was a rather long meeting. It was about two hours or so?
A. Something like that.
Q. Okay. And that meeting was recorded how?
A. I have no idea.
Q. Okay. Did you set up the recording in that?
A. No.
Q. Okay. But later on you did review a recording.
A. Yes, sir.

Q. A lot of that is just an empty room and then some of that is you and then there's conversation.
A. Yes.
Q. Who was present during the -- during the actual conversation part?
A. Another person called Bilal.
Q. Okay. Bilal?
A. Yes.
Q. And who is Bilal?
A. Bilal is working for the FBI too.
Q. Okay. And did you know Bilal before that meeting?
A. Yes, sir.
Q. How is it that Bilal was introduced to the defendant, if you know?
A. Yes. Because he was struggling to raise money for his trip and we want to know if he's serious, so we -- I did ask him there is a guy who can help him find a job, and we actually introduced him to Bilal and he started working with him.
Q. And what kind of jobs were they doing?
A. They were buying old cars and renew them and resell them.
Q. And do you know whether or not the defendant actually worked with Bilal?
A. Yes.
Q. And did he earn money?

A. They said that they earned some money and they got another car. Was difficult.
Q. Okay. Well, why not just give the defendant $2,000 and say go buy a ticket?
A. The government can't pay for terrorism stuff.
Q. Okay. Now, in this particular tape, you're actually present in the room sitting on a bed, but the face is blurred; is that correct?
A. Yes, sir.
Q. Okay. Other than that is that the same recording -- is that recording the same as the conversation and what transpired in that room during the time you were there?
A. Yes, sir.
Q. Okay. And Bilal is off the screen.
A. Yes.
Q. He's in another part of the room.
A. Yes.
Q. Now, as I said, this recording is about two hours long. Did you review select -- or transcripts of three different parts of that --
A. Yes, sir.
Q. -- meeting?
And the transcripts that were made, were they accurate verbatim transcripts of the words that were spoken in the meeting?

A. Yes, sir.

MR. SAVAGE: Your Honor, at this time we're going to move for admission of Government's Exhibit Number 6.

MR. TATE: Mr. Savage, can we get the date of this recording?

MR. SAVAGE: Certainly. The date is going to be -- let me make sure I get it right. The 11th of November 2014.

MR. TATE: This is what, about seven weeks later?

MR. SAVAGE: Well, you can do the math, but it's 11/14.

Q. And I'm sorry, does that fit with your recollection about the 11th of November 2014?

A. Yes.

Q. Okay. Why so long before the next meeting between August and November?

A. Because I was waiting for him so he can raise money for his trip.

Q. Okay. And what was your cover story? What other things were you supposedly doing in your cover?

A. I was meeting other brothers and helping other brothers because I'm supposed to be working the whole east coast to Canada, so I be traveling everywhere.

Q. Okay. And, in fact, you were not.

A. No.

Q. But you turned off your phone and weren't in

communication --
A. Yes, sir.
Q. -- with the defendant during that whole time.
A. And this was way again to make sure he is serious about what he wants.
Q. Okay.

MR. SAVAGE: Your Honor, at this point we're going to offer into evidence what has been marked as Government's Exhibit Number 6. Government's Exhibit Number 6 is the entire recording beginning at approximately 11:45 a.m. on the 11th and continuing until -- about 12 hours until the next day when the recording runs out. The entire recorded activity on the Government's Exhibit Number 6 is approximately 103 minutes. It begins at 13:22 and the last person departs at 16:45.

We're also going to ask to admit Government's Exhibits A, B, and C which are verbatim transcripts of the selected parts of that video. Other than playing 2-1/2 hours, we have about 30 minutes of that recording, but the entire recording will be in evidence and the defense -- the defense can play all of it or none of it, and the jury will have it to review in its deliberations.

MR. TATE: No objection.

THE COURT: Let it be admitted.

MR. SAVAGE: Thank you.

(Government's Exhibits Nos. 6, 6A, 6B, and 6C were

received into evidence.)

THE COURT: Let it be played.

Again, ladies and gentlemen, it is the audio that is in evidence. The transcript is an aid.

MR. SAVAGE: So we're going to begin by playing the first -- we'll say clip one. It begins at 14:36:23. And why don't we go ahead and just play that first clip.

(Government's Exhibit Number 6 was played.)

MR. SAVAGE: Can we just stop it there for just a moment.

BY MR. SAVAGE:

Q. So, Mr. Khalid, can you see the video on the screen there?

A. Yes, sir.

Q. The person who's in the bed, who is that?

A. Amir.

Q. Okay. And the -- Amir. And he is -- who is -- can you describe some of the clothing that Amir might be wearing.

A. Yeah, with the white T-shirt and the North Carolina blue cap.

Q. Okay. And where are you in that photo?

A. I'm laying in the bed.

Q. Okay. And that circle is over --

A. Covering my face.

Q. Your face.

And where is Bilal in that picture?
A. He was on the other side closer to the door.
Q. So he never appears on the camera.
A. No.
Q. And the date stamp is apparent on the bottom there where it says 14/11/11, 14:36, correct?
A. Yes, sir.
Q. Thank you.
MR. SAVAGE: May I proceed, Your Honor?
THE COURT: Yes.
(Government's Exhibit Number 6 resumed.)
BY MR. SAVAGE:
Q. Let me, before we go to the next section, ask a few questions about that.
On November 11th, 2014, was the defendant still planning on traveling to Syria?
A. Yes, sir.
Q. And what was -- when was he planning on traveling?
A. I'm sorry?
Q. When was he planning on traveling?
A. When he get the money.
Q. And was Bilal there during that discussion?
A. Yes, sir.
Q. And did that discussion include traveling for the purposes of joining and fighting with ISIS?

A. Yes, sir.
Q. Was the defendant at that time still in communication with his friends in Syria?
A. Yes, sir.
Q. Did you ask the defendant if his friends in Syria were aligned with ISIS?
A. Yes, sir.
Q. What did he say?
A. He said yes.

MR. TATE: Objection. It's not in that passage at all. Move to strike.

THE COURT: Hold on. Let me hear the government's response.

MR. SAVAGE: One second, Your Honor.

Your Honor, what I have in the transcript is, "From what I understand is that his father is in close ties with that group that I told you about."

Khalid goes, "Mmm hmm."

THE COURT: I'll overrule it.

Members of the jury, it's going to be for you to interpret these conversations. You can decide what people meant, what people were talking about. Again, you're the judges of the facts so you're to take your interpretation, but I will allow the question.

MR. SAVAGE: Okay.

THE COURT: Overruled.

Q. Did you tell the defendant that he would be expected to kill for ISIS if he went to Syria?

A. Yes, sir.

Q. How did he respond?

A. He said no problem.

Q. Did he say -- with regards to jihad, did he make any comments regarding jihad?

A. Yes, sir.

Q. What did he say about jihad?

A. He said that jihad -- what have to be done for jihad have to be done.

Q. And you clarified that by, "Meaning getting killed."

A. Yes, sir.

Q. And the defendant responded, "I'm no hardened soldier in that respect on the battlefield, but at the same time, though, I'm no coward. If there's a disgruntlement around me, I don't take much BS and stuff. So if there's a situation that arises and something needs to be done, that needs to be done." Was that his response?

A. Yes, sir.

Q. How was the defendant planning to pay for his travel to Syria?

A. He was working on some cars and trying to raise some money.

Q. And was there a discussion between him and Bilal about future plans to raise that money?
A. Yes, sir.
Q. Were they working on that?
A. Yes, sir. They were working on some cars.
Q. Was the defendant concerned about the FBI at all and their possible -- any possible investigation?
A. He was concerned about his friends in Syria going to Turkey, that the FBI might know about them.
Q. Subsequently, was there a discussion, if you recall -- and I can play the tape, but maybe we can save some time -- about the defendant crossing into Canada using an ID card?
A. Yes.
Q. What do you recall about that discussion?
A. I told him that moving from States to Canada, Mexico, you don't need a passport. You need just ID passport.
Q. And did he indicate that he had an ID?
A. No.
Q. Okay. What did he say?
A. He has a passport.
Q. Okay. And did he say that he needed to renew that passport?
A. He said the stamps from Syria and Egypt are going to be a problem. He can renew the passport.
Q. Thank you. And was there a discussion about how much it

would cost to get a new passport?
A. Yes.
MR. SAVAGE: And then finally, we're going to go to clip three and play that starting at 15:44 to the end.
May we have just a moment, Your Honor?
(Pause.)
(Government's Exhibit Number 6 resumed.)
MR. SAVAGE: Thank you.
BY MR. SAVAGE:
Q. Now, to be clear, there is a lot more to that conversation than just those parts that we just played for the jury; is that right?
A. Yes, sir.
Q. And they're all included on the tape, the entire thing --
A. Yes, sir.
Q. -- that is Government's Exhibit 6.
But let me go back to just this last part. Did you discuss with the defendant Canada as a possible route to travel to Syria?
A. Yes, sir.
Q. Why Canada?
A. Because with the American passport it is easy to get to Canada.
Q. And then how does one -- what was the route from Canada to Syria?

A. When you get to Canada, it's easy to get to Europe before you get to Turkey. You get to any country in Europe and from there you get to Turkey.
Q. And that was all discussed with the defendant.
A. Yes, sir.
Q. Now, you get to a part in this particular part of the transcript where you talk about some of the brothers wanting to come back. What brothers were you referring to?
A. The brothers who went to fight and when they got there they changed their mind. They got scared and they want to come back.
Q. And what did the defendant have to say about those brothers?
A. They are coward.
Q. In fact, he said, "May Allah forgive these brothers because that's the big -- that's one of the worst things to do, brother."
A. Yes.
Q. He also asked you questions about what it would be like there.
A. Uh-huh.
Q. "They wear body armor there, don't they?"
A. Yes, sir.
Q. And you responded how?
A. "ISIS. You have an army. You have everything."

Q. Let me draw your attention to the 19th of November of 2014. Did you meet with the defendant in Charlotte again on that day?
A. Yes, sir.
Q. And where was that meeting?
A. All the meetings were in public places, mall or something like that.
Q. Okay. That one was again in Matthews in a car.
A. Yes.
Q. Okay. And how was -- was the meeting recorded?
A. Yes, sir.
Q. And how was it recorded?
A. With an FBI device.
Q. Okay. And did you activate that recording equipment?
A. Yes, sir.
Q. To your knowledge was it in working condition on that day?
A. No.
Q. The recording equipment, did it work?
A. Yeah.
Q. Okay. Did you review a recording of that --
A. Yes, sir.
Q. -- which is marked as Government's Exhibit 7, before coming here today?
A. Yes, sir.

Q. And that recording is probably about -- let's see, about half an hour, 45 minutes long was that meeting?
A. Something like that, yes.
Q. And the entire -- the entire thing was recorded?
A. Yes, sir.
Q. And you reviewed two transcripts of that meeting which begin on -- the first clip begins at 13:14 and ends at 13:30. The second -- I'm sorry, it ends at, my mistake, 13:33. And the second transcript beginning at about 13:35 and ending at 13:54.
A. Yes, sir.
Q. And when you reviewed those transcripts, were they verbatim transcripts of the conversations that were contained in those tapes?
A. Yes, sir.
Q. And to be clear, that Exhibit 7 includes the entire video even if not all of it is transcribed.
A. Yes, sir.
Q. Was the transcript -- were the Arabic words accurately translated?
A. Yes, sir.
Q. Okay.
MR. SAVAGE: Your Honor, at this time we move for admission of Government's Exhibit 7 and the transcripts at clips 7A and 7B.

MR. TATE: No objection.

THE COURT: Let them be admitted and published.

(Government's Exhibits Nos. 7, 7A, and 7B were received into evidence.)

MR. SAVAGE: We're going to publish just the part that begins at 13:48.

THE COURT: Once again, the evidence is the tape and the transcript is there to aid you in hearing the tape.

MR. SAVAGE: And just to 13:49. Okay.

(Government's Exhibit Number 7 was played.)

MR. SAVAGE: Let's stop there.

BY MR. SAVAGE:

Q. Now, in that part of the tape, to put it in context, why are you describing your travel to the defendant? What are you describing?

A. Because he wasn't getting no money to travel and we have to pick some time. And I was working. I have my own job. I'm not able to be with him every day. So I have to pick some time. And I have a family. So I told him I'm traveling. I'm going somewhere.

Q. Okay. That's part of your cover, that you were traveling.

A. Yes.

Q. Okay. And you were saying that you were driving and it was taking a long time and --

A. Yes.
Q. -- it was tiring.
A. I told him it was cold. I'm not driving. I think I'm flying. That when he told me he can get me some cheap pass.
Q. Okay. In fact, his exact words, "If you need a buddy pass or something like that to be cheaper on the flight, let me know."
Had you ever -- was that a yes?
THE COURT: Wait, wait, wait. It has to be a question. Is that right?
Q. Is that right?
A. Yes, sir.
THE COURT: All right. Thank you.
MR. SAVAGE: Thank you.
Q. And had you ever mentioned a buddy pass or a cheaper flight to him before?
A. No, sir.
Q. Was this the first time that a buddy pass or a cheaper flight was suggested to you?
A. Yes, sir.
Q. Who made the suggestion?
A. Amir.
Q. Do you know about -- did he explain to you or did you know how he could get a buddy pass or a cheaper flight?
A. He did. He told me he get someone at airplane company

can help him to get a cheaper buddy pass.
Q. Okay. But he didn't tell you who.
A. No.
Q. Was there a period -- a long period of time at the end of 2014, early part of 2015 when you did not meet with the defendant?
A. Yes.
Q. Okay. And what were you -- generally speaking, what were you doing in that time?
A. I'm living my life.
Q. Okay.
A. Working, taking care of my family.
Q. Were you in contact with the defendant during that time?
A. No.
Q. Did he -- could he contact you in any way?
A. He had my email and my phone.
Q. Okay.

MR. TATE: Objection as to unresponsive. He asked him if he contacted him in any way and he said, "He had my email and phone." Never answered the question.

THE COURT: Okay. Is the answer yes or no, he had my email and phone? Did you contact him? Or is it no, he had my email and phone? Or is it yes, he did?

THE WITNESS: Your Honor, it's been a long time. I need something to refresh my memory.

THE COURT: I'm just going to leave it there. I think we've cleared it up for the jury. Go ahead.

Q. Let me draw your attention to the 18th of March 2015. Did you at that time have a Skype session with the defendant?

A. Yes, sir.

Q. Okay. And how is that -- if you recall, how was that Skype session arranged?

A. I think we were talking about the pass.

Q. Okay.

A. Okay. Can I go back a little bit?

Q. Sure.

A. When the FBI heard that recording about the pass, they found out that something is there so I have to push about that thing and see if he can get something. That's where we got Skype. I told him if he can get me a pass, and we had that discussion on Skype.

Q. And that was the purpose of that Skype call was to see if the defendant would follow through on a pass --

A. Yes.

Q. -- at the Charlotte airport?

A. Yes, sir.

Q. Okay. Before coming to court today, did you review the transcript which is both -- which is a combination of text, video, and audio before coming here today?

A. Yes, sir.

Q. What did you use to Skype the -- what equipment did you use to Skype with the defendant?
A. A laptop.
Q. Okay. And did that laptop have ability to record Skype?
A. Yes.
Q. Do you remember how you recorded it?
A. I had software called Snap.
Q. Okay. And that captured -- that captured the --
A. Captured the video, captured everything in the screen.
Q. Okay. And did you turn that recording over to the FBI?
A. Yes, sir.
Q. Where did you -- where was the -- do you know how the defendant was receiving it or what equipment he had to receive your Skype?
A. I think in his cell phone.
Q. And he also -- but you could see his face and you could hear him clearly.
A. Yes, sir.
Q. Did you review a transcript, which is marked Government's Exhibit 8A, which is a transcript of the Skype communication between you and the defendant on the 18th of March 2015?
A. Yes, sir.
Q. Thank you.

MR. SAVAGE: Your Honor, move for admission of Government's Exhibit Number 8.

MR. TATE: No objection.

THE COURT: Let it be admitted.

(Government's Exhibit No. 8 was received into evidence.)

MR. SAVAGE: May we publish Government's Exhibit Number 8?

THE COURT: Let it be published, yes.

(Government's Exhibit Number 8 was played.)

MR. SAVAGE: And if I can stop there just a minute before we start the...

BY MR. SAVAGE:

Q. Okay. At the very top of that -- can we make that larger? Is that possible or no?

There are some blue boxes with texts in them. Whose texts are those?

A. (No response.)

Q. Let me ask -- let me go back.

On Skype can you -- can you use a function where you can do a chat, a text conversation, as well as a video or audio conversation?

A. In Skype you can chat, you can make audio calls, and you can make a video of your calls.

Q. Was there a chat to arrange the call before the call itself?

A. You always start with the chats to make sure that

everything is good and everything is working.

Q. So those chats were not audio, they were just chats setting up the call.

A. Yes.

Q. And then the call occurs.

MR. SAVAGE: And then if we can play that.

(Government's Exhibit Number 8 resumed.)

THE COURT: Let's just stop for a minute so I can get -- I don't even understand what we're doing.

MR. SAVAGE: Let me --

THE COURT: Just a minute. Let's do a sidebar so I understand and then we'll tell the jury what's going on.

MR. SAVAGE: Okay.

THE COURT: Okay.

MR. SAVAGE: All right.

(Sidebar conference as follows:)

THE COURT: Okay. Are these with all the heavy breathing, are these the chats?

MR. SAVAGE: Yes.

THE COURT: Okay. Because it appears the way you've done it, it's the transcript of a call and nobody can hear.

MR. SAVAGE: Right, but it's the entire -- it's a transcript of the entire Skype communication.

THE COURT: Okay. All right. So right now all we're doing is the two of them are going back and forth.

MR. TATE: Messaging.

THE COURT: Messaging. They're messaging each other.

MR. SAVAGE: Yes, and they're recording.

THE COURT: And this is what's on those.

MR. SAVAGE: Right.

THE COURT: Okay. All right.

MR. SAVAGE: So I mean, I can -- I probably should have cued it up before. What it is is a recording from the witness's side. In a very few seconds the defendant's going to come on and there's going to be the verbal communication.

THE COURT: Okay.

MR. SAVAGE: Okay.

THE COURT: All right. I wanted to explain that to the jury because I didn't understand what was happening there.

MR. SAVAGE: Well, I tried to do that, but it didn't work.

(End of sidebar conference.)

THE COURT: Okay. Members of the jury, this is a -- part of this transcript here is repeating what is in this chat up top. You may have understood that. I did not. So what they're going to do is this is the chat part of the Skype and in a moment they will -- they will play the audio and I guess video part of the Skype, so that will happen in a few minutes. But this is the part, when it moves down, they're whatever

back and forth. You all probably know. Whatever you call it. All right.

MR. SAVAGE: Thank you, Your Honor.

THE COURT: Thank you. Start over, please.

MR. SAVAGE: Do you want us to start --

THE COURT: Yeah, start the tape over. Start that over again. I realize all we're going to do is read chats and heavy breathing, but...

MR. SAVAGE: At this point in time this is ready to start the audio.

THE COURT: I'd like to go back and read the -- because I was sitting there trying to hear what somebody was saying.

MR. SAVAGE: Okay.

THE COURT: And I was not able to pay as much attention to the transcript --

MR. SAVAGE: Yes, Your Honor.

THE COURT: -- because I was trying to hear the evidence.

MR. SAVAGE: We'll restart it at the beginning.

THE COURT: Thank you.

(Government's Exhibit Number 8 restarted.)

BY MR. SAVAGE:

Q. Mr. Khalid, when you refer in the transcript to "I'm trying to get him tickets," meaning the brother, "from Tampa,

Florida, to Buffalo, New York, and from there to Canada and from Canada to Europe so I can send him you know where," what were you referring to by you know where?
A. To Syria.
MR. TATE: Your Honor, we request an instruction at this time that this man's interpretations of what he meant is not evidence against Mr. Smith.
THE COURT: Well, the conversation is evidence that the jury can consider as to what value it has. But I will instruct the jury that his interpretation of what is being said and what he means by that and what he -- what he means he can say. What he understands is being said back to him, he can say. As for what it actually means is up for you as the jury to decide, and so the -- I'll leave it at that. Proceed.
Q. And when you said, "This brother is very important for us," what did you mean by us?
A. ISIS.
Q. With regards to Mr. Smith and his plans, did he indicate whether or not it was still his plan to travel to Syria if he could?
A. Yes.
Q. In fact, his words were, "I have everything in my mind and I have it planned out to where my strategy, where I have a plan now. I, inshallah, whenever I'm able to move, I can move, you know, comfort. And you know, you have to have, what

is it called, salat, like tranquility, like khushu." What is salat?
A. Prayer.
Q. And what is khushu?
A. Khushu in the prayer in Islam, when you start praying, you have to be out of this world and you be in contact with God. Nothing can disturb you. Nothing can interrupt you. Is only you and the God when you're praying. That's khushu.
MR. SAVAGE: Let me show just the witness and counsel and the judge what has been marked as Government's Exhibit Number 9.
Q. Mr. Khalid, before coming here today did you review this Exhibit Number 9?
A. Yes, sir.
Q. And what is it?
A. It is a text message in the phone.
Q. Okay. And do these text messages relate in any way to the conversation we just heard on the Skype?
A. Yes, sir.
Q. How do they relate?
A. He was sending me text to know about the information about the guy who we going to get ticket and stuff like that.
Q. Okay.
MR. SAVAGE: Your Honor, at this time we'd move for admission of Government's Exhibit Number 9.

MR. TATE: No objection.

THE COURT: Let it be admitted and published.

(Government's Exhibit No. 9 was received into evidence.)

MR. SAVAGE: Request permission to publish.

THE COURT: You may.

MR. SAVAGE: And if we could make the -- if we could make the top part larger and scroll down so we can all see it.

Q. So we can see across the top there it has a date. What did that date indicate?

A. March 18, 2015.

Q. Okay. Is that the date on which the text was sent?

A. Yes, sir.

Q. And these texts were sent and received on your phone?

A. Yes, sir.

Q. Okay. And if you -- are these verbatim transcripts of those phone texts?

A. Yes, sir.

Q. When it says from Smith and there's a 704 number, do you recognize that number?

A. Yes, sir.

Q. What was that?

A. That's Amir number.

Q. Okay. And it says, "7:00 is fine. I will see you there, inshallah." What does that refer to?

A. That's for the meeting.
Q. Okay. And what meeting was that?
A. My coming to give him the money for the pass.
Q. Okay. And then you asked him, "Any news about what I did ask you yesterday?"
A. Yeah, I was asking about the pass.
Q. And he responds, "I'm still working on it. I think I can do it Friday, but I will have to pay for it in person the same day."
A. Yes.
Q. Okay. How did you respond?
A. "How much money you need from me?"
Q. And then he says, I'll need how much?
A. About $80.
Q. Okay. Because it's a one-way ticket.
A. Yes.
Q. And then you asked what other information does he need, and how -- what information does he need about your traveler?
A. Yeah, and he said he needed his name and his ID and date of birth.
Q. Okay. And you didn't send it on these texts, right?
A. No.
Q. Okay. Why not?
A. It's a security matter.
Q. Okay.

A. Don't send information like that in the phone.
Q. Okay. And then did you, in fact, arrange a meeting after that in Charlotte in person?
A. Yes, sir.
Q. Let me show you what has been marked as Government's Exhibit -- well, let me say. And that meeting occurred the next day on about the 20th of March 2015; is that right?
A. I'm sorry, sir?
Q. The meeting occurred right after these texts on the 20th of March.
A. Yes, sir.
Q. And where were they?
A. In Charlotte.
Q. Okay. Were they in your car?
A. Yes, sir.
Q. And did you record it?
A. Yes, sir.
Q. Did you use the same equipment as before?
A. Yes, sir.
Q. And did you review that recording as Government's Exhibit Number 10 before coming here today?
A. Correct.
Q. And is it the same as -- do you recall it being in person back on the 20th of March --
A. Yes, sir.

Q. -- 2015?
A. Yes, sir.
Q. Have you reviewed a transcript of that call as well?
A. Yes, sir, I did.
Q. And was it verbatim and were the translations accurate?
A. Yes, sir.

MR. SAVAGE: Your Honor, move for admission of Government's Exhibit 10 and the transcript, 10A.

MR. TATE: No objection.

THE COURT: Let it be admitted.

(Government's Exhibits Nos. 10 and 10A were received into evidence.)

(Government's Exhibit Number 10 was played.)

MR. SAVAGE: If we can stop the tape for just a minute.

BY MR. SAVAGE:
Q. This earlier part is a phone call and it's just you in the car; is that right?
A. Yes.
Q. And then the defendant arrives. The next thing that happens --
A. Yes.
Q. -- is the defendant arrives after the phone call --
A. Yes.
Q. -- in just a few seconds.

MR. SAVAGE: May we proceed, Your Honor?
THE COURT: Yes.
MR. SAVAGE: Okay. Thank you.
(Government's Exhibit Number 10 resumed.)
BY MR. SAVAGE:
Q. Mr. Khalid, did you know anyone by the name of Mohamed Hilal?
A. No, it was a made-up person.
Q. So was there an actual ISIS fighter who was going to be traveling from Tampa to Buffalo?
A. No.
Q. But you told the defendant that there was such a person.
A. Yes, sir.
Q. At any time did he hesitate to buy the ticket?
A. No.
Q. Let me show you what's been marked as -- admitted as Government's Exhibit Number 11, and I'll ask if you'd go to page 2.
Did you receive this email from the defendant later that day?
A. Yes, sir.
Q. And what is the information that was provided?
A. The ticket from Buffalo, Florida -- from Tampa, Florida, to Buffalo, New York.
Q. And was this the very same information that you had just

provided in that recording -- or that meeting to the defendant?
A. Yes, sir.
Q. So he went from there to the airport on that very day and bought the ticket.
A. Yes, sir.
Q. Do you know if anyone traveled on that ticket?
A. No.
Q. You don't know or did anyone travel?
A. No, nobody traveled.
Q. Okay.
A. Because there is no Mohamed Hilal.
Q. Let me show you what's been marked and admitted as Government's Exhibit Number 13.
And this is an email dated Sunday, the 22nd of March. That was the day on which the travel was supposed to have occurred; is that correct?
A. Uh-huh.
MR. SAVAGE: If we could go to the next page.
Q. Did you receive this email from the defendant asking you what had happened?
A. Yes, sir.
Q. Did you respond immediately?
A. I can't remember exactly if I did respond.
Q. Okay. Well, let me show you what's been admitted as

Government's Exhibit Number 14.

Is this an email you sent to the defendant about a week later on the 31st of March?

A. Yes, sir, I remember that.

Q. And that is all in caps and it's basically -- it says you're sorry you didn't contact him afterwards, but that the brother had traveled, but there was some confusion.

A. Yes, sir.

Q. Is that the gist of that?

Why did you send this email?

A. Because the brother -- there is no brother to travel.

Q. Okay.

A. So I have to explain to him why he didn't -- he didn't travel.

Q. Okay. So in -- the defendant -- let me show you what's been marked and admitted as Government's Exhibit Number 15.

MR. SAVAGE: 15 is in, right?

THE COURT: Mr. Savage, how much longer do we have on direct?

MR. SAVAGE: This is it.

THE COURT: Okay.

MR. SAVAGE: I can see the end.

Q. And this is an email you received on the 11th of April, is it not -- if you can make the other part large -- from Amir Alexander; is that right?

A. Yes.

MR. SAVAGE: If we can go to the text on the next page.

Q. And he says to you, "I can't have anything to do with this. All I wanted was to go visit my friends to make sure he and his family was okay. You then started asking me to do things I had no intention of doing. I can't have anything to do with this period."

Did you receive that email?

A. Yes, sir.

Q. In any of your encounters with the defendant, did you ask him to do anything he didn't want to do?

A. No, sir.

Q. Who initiated the contact in this whole thing?

A. Him.

Q. Who asked for help traveling to Syria?

A. Him.

Q. Did you warn the defendant many times that he was planning -- what he was planning was dangerous and illegal?

A. Yes, sir.

Q. Who first offered --

MR. TATE: Move to object. Never once did we see anything where he said it was illegal. Move to strike. Leading.

THE COURT: I'll sustain the illegal. Strike the

word illegal.

Stick with what the transcript is, Mr. Savage. You'll be able to argue --

MR. SAVAGE: Yes, sir.

THE COURT: -- what you say it is. The defense can argue what they say is going on.

MR. SAVAGE: Certainly, Your Honor.

THE COURT: And this jury will be able to tell what the story is.

Q. Who first offered the buddy pass?
A. Him.
Q. Was this your last contact with the defendant?
A. Yes, sir.

MR. SAVAGE: Your Honor, we'll pass the witness to the defendant.

THE COURT: All right. Members of the jury, we're going to take our lunch break at this time. Enjoy each other's company, or not. And go out in the sunshine or stay in here, it's your choice.

Now, don't talk about the case. Don't let anybody else try to talk to you about the case. I don't anticipate anybody is going to come up to you, but if anybody does, do not talk to them about the case.

And remember, the attorneys in the case are going to appear rude if you happen to bump into them because they're

not supposed to engage in any contact with you.

So be safe. We'll see you back here at, let's say, 2:00. Okay. Thank you.

(Jury exited the courtroom.)

THE COURT: All right. You may come down.

(Witness stepped down.)

THE COURT: Okay. We'll have cross and then...

MR. SAVAGE: Then it will be Agent Godfrey. And depending on how much of that conversation is played, it will take him about an hour. And I would expect that the direct would be somewhere around an hour and a half.

THE COURT: Including --

MR. SAVAGE: Including that.

THE COURT: Because it's -- these have taken longer than your projections have been.

MR. SAVAGE: Well --

THE COURT: We're going to go into the evening if we have to to try to get this evidence in, if we can get it today. Get in defense evidence if we can get it today. And come in early in the morning if we have to and get the evidence in, get this case to the jury tomorrow and give them time to deliberate --

MR. SAVAGE: Yes, Your Honor.

THE COURT: -- tomorrow.

But there is -- I understand context and everything,

but -- you know, play what you need to play. I'm not going to -- I'm not limiting what you play, but you sometimes bury the important part in some of this stuff.

MR. SAVAGE: Well, Your Honor, I don't mean to displease the Court or bore the jury, but there is also agreements with the defense regarding the -- how much we would play of these tapes. So we tried to accommodate the --

THE COURT: Okay. Well, then, that would explain some of it because some of it I'm sitting here listening to it going why are we...

MR. SAVAGE: Right.

THE COURT: Okay.

MR. SAVAGE: Okay.

THE COURT: All right. Mr. Tate, any questions about anything at this point?

MR. TATE: No, Your Honor.

THE COURT: Okay. All right. Let's be back at 2:00 and ready to go.

(Lunch recess at 12:51 p.m.)

WEDNESDAY AFTERNOON, MARCH 20, 2019

(Court back in session at 2:05 p.m.)

THE COURT: Okay. We need a witness.

MR. SAVAGE: Yes, Your Honor.

(Witness resumed the stand.)

THE COURT: All right. Anything for the Court

before we resume?

MR. SAVAGE: No, sir.

THE COURT: Okay. Let's bring them in.

(Jury entered the courtroom.)

THE COURT: All right. Mr. Tate, you may cross examine.

MR. TATE: Thank you, Your Honor.

ABU KHALID

CROSS EXAMINATION

BY MR. TATE:

Q. Good afternoon, Mr. Khalid. My name is Kevin Tate. I represent Alexander Smith.

A. Yes, sir.

Q. I'm going to ask you some questions this afternoon.

We haven't had an opportunity to meet or speak before, have we?

A. No.

Q. I'm going to ask you to speak up and make sure you speak --

A. No, sir.

Q. Okay. Thank you.

Prior to testifying here today, did you prepare for your testimony?

A. What you mean by prepare?

Q. Did you review reports and transcripts?

A. Yes, sir.
Q. And you did that because you understood you'd be asked about them under oath in court, correct?
A. Yes, sir.
Q. And in order to make sure that you were giving the correct answers, you're allowed to review those transcripts, read them, make sure you were able to answer the questions to the best of your ability, correct?
A. Yes, sir.
Q. And how many times did you do that?
A. Three or four times.
Q. And in fact, were you given the transcripts, allowed to take them home and read them?
A. No.
Q. Okay. Did you read them in someone's office?
A. Yes, sir.
Q. And about how many hours did it take you to do that?
A. Long time.
Q. More than five hours?
A. Sometimes, yes.
Q. And each time you went in, those three or four times, you took several hours to review all of those records, correct?
A. Yes, sir.
Q. And then you were told what questions you would be asked here in court?

A. I'm sorry, what's that?
Q. You were told what questions you would be asked about here in court?
A. No.
Q. Did you go over any questions?
A. We went over all the scripts and the videos and stuff like that.
Q. And who did you go over that with?
A. With the U.S. attorney.
Q. With the U.S. --
A. I don't know what they call him.
Q. Did you say the U.S. attorney?
A. I don't know the name in English so...
Q. Prosecutor?
A. Yes.
Q. FBI agents?
A. FBI agent, that was before.
Q. Okay. You reviewed them with the FBI agent before and then you came back and did the same thing with the prosecutor?
A. No, the FBI was when I did the recording, I gave them to them. They asked me, "What's this, what's this," and I tell them what is that.
Q. Thank you.
And that was all in preparation for your truthful testimony here today.

A. Yes, sir.
Q. All right. Now, we heard several times in the transcripts, we heard Mr. Smith use the term na'am.
A. Yes, sir.
Q. Is that an Arabic term?
A. Yes, sir.
Q. And you testified that it meant yes.
A. Yes, sir.
Q. But in actuality, na'am can mean okay.
A. Na'am is yes.
Q. Does it also mean okay?
A. Na'am is yes.
Q. Okay. Well, how do you say okay in Arabic?
A. We don't have okay in Arabic.
Q. Do you have yeah?
A. We have na'am.
Q. If you're speaking to someone and someone is speaking and you're acknowledging that you hear what they're saying, in English you might say, okay, yeah, yeah, okay, as they're talking.
A. If we talk in Arabic, it's na'am.
Q. Okay. And that's the equivalent if in English, me and you were talking in English and you're talking, I say, uh-huh, yeah, okay.
A. Na'am for English is yes.

Q. Okay. But as a conversation piece, when someone is in conversation and they're talking in English -- let's say we're talking in English, okay?
A. Uh-huh.
Q. Just like you went uh-huh, you're acknowledging that you heard what I said, right?
A. Yes, sir.
Q. Is that the same way na'am is used in Arabic?
A. When you say na'am in Arabic, it is yes. That's the translation of na'am.
Q. So how would you say --
A. It's not okay. It's not uh-huh. It's yes. It's na'am.
Q. How would you say uh-huh in Arabic?
A. Uh-huh.
Q. Okay. Same way. All right.
Now, when you say ashallah --
A. Inshallah.
Q. Inshallah, what does that mean?
A. Are you familiar with Muslims?
Q. Vaguely.
A. We don't assume something. Everything we do we have to say inshallah. That's mean with the will of God. If God wants you to do that stuff, you will do it.
THE COURT: Is the allah part of inshallah, the last word, is that God?

THE WITNESS: Allah is God, yes.

THE COURT: Yeah, so -- and so that's the last part And inshallah is...

THE WITNESS: Inshallah is if he will.

THE COURT: Okay.

Q. So when Mr. Smith was heard saying inshallah, that means if God's will.

A. Yes.

Q. And oftentimes when you talked about him traveling to Syria, he would say inshallah.

A. Uh-huh, yes.

Q. But God never willed it, did he?

MR. SAVAGE: Objection. I mean, now we're asking for an assumption of what God meant.

THE COURT: Yeah, I'll sustain that. Just ask the questions about what he did or didn't do. That's for argument to the jury.

THE WITNESS: I'm not God.

THE COURT: Hold on a minute. Hold on a minute.

You can argue that to the jury if you want to, that God didn't will it. Go ahead.

Q. Well, Mr. Smith never traveled to Syria, did he?

A. I'm not God.

THE COURT: That you can ask.

Q. Huh?

A. I'm not God.

THE COURT: He asked now -- we're not getting into the God part.

Did Mr. Smith, as far as you know, ever travel to Syria?

THE WITNESS: No, he didn't.

THE COURT: Thank you.

Q. And every time you asked him -- in several portions you would say, "What are your plans?"

A. Yes.

Q. And you said the reason you did that -- did he ever give you any plans?

A. What you mean any plans?

Q. Did he ever have a plan with you to travel to Syria?

A. Yes, he did.

Q. Okay. Well, why didn't he travel?

A. Ask him.

Q. Well, I'm asking you. You testified that you told him that you would help him once he got there.

A. I'm working for the FBI. I'm gathering information.

Q. Right.

A. That's all my job.

Q. Uh-huh, I understand that. But did he ever call you and say, "I need your help; I'm traveling to Syria"?

A. He didn't call me and tell me; but in the conversation,

it was all about traveling to Syria.
Q. Right. But he never -- following any of those conversations, he never called you and said, "I'm ready to travel to Syria; I need your help."
A. No, he didn't.
Q. And oftentimes -- many times in the conversations that we looked at, you would say, "If you know some good brothers, someone honest like you, give them my phone number or my email and put them in touch with me so I can help them."
A. Yes, I did.
Q. And nobody ever contacted you, did they?
A. No.
Q. He never gave you the name of a single person that was going to travel, did he?
A. He told me about a person, but he didn't give me the name.
Q. But that person never contacted you.
A. No.
Q. When you first met -- your first contact with Mr. Smith was on August 6th, 2014, correct?
A. I can't remember the dates, but it was in the summer of 2014.
Q. Why can't you remember the date?
A. It's 2014. We're in 2019.
Q. Okay. But you reviewed the transcripts ahead of time.

A. Yes.
Q. And even doing that you don't remember the date, do you?
A. No. When you give me something to refresh my memory, I remember.
Q. But your memory needs to be refreshed to help you remember, right?
A. Yes.
Q. Do you recall looking at Government's Exhibit 3?
MR. TATE: If we can pull it up to refresh his recollection.
MR. SAVAGE: Do you want us to?
MR. TATE: We'll see if we can do it.
Q. That was just a phone call. Do you remember the very first phone call that you had with Mr. Smith?
A. Yeah.
Q. And during that phone call he didn't mention anything -- it was a discussion about him coming to Raleigh the next day. Do you recall that?
A. I'm sorry, I don't get...
Q. It was a discussion between you and Mr. Smith about coming to Raleigh the next day, the very first phone call.
A. I can't remember.
Q. Can't remember.
We're going to put something on the screen to see if it helps you.

Do you recall that when you first talked to Mr. Smith, you asked him to meet you in Cary, North Carolina?
A. Yes, maybe.
Q. You maybe recall it, you maybe don't?
A. There was hundreds of hours of recording and calling and emails. I can't remember everything. If you have something to refresh my memory, I can tell you what's going on.
Q. Do you recall reviewing this prior to your testimony?
A. Yeah, I remember.
MR. TATE: This has been admitted so we can show it to the jury as well.
THE COURT: Yeah, if it's been admitted, you can show it to the jury. Anything that's been admitted can be shown.
MR. TATE: Is it on everyone's screen?
MS. NEILL: Yes.
MR. TATE: Okay.
Q. I'm going to ask you to take a look at this. And do you recall now that this is a discussion you had on August 6, 2014, with Mr. Smith about coming to Cary?
A. Uh-huh.
Q. And during this initial discussion, he doesn't mention anything to you about traveling for -- wanting to travel for ISIS, does he?
A. We can't talk about that stuff on the phone.

Q. I didn't ask you that. I'm going to say this to you again. I'm going to ask you a question and I'm going to ask you to answer my question.

THE COURT: The two of you don't argue together. But Mr. Tate is right. Answer the question first. What you would say is yes or no to the question.

THE WITNESS: Yes, sir.

THE COURT: And then you're allowed to explain --

THE WITNESS: Yes, Your Honor.

THE COURT: -- we didn't talk about it on the phone if you want to. But you do have to answer the question.

THE WITNESS: Yes, Your Honor.

THE COURT: And let's don't have arguments here. Thank you.

Q. This is the very first conversation you ever had with him, correct?

A. Yes, sir.

Q. And in this very first conversation with you, you didn't have any discussion about what could be talked about on the phone, did you?

A. I'm sorry, I didn't get it.

Q. In this conversation --

A. Yes, sir.

Q. -- you had no discussions with him about what could be talked on the phone and what couldn't, did you?

A. No, sir.
Q. And in this conversation he never mentioned one thing to you about wanting to travel for ISIS, did he?
A. No, sir.
Q. Now, the next day there was a -- we can take it down. There was a meeting in Cary and that was August 7th of 2014, correct?
A. Yes, sir.
Q. And one of the first things he told you was that he had some friends in Syria that he wanted to help defend; is that right?
A. That's right.
Q. And he didn't mention anything about ISIS, did he?
A. The first time, no.
Q. And then you asked him who was in charge. I can't remember the exact words you used. Who was in charge of this area. Did he tell you what area that was?
A. Which area was his --
Q. In Syria where his friends were.
A. Yeah, Kafr Hamrah.
Q. And Kafr Hamrah is part of Aleppo?
A. Aleppo is different than Kafr Hamrah. It's two different cities.
Q. Have you ever been there?
A. No.

Q. Okay. How would you know?
A. That stuff start in Syria. Everybody knows about Syria in all the news. I did some research.
Q. You did some research on your own?
A. Yeah.
Q. And so you're saying -- your testimony is that Kafr Hamrah is not a part of Aleppo?
A. No, I'm not saying it's not -- it's not part of Aleppo. Kafr Hamrah is a small city. Aleppo is a big city.
Q. I understand. They're nearby.
A. You can say that, but they are not the same city.
Q. Okay. Where is Kafr Hamrah since you did some researching and --
A. It's in Syria.
Q. I know, but where is it in relation to Aleppo?
A. I don't know.
Q. Okay. You don't know how many miles away it is?
A. No.
Q. You don't know if it's north or south?
A. I don't know.
Q. Now, one of the first things he told you is, well -- on August 7, 2014, was that he was in some need of financial help.
A. Yes.
Q. And he told you he had been out of a job for a month.

A. Yes.
Q. And you told him you could help him.
A. Yes.
Q. And one of the other things he told you is that when he's traveled internationally, he's always had problems getting back into the country.
A. He said that.
Q. And you asked him when he could travel, if he was able to travel. And do you recall him telling you he could not travel; he needed to resolve some family affairs?
A. That's what he said.
Q. So he hadn't reached any agreement with you to travel at least on August 7, 2014.
A. No.
Q. Then your very next meeting with Mr. Smith was on about August 20th, 2014, correct?
A. Uh-huh.
Q. And was that meeting in person?
A. Yes.
Q. It was in Charlotte. It was about, let's say, almost two weeks later.
A. Yes, sir.
Q. In between those two weeks, did you have any communications with Mr. Smith?
A. Maybe by email or cell phone. I can't remember all that

stuff.
Q. You can't remember. Do you remember him ever -- between those two meetings, ever contacting you and saying, "I'm ready to travel to Syria to fight for ISIS"?
A. No, he never called me and told me that "I'm ready to go fight with ISIS."
Q. So when you met him on August 20th, 2014, you asked him whether he had been in training, correct?
A. In what?
Q. You asked him had he been training.
A. Yes.
Q. And he said no.
A. Yeah.
Q. You asked him had he obtained any weapons.
A. Yes.
Q. And he said no.
A. Yes.
Q. And he mentions to you during that conversation as well that he spoke with the family in Kafr Hamrah, correct?
A. Yes.
Q. And during that same conversation, does he tell you that he's going to travel to Syria to meet that family?
A. In the same conversation?
Q. Yes.
A. Maybe.

Q. Do you recall him complaining again on August 20th of 2014 that he had barely had enough gas to get where you were meeting him at and he had no money?
A. I'm sorry, what's that?
Q. Do you recall during the August 20th, 2014, meeting, him telling you he had no money and he barely had enough gas to get to where he was meeting you?
A. Yeah.
Q. Do you recall him -- you asking him what his plans were, and do you recall him telling you he wanted to travel to defend a family back there?
A. Yes.
Q. He didn't say he wanted to defend ISIS, did he?
A. Not at that time.
Q. And one of the things you start talking about was ISIS and that you arrange for people to travel to -- in support of ISIS.
A. I'm sorry, say that again.
Q. One of the things you mentioned to him is that you basically arrange for people who wanted to go train and fight for ISIS. You said --
A. Yes, sir.
Q. -- "I know you want to meet this family, but this is what I do."
A. Yes, sir, I did.

Q. And he -- his response was that he wanted to go there to defend a family back there.

A. The first time it was assisting about that. He wanted to find the family. But after that he has no problem to fight somewhere else.

Q. Where else did he go to fight?

A. He'll fight in Syria, so where you fight.

Q. So he fought in Syria?

A. We fight in Syria. When you fight in Syria, where you going to fight?

Q. I don't know.

(Simultaneous conversation.)

THE COURT: Whoa, whoa, whoa.

THE WITNESS: This is --

THE COURT: Hold on. Hold on a minute.

We know he didn't go over there.

MR. TATE: I understand.

THE COURT: Just ask directly.

MR. TATE: I did, but you got to get a direct answer.

THE COURT: The question was so he went to fight in Syria. Everybody in this courtroom knows he did not go to Syria to fight. That's what I'm saying. Move on to questions that get --

Q. I'm going to ask you my question again. When you

mentioned going over to fight for ISIS, he told you he wanted to go there to defend a family back there, correct?
A. Yes, the first time.
Q. And he mentioned to you that he wanted to be with his brothers. He knew his brothers well and that's where he wanted to go. Do you recall that?
A. Yeah.
Q. And that was his -- the family back in --
A. No, the brothers is not the family.
Q. Well, when he said brothers, he didn't define brothers, did he?
A. When he say the brothers, he meant the brothers. He means the jihadi brothers.
Q. All right. But let's look at that. Let's pull it up then, the August 20th.
You reviewed the transcript. Mr. Savage went through that August 20th, 2014, correct?
A. Yes, sir.
Q. I'm going to show you the transcript. It's already been read so we don't have to play it again.
MR. TATE: Can everybody see that?
MR. SAVAGE: No.
MR. TATE: You're going to get it on your screen.
Can you see it, Mr. Savage?
MR. SAVAGE: Yes, we're good.

THE COURT: Can the jury see it?
THE JURY: (Affirmative nods.)
Q. This is a transcript that you reviewed prior to testifying and it was played already during the recording. Do you recall that?
A. Yes, sir.
Q. All right. This is page 2. This is where you ask him did he get any weapons. We covered that.
You asked him does he speak any other languages. He says no.
Here's where you -- this is where you testified, "Yeah, okay. See, we have bigger enemies."
You don't divide -- you don't say who that bigger enemy is, do you?
A. I said they were hit by American air force.
Q. It says, "For that the brothers are looking for new brothers, a lot of brothers. It doesn't matter. They want some with training. So don't have time to just start training people and stuff."
Do you remember that?
A. Yeah.
Q. And you say, "One more thing. Did you communicate with Kafr Hamrah?"
Who are you talking about?
A. The family he want to protect.

Q. He says, "I talked to the son today, inshallah," and he mentions Kareem.
You never actually met Kareem, right?
A. No.
Q. You don't know anything Kareem may have told the FBI here in Charlotte, do you?
A. No.
Q. Then you tell him, "Kareem is done with you."
Why do you say that?
A. I don't want him to go back to Kareem. He need to talk to me.
Q. Then you ask him, "Have you raised any money?"
And what he says on here is, "Nah, I haven't had any work. There's been no work. I barely have enough gas."
Do you remember me asking you about that?
A. Yes, sir.
Q. All right. Now, let's go down here to the six-minute mark where you say, "There is one thing, the brothers. I did talk with my emir. I told him that's your intention to travel is to defend a family back there." Right?
A. Yes.
Q. That's what you understood his intentions to be.
A. That's what he told me.
Q. Well, this is you talking, right?
A. Yeah.

Q. That's your words.
A. Yeah.
Q. "And he did ask me that if that family is fighting with Dawla Islam?"
A. Dawla Islam.
Q. Right.
He says, "We can't really talk freely on Skype. From my understanding, yeah."
That's what he says, correct?
A. (No response.)
Q. At that point, correct?
A. Yes.
Q. And you say, "If he asks you to fight somewhere else, not with the family, you would do it?"
He says na'am. Then he said, "But I'd rather be with the family and the brothers because they are on the same side. You see what I'm saying?"
When he says the family and the brothers, he doesn't say anything about ISIS, does he?
A. "You know what I mean." Did you read that?
Q. What do you want me to read?
A. See the brothers?
Q. My question is right here. This is Mr. Smith talking, right? He says, "Yes, but I'd rather be with the family and the brothers."

That's what he said, right?
A. Yes.
Q. He didn't say ISIS, did he?
A. Yeah, but the brothers for us are ISIS.

MR. TATE: Move to strike as unresponsive.

MR. SAVAGE: Your Honor, objection. He's misreading the transcripts. He says, "You know, my brothers, you know what I mean," which was the response that the witness gave. He's asking him for his opinion on what he meant. He gave it.

MR. TATE: I'm asking him what he said right here. "But I'd rather be" --

THE COURT: All right. Listen. Listen. Stick with what the -- stick with what the transcript says and then he -- a while ago we were not saying what his -- we were going -- I was making you only ask -- or making the government only ask what his opinion of what the conversation was about, not what the defendant's conversation was about.

MR. TATE: And I haven't asked him his opinion. I asked him what did Mr. Smith say.

THE COURT: Well, specifically the words. But then you -- he's taking the words one way. You may be taking the words another way. The jury will decide what the words actually mean. Y'all can fight over what the word brothers means. They'll be able to see the context. They can decide what all of that means when they have this after arguments.

MR. TATE: All right.
Q. But he says he'd rather be with the family and the brothers, correct?
A. Yes.
Q. He doesn't mention Daesh.
A. No.
Q. He doesn't mention ISIS.
A. No.
Q. Then he says, "I can do it. I can do it. Like I said, if the chance arises, I'd rather be with, you know, my brothers."
Who -- did you have an understanding of who his brothers were?
A. The brothers are the mujahideen.
Q. When he says, "You know, my brothers. I'd rather be with my brothers."
A. Yeah, when I say with my brothers, I mean mujahideen. Every Muslim means that.
Q. "When I went to Syria the first time, they took me into their home."
Do you know who took him into his home the first time he went there?
A. Yeah, the family he want to defend.
Q. Right. So when he says, "You know, my brothers, you know what I mean, the ones -- the ones I know -- the ones when I

went to Syria the first time, they took me into their home."
He never said -- told you that ISIS took him into their home, did he?
A. He didn't say that.
Q. He says, "I trust them, I know them, you know what I mean."
A. Yeah.
Q. And he's talking about the family in Syria, correct?
A. Yes, sir.
Q. Do you recall him asking you how long -- in that same conversation, how long you had known Kareem?
A. Yeah.
Q. And you lied to him and told him that you met Kareem in Dubai, right?
A. Yeah.
Q. Do you recall him asking you about how it could be in Islam that different groups could fight each other and still be in Islam?
A. Yeah.
Q. At that point did you understand he was trying to get information from you that he thought you had about what's going on in the Middle East?
A. Yes.
Q. He was curious.
A. Yes.

Q. He was asking questions.
A. Yes.
Q. And toward the end of that conversation on August 20th of 2014, he tells you again that he's been employed -- unemployed for a month and he needs more work.
A. Yeah.
Q. Did you find him some work after that August 20th meeting?
A. I didn't find him work, but we got somebody else to try to help him to get some money.
Q. And who was that somebody else?
A. His name is Bilal.
Q. Okay. Did you make the introduction between Mr. Smith and Bilal?
A. Yeah, I think I did give him his phone number and he called him. I can't remember exactly how he met him.
Q. Were you there when he met him?
A. I can't remember exactly. It's been five years.
Q. I understand.
Q. But as you sit here today, you can't say you were there and introduced them face-to-face.
A. To be honest with you, I can't remember.
Q. Okay.
A. If you have something to refresh my memory, I can remember.

Q. Do you know whether it was in September or October that you introduced him to Bilal?
A. I can't remember exactly the date.
Q. Between August 20th, 2014, and your next meeting with Mr. Smith, which was in November, I believe it was almost seven weeks later, on November 11th of 2014. Do you recall that?
A. Yes, sir.
Q. And you reviewed the transcript of that --
A. Yes, sir.
Q. -- conversation as well prior to testifying.
In between those seven weeks, had you had any contact with Mr. Smith?
A. I don't think so.
Q. Because he was dealing with Bilal now, correct?
A. You have to know something. I'm working for the FBI. I do whatever they tell me to do.
Q. Right.
A. I don't look for the people.
Q. Right.
A. What FBI do -- tell me, I do it.
Q. I understand that. Did the FBI -- between those seven weeks, did the FBI ever ask you to contact Mr. Smith?
A. I can't -- I can't remember exactly what happened. But for six or seven weeks, we didn't get no contact because I

have my own life. I have my work. I have my family. I have to take care of them. I don't have only this thing.
Q. But Mr. Smith had your phone number.
A. Yes.
Q. And he never called you.
A. You have to know that phone was only for that case. It's not my phone number. It's not my real phone number.
Q. I understand. I'm asking did he ever call the phone?
A. He might call, but the phone was off.
Q. Okay. Could you receive messages on the phone?
A. I can't remember.
Q. You can't remember whether you could receive a message on the phone?
A. I can't -- I can't remember if I did receive them in that period or not because it's been four or five years. It's not yesterday.
Q. So you don't have any recollection of him ever trying to contact you during that seven weeks.
A. I can't remember.
Q. Now, the next time you met with him was on the 11th and that was a recorded conversation, and we looked at the transcript.
Mr. Khalid, I'm not going to play the tape again, but I'm going to put the transcript in that's been admitted into evidence. I'm going to ask you to look at it.

Do you see that?
A. Not yet.
Yes, I can see it now.
Q. All right. Now, this is on November 11th of 2014. And this is a hotel room that you were staying in, right?
A. Yes.
Q. And we only played portions of the conversations that happened that day.
A. Yes, sir.
Q. And the first thing you ask him is, "Brother Amir, what are your plans?"
A. Yes, sir.
Q. And his response to you is, "What do you mean?"
You say, "You know, what we talked about before."
And he says, "Na'am."
And you say again, "I want to know your plans."
Why are you asking him that?
A. I want to know what's in his mind.
Q. Okay. And what he says, "Inshallah, God willing, me and this brother have some investments that we're trying to make and make some money."
A. Yes, sir.
Q. What brother is he referring to there?
A. I think Bilal.
Q. Bilal, right?

A. Yes.
Q. And you know him as an FBI informant, correct?
A. Yeah.
Q. All right. Then you say, "No, tell me what your plans for Syria."
And his response is, "The money. I need to get money to get there and that's what we're working on, so I can have money to get there."
A. Yes, sir.
Q. Then you ask him, "So the family you are -- you're still talking to them."
What family are you talking about?
A. The family in Kafr Hamrah.
Q. And he had asked you earlier on whether you knew Wael. Do you remember him asking you that? He said, "Do you know Wael?"
A. Wael, yeah.
Q. And you said, "Wael who?"
A. Yes.
Q. And then he said, "Wael Kodaimati."
A. Yes.
Q. Did you understand when he references the family and you reference the family, you're talking about the Kodaimati family?
A. Yes.

Q. Okay. And he says, "I talk to them, yeah. I talk to them all the time. They're my friends. You know, I talk to them all the time."

Then you asked him, "So are you planning to meet them -- to go to Syria and meet them or are they meeting you somewhere else?"

And he tells you that, "Right now, you see, it's complicated now, ah, because the son is in Turkey right now."
A. Yes.
Q. And Turkey is outside of Syria, correct?
A. Yes, sir.
Q. And Turkey is not an ISIS stronghold, is it?
A. No.
Q. It's not an ISIS-ruled territory, is it?
A. No.
Q. He mentions that where they were talking about the FBI and stuff.

And you say, "FBI."

And he says, "I don't know what's the situation with him in Turkey and what's going on there. I'm getting more information slowly to figure out what's going on. But as of now him and his brother are in Turkey and I think Ankara."

Did you know what he meant by Ankara?
A. Ankara.
Q. Ankara.

A. Ankara, the capital of Turkey.
Q. Capital of Turkey. And one of the things he's telling you is he's trying to figure out what's going on.
A. Yes.
Q. He couldn't tell you what was going on with the guy in Turkey because he didn't -- he said he was slowly figuring it out, correct?
A. Yes.
MR. TATE: Then if we can go to page 2 at the top.
Q. Do you see that? That's Mr. Smith talking to you. And he says, "I think that's where they are in Turkey and, ah, he's staying with some brothers there."
And when he uses the term brothers there, he's not referencing ISIS, is he?
MR. SAVAGE: Objection, Your Honor. This has been repeated. This witness cannot talk about what the defendant thought, intended, or otherwise meant.
THE COURT: Sustained.
Q. What did you understand him to mean by he's staying with some brothers in Turkey?
A. Well, all brothers in Islam.
Q. Right, that's the point I'm trying to make.
A. But let me explain to you. In that situation we were talking about brothers, it's always with the mujahideen because we call the mujahideen brothers. That's what I

understand.
Q. But in Islam you refer to everybody as brothers, right?
A. Yes.
Q. And when he's referring to brothers here, are you trying to say he meant that?

MR. SAVAGE: Objection, Your Honor.

THE COURT: Yeah, sustained. Don't get into what he thought.

MR. TATE: I'm asking what he thought.

THE COURT: What he thought you can do, but don't argue with him about it. When he tells you what he thought, don't go, "No, you must be wrong. It's this."

MR. TATE: Okay.

THE COURT: Just let him tell what he thought.

MR. TATE: I understand.

THE COURT: Okay.

Q. Let's look at this in context here, Mr. Abu Khalid. When he says, "I think that's where they are in Turkey and he's staying with some brothers there" --

MR. SAVAGE: Objection, asked and answered.

THE COURT: Overruled.

Q. -- what did you understand that to mean?
A. In that situation, in that area when you say brothers, it's mujahideen.
Q. Okay. In Turkey?

A. Everywhere in the world.
Q. Okay. Then he says, "He was telling me that eventually he's trying to get his family, like his mother and father, but not really his father, his family, like his mother and his sisters, to Turkey because the onslaught type of thing that's been going on there."
A. Yeah.
Q. He's telling you that they're trying to get their family from Syria into Turkey, correct?
A. Yes.
MR. TATE: And let's go down to where it says Smith. Let's blow this up right here.
Q. Mr. Smith says, "They want to know what's the effect, what's it going to be. It's going to be, you know, confrontation."
What is that word that's underlined there?
A. Mujahireen wal-Ansar.
Q. And what does that mean?
A. Mujahireen is the wrong word. It's Muhajirin wal-Ansar.
Q. Does it mean immigrants and helpers?
A. Immigrants is Muhajirin, not Mujahireen. That's the wrong word.
THE COURT: All right. Which one is this now? What exhibit is this?
MR. TATE: This is Exhibit -- let me get my exhibit

list out.

Exhibit 6 that's been admitted.

Q. So you're saying this is wrong.

A. The word right there, can you read it, is not Muhajirin. It's Mujahireen. Mujahireen is not -- if you go to the next line, you're going to find translation of Muhajirin. Muhajirin wal-Ansar.

Q. And then there's something that says JAMWA, J-A-M-W-A.

A. Yeah.

Q. And what does that mean?

A. Jaish al Muhajirin wal-Ansar. Jaish mean army.

Q. It says they're the Army of Immigrants and Helpers. Is that what it means?

A. Yes.

Q. And so Mr. Smith is referring here now to Army of Immigrants and Helpers.

A. Not helpers. Ansar is not helpers.

Q. And he wants to see how it plays out even though, you know -- you know, they fought together before.

And then you say uh-huh; is that correct?

A. Yes.

Q. Now, I'm going to ask you to look to the very next line.

Blow that up.

It says here, this is Mr. Smith talking, "Whatever way, brother, if when I -- if when," he uses the term if -- "when I

get to Turkey and there's some areas around there that brothers need help at," and then there's an Arabic term and it has -- is that true where it says "for the sake of God"?

A. Yes, fi sabilillah.

MR. TATE: Okay. You can take it down.

Let's go to the next page. We're going to go to 14:40:01. Blow up the next two.

Q. Okay. In this same conversation on November 11, 2014, it says, "That's what you wanna do. So about the financing, what's your -- what's your plans?"

You asked him what his plans are again, correct?

A. Yes.

Q. And he says, "Right now, like I said, me and the brother are working on this."

What brother is he talking about there?

A. Bilal.

Q. Okay. The FBI informant.

A. Yes.

Q. "This first project whereas with the car, to get maybe, you know, a couple thousand dollars in each of our pockets, but I have to pay some of that money back to the person that let me borrow it to finance it. So I might have to flip two or three cars before I have enough finances to finance the trip." Right?

A. Yes, sir.

Q. So at that point he could not finance the trip.
A. Yes, sir.
Q. All right.
MR. TATE: I want to go to the very next page on 4. And just blow up where it says 14:41:23 all the way down.
Q. Okay. This is the same conversation November 11th in the hotel room. This is Smith talking. He says, "The only concern I have over there is that I'm -- I'm -- I'm down with jihad and fighting, you know, the way we're supposed to fight, but as far as some martyrdom mission or something that I'm not, like, with that, you know what I mean. I feel that if a brother is going to fight, he's going to fight to live to the next day if he can."
Did you understand what he meant by martyrdom?
A. Martyrdom for me in Islam is --
MR. SAVAGE: Objection, Your Honor.
THE COURT: Sustained as to what he meant. You can argue that. You can argue that.
Q. I didn't hear his answer about martyrdom.
THE COURT: Because I'm not -- I said he can't do it. I'm sustaining the objection. What did he mean by it? Did he understand what he meant by it?
MR. TATE: That's what I asked him.
THE COURT: Not what he meant by it
MR. TATE: No, I didn't ask him that. I asked him

did he understand what he meant.

THE COURT: No, he can't answer that because we have kept that out as to him interpreting what your client is saying. That's for the jury to do. He can say what his understanding of it was, but he can't -- he can't read his mind. This is for the jury to look at the circumstances surrounding this. And then in a little bit we're going to actually hear testimony about what occurred with regard to any statements that we're trying here today.

All right. Go ahead. Ask the questions. But it's what -- he can say what he thought, but he can't say what he thought your client thought.

Q. What did you think when he said, "But as far as some martyrdom mission"?

A. Can I go to the first?

Q. Say it again, sir.

A. Can I start from the first what he's saying?

Q. Yes.

A. "I'm down with jihad and fighting, you know." He's okay with fighting and jihad. But when it comes to martyrdom missions, like people blowing their self and stuff, he don't want to do that.

Q. Yes. Okay. Thank you.

Do you see the next passage where it says, "But me myself will never volunteer, as of right now where my heart is, for

something like that, to do something like that. As far as picking up an AK or something like that, RPG, and going out there."

What did that mean to you?

A. He was explaining what -- he don't want to have nothing to do with martyrdom missions. But when it come to picking up AK or RPG, has no problem to do it.

Q. Okay.

A. That's what I understood.

Q. But he said he would never volunteer.

A. For what?

Q. Well, I wasn't --

THE COURT: Well, if y'all are going to start arguing, sustained. I'm sustaining my own objection to what he's talking about on that. In other words, if you want to ask him what he thought, what he took -- when he said it, but not what he means. In other words, we were -- we were objecting and I was sustaining objections to him saying what your client thought on the parts the government wanted to know. He's not going to do it on the parts that you want to know. The jury will look at this information, will review it in context and make its own decision about what's being talked about after you all argue to them about what's being talked about or not talked about.

MR. TATE: Okay. Let's go to 14:42:54 and blow that

up.
Q. Do you recall this part of the conversation here? "Mr. Smith: What I want, inshallah, is first for this Bashar al-Assad to go. That's number one."
A. Yes.
Q. Did you know who Bashar al-Assad was?
A. The Syrian president.
Q. And if you knew at this time, was the United States opposed to Bashar Assad?
A. I'm not a politician.
Q. You don't know?
A. I don't know. I'm not a politician.
Q. And then he's saying, "And while I'm doing this, trying to remove him, I want to help the family, like I said, do whatever they need to be done. To either be there and live with protection or to get to Turkey with his family, and his sons and him go back to Syria to finish what they do."
A. Yes.
Q. The family, did you understand the family to be the Kodaimati family?
A. Yes, sir.

MR. TATE: And go to the very next page, 14:45:12, and blow that up.

Q. Toward the end of that first clip we played, Mr. Smith is talking. He says, "My only concern, ah, besides just -- just

like what I told you about martyrdom type thing, that's the only concern I really have again with brothers over there."

Did you understand -- well, what was your understanding of what brothers over there he was talking about?

A. About ISIS.

Q. All right. "Because I know they practice this and they do this regularly."

A. Yeah.

Q. Thank you.

Do you remember some discussions about -- you asked him if he knew who the caliph was and he mentioned someone by the name of Baghdadi.

A. Yes.

Q. That's someone whose name had been in the news. His name wasn't secret or anything, was it?

A. Yeah.

Q. He was pretty well-known if you watched the news or anything about --

A. Yeah.

Q. -- the Syrian conflict.

And do you recall having a discussion with him about -- on that same day in the hotel room about whether Baghdadi had been killed?

A. Yes.

Q. And do you recall telling him that you weren't sure, but

you might find out later on?
A. Yes.
MR. TATE: And if we can go to 3631, 15:37:43.
Q. Where it says -- and you reviewed this transcript prior to testifying. Where it says, "He might be, ah, injured or something, but killed, I don't think so. But if he's killed, no problem. As I said, we're not working for him."
A. Yes.
Q. You're telling Mr. Smith you're not working with Mr. Baghdadi?
A. Can I explain?
Q. No, I'm asking you what you're saying right here.
THE COURT: Answer the question first, then you can explain it.
THE WITNESS: Yes.
THE COURT: Okay. Now, you can explain.
THE WITNESS: Because in Islam when you're fighting, you're not fighting for the caliph, for your emir. You're fighting for Allah. We're working for Allah. So anybody else, he's just working like you. He's doing the same thing like you. He's above you or below you, we working for Allah. That's in Islam is like that.
Q. But you've never been an Islamic fighter, have you?
A. No.
Q. And I'm talking about right here you tell Mr. Smith, "As

I said, we're not working for him."

A. Yes.

Q. Correct?

A. Yes.

Q. And you're talking about Mr. Baghdadi.

A. Yes.

Q. Thank you.

MR. TATE: If we can go to 3635.

Q. Now, one of the reasons you introduced Mr. Smith to Bilal was so that Bilal could keep -- or assist him with making some money or keep him with a job, correct?

A. Yes.

Q. And I want to highlight a portion here, the third passage down. You're talking to Bilal now, right?

A. Yes.

Q. And you tell him, "I'm going to tell you that again. Take care of the brother and help him."

A. Yes.

Q. What did you mean by that?

A. Help him find something to do to get money.

Q. Thank you.

So after this meeting -- after this meeting in the hotel on November 11th, do you recall when your next contact was with him?

A. I'm sorry?

Q. After the meeting on November 11th in the hotel room, do you recall your next contact?
A. I can't remember the exact dates.
Q. Do you recall whether or not you didn't speak to him again until you had the Skype conversation about the buddy pass?
A. Yes.
Q. And that conversation, if it will refresh your recollection, occurred on about March 18th of 2015.
A. Maybe.
Q. And that would have been about four months later.
A. Yes.
Q. During that four months did Mr. Smith ever contact you?
A. I don't think so.
Q. Did he ever contact you and say, "Hey, I'm ready to travel to support ISIS?"
A. No.
Q. And initially when he offered you the buddy pass, the buddy pass -- he offered you a buddy pass, correct?
A. The first time, yes. He told me, "If you need any buddy pass, I'm okay."
Q. And that was in response to you talking about all the driving that you have to do.
A. I'm sorry?
Q. You were talking about all the driving that you do.

A. Yeah.
Q. And he said, "Hey, if you ever need a buddy pass, let me know."
A. Yeah.
Q. But you never requested a buddy pass, did you?
A. For myself?
Q. Yes.
A. No.
Q. And then the next conversation was you called -- or you had a conversation with Mr. Smith and you said, "Hey, I need a favor. I need a buddy pass."
A. Uh-huh.
Q. Do you recall that?
A. Yes, sir.
MR. TATE: If we can bring up the 3/20/15 transcript. I think it's Exhibit Number...
MR. SAVAGE: 10.
MR. TATE: 10.
Q. Okay. This is dated 3/20/2015. This is about nearly -- well, more than four months after the meeting in the hotel. This is actually the discussion of the buddy pass, right?
A. Yeah.
Q. And this is a meeting that you're having in person in Matthews.
A. Yeah.

Q. And he asks you the name of the person that's traveling, correct?
A. Yes, sir.
Q. And during this conversation, all you provide him is the name Mohamed Hilal.
A. Yes.
Q. And it's a made-up name.
A. Yes, sir.
Q. And a made-up date of birth.
A. Yes, sir.
Q. All right. And the only thing you tell him about this guy is that he's a genius in computers, cell phones. He can highjack any computer, any cell phone around the world. Do you recall that?
A. Yes, sir.
Q. You don't tell him that he's going to kill anybody, do you?
A. I told him where he's going.
Q. Right. But you told him he was flying from Tampa to Buffalo.
A. And from Buffalo to Canada, from Canada to Europe, from Europe to Syria.
Q. Right. But you didn't tell him how he was going to get there or who was taking him, did you?
A. I told him brothers are going to wait for him and they're

going to sneak him to Syria.
Q. Okay. Do you recall the Skype conversation? You looked at a transcript of that where you were on Skype at first.
A. Yes.
Q. And do you recall on March 18th, 2015, you told him, "I can send him you know where"?
A. Yes.
Q. You didn't say where. You just used the term you know where, right?
A. Yes.
Q. You did not provide any details about what the person was doing or where you know where is, did you?
A. Not the first time.
Q. And during that same conversation, do you recall telling him on March 18, 2015, you were so proud of him for taking care of his family.
A. Yes.
Q. What did you mean by that?
A. It mean what I said. Proud of him for taking care of his family. His mom and...
Q. Were you really proud of him?
A. I'm proud of anybody taking care of his family.
Q. You wanted to make him think that you were on his side, right?
A. I'm working for the FBI --

THE COURT: Yes or no, and then you can explain.

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: I'm working for the FBI and I have to give him that image I'm serious. I'm not someone -- I have to be that person.

Q. As part of being that person, you were telling him how proud you were of him, correct?

A. I can do anything to get information can harm this country.

Q. Do you recall asking him during the March 18, 2015, Skype whether he was ready to move?

A. Is he ready to move?

Q. Yes.

A. What you mean?

Q. Whether he was ready to travel.

A. Yes.

Q. And he told you he has to pray, or he used the term salat. Is that prayer?

A. Salat is prayer, yeah.

Q. And is khushu -- what does that mean?

A. I did explain it before; but if you want, I can explain it to you again.

Q. Yes.

THE COURT: Yes, do.

THE WITNESS: In Islam in salat, when you pray, when you get that moment, you forget about the whole world, even the people with you in that place like they don't exist. It's just you and God. That the moment we call khushu in Islam. That's meaning you are -- you forgot about yourself, about everybody, about everything. It's just you and Allah, and the God.

Q. And during the Skype on March 18, 2015, when you asked him whether he was ready to travel and he told you that he had to pray for comfort and he used the term salat and khushu, correct?

A. Yes.

Q. He never gave you a date that he was leaving, correct?

A. No.

Q. He never told you then that he was ready to travel to fight for ISIS, did he?

A. No.

MR. TATE: Let's go back to the March 20th transcript. Page 3.

Blow that up at 13:15.

Q. This is the transcript you reviewed prior to your testimony. Let me ask you a couple questions. We've heard this recording. You're talking to Mr. Smith, correct?

A. Uh-huh.

Q. And this is during the meeting on March 20th where you're

discussing the purchase of a buddy pass and you said, "I told him, 'Okay, give me a few days and let me see if I can do something.' Now I'm gonna get him tickets from Tampa, Florida, to Buffalo. From Buffalo, two or three brothers meet him there. They're going to sneak him to Canada. Sneak him -- so from Canada he goes to Europe, from Europe going to Turkey, from Turkey to Syria."

Do you see that?

A. Yes, sir.

Q. That's what you told him on that day, right?

A. Yes.

Q. You don't mention anything that Mohamed Hilal is going to be doing there, do you?

A. That was 2014, 2015. You remember what we got in 2014, 2015? Whole world was talking about what happened in Syria, why people are going to Syria.

Q. All right. I'm not asking about what the world was talking about. I'm asking about what you said right here --

A. Yeah, that's what I said.

Q. -- to Mr. Smith. I'm asking what you said to Mr. Smith.

You didn't say what this person was going to do if they got to Syria, did you?

THE COURT: Yes or no.

THE WITNESS: No.

Q. All right. So after this conversation on March 18th on

Skype, then the meeting on March 20th where you provide the name Mohamed Hilal for the buddy pass, you ask him again about putting you in touch -- or putting people in touch with you, good brothers that might want to travel, right?
A. Yes.
Q. And he never puts anybody in touch with you.
A. No.
MR. TATE: Let's bring up Government's Exhibit 14. It's an email from Mr. Abu Khalid to Mr. Smith.
Just blow up that highlighted portion.
Q. We looked at this before. This is an email you wrote Mr. Smith, right?
A. Yes.
Q. And did you write that on your own or at the direction of the FBI?
A. By my own.
Q. All right. And in this email, what does that mean at the top, Busmi Allah arrahman arahim. What does that mean?
A. The first phrase, Busmi Allah arrahman arahim.
Q. Say that again.
A. Busmi Allah arrahman arahim.
Q. What does that mean?
A. In the name of Allah, the merciful.
Q. And you say, Dear -- you refer to him as brother. "Dear Brother Amir, I'm sorry if I did not contact you after I saw

you last time in Charlotte and trust me, that's only for the safety of our brother."

Then you go on to tell him, "He did not use the pass. He got confused." And you told him you would tell him everything when you see him.

Is that what you said?

A. Yes, sir.

Q. Did you ever see him again to tell him everything?

A. No.

Q. "And then the next time, inshallah. But he made it to Buffalo and from there he made it to Canada and he is saf now."

A. Yes.

Q. You never mention in this email him going any further than Canada, do you?

A. No.

Q. Then you tell him you're leaving here to go to Dubai.

A. Yes.

Q. And so -- you can take that down.

And then let's pull up -- the very last contact you had from Mr. Smith was his email on -- I believe it was 15. Yeah, 15. Next page.

Blow up the top. The top portion.

So up to this point Mr. Smith has never given you any plans about him traveling to Syria in support of ISIS,

correct?
A. He didn't travel.
Q. Did you ask him if he can travel?
A. He didn't travel.
Q. I know. And he never gave you any date he was going to travel, did he?
A. No.
Q. And he never asked you for any help traveling there, did he?
A. What you mean by that?
Q. He never asked you, "Hey, I'm going to Turkey. I need your people in Turkey to help me." He never asked you to help him to travel to Syria, did he?
A. At the beginning, yes, he did. He wanted to go to Syria.
Q. Okay. Well, why didn't you help him?
A. Because I'm working for the FBI.
Q. Did he ever ask you for any money for him to travel to Syria?
A. No.
Q. Did he ever ask you to get him a ticket to travel to Syria?
A. No.
Q. Did he ever ask you for the name of anybody in Turkey that's going to help him when he gets there?
A. No.

Q. And the very last thing he says to you is what?
A. "I can't have anything to do with this. All I wanted was to go to visit my friend to make sure he and his family was ok. Then started asking me to do things I had no intention on doing. I can't have anything to do with this period."
Q. Did he have any contact with you -- and this is March 31st, 2015. The rest of the year 2015, did he have any contact with you?
A. At that time I give up everything, the phone, email, everything to the FBI. I was done with the case.
THE COURT: The answer is no, right? The answer is no because of that.
THE WITNESS: Okay. No.
THE COURT: Then that's the explanation.
Q. Now, with respect to the identity you gave to Mr. Smith, the only thing he knew you by was Abu Khalid, correct?
A. Yes.
Q. You didn't give him a last name.
A. Yes, I did.
Q. What last name did you give him?
A. I give him Soufiane Khaldi. That was in the email.
Q. And so Soufiane, is that a first name or a last name?
A. That's a first name.
Q. Is it a real name?
A. No.

Q. Did you give him your date of birth?
A. No.
Q. Did you tell him where you lived?
A. No.
Q. Did you tell him anything about your family members?
A. No.
Q. And one of the things you told him is that you had multiple phone numbers, correct?
A. Yes.
Q. And that when -- you only had one phone number and that was just for him, correct?
A. Yes.
Q. And you turned that phone in.
A. Yes, sir.
Q. I think he asked you where you were from and you told him you were from Morocco.
A. Yes.
Q. But that's about all you told him, right?
A. Yes.
Q. Had he ever been to your house?
A. No.
Q. And when you met him, you met him in rental cars?
A. What's that?
Q. When you would meet with him in your car, were those rental cars?

A. Yes, sir.
Q. And you told him they were rental cars.
A. Yes.
Q. When you introduced him to Bilal, did you tell him anything about Bilal other than his name is Bilal?
A. I told him his name is Bilal.
Q. You didn't give him his last name, did you?
A. No.
Q. You didn't tell him where Bilal lived, did you?
A. No.
Q. And the made-up person Mohamed Hilal, the only thing you gave him was the name Mohamed Hilal, correct?
A. Yes.
Q. And you gave him a date of birth to purchase the ticket, right?
A. Yes.
Q. And did he ask you for -- or say anything like, Well, we need -- you know, "we better get a fraudulent name and date of birth for this ticket"? He never said that, did he?
A. He just asked for name, birth date. That's it.
Q. And with respect to Mohamed Hilal, he -- you didn't tell him where Mohamed Hilal lived other than he was from Tampa, correct?
A. Yes.
Q. The only thing you told him about Mr. Hilal was that he

worked in computers.
A. Yes.
Q. Do you recall telling him that -- on an earlier occasion that if Hilal got to Turkey, he was going to be in a room with computers?
A. I could say that.
Q. You didn't tell him Mr. Hilal was going to be on a battlefield, did you?
A. I told him that we can fight with guns and we can fight with computers.
Q. I understand you told him that, but you didn't tell him he was going to be on a battlefield, did you?
A. I told him he going to be in the field.
Q. You told him he was going to be in an office with a computer, correct?
A. I told him -- if you go back, he say he cannot be in the field in Friday. I remember that.
Q. Right. But do you remember saying he was going to be in an office with a computer?
A. I told him he going to work in computers, but I can't remember office.
Q. Did you say a room with a computer?
A. Maybe, but I can't remember office.
Q. But at the end of the day, the last communication that you had with him was that he was in Canada.

A. Who?
Q. Hilal, Mohamed Hilal.
A. Mohamed Hilal doesn't exist.
Q. I know that. Thank you.
One of the very first things you said, Mr. Khalid, is that you initially when you began working for the FBI, you were forced to work for the FBI.
A. Yes.
Q. How were you forced?
A. I was new in this country and I'm coming from third world.
Q. You're coming from where?
A. From third world, from a country where when you see a policeman with uniform, you run to your house. You get scared.
Q. And you said you're coming from a third world, is that what you said?
A. Yes.
Q. What country were you coming from?
A. North Africa.
Q. North Africa.
A. Morocco, yes.
Q. Morocco.
A. Yeah.
Q. Okay.

A. So when you see a policeman -- not policeman. If you see somebody with uniform, you get scared. There's no freedom. There's nothing. And imagine the FBI come to you, what you going to do?

So when they ask me to help them, I start looking at stuff different way and I did help them. And I find out that when I'm doing that, I'm helping myself. I'm helping my community, my Islamic community because we don't want the people like this in our community. That's my opinion. I don't -- I don't care about what other people think. But in my opinion, I don't want those people in our Islamic community. And plus, I'm helping this country. I don't want nobody to be harmed in this country because I'm part of this country now. I'm here --

Q. Yeah, but at the time you weren't. You were here illegally, right?

A. Yes.

Q. You had overstayed your visa.

A. Yes.

Q. And so was it the immigration authorities that arrested you or who --

A. No, the FBI come for me.

Q. The FBI came. Just showed up at your house?

A. No, to my job.

Q. And what did they say?

A. They came up with some stuff. I can't discuss it with you. And at the end he told me, "We need your help."
Q. Were they --
A. I say, "Okay. What kind of help you need?" And they told me what they need.
And I said, "Okay. I can do it."
Q. So they didn't force you. You agreed to do it.
A. That's forced. Don't take it the way you take it in your mind. Forced. That's mean I had to do it because I was overstaying my visa and I don't want to go back to that country.
Q. Right. And it was the most important thing in the world for you to stay in the United States. You had overstayed your visa. And were they investigating you for other crimes as well?
A. No.
Q. So they just came about you overstaying your visa.
A. No, they didn't come for that. They came up with something else. I told you I can't discuss that stuff with you.
Q. Okay. I understand you can't discuss it, but did it have to do with criminal conduct by you?
A. They come for me. They told me some stuff, it wasn't true, and they left. They told me you have to contact the immigration. I didn't contact the immigration. And they

contacted me one more time. They asked me to help them and I -- I agreed with them. I helped them.
Q. Right. And for that help they gave you a special visa that allowed you to stay in the country longer, right?
A. Yes.
Q. And in the meantime, you were to adjust your status to a lawful permanent resident.
A. No, not from that.
Q. Okay.
A. Because my wife is American citizen.
Q. Okay.
A. I got my green card because my wife is American citizen.
Q. But you got married to an American citizen after you had already overstayed your visa.
A. No, I was married to her before they get to me.
Q. Okay. Were you married to her at the time you overstayed your visa?
A. Yes.
Q. Okay. But you would have had to leave the country if they didn't give you -- the FBI didn't intercede and allow you to get some special provision to stay.
A. That's true.
Q. And during that time period, you were able to adjust your status to a lawful permanent resident, correct?
A. When my wife -- my wife at that time was green card.

When she got her citizenship, I applied for my green card. I got it. So the FBI has nothing to do with my immigration.

Q. I understand. But you got your green card after you were already supposed to be deported from the country.

A. Nobody told me I'm going to be deported.

THE COURT: Let me -- just to shorten this. Did you -- after -- after the FBI allowed you to -- gave you the visa, it was after that that you got your green card, after that.

THE WITNESS: Yes, sir.

THE COURT: During that period of time.

Okay. Let's move on.

Q. And then eventually you adjusted your citizenship, correct?

A. Yes, sir.

Q. All right. Now, one of the things you also said at the beginning of your testimony was that you're just doing this -- being an informant because you just want to be a good citizen, right?

A. Yeah.

Q. Now -- but you get paid for being an informant, correct?

A. Not paid. I have my own job, but they pay for my expenses.

Q. And do you recall, between the period of June 29th and September 2017, being paid for your services $190,866?

A. I don't know what's the amount, but I wasn't paid for my service. I was paid for expenses. Most of it is expenses. These things cost money.

Q. Well, do you recall during that same time period being reimbursed for expenses of 147,603 -- let's just bring up Defendant's Exhibit 4.

MR. SAVAGE: Is it admitted?

MR. TATE: Yes.

MR. SAVAGE: Okay.

MR. TATE: Blow it up, Lisa.

Q. Do you see that? Did you review that? Has anybody ever shown that to you?

A. Yes.

Q. Okay. So it shows between January 2006 and June 2009 -- that's actually before the time your visa had initially expired, so in 2006 you were already working as an informant.

A. Yes.

Q. And that's when you were in the country on a visa.

A. Yes.

Q. So in -- you just testified on direct that the FBI forced you into it because they came and then they told you that your visa expired; but, in fact, you were working for the FBI in 2006.

A. Yeah.

Q. That was before your visa expired.

A. No, my visa was expired when they come to me.
Q. Okay. So it shows total payments 64,599; is that correct?
A. I don't know.
Q. Then you said you were only -- you only were given back your expenses; but this shows you were paid for services $190,866, correct?
A. That's what this says.
Q. Is that not true?
A. I told you I get some money. I'm not denying I didn't get no money, but most of it was expenses.
Q. Well, the expenses down here, it says you got $147,603 for your expenses.
A. Yes.
Q. That's different than services, correct?
A. Yes.
Q. So you got more money than just expenses, right?
A. I can't remember how much money I get, so...
Q. But you did review this, you said, before you came to court.
A. No, I didn't review this.
Q. Okay.
A. That's first time I see this.
Q. Okay. And between August and April of 2015, you received 8,500 for your services, and expenses of 3,246. Does that

look about right?
A. That's what it says.
Q. Thank you.
Final question. During your interactions with Mr. Smith, you understood that he was not an Arab, right?
A. Yeah.
Q. You understood that he was an American citizen.
A. Yes.
Q. And he was biracial.
A. What's that?
Q. Did you understand that he was biracial? His mother was white. Did he discuss that with you?
A. I never know that.
Q. So what did you think his race was?
A. That's a problem. For me is a problem. I don't have the thing in my mind. All human being for me are the same. We don't look at the color.
Q. But you knew he wasn't Arab, right?
A. I know he wasn't Arab, yes.
Q. And he wasn't fluent in Arabic, was he?
A. No.
MR. TATE: Thank you. No further questions.
THE COURT: Thank you.
Any redirect?
MR. SAVAGE: One minute, Your Honor.

THE COURT: Okay.

(Pause.)

MR. SAVAGE: Nothing further from the government.

THE COURT: All right. Thank you. You may come down.

MR. SAVAGE: Your Honor, can this witness be fully and finally excused?

MR. TATE: (Affirmative nod.)

THE COURT: Okay. Without objection, yes, he's excused.

MR. SAVAGE: Thank you.

(Witness stepped down.)

THE COURT: The government has one more witness; is that right? To recall the agent.

MR. SAVAGE: Yes, Your Honor.

THE COURT: We're going to take a quick break so you can have everything set up so we can go through this next testimony --

MR. SAVAGE: Yes.

THE COURT: -- with some dispatch.

MR. SAVAGE: Right. And just to preview for the Court, there is a 43-minute segment that we've agreed with the defense so it's going to be long.

THE COURT: Yeah. This is -- I understand that. This is the interview, correct?

MR. SAVAGE: Yes.

THE COURT: This is the interview --

MR. SAVAGE: That's the interview.

THE COURT: -- that we've got -- okay.

MR. SAVAGE: Yes.

THE COURT: Okay.

All right. Members of the jury, we're going to take our break at this time. Don't talk about the case. We'll get you back in here in about 10 or 15 minutes. We'll try to go as quick as we can. Probably going to be 15, but I'll try to make it a little bit quicker than that. And of course, if you all aren't ready to come back in, we'll wait on you. We know there's a situation with limited facilities. We understand that.

(Jury exited the courtroom.)

MR. SAVAGE: Your Honor, I have one housekeeping matter. The government still has Bilal.

THE COURT: Keep him here. I'm not going to ask them until all the evidence is in, then they can make a decision.

MR. SAVAGE: We should keep him in Charlotte?

THE COURT: You should keep him here because we're going to -- we're going to go. When this is over with, if they want to call him, we're going to start him tonight. We can't finish him tonight, but we're going to start him

tonight. We're going to go a little while.

MR. SAVAGE: Well, just to remind everybody, I need an hour to get him here, so if they need him --

THE COURT: You better --

MR. TATE: I would say get him here.

THE COURT: I'd get him here.

MR. SAVAGE: Okay. And how about the Memphis witness?

MR. TATE: Get him here.

MR. SAVAGE: Okay. We'll bring them.

THE COURT: We're going to -- we're going to start this thing. We're going to go through this thing and see if there's anything there.

MR. SAVAGE: Okay.

THE COURT: Let's go ahead and everybody -- let's be in recess. Let's get back fairly quickly.

(Brief recess at 3:36 p.m.)

(Court back in session at 3:51 p.m.)

(Jury not present.)

THE COURT: Okay. Are we ready -- are we ready to bring the jury in? How are we doing here?

MR. SAVAGE: We're ready.

THE COURT: This case at its heart is a 1001 violation, lying to the FBI. I think we've had materiality to the nth degree issues battling back and forth, but in the

end --

MR. SAVAGE: We're with you.

THE COURT: When they talk to you about something important, you've got to tell the truth. That's going to be the heart of this case.

Let's get him up here. Let's get the evidence on on it and move on.

MR. SAVAGE: Just to remind everybody, we do not have a transcript on this -- we don't have a transcript on this recording.

THE COURT: And that's all right. You don't have to have one. But any reason why you don't?

MR. SAVAGE: Because it was -- it's crystal clear. The acoustics were good and it's two and a half hours long.

THE COURT: Okay.

MR. TATE: Your Honor, we do have a running transcript of it that we may want to use. I don't know if we will, but...

MR. SAVAGE: I've never seen it so I don't know how accurate it is.

THE COURT: We're going to let them play that. If there's something you want to play back, you can use your transcript, but you'll need to get a copy of it -- or the government will have an opportunity to see whether it's accurate or not accurate. I'm assuming if it was done by

employees of the defender's office, it's --

MR. TATE: We had an outside --

THE COURT: It's probably accurate if it's from your office. I don't know whether -- I don't know. You would have to tell me who the outside people were, whether it is -- I trust the folks in your office, Mr. Tate, but there are others that are...

MR. TATE: We reviewed it for accuracy.

THE COURT: Okay. All right. Well, let's go ahead and just give the -- let's go ahead and let them play it and then we'll -- if there's something you want to go back over and you've got a transcript of it, you can do it.

All right. Let's go with the -- let's get the jury out here.

(Jury entered the courtroom.)

THE COURT: Call your next witness.

MR. SAVAGE: Your Honor, the United States would recall Special Agent Godfrey.

THE COURT: All right. Special Agent, you're still under oath. Please take the stand.

RONALD GODFREY, GOVERNMENT WITNESS, PREVIOUSLY SWORN,

THE COURT: Go ahead, Mr. Savage.

Members of the jury, we may stay here a little while. We're going to see what evidence we have to get in tonight. We're going to try to get as deep into the evidence

as we can, once again, as I told you, with an eye toward trying to do what we told you when it began and make it no more than three days. It may be impossible, but we're going to do what we can to do that.

All right. You may proceed.

DIRECT EXAMINATION

BY MR. SAVAGE:

Q. Okay. You are the same Special Agent Ronald Godfrey who testified earlier in this trial?
A. Yes, that's right.
Q. And as the judge told you, you're still under oath.
A. Yes.
Q. You mentioned as we last spoke that you had interviewed -- that the defendant responded and called you on the 16th of February 2016. Do you recall that?
A. Yes, that's correct.
Q. And what was said in the conversation in which the defendant called you?
A. Basically, he wanted to know if he could come and speak with us and explain the circumstances around the buddy pass.
Q. Okay. And did you make arrangements for him to come?
A. Yes, we made them that day.
Q. And was it the same day?
A. Same day.
Q. About how long after the phone call?

A. I would say a few hours, I believe. If I remember correctly, his appointment at our office was at 1:00.
Q. Did you agree on a time?
A. Yes, 1:00.
Q. Okay. And how did he get to your office?
A. He drove himself.
Q. And when he came in, where did you -- where did you take him?
A. There's a -- we have interview rooms right at the front of our building and we took him to one of those interview rooms.
Q. Okay. Was he in custody at the time?
A. No, absolutely not.
Q. Was he restrained in any way?
A. No.
Q. Was he free to leave at any time?
A. Yes.
Q. Did you tell him that?
A. Yes, we did.
Q. Who else was present during the interview?
A. Special Agent James Fallon.
Q. Okay. And was the interview recorded?
A. Yes.
Q. And how was it recorded?
A. The -- our interview rooms are equipped with audio/video

recording equipment just wired into the room, and it's just a matter of turning on a switch to start the recorder.
Q. And the camera is inside the room?
A. That's correct.
Q. And is it visible or can you see where it might be?
A. It's a dome in the corner of the room, you know, similar to the one in the back of the court back there.
Q. Okay.
A. But it's up on the ceiling. So, I mean, it's not publicly advertised, I guess, that there's a camera, but, I mean, I look at that and I know it's a camera.
Q. Before coming today did you review a recording that we marked as Government's Exhibit Number 16?
A. Yes, I have.
Q. And after the interview -- and you, of course, were present during the interview.
A. Yes, of course.
Q. During the entire time?
A. Correct.
Q. About how long was the entire interview?
A. An hour and a half to two hours. Something like that.
Q. And did you record the entire thing from the beginning to the end?
A. Yes. The recording equipment was actually started before any of us entered the room.

Q. Okay. Now, Government's Exhibit Number 16, is that the entire, I think it's 103 minutes, interview that was conducted from the beginning to the very end?
A. That's correct. We provided the entire recording.
Q. Okay. And when you reviewed it, had it been altered in any way or was it substantially -- was it exactly the same as when you had given the interview yourself?
A. Exactly the same. Unaltered.
Q. Okay. And the FBI's recording equipment was working properly and there was no gaps or flaws in it.
A. That's correct.
MR. SAVAGE: Your Honor, at this time we would offer what has been marked as Government 16 which is the entire recording of the interview of the defendant on the 16th of February 2016.
THE COURT: Any objection?
MR. TATE: No objection.
THE COURT: Let it be admitted.
(Government's Exhibit No. 16 was received into evidence.)
MR. SAVAGE: Okay.
THE COURT: Now, you're going to play how much of this?
MR. SAVAGE: We're going to play the first 43 minutes of this.

THE COURT: All right. Members of the jury, there will not be a transcript with this so listen to it. I believe that it may be clearer than the other tapes.

MR. SAVAGE: Okay. And just to be clear, Your Honor, just so we can get a context, there may be additional parts of that that would be played by request of the defendant later on.

THE COURT: Sure.

MR. SAVAGE: Okay.

THE COURT: That would be fine.

MR. SAVAGE: So without any further comment, I think let's just get to it.

(Government's Exhibit Number 16 was played.)

MR. SAVAGE: Okay. I'm going to ask you to stop it there just a moment.

BY MR. SAVAGE:

Q. Okay. Now, this is a few minutes into the tape, is it not?

A. Appears to be, yes.

Q. Okay. What happens before this?

A. Well, I don't know what's about to happen so -- but basically, we brought Smith into the room. We offered him a bottle of water. I believe we told him that if he needed to use the restroom or something like that, to please let us know and, you know, we could take care of that. Basically, just

tried to make him comfortable before we began the interview.

Q. Okay. And the time on there, it says 16 February. What is the time that's 1:23:42. What is that?

A. That should be the actual time of day on February 16, 2016.

Q. And Room 103?

A. That's correct. That's the interview room where we conducted the interview.

Q. And can you identify yourself in that video by your clothing.

A. I am in the very bottom right corner of the screen wearing a navy blue short-sleeve shirt.

Q. And can you describe Agent Fallon.

A. Agent Fallon is seated next to me in either a gray or olive green shirt.

Q. And the defendant is...

A. He's across the table from us wearing a white shirt and eye glasses.

MR. SAVAGE: And, Your Honor, I think the tape is pretty clear and audible from here.

THE COURT: Let's play it.

MR. SAVAGE: Okay.

(Government's Exhibit Number 16 resumed.)

MR. SAVAGE: Okay. Thank you.

BY MR. SAVAGE:

Q. Agent Godfrey, the tape goes on for about another hour after that; is that correct?
A. I believe so. I believe so, yes.
Q. And after that did you actually go over these same questions more than once?
A. We did.
Q. Now, at some point in there you pointed out a statute, 1001. What does that provide?
A. Repeat the last part.
Q. You provided a copy of a document that you said was United States Code 1001. What is that, basically?
A. It's basically the -- part of the United States Code that says that it's a violation of federal law to make a materially false statement to an agent of the federal government.
Q. Okay. And at one point in that interview, you could be heard -- you said, "Let me put my cards on the table." What were you doing at that point?
A. We were essentially revealing some of our evidentiary information to Smith --
Q. And --
A. -- to try to elicit --
Q. I'm sorry, go ahead.
A. To try to get to a more productive conversation with him.
Q. Did you know that up to that point that some or many of his answers were false?

A. Yes, we did.
Q. Why did that make any difference to you?
A. Well, I mean, it's an investigative technique to some degree. I mean, I think pretty much every interview that I've been involved in since I've been an agent, we ask people things that we know the answer to because we need to discern whether they're going to be truthful with us. We can't really -- you know, there's things that we want to ask that we don't know the answers to, but we need to first establish is this person going to be truthful to me about the things that I do know the answers to.
Q. Okay. During the course of this interview, did you ask even more than once words to the effect of, "Okay. I mean, I guess what it comes down to is have you ever talked with anyone that you expressed to someone that you wanted to go to Syria and fight?"
Did you ask that question?
A. Yes, I did.
Q. And did the defendant reply, "No, I've told them that I wished there was something I could do for people, but I never had any plans to go there and do anything."
A. That's correct.
Q. Those were his words?
A. Right.
Q. Did you ask the question -- the defendant the following

question: "Okay. I mean, we talked about -- I mean, have you ever talked with anyone that you wanted to go to Syria and join ISIS?"

Did you ask him that?

A. Yes, we did.

Q. And he replied, "No, we've talked -- I talk to numerous -- you have to understand the Muslim community. There's so much stuff going on now in the Muslim community with everything" --

MR. TATE: Can we just play that portion instead of you reading it?

MR. SAVAGE: Well, we just did and I'm trying to save a little time.

THE COURT: He can go over it that way.

MR. TATE: It hasn't been played.

MR. SAVAGE: It has.

THE COURT: Has this part been played?

MR. SAVAGE: Yes.

MR. TATE: That's been played, what you're reading?

MR. SAVAGE: I think so, yes.

MR. TATE: No, it hasn't.

THE COURT: Let's make sure it's been played. If it hasn't been played, we have to play it.

MR. SAVAGE: Give me just a minute, Your Honor.

MR. TATE: Your Honor, Mr. Smith -- with this

confusion, Mr. Smith has been charged with making false statements during this interview. At this time, under the rule of completeness, we require the government to play the whole recording.

MR. SAVAGE: The whole recording is in evidence, Your Honor. Under the rule of completeness, the entire two-hour interview is in evidence.

THE COURT: It's in, yeah, it is in. They don't have to play it. You can play whatever portions you want to play, Mr. Tate, after it's over and we can stay here and hear it. We'll do whatever needs to be done to get everything in front of the jury.

MR. SAVAGE: Your Honor, I'm going to move on at this point. I don't want to waste any more of the jury's time. And I'll find those provisions in the transcript and I'm sure we'll have an opportunity to come back.

Q. But let me just finish up with, there was numerous questions asked in the transcript that we just talked about about whether or not the defendant had expressed any plans or desires, intentions or aspirations to go to Syria. Do you recall those questions?

A. Yes.

Q. And what were his answers?

A. That he had not made any plans or had not discussed any plans to travel to Syria.

Q. In fact, there were numerous other lies, both big and small, such as, "Does the name Mohamed Hilal mean anything to you?" What was his answer to that?
A. He basically claimed he didn't know anything about what that person had planned to do.
Q. The whole business about Abu Khalid talking about nonbelievers and kafirs, in all of the tapes and all the hours and hours of transcripts, did Abu Khalid discuss kafirs and his hatred or any kind of animosity towards nonbelievers?
A. He did talk some within his character about the kafirs, but the part of that that's false in what Mr. Smith told us in the interview was he said that this radical talk about kafirs and everything came after the buddy pass. The reality is he never saw or talked to Abu Khalid again after the buddy pass.
Q. And in all this time did Abu Khalid and the defendant ever have coffee anywhere?
A. I'm not aware that they ever shared a cup of coffee together. Maybe -- I think Smith had coffee in the hotel room when they were all gathered there that day, but I don't believe Abu Khalid drank coffee that day.
Q. All of their meetings, in effect, were prearranged and very secretive.
A. Correct.
Q. Was it important for you to get the truth from the defendant?

A. Yes, it was.

Q. Did the defendant at any time tell you in any part of this two-hour interview that he was talking about going to Syria, but he really didn't mean it?

A. No.

Q. Did he ever tell you that he didn't understand that Abu Khalid wasn't talking about brothers or he was somehow confused about what Abu Khalid was talking about?

A. No.

Q. Did it make any difference to your investigation that the defendant lied about this fictitious ISIS traveler, Hilal? Why did it make a difference to your investigation?

A. Well, the fictitious traveler would have been traveling on a buddy pass that Smith obtained through his girlfriend at the time, Palak Sheth, and so there's many more questions that we would have liked to have known the answers to if -- that we needed to know the answers to if we could have established a baseline of truth.

Given Ms. Sheth's position at the airport and the access that she had at the airport and how this buddy pass was misused, we needed to understand more about her. We needed to know was -- to what extent was she involved in this. Was she complicit somehow? Did she know about all of this from the beginning? Or was she taken advantage of somehow? We had interviewed her just prior to this, a few days prior to this,

and she had lied to us. And she had not yet appeared before the grand jury for us to get a truthful statement, so it was important for us to know about that from her.

It was also important for us to know about Yahya Assad whose credit card, you heard, was used to pay for the buddy pass because, again, we didn't -- we didn't know what his involvement was. Was he someone who was affiliated with ISIS, whose ideology was aligned with ISIS who was possibly a danger in some way to the United States because of something like that? Or was he taken advantage of and deceived and an unwilling -- -- unwitting accomplice, rather, in this endeavor with the buddy pass?

So there's a lot of other things, essentially, that we would have liked to have known, but we couldn't even establish a basic baseline of truth to work from in the interview.

MR. SAVAGE: Your Honor, at this time I'm going to ask the -- to play another short segment. It's going to be what we've marked in our evidence as clip number 4, and it is the --

THE COURT: And this is part of the exhibit that's in evidence?

MR. SAVAGE: Yes.

THE COURT: Fully in evidence?

MR. SAVAGE: Yeah. And it would be -- the time mark would be 2:48 and 55 seconds to 2:51 and 25 seconds.

MR. TATE: We object to --

THE COURT: Overruled.

MR. TATE: Just for the record, Your Honor, we believe that the -- playing selected clips takes the interview out of context.

THE COURT: I understand. And you can play the portions you want to play if you wish to do that. The entire tape is in and the jury can listen to the entire two-hour tape if they wish to in the jury room.

MR. SAVAGE: May we proceed, Your Honor?

THE COURT: Yes.

(Government's Exhibit Number 16 resumed.)

BY MR. SAVAGE:

Q. Agent Godfrey, just to finish up here, at any time during this 103-minute interview, did the defendant state to you that he had never discussed his desire or plans to travel to Syria?

A. He did.

Q. And what did he tell you about those, whether he had ever discussed his plans to travel to Syria?

A. He said that he, you know, had maybe talked about Syria and wanted to help the folks there and that kind of thing, but that he had never discussed going there and doing anything or helping any one particular group.

Q. And in your investigation did he ever -- did you ask him whether or not he knew that Mohamed Hilal, referred to in the

indictment as individual A, intended to use the buddy pass he procured to travel and support ISIS? Did you ask him that question?
A. We did ask him that.
Q. And what was his reply?
A. He claimed that he didn't know anything that Mohamed Hilal was planning to do and that he had done nothing to help this individual in any way whatsoever.
Q. Based on the information that you had reviewed from all of your sources in your investigation, including the ticket itself, and the tapes that had been produced by Abu Khalid, were those statements true?
A. No, those were false statements.

MR. SAVAGE: Thank you. No further questions, Your Honor.

THE COURT: Cross examination.

MR. TATE: Thank you. The Court's indulgence.

THE COURT: Yes, sir.

(Pause.)

CROSS EXAMINATION

BY MR. TATE:
Q. We're going to play a passage before I ask you any questions, Agent Godfrey. Let me -- while she's getting that ready, let me ask you a question.

Just about every witness that testified in here,

including yourself, testified that they reviewed transcripts, that they reviewed notes in preparation for their testimony to make sure they could remember everything, correct?
A. Yes, sir.
Q. In fact, your informant, Mr. Abu Khalid, a number of times he asked for something to refresh his recollection, correct?
A. I believe so.
Q. And what does that mean?
A. What does it mean?
Q. Yes.
A. I think --
Q. To refresh your recollection.
A. Are you asking me to comment on what it meant to Abu Khalid?
Q. No, I'm asking you. You said it yourself. What did it mean when you said you need to refresh your recollection?
A. It means that I deal with a ton of details in my job and in my everyday life and that I don't recall all of them instantaneously, especially as I'm getting a little older.
Q. When you asked Mr. Smith to come in, you told him he was coming in to talk about the buddy pass, right?
A. I don't believe that's completely accurate. He called us and asked us if he could come in and explain the circumstances of the buddy pass to us.

Q. Right.
A. We didn't call him. We didn't ask him to come in. And we didn't convey to him that we wanted to speak with him about anything in particular.
Q. Well, the first thing that you said -- you told him about the circumstances -- we want to talk to him about the circumstances of the buddy pass.
A. Right, that's -- when he called and he -- he understood at that point that Palak, his girlfriend, had been subpoenaed in reference to the buddy pass. So he was calling wanting to know could he come in and speak with us about the buddy pass.
Q. Right. And you didn't tell him you were coming here to talk about any plans he might have had to travel to Syria, did you?
A. No. I mean, I was under no obligation to tell him that.
Q. I didn't ask you what you're obligated to. But you didn't tell him, did you?
A. No, but I'm trying to give you a complete and truthful answer.
Q. I understand. Complete and truthful answer is, no, you didn't tell him.
A. No, we didn't tell him.
Q. And you didn't tell him you were coming there to ask him about whether or not he was planning to travel on behalf of ISIS, did you?

A. That's correct. But to my understanding, there were no questions that were off limits in our interview.
Q. That was your understanding, right?
A. I don't know of a basis for any questions being off limits in my interview.
Q. Okay. And in fact, he didn't have an attorney with him.
A. Did he have an attorney with him?
Q. Right.
A. Everybody saw the same video I did. There was only three people in the room, sir.
Q. Right. Two agents and him by himself, right?
A. That's correct.
Q. And you did not say prior to him coming in there, "Hey, you know what? Abu Khalid is really an FBI informant," did you?
A. No, we wouldn't tell anyone that.
Q. Right. And you didn't tell him that all of your conversations with Abu Khalid have been recorded and we want to ask you about those conversations, did you?
A. No, sir. I could not tell him that at that point. It was classified information. In fact, the vast majority of our evidence at that point was classified and I could not do that or I would have been violating the law myself.
Q. And you didn't tell him that Mohamed Hilal wasn't a real person, correct?

A. No, sir.

Q. And almost every question that you asked him during the interview, you already knew the answer to it.

A. That's true, but that's because we couldn't get to the questions that we didn't know the answer to because we couldn't establish a basic baseline of truth with him.

Q. Well, what questions didn't you know the answer to?

A. Didn't we know the answer to?

Q. Yes.

A. I can give you a whole list. I just talked about some with the buddy pass. So in addition to the -- regarding -- I talked before about the ones related to the buddy pass.

Then there were other things that we wanted to know in reference to Smith's expressions of desire to travel to Syria.

There were other names that came up during our investigation, some of which he brought up explicitly, some of which we discovered through our own investigation. For example, the individual that drove him to the first meeting with Abu Khalid on August 7th, I believe you heard in the recordings that Smith said that he told that individual why he was going there and to --

Q. Did you ever ask Mr. Smith during this interview what his name was?

A. What whose name was?

MR. SAVAGE: Your Honor, we object. He's answering

the question and now he's interrupted. Can he finish?

THE COURT: Yeah, let him finish his question and then you can ask him --

Q. I'm going to ask the question. The guy that drove --

MR. SAVAGE: Objection.

THE COURT: Hold on a minute. Let him finish answering the question and then you can ask him that specific question.

Finish answering the question.

THE WITNESS: We identified the individual ourselves, but from --

Q. So you already knew the answer --

MR. SAVAGE: Objection, Your Honor. He still hasn't answered the question.

THE COURT: Yeah, sustained. But just keep seated. I'll take care of this.

MR. SAVAGE: All right.

THE COURT: All right.

THE WITNESS: So --

THE COURT: Finish your answer.

THE WITNESS: Absolutely.

So your question, I believe, was what are the other questions that we didn't know the answers to that we wanted --

Q. Can you do them one by one.

A. What's that?

Q. Can you do them one by one.
A. Absolutely.
So on August 7th Smith told Abu Khalid that the individual who drove him to Cary knew the reason that he was driving him there. That's a very big issue of concern for us because it implies a conspiracy.
Q. Okay. Now, you answered that question.
THE COURT: Hold it. Hold it. You're not -- let him finish the question. You may be satisfied he's answered, but he's still talking.
MR. TATE: All right.
THE COURT: Keep finishing your question.
THE WITNESS: So that's possibly someone that we would want to look into a little further because if he knew why he was driving Smith to meet with Abu Khalid in Cary, then that would suggest that maybe he also has an ideology that is in line with ISIS that we should be concerned about, so we would want to look into him.
THE COURT: All right. Now, next. He's going to ask another question.
THE WITNESS: Okay. So I --
THE COURT: Hold on.
THE WITNESS: Can I ask you a question? I thought he wanted me to go through them one by one.
THE COURT: He did one by one, but he wants --

THE WITNESS: Okay. Okay. I understand. Go ahead.
Q. This trip to Cary, the guy that drove him, do you know his identity?
A. I do, sir.
Q. And you knew his identity on the date that you interviewed Smith, correct?
A. I did.
Q. And had you interviewed him yet?
A. No, he declined to speak with us.
Q. So you knew who he was, right?
A. Yes, we did.
Q. Okay. Now, what's the next thing that you say that you couldn't get the truth out of?
A. Okay. So on -- make sure I have the dates right in my mind. So I believe on August 20th in the recordings that we heard, Smith referred to an individual that he thought may want to go with him to Syria and this individual was a former marine, had been -- had led men in battle, I believe is the way that he described it. That also was very concerning for us that either a current or former member of the U.S. military may have an ideology that could be aligned with ISIS and may therefore be a very big danger to us.
So that's another line of questioning that we needed to get into with him if we could have established a basic baseline of truth to learn more about who that individual was,

what exactly he was about and, you know, what his connection was to Smith, what his connection was to Syria, what his connection was to ISIS. There's an unlimited number of questions that we would have wanted to know the answers to regarding that person.

Q. Okay. Now, let me ask you about that. That's the marine, right?

A. Yes, sir.

Q. Had you identified who that person was?

A. We had.

Q. Had you interviewed him?

A. I -- I personally did not interview him.

Q. But you knew who he was on the date that Mr. Smith came to interview with you, correct?

A. Yes.

Q. And you had already tried to interview him, correct? Or he had been interviewed by the FBI, correct?

A. I don't know that he had. I can't -- so I was not in charge of every aspect of -- in other words, I had my hands full with this matter and so as different things would come in, they would be assigned to other agents. And, you know, I trust those agents to do their jobs and so someone else would take that particular lead and start working on it.

THE COURT: It's been answered. Move to the next question.

THE WITNESS: So I don't know.

THE COURT: Move to the next question.

Q. During the interview on February 16th, you never asked Mr. Smith a single question about that marine, did you?

A. No, we didn't.

Q. All right. Now, what's the next thing that you claim that you couldn't get out?

A. On November 11th when they met in the hotel room, Smith told Abu Khalid that there was another individual that he was -- he didn't say friends -- another individual that he was associated with who would not travel, but that he would do anything that was needed here. That also was very concerning to us because the message from al-Adnani that has been talked about in previous testimony was, you know, if you can't come to the Islamic State, then, you know, conduct attacks to kill Westerners wherever you are. I can't quote the thing, but it basically says shoot them, run over them, whatever you can do. Okay.

So the implication from the defendant that an associate of his, although he wouldn't travel to Syria, could somehow do whatever was needed in the context of ISIS here in the United States is something that was very concerning to us and obviously we would have had an entire line of questioning that we would have liked to have gone down with Smith that we needed to understand about that individual. But again, we

couldn't even establish a basic baseline of truth with him.

Q. But you never asked him about the individual during that interview, did you?

A. No, because here's the reason why, sir. Just like I said in the interview, I put some cards on the table for him, as I said in the interview. Every question that I asked him, how I phrase it and what I say in the question to him, I'm giving up a little bit of our investigation. Okay. And that's not -- that's not operationally secure for an investigation. I can very -- inadvertently, if I'm interviewing someone, I may give them information about our investigation that would then compromise our investigation.

So if I began asking questions, for example, about this individual that Smith had referred to, and I do know his name and his full identity, Smith may very well have lied to me about it and then gone and told that individual, "Hey, not for nothing, but the FBI knows about you and they're asking about you too." That would not be good for either of our investigations at that point.

Q. I understand that, but you didn't ask about it.

A. No, and I just explained why not.

Q. And you already knew the answer to the question anyway, correct?

A. Which question?

Q. You already knew who the individual was.

A. We knew who he was, sir, but there's a ton more stuff that we needed to know about him based on the context than just his name.
Q. But you didn't ask those questions.
A. No, and I just explained why not.
Q. What else --
THE COURT: Let's have a sidebar. We're not going to go through every question he asked.
(Sidebar conference as follows:)
THE COURT: This is not about what questions that were asked. The question is, did he lie about the questions he was asked and were they material?
MR. TATE: Right.
THE COURT: We heard a massive amount of stuff as to whether they were material or not. Now, the jury may think that he -- that his statements were squishy enough that he wasn't lying. But there is nothing wrong -- I don't have to give an instruction that the FBI -- when you go to the FBI and they know the answer to all the questions and you lie to them, you still are guilty.
MR. TATE: Right.
THE COURT: You can't lie to them.
MR. TATE: I understand that.
THE COURT: I know you do.
MR. TATE: I understand that. But I'm impeaching

the witness because he said that Smith was so dishonest, there was stuff he needed to know and, you know --

THE COURT: Okay. I want you to be able to ask him the question. I want you to be able to get him -- but I don't want to go through every -- we'll be here until 7:00 tonight.

MR. SAVAGE: Impeach away. We're enjoying it. I don't think this hurts the government at all.

THE COURT: I don't know about that. The agent is not doing very -- I mean, he's a little bit nerve-racked up there. Most of the FBI agents don't go off on long explanations. That's why I'm letting him go for a while. So I don't know that that's helping you -- helping anybody.

I'll let you ask some more questions on that, but just don't --

MR. TATE: I got you.

THE COURT: And let me ask this question. How long -- how long is your evidence going to take because that's how long I'm going to go tonight.

MR. TATE: Well, we may have one or two witnesses. It depends on the client. You know, I'm inclined not to call anybody, I'm just telling you that, but I have to balance that. Sometimes if I'm able to talk to them and say, "Hey, you know, we don't need this," you know. But again, I've got to get him to affirm that, you know, he's okay with that.

THE COURT: Okay.

MR. TATE: Otherwise we've got an issue.
THE COURT: All right. Very good.
(End of sidebar conference.)
THE COURT: Okay. Mr. Tate, I understand what you're doing. Go ahead and proceed.

CROSS EXAMINATION (Cont'd.)

BY MR. TATE:
Q. Agent Godfrey, what else -- state something else that you wanted to get from Mr. Smith, information that you didn't already know.
A. We believed that he obtained firearms during our investigation and we don't believe he obtained, at least some of them, legally so we had questions about that.
Q. Let me stop you --
A. Sure, go ahead.
Q. -- on this and ask you one thing. During this interview you didn't ask him any questions about firearms, though, did you?
A. No, I did not.
Q. Okay. So tell me something that you did ask him that he lied to you about that you didn't already know.
A. Okay. So we -- I guess it comes down to the extent that we knew something. Okay. Because we had what we believed to be very reliable information about Wael and Saeed Kodaimati and their involvement with ISIS in Syria. Okay. We believed

that he did too. In fact, he told our source -- when I say he, I mean Smith. He told our source on August 7th -- rather, August 20th he told our source that he believed -- that his understanding was based on the limited context of their conversations that they could have over Skype and Viber, he believed that they were supporting the Islamic State. It was referenced as Dawla Islam in that statement, not ISIS, but we all know now it's the same thing.

So we had an entire line of things that we would like to have known from him about that to -- you know, it's an investigative technique that we don't want to take one source of information as the gospel truth. Usually we'll try to corroborate the information somehow. So we have information about the Kodaimatis from one or two other sources. We think that it's fairly reliable, but I'm not in Syria. I don't have a way to, you know, thoroughly investigate them there. So we try to corroborate the information in other ways.

There are things that we could have asked him --

Q. Let me ask you about the Kodaimatis before you go on.

A. Okay.

Q. You talked about the Kodaimatis during the interview, correct? You listened to it, right?

A. Right.

Q. And in fact, he asked you, "Listen, is something wrong with the Kodaimatis? If they've done something wrong, I need

to know that." He mentioned several times he's concerned. He doesn't know everything that's happening over there, correct?
A. I understand, yes.
Q. And your partner told him that you couldn't tell him anything, right?
A. That's true.
Q. And then you didn't ask him another question about the Kodaimatis, did you?
A. Right, because he hadn't been truthful with us about anything. So therefore, if I started asking him pointed questions about the Kodaimatis, we're going to compromise our investigation of that because we haven't -- we haven't established anything yet that he's been truthful with us about that we did know. So why would we expose our investigation and potentially compromising it by asking him about things that we did not know only for him to potentially turn around and tell them, "Hey, the FBI must know this, this, this, and this about you because they're asking specific questions about what your activity is in Syria and Turkey."
Q. Let me ask you this. You said he hadn't been truthful about anything, so I want to go through some of the things that he said during the interview.
He told you about Abu Khalid asking him to purchase a buddy pass and that he got it for a person named Mohamed Hilal, right?

A. Yeah. Let me clarify -- if I may clarify something real quick?

Q. No, just answer my question.

A. I did --

THE COURT: First answer the question, yes.

THE WITNESS: Yes, he did --

THE COURT: All right. Now --

THE WITNESS: -- tell me that and that was true.

THE COURT: Now he'll ask the next question and you probably can clarify with that.

Go ahead, Mr. Tate.

THE WITNESS: Okay.

Q. During the evidence in this trial, did Abu Khalid ever tell him anything else about Mohamed Hilal, like his date of birth?

A. Are you asking me if that happened?

Q. Yeah, in the evidence. Did Abu Khalid give him any other information about Mohamed Hilal other than his name and date of birth for the ticket?

A. Yes, he did.

Q. He said he lived in Florida, correct?

A. Are you asking about Abu Khalid said that or if Smith said that, sir?

Q. Smith said it to you in the interview. He told you he was from Florida, right?

A. Right, yes.
Q. And he told you he knew Mohamed Hilal was flying from Florida to New York, correct?
A. Right.
Q. And he said it was so long ago he couldn't remember the cities.
A. Right. So if I could clarify --
THE COURT: Now you can explain.
THE WITNESS: What I was saying a minute ago, I understand that what you're saying -- what you're asking me about is a statement that I made that he wasn't truthful with us about anything. Perhaps that's a figure of speech in my mind. I don't mean to say --
Q. Calling him a liar is a figure of speech?
A. No, sir. What I'm saying is I don't intend that statement to be taken literally, that he wasn't truthful with us about anything. Obviously, when he came in the room and we began talking with him, he was truthful with us about his name. So I didn't intend that statement to be taken literally. There were some things that he were -- that he was honest with us about in the interview.
But in the overall context of the interview, the things that we needed to know that we asked him about that were the main themes of the interview, about his own discussions of his plans to travel and the buddy pass and all the circumstances

surrounding that, those were the main two things that we were asking him about in the interview and those two things he ultimately was not truthful about.

Q. Okay. Let's talk about that. He told you that the buddy pass was -- he used a friend named Ayaad -- what's his name?

Yahya Assad purchased the buddy pass with his debit card, correct?

A. That's right.

Q. And you asked him why. And you said because -- and he told you that because you needed cash, correct?

A. That's right.

Q. And then he gave you information about where Yahya Assad worked. He told you he worked at a car stereo place, correct?

A. That's right.

Q. And you subsequently interviewed him.

A. I did not, but I believe someone from the FBI did.

Q. Did you go to the car stereo place to interview him?

A. No, I've never been to the Car Stereo Warehouse.

Q. And he identified a person that he knew as Abu Khalid.

A. Smith did?

Q. Yes.

A. Yes.

Q. And that's the only name Abu Khalid had ever gave him, right?

A. That's correct.

Q. He told you he didn't know where he lived, correct?
A. That's correct.
Q. He said, "I think he lives somewhere around the Greensboro area or something like that," correct?
A. Right.
Q. Did you think he was lying when he said that?
A. Nope.
Q. Did he tell you -- when he told you he hadn't talked to him in nearly a year, was that true?
A. Yeah, that's -- almost a year.
Q. And, of course, he didn't know he was an informant at that time, right?
A. Smith did not know that Abu Khalid was an informant.
Q. And he told you about the buddy pass. And not only that, he told you how much Abu Khalid paid for it, correct? He said $80.
A. That's right.
Q. Was that true?
A. That's true. It was $78 and some cents, but essentially it was 80 bucks.
Q. And you asked him what Mohamed Hilal's age was, correct?
A. Right.
Q. And he said, "Well, we have to go and try to figure that out from the date of birth that he gave for the buddy pass," correct?

A. That's right.
Q. And then there was some discussion about Bilal. You asked him about Bilal, right?
A. We did.
Q. But, of course, you already knew he was. You knew he was an informant.
A. Yes, sir.
Q. And he told you that where Bilal lived was in the Greensboro area, correct?
A. Right.
Q. Was he truthful about that?
A. That may have been part of Bilal's ruse to him. I don't know what Bilal specifically told him about where he lives.
Q. But did you have any information he had ever been to Bilal's house?
A. I don't think he had, but it's possible, I guess. I don't -- maybe he went somewhere that Bilal purported to him to be his house, but I don't know for certain.
Q. But he told you he didn't know an address for Bilal, correct?
A. Right.
Q. But he said, "I can drive up there and try to find him."
A. He did say that.
Q. And was that a lie?
A. I mean, I believe he could probably drive wherever he was

talking about. I don't know where that location is.
Q. Now, at the time of the interview, he admitted to you that he met Abu Khalid, correct?
A. Yes.
Q. And he said Abu Khalid had gotten him connected with Bilal for work, correct?
A. That's true.
Q. That wasn't a lie, was it?
A. No, that was not a lie.
Q. Was Abu Khalid ever instructed by the FBI to give him any other identifying information on himself other than Abu Khalid?
A. Well, as a matter of nuance; but basically, whenever they first met, Abu Khalid gave him his full name, his full pseudonym, which was Soufiane Khaldi; but, yeah, that was his identity, and he went by Abu Khalid.
Q. And that was back in August of 2014.
A. Right.
Q. About a year and a half prior to this interview.
A. Right.
Q. So he identified Wael Kodaimati.
A. Right.
Q. He identified Saeed Kodaimati.
A. When you say identified, he gave us names that we already knew. I mean...

Q. But he didn't lie about their names. He didn't lie and say he didn't know them.
A. No, but his names, sir, were not part of our -- the names -- these details that you're asking me about were not the focal point of our interview. They were small matters that Smith was truthful about.
Q. And you asked him about whether he planned to travel to Syria and support ISIS, correct?
A. If who planned to travel to Syria? Himself?
Q. Yes.
A. We did ask him that.
Q. And he said no.
A. He said no.
Q. And in fact, he's never traveled to Syria, has he?
A. He traveled to Syria in 2006.
Q. Well, you weren't investigating him in 2006.
A. No, but that's not what you asked me. You asked me had he ever traveled to Syria.
Q. From the time you introduced the informant in 2014 through today, has he traveled to Syria?
A. Not to my knowledge.
Q. Has he had a valid passport after it was expired to travel to Syria?
A. Well, his passport expired in April of 2015, so it was valid during the time period that he was saying that he wanted

to travel to Syria.

Q. But he never did.

A. No, sir.

Q. Even with a valid passport.

A. No.

Q. And he never renewed it, correct?

A. No.

Q. When he told you -- you asked about Bilal and he said, "Hey, I stopped hearing from Bilal after I stopped dealing with Abu Khalid." That was the truth, wasn't it?

A. That was true.

Q. When he told you that he had met with Abu Khalid four or five times, that was the truth.

A. I'm counting in my head, but it was approximately true, if not completely true, how many times they had met, yes.

Q. He couldn't give you dates of when they met, could he?

A. We didn't ask him for specific dates in the interview, I don't believe.

Q. When he told you that -- when you asked him about how he communicated with Wael and he told you, "I communicated through Skype," that was true.

A. Partially true. We know -- we know from our investigation he communicated in other ways.

Q. But you also knew he communicated through Skype.

A. Yes, we did.

Q. In what other ways did he communicate?
A. I'm not sure -- well, let's see. I'm trying to think what I can say without getting too much into something that I'm not supposed to talk about because of classification matters.

But we know, and I believe you have through discovery Facebook accounts, that they communicated via Facebook.
Q. With Wael Kodaimati or --
A. Yes, Smith with Wael and Smith with Saeed and Wael with Saeed.
Q. But you didn't ask him about those, did you?
A. No. Didn't feel like it was something that I could ask him in the interview without exposing parts of our investigation.
Q. And another thing he asked you during the interview was, "Has anyone done anything?"
A. Yeah, he asked me that you're saying?
Q. Yes.
A. He probably did ask me that.
Q. And you didn't answer him. You didn't answer him, did you?
A. I could not answer that without exposing potentially classified information and just investigative details in general at that point.
Q. One thing you asked him about was how old Saeed was,

correct?
A. I think -- yeah, one of us did, either myself or my colleague, but we asked him, yes.
Q. And he told you how old he was.
A. Yes.
Q. And, of course, you already knew the answer to that.
A. We already -- these are all small things that we knew, yes.
Q. And he told you, "I don't have addresses for anybody."
A. He did tell us that.
Q. And that was true.
A. That's true.
Q. Now --
A. Well, it was true as far as I know. I don't know if he had addresses for anybody.
Q. Now, before this interview happened, you had attempted to on February 16 -- the FBI had attempted to interview Smith or approach him a couple times and talk to him, correct?
A. We had tried to reach him with no success.
Q. And when you say no success, does that mean he declined to talk to you?
A. We left him -- he didn't decline because we weren't able to -- the morning of February 16th is the first time that we heard back from him. We had, I believe, left him messages. We spoke to his mother. Because we weren't getting a response

from him on his phone, we spoke to his mother and told her that we needed to speak with him. Asked him -- asked her to have him to reach out to us. We provided our contact information. We didn't hear from him in reference to that.

But yes, we were trying to reach him and were not able to do so.

Q. And because you were not able to do so, you decided to put some pressure on his girlfriend.

A. I wouldn't say that was exactly true. She was -- she was a part of the investigation because of the buddy pass and we needed to know what -- what her role in the investigation was, and so ultimately we went an interviewed her.

Q. But you knew that she had purchased the buddy pass already. You knew that she --

A. We knew that the buddy pass had been purchased with her employee benefits.

Q. And you had been out to her job earlier to interview her, correct?

A. Right. Before the -- earlier than the 2/16 interview, yes.

Q. And you knew the buddy pass was purchased for Mohamed Hilal that didn't exist, correct?

A. That's correct.

Q. So no need to find him because he's not real, right?

A. That's right.

Q. And you knew that it was Smith who asked her to purchase the buddy pass already, right?

A. Yes, we believed that through his interaction with the source.

Q. And you knew it was your confidential informant that asked Smith for the buddy pass.

A. That's correct.

Q. So what more did you need to know about the buddy pass?

A. Like I said a minute ago, we needed to know what Palak knew about the individual that she obtained the buddy pass for. We needed to know what Yahya Assad knew about that individual. Were they someone who were -- were they witting accomplices or were they taken advantage of? Did they buy the thing because they knew that he was going to Syria or did really all that they know is that Smith asked him to get this as, you know, a favor to get someone from Tampa to Buffalo. But that was not anywhere near the entire story. That was not anywhere near the entire information that was given to Smith about that.

So we needed to know was Palak complicit in this and was she a part of it? And was Yahya complicit in this and was he a part of it? And was there anyone else in this who was potentially involved or knew about what this buddy pass was for other than Smith and Abu Khalid?

Q. Right. But it was the FBI's movie. It was their story

about the buddy pass. You knew that Palak couldn't know anything about Mohamed Hilal because he didn't exist, right?

A. I don't think that's true. I think that it's possible that Smith may have relayed to her details, if she were complicit in it, and this is what we didn't know at the time. But it's possible that he would have relayed to her details about an individual that was traveling to Syria to join ISIS and he needed a buddy pass and could she help him with that. We didn't know.

THE COURT: Let's move along, Mr. Tate.

Q. And again, you mentioned Yahya Assad, but you just -- you knew his involvement was just that his debit card was used, correct?

A. We did not know that, sir. We didn't -- I mean, we didn't know that. That's what we were trying to get to. That's part of what our interview was about was to learn more about these people who were on the fringe of our investigation, that their names had come up. And based on the context, it wasn't something that we could ignore.

Q. I understand that. But he -- during the interview on February 16, he told you about Yahya Assad --

A. He told --

Q. -- and he told --

A. He told us his name and where he worked. The part of it that we weren't able to get to with him was what did he tell

Yahya Assad about this ticket and, you know, did he tell him the whole story of information -- did Smith tell Yahya all of the information that Smith had about the ticket or did Smith just ask for it as a favor and didn't give him any more information than that. We didn't know was Yahya a part of this and complicit in it or was he an unwitting accomplice.
Q. And in fact, during that interview he told you that he just asked Yahya Assad to use his debit card because they didn't take cash. He said that in the interview, correct?
A. Yes, that's correct.
Q. And that's true.
A. We think it is now. We believe it is now. But, I mean, we didn't know what Smith had told him.
Q. And -- but that's what Smith told you during the interview.
A. That's what he told us, yes, sir.
Q. And it turned out to be true.
A. We believe that's true. There's some things, honestly, that we'll never know the answer to because -- because we couldn't get to that.
Q. Sir, yesterday -- I want to ask you a question first. One of the things I said to you when you were on -- testifying before was that you were looking to investigate Mr. Smith in relation to his willingness to travel to Syria, correct?
A. Yeah, that's part of it.

Q. And then that investigation ceased around -- well, I'm not saying it ceased, but at least his contact with Abu Khalid stopped around the end of March of 2015, right?
A. Abu Khalid's contact with him stopped. That's the way I -- from my perspective.
Q. Yeah. So from March of 2015 all the way through the end of the year into February -- January and February of 2016, did you have any contact with Mr. Smith?
A. No. We were -- we were trying to reach him prior to February; but like I was saying a minute ago, we weren't having any success reaching him.
Q. And at one point you put together a strategy, so to speak, to put pressure on his girlfriend because you thought she was a weak link.
A. We felt like she had information and that she would probably -- if she did, that she would be more likely to give us good information than he would. Turned out to be false.
Q. Thank you.

I marked and identified an Exhibit 1 yesterday which was a transcript and recording of you and another agent discussing that strategy, and we were not able to play it yesterday and we'd like to play it now.

MR. SAVAGE: Your Honor, we're going to object during this particular time, which is a second bite at the cross examination. We have facilitated this by providing a

transcript. He read it out loud. And it's simply duplicative and unnecessary for them to go ahead and replay that now. The jury can have it if they want, but the transcript is in evidence and this has already been asked and answered.

THE COURT: I'm going to -- I'm going to -- I'm going to overrule it. We've been -- we've been all over the -- once again, we have two counts of a violation of 1001, which indicate that there were -- during this conversation there were two -- there's two falsehoods here. It's -- the -- that's what we're dealing with. Now, you all can -- you spent a lot of time with all this evidence showing what the investigation was about and the defense is going down that same road.

The Court -- there's two things here. We can spend all night long on this, but I'm going to overrule it because we've had plenty of testimony about this. So I'm going to allow the defense to go into this aspect of it too.

MR. SAVAGE: Yes, Your Honor.

THE COURT: The question is, were these two lies told or not?

MR. SAVAGE: Right.

THE COURT: That's the question.

MR. SAVAGE: Your Honor, with all due respect, this has already been in evidence. The tape is in.

THE COURT: I understand. He wants to go over it

with this witness and I'm going to allow him to do it if he can do it with some dispatch. So it's overruled.

MR. TATE: We're just going to play the recording.

THE COURT: Yes, sir.

(Defendant's Exhibit No. 1 was played.)

MR. TATE: If we could pause it for a second.

BY MR. TATE:

Q. I think yesterday, Agent Godfrey, you identified yourself as male one on this transcript.

A. Right. But then I also said that there are -- I said that initially; but as I read further down while you guys were trying to get the audio to work, I see that somewhere it got off track and some things that are attributed to me are not mine --

THE COURT: Here's what we're going to do. If something is mislabeled in your opinion --

THE WITNESS: Okay.

THE COURT: -- we'll stop and you can say that. I think that's the easiest way to do that.

THE WITNESS: I mean, when should I do that?

THE COURT: Right -- as soon as you hear yourself or don't hear yourself. Either you're identified as saying something you didn't say or you're misidentified -- somebody else is identified as saying something.

THE WITNESS: So right at the top here starting on

line 4 where it has male one, that's not me speaking.
Q. Who's speaking there?
A. Well, there are only two of us on the recording at that time. It was Special Agent Fallon.
MR. TATE: Okay. Let's play it.
(Defendant's Exhibit Number 1 resumed.)
MR. TATE: Let's stop right there.
BY MR. TATE:
Q. Agent Godfrey, who are you discussing about giving him money?
A. He's talking about -- we're talking about Bilal. We're on our way to meet with Bilal.
Q. And Bilal was giving money to Mr. Smith?
A. Right. As we talked about before, he -- you know, he and Mr. Smith would work together and he would pay Smith for his service -- or for his work initially. This was before they started getting into the -- more into the car stuff. I believe at this time they were still doing some construction type work.
MR. TATE: Thank you.
MR. SAVAGE: Your Honor, can I ask at this point is the transcript accurate with respect to who is speaking, male one or male two? And are you male two or male one?
THE WITNESS: So with regard to the statement that begins, "But how many times," that is me speaking. It's

labeled as male two, but that is me speaking.

THE COURT: But both the people on here are agents; is that correct?

THE WITNESS: That's correct.

THE COURT: Okay. So it's going to be an agent or -- it's going to be an agent. One of these -- everybody in here is an agent, so it's not like we're trying to parse between a defendant and an agent. This is both agents. So I don't think the fact that we miss an identification is that big a deal, but I do want you to stop it if you are misidentified.

THE WITNESS: Okay.

THE COURT: Go ahead, Mr. Tate.

(Defendant's Exhibit Number 1 resumed.)

MR. TATE: Stop it.

BY MR. TATE:

Q. Is that you talking there, male two?

A. Can you tell me which line specifically?

Q. Lines 5, 6, 7, and 8.

A. So line 6, I believe, is Fallon. The others are me. 5, 7, 8 are -- that's my voice.

Q. Okay. Thank you.

MR. TATE: Go ahead.

(Defendant's Exhibit Number 1 resumed.)

BY MR. TATE:

Q. That clip ends shortly later without any other conversation, correct?
A. Right, I believe so.
Q. And, of course, at the time this recording was made, you didn't know you were being recorded, did you?
A. No, sir.
Q. In fact, you -- did you testify later that prior to Mr. Smith coming in on the 16th, you had tried to actually subpoena Palak, correct?
A. Right.
Q. And you did that by going to her mother's house.
A. Right. She wasn't at her mother's house. We left a copy of it there. And I reached out to her via text message to let her know that we had left it there for her.
Q. Right. But, of course, your confidential informant Bilal had been to Mr. Smith's house, correct?
A. That day, right.
Q. And he --
A. He was headed there that day. He had been there the previous day or something like that, yes.
Q. And, in fact, he had reported to you that his girlfriend lived at the house with Mr. Smith, correct?
A. I don't know if that's true at that time. She was at the house a lot of times, but we didn't -- we couldn't discern from the information that we had whether she lived there.

Like I said yesterday, at that point she was not a target of our investigation and we were not keeping track of where she lived.
Q. But your informant advised you that he saw her at the house and had talked to her.
A. We saw her there, but I don't think we had information to indicate that she lived there at that time.
Q. You had saw her at the house with Mr. Smith more than once.
A. Yes.
Let me rephrase that. Our informant had seen her and Smith present at various places more than once. I don't know if they were all at Smith's house. I know at some point they were together at a Panera Bread restaurant. At some point they were together at an auto shop. I don't know without seeing the reports which days he reported that she was at Smith's house, but they were together in different places a lot.
Q. Now, after this interview on February 16th of 2016, that wasn't your last contact with Mr. Smith, was it?
A. I mean, I was present the day that he was arrested, but I didn't have any contact with him that day.
Q. Did you or other FBI agents go to his job to interview him after that day?
A. Yes. I was there -- are you talking -- can you tell me

where you're talking about exactly.

Q. Well, do you recall?

A. Well, the reason I'm asking, sir, is because we tried multiple times to get in touch with him again because he had offered at the end of our first interview -- this wasn't part of a clip that was played, but he had offered to help us in any way that he could, so we -- we tried for a while to get in touch with him again. And I know that I was with agents when they approached him at his workplace one night -- one evening, but I didn't have any interaction with him and he probably didn't even know I was there. I was just nearby in support of the other agents.

Q. So what was the purpose of that contact?

A. They were trying to reach him again. Like I said, he offered at the end of our previous interview on February 16th that, you know, he was willing to do whatever he could to help us. And at that time, like I said before, most of our evidence was still classified. We couldn't actually confront him on his false statements at that time because our evidence was secret.

And so actually, what we did against -- I won't say precedence, but against common practice. Normally we can't get something declassified unless we already have an approved charging document. In this case the bureau went to a very uncommon practice, not something that we do, and we had to

jump through a lot of hurdles to do it, to get some information declassified for the purpose of being able to sit down with him again to now be able to show him and present to him some of the evidence that we had in order to hopefully get to a more productive conversation with him.
Q. And so when did that happen?
A. I believe the instance that you're talking about where we approached him at his workplace at the grocery store where he was working as an armed security guard --
Q. I'm asking when did you get this information declassified to show him?
A. When did we get it declassified?
Q. Yeah.
A. I don't know the exact date because it may have come through also in batches, but, I mean, it was between February and the following -- I think we were trying to reach him the following November maybe. I mean, I --
Q. So it was roughly about seven, eight months later.
A. Right. It takes that long to get stuff declassified sometimes.
Q. And, of course, you knew where he lived, right?
A. Yeah, his address had changed at least once so we -- you know, we thought we knew where he lived.
Q. But instead of going to his house, you went to his job.
A. We did go to his house, sir.

Q. You did?
A. And we believed he was there that day, but he wouldn't come to the door. I didn't go to his house. Again, I was nearby to support the agents who went to his house in case there was some sort of incident or problem. But there were three agents, I believe, that went to his home in Waxhaw and his car that he drives was there. We believe he was at the house. Another individual came to the door and told us that Smith was not there. Wouldn't -- wouldn't have him come to the door. We believed he was there.
THE COURT: Let's move to -- if there's another line of questions that helps us out, let's move to it.
Q. And then after his house you went to his job.
A. I don't know what order they occurred in, but I believe that's right. I believe we first -- we first tried to call him. Then we went to his -- I think we went to his home. Then we approached him at the Food Lion where he was working that night.
Q. He was working as a security guard.
A. Yes, sir.
Q. And did you have some text messages about him working there as a security guard?
A. Not -- I don't know if -- I know the text message you're referring to. I don't know if it was in reference to him working there. It was -- another agent basically notified me

that he had been observed wearing a security uniform, I believe is what the text says. But I don't know where that was observed, is my point.

Q. And when you went to the Food Lion, did you -- were you able to interview him?

A. I was not part of the interview again. But the agents that tried to speak with him, they talked with him, but he didn't want to discuss anything about the case. They just had a -- they tried to ask him basically would he be willing to speak with us again and take a look at some of the evidence that we had and he did not want anything to do with that.

Q. But he was at work at the time, correct?

A. He was going into work, but we weren't asking him necessarily -- the agents that were speaking with him were not necessarily asking him to do this right then. It's that we hadn't been able to reach him in multiple attempts. We were basically approaching him to say, "Look, can we speak with you again sometime someplace to show you our evidence and, you know, have another conversation with you?"

Q. Did you actually say that to him, "We want to show you some evidence"?

A. The other -- like I said, I wasn't a part of that conversation with him, but the agents who approached him that night told him that there were some -- I don't know if they said evidence, but they basically told him that they had some

things that they wanted to show him and speak with him about in connection to our previous conversation that we had with him on February 16, 2016.

THE COURT: Mr. Tate, let's move on. We've been on this a long time.

Q. So the next thing that happened was he was arrested on these charges.

A. I mean, I wouldn't say that was the next thing, but that ultimately is -- he was arrested on June 29th, 2017.

Q. June 29, 2017, and that was like a year and a half after the interview with you.

A. That's correct.

MR. TATE: Thank you. No further questions.

THE COURT: All right. Redirect about --

MR. SAVAGE: I know the rules, Your Honor.

THE COURT: As direct as you can about what this case is about. Go ahead.

MR. SAVAGE: Your Honor, this person tried to -- I mean, the defense tried to impeach our witness. We'd ask for some patience. We're going to be brief.

THE COURT: You go back through it. I want to know the part about this. If you're going to chase rabbits, we don't have time for that.

MR. SAVAGE: I have --

THE COURT: Go ahead, do your redirect and I'll stop

it if you get off in the weeds.

MR. SAVAGE: Okay.

REDIRECT EXAMINATION

BY MR. SAVAGE:

Q. With regards to -- going back to the interview, the interview in which the defense asked you how many truthful things were there that the defendant said. Do you recall that line of questions?

A. Yes, I do.

Q. At that time you told the defendant you had the E-ticket that had Mohamad Hilal's name on it; is that correct?

THE COURT: Yes or no.

THE WITNESS: I don't know without --

THE COURT: He doesn't know. Move on.

Q. Okay. Did you have the E-ticket?

A. We had the information at that time, yes.

Q. Okay. And I'm not going to bring it up, but we've seen the E-ticket. All the information that he told you about in your interview was on that ticket.

A. Yes. That's all we had.

Q. With respect to the questions about whether or not he told the truth about Abu Khalid, you saw the email that was sent by the defendant to Abu Khalid shortly after there was a no-show by the traveler.

A. That's correct.

Q. And at that point he said, "I don't want anything to do with you." Also at that point Saeed Kodaimati had been arrested around that time; is that right?
A. That's correct.
Q. In the United States.
A. Yes.
Q. Was it fair to assume that Abu Khalid's cover was blown at that point?
MR. TATE: Objection as to assume.
THE COURT: Sustained. That's argument. That's argument. In other words, he'd been arrested at the time he came and said those things. So that's enough. You just have to argue it.
Q. Did you have any information that Abu Khalid's cover was blown back in 2015?
A. We had a pretty good idea that when Saeed came back here, we were going to interview folks that were connected to Saeed, and Smith was connected to some of the same people and so we thought it was a pretty good possibility that he was going to discern based on that --
THE COURT: Let's move on. Argument. Argument. There's a good possibility that he was going to discern.
MR. SAVAGE: Thank you.
THE COURT: If you've got something specific, we can do it. Other than that it is -- it is -- you're making a

logical conclusion which you can make in argument.

MR. SAVAGE: Yes, Your Honor.

Q. With regards to the tape that was played again, again, you're the person who discovered that tape and you turned it over; is that right?

A. That's correct.

Q. With regards to the questions about Ms. Sheth and her mother, did you ever approach her mother in any kind of negative way?

A. No. I spoke with her mother when we tried to serve the subpoena that day, but there was nothing negative about the conversation. She was a very pleasant lady and we were pleasant with her.

Q. In response to the defense's questions on cross examination about whether you had interviewed Ms. Palak before you interviewed the defendant, you indeed had interviewed her; is that correct?

A. That's right.

Q. And she was less than forthright.

A. That's right.

Q. In fact, she provided you with a statement at that time, a handwritten statement, didn't she?

A. That's correct.

MR. SAVAGE: Your Honor, we're going to -- may I approach?

THE COURT: Yes. Let me see what you've got. Is this going to have an exhibit number?

MR. SAVAGE: Yes, 24. And I'd ask the witness to identify it.

(Document tendered to the Court.)

THE COURT: Okay. You may show it to the witness.

Q. Agent Godfrey, have you got what's been marked as Government's Exhibit Number 24?

A. Yes.

Q. Can you identify that document.

A. This is the statement -- written statement that Palak Sheth provided to us, myself and Special Agent Fallon, on January 29, 2016.

Q. And is that the date that you interviewed her?

A. Yes, it is.

Q. And did she write that in your presence?

A. Yes, she did.

Q. Is that a true and accurate copy of the statement she wrote in your presence?

A. Yes.

Q. And does it address the buddy pass that's at the issue of this case?

A. Yes, it does.

MR. SAVAGE: Your Honor, we move for admission of Government's Exhibit 24.

MR. TATE: Our objection is to relevance to Mr. Smith.

THE COURT: Overruled.

(Government's Exhibit No. 24 was received into evidence.)

MR. SAVAGE: Request permission to retrieve and publish Exhibit 24.

THE COURT: You may. You may.

Just read the exhibit. You don't need to hand it to the jury. Just read --

MR. SAVAGE: No, we'll publish it on the --

THE COURT: Okay.

(Government's Exhibit No. 24 was published.)

Q. Okay. This document, if -- I think the jury can -- I'll give the jury a minute to read it. We won't waste time having you read it. We'll give them a minute.

(Jury peruses document.)

Q. So on the 29th before you interviewed the defendant or before the subpoena was issued for her appearance before the grand jury, she told you she couldn't remember who contacted her about Mohamed Hilal. She didn't know anything about it.

A. That's correct. She recalled getting a buddy pass for an individual with that name, but she couldn't remember who asked her to obtain the buddy pass.

Q. So in your interview with the defendant on -- shortly

thereafter on February 16th, this was still very much an issue about what Ms. Palak knew and how she knew it.
A. That's correct.
MR. SAVAGE: Thank you.
No further questions, Your Honor.
THE COURT: Any redirect?
MR. TATE: One question.
THE COURT: Any recross, I'm sorry.

RECROSS EXAMINATION

BY MR. TATE:
Q. One question about Mr. Saeed, his arrest. Mr. Savage asked you about Mr. Saeed's arrest around the time you had -- around the time of 2015; is that correct?
A. That's right. It was in the spring of 2015. Saeed -- you're talking about Saeed Kodaimati, the arrest of Saeed Kodaimati?
Q. Yes.
A. Yes.
Q. So you knew he had been arrested and was in jail in 2015.
A. Yes.
Q. So when I -- when you testified on cross -- when I asked you about what you needed to know, you said you needed to know the whereabouts of Mohamed Saeed, that wasn't true, was it?
A. I don't know that I said whereabouts. Basically, what I was saying we wanted to know was what was their involvement

related to ISIS and Syria.
Q. But you never asked Mr. Smith that question, did you?
A. No.
Q. And, of course, you already knew that Mr. Saeed Kodaimati had at least been arrested.
A. He was arrested after this interview, sir. This interview was February 16th, 2016. Saeed didn't return to the United States until March 23rd, I believe. I think he was arrested on April 8th, or something like that. So he had not been arrested at the time of this interview.
Q. So when Mr. Savage asked you whether or not Abu Khalid's cover was blown because of his arrest, that couldn't possibly be true, then, because that was back in 2015, correct?
A. It was in 2015. So Abu Khalid -- so, I'm sorry. Saeed returned to the United States in March, like I said, I believe it was March 23rd of 2015. Okay. And we knew that when he returned, we were going to interview folks that knew him and that possibly also knew Smith.
So basically, after this whole buddy pass thing, we believed that Smith would know or at least discern that he was caught up in some sort of FBI investigation. So that's a big part of the reason that after March 20th, which is the last time that Abu Khalid met with Smith in person, we told him to withdraw. We told he and Bilal to -- you know, they could still at that point have phone or email contact, but we

directed them not to have any further in-person contact with Smith because we thought that there was a really good possibility that Smith knew or would find out from people in the community that he was connected to one or more FBI investigations at that point.

Q. Well, that's not clear. You said two different dates. That Saeed was arrested in April of 2016. Then you said --

A. No, no, no. 20 -- what did I say?

THE COURT: Whatever you said, do you now know when he was arrested? Yes or no.

THE WITNESS: I'm sorry, I'm just getting the dates confused because they're all around the spring.

THE COURT: Do we have something that we can show to try to get this date tied down since this is something we're talking about?

Q. Let me ask you from your own knowledge, do you know, was he arrested in 2015 or 2016?

A. Saeed was arrested just after -- he returned to the United States just after the buddy pass was purchased because that's the reason we did the buddy pass thing when we did because we knew that once Saeed returned here, we wouldn't have another shot at it. So it was 2015.

Q. So he was arrested in 2015.

A. That's correct.

Q. So when you interviewed Mr. Smith in February 2016 when

you said you needed to learn -- one of the things you thought you could get from him was learn where Saeed was, you already knew he had been arrested nearly seven months earlier, correct?
A. I don't know that I said knowing about his whereabouts at the moment. What we were referring to was what had he been doing in Syria. Because we had information at one time that he was in Syria. We had information at another time that he was in Turkey. The information that we had was that Saeed and Wael would transition back and forth between Syria and Turkey, and so that may be what you're referring to. What we're asking is where was he at any given time and what was his --
MR. SAVAGE: Your Honor, can I approach the witness to refresh his memory?
THE COURT: Let him finish.
THE WITNESS: My point is what we wanted to get to in the interview was information about Saeed and Wael's activities in Syria and Turkey.
Q. Right.
A. When they were there.
Q. Right. So the fact of the matter is in February 2016, isn't it true that Saeed Kodaimati was already in federal custody and had pled guilty to an offense in federal court?
A. That's right, but we -- we were -- just because he pled guilty to one offense doesn't mean that he was still possibly

culpable for other offenses related to terrorism while he was in Syria and Turkey. We still needed information about that.

Q. And you needed it from Mr. Smith?

A. We needed it from whoever we could get it from, sir.

THE COURT: All right.

THE WITNESS: We have a forward-leaning posture regarding investigations of matters concerning international terrorism.

Q. One final question, though. During the interview in February of 2016, you never asked Mr. Smith any questions about Mr. Kodaimati who was already in federal custody, did you?

THE COURT: Yes or no.

THE WITNESS: No, we didn't.

THE COURT: Okay.

MR. TATE: No further questions.

MR. SAVAGE: Nothing further, Your Honor.

THE COURT: Do you want to ask him about that date?

MR. SAVAGE: Do you want me to clarify that?

THE COURT: Yeah, I'd like to get it clarified since it's out there.

MR. SAVAGE: Okay.

THE WITNESS: So --

THE COURT: Hold on. Let him show you something to refresh your memory.

REDIRECT EXAMINATION

BY MR. SAVAGE:

Q. I'm going to show you something and ask you if this refreshes your memory --

THE COURT: Then you can give a very short answer --

Q. -- about the date --

THE COURT: -- about the date.

Q. -- of Mr. Kodaimati's arrest and where it was.

A. Right. It was definitely --

Q. Let me take it back.

Does that refresh your recollection?

A. It does.

Q. Okay.

THE COURT: When was the arrest?

THE WITNESS: The arrest was in 2015, spring of 2015.

THE COURT: All right. Anything about that, Mr. Tate, at all?

MR. TATE: Nothing.

THE COURT: Okay. Thank you.

All right. Members of the jury, stay where you are for a moment. We're going to do a sidebar.

Is there further evidence from the government after this witness?

MR. SAVAGE: I think not, but let me just have a

minute to confer with my colleagues.

THE COURT: All right. Come over here, then. Let's talk right now for a minute.

(Sidebar conference as follows:)

THE COURT: Okay. Assuming arguendo that we are at the end of the government's case, any evidence for the defense?

MR. TATE: He wants us to call Kareem. I'd like to be able to talk to him about that. I'm not comfortable making that decision right now. If we're going to call him, I would ask that we be able to call him first thing in the morning. I would like to talk to Mr. Smith about that, confer with him about that. I don't typically allow clients to tell me who to call as a witness, but I don't want to --

THE COURT: I know.

MR. TATE: -- have an issue later and I'd like to talk to him about that.

MR. SAVAGE: I'd like you to have a full record and memorandum.

MR. TATE: Huh?

MR. SAVAGE: We'd like you to have full time to discuss that.

THE COURT: All right. Everybody is going to have to -- so far who have we gotten instructions from? Who have we got instructions from?

THE COURT: We have about 26 pages of instructions. I can't -- I don't think -- we have nothing from you guys.

MR. TATE: We usually wait until the evidence is closed and then try to determine. We can get a pretty good sense, but I know that --

THE COURT: Read these instructions because unless you all have got something that's not included, I'm going to use the ones we've got now.

MR. SAVAGE: We're good with them.

MR. TATE: Okay.

THE COURT: So look at them and see; and if y'all have something that needs -- something that needs to be added, then I'll add it. But we've got -- we've got those instructions. It's going to take me about 40 minutes to do the -- to read the instructions.

How long are you going to request to argue this case?

MR. SAVAGE: Oh, I don't think we'll -- 45 minutes, both opening and close. Thirty and 15.

THE COURT: Mr. Tate?

MR. TATE: I would say 30.

THE COURT: All right. I'll think about giving you each 45. If I give him 45, I've got to give you 45 just in case you want it. So I hesitate to give --

MR. SAVAGE: I'll come down to 40.

THE COURT: Are you going to have tomorrow, hopefully, some charts or something?

MR. SAVAGE: Yeah, I've got the whole government PowerPoint.

THE COURT: Then you probably can go faster than 45. I'll let you start it, but don't ramble on. You're a rambler, Mr. Savage.

MR. SAVAGE: Judge, that's not fair.

THE COURT: You go on and on. Mr. Tate does too, but he's just trying to throw sand on everything so I understand his rambling. But, I mean, this case is --

MR. SAVAGE: I'm trying, Judge.

THE COURT: All right. And, of course, your witness over there is one of the longest-winded FBI agents I've ever seen in terms of answering questions.

MR. SAVAGE: It's only his first time testifying.

THE COURT: Well, you ought to get a transcript of this and go over it with him.

MR. SAVAGE: Okay.

THE COURT: The answers are just diarrhea coming out of there. Mr. Tate is glad for him to do it.

MR. SAVAGE: I was happy too.

THE COURT: Maybe both of you were, but I tell you it was a lot of wiggling and jiggling. Okay.

MR. SAVAGE: So can we allow Mr. -- assuming we

rest, we'll release our witnesses.

THE COURT: Ms. Palak, are you going to call her? If you're not going to call her, she can come in.

MR. TATE: I don't think we're going to call her.

MR. SAVAGE: I'll release her assuming --

THE COURT: Any problem releasing her?

MR. TATE: Palak? She's going to be here anyway so no problem with you releasing her.

MR. SAVAGE: How about Mr. Bilal?

MR. TATE: Bilal?

MR. SAVAGE: Yeah, the third CHS.

MR. TATE: I'm not going to call him.

MR. SAVAGE: So I'm going to let him go. He's got an FBI agent here watching him.

THE COURT: The worst thing you can do is put somebody up you have no idea what they're going to say.

How long do you think that's going to take because I've got to figure out when to bring them in, bring the jury in tomorrow. I mean, I can come in as early as 8:00.

MR. TATE: When we walk in here in the morning, I'll know whether I'm going to call him.

THE COURT: If you do call him, how long do you think direct will take? Do you have any idea?

MR. TATE: I think it will take about ten minutes.

THE COURT: All right.

MR. SAVAGE: I can't say if they put him up. We'll cross him.
THE COURT: Okay.
MR. SAVAGE: He helps our case. I'm not going to say we're not --
MR. TATE: If I come in and say we're not calling him, then everything is good. You know, we don't have to go through all this --
THE COURT: Yeah, we're done.
MR. TATE: So I would say, you know, my anticipation --
THE COURT: Maybe ten minutes from you. And I'll hold Mr. Savage down some on his.
MR. SAVAGE: Okay.
THE COURT: I know he may have some -- in other words, go to your good stuff first --
MR. SAVAGE: Yes, sir.
THE COURT: -- because I may stop you.
MR. SAVAGE: All right, Judge.
THE COURT: All right. I'm going to bring the jury in at 9:00, then. I'm going to let them come in at 9:00.
MR. SAVAGE: Mr. Tate, can you let me know as soon as you know.
THE COURT: He won't know until tomorrow morning probably.

MR. TATE: Yeah.

THE COURT: You find out -- yeah.

MR. SAVAGE: All right.

THE COURT: Yeah, let's just wait until tomorrow morning. That way -- it's just one person. Wait until tomorrow.

MR. TATE: Just have him here at 9:00.

MR. SAVAGE: I'll have him here at 8:45.

THE COURT: Yeah, have him here at 8:45. And all the lawyers and everybody else come in at 8:30. If there's anything about the instructions, any objections, we'll get those done at 8:30. Read through them, see if there are any objections.

MR. SAVAGE: Okay. The security procedures apply to the Memphis guy. He's a source.

THE COURT: Right.

MR. TATE: So you want us here at 8:30 for a charge conference, is that what it is?

THE COURT: Yeah, essentially for a charge conference. And I want to -- I want to try and figure out -- in other words, they have to look at -- there are specific lies that those two things are on, but there is a context to them which the jury has to decide whether they're actually falsehoods rather than just the specific statement.

MR. SAVAGE: Right, and the --

THE COURT: And whether it meets what's charged in the indictment.

MR. SAVAGE: And the specific statements, although they're summarized, are incorporated by reference from the introduction of the indictment. There are very specific statements in those.

THE COURT: I know.

MR. TATE: I mean, those are argument.

THE COURT: They are. The charges are what's important, but they -- but the statements -- he can point to those statements. Those statements are in the transcript. As long as they're in that transcript --

MR. SAVAGE: Right.

THE COURT: -- as they appear --

MR. SAVAGE: Right.

THE COURT: -- and they're incorporated by reference into the charge.

MR. TATE: But I'm saying that's a speaking indictment. It can't go back.

THE COURT: It can go back.

MR. SAVAGE: It's the indictment.

THE COURT: Yeah, I mean, it can go back. I mean, that's why they do a speaking indictment. The thing about a speaking indictment also is whatever they say, if they don't prove it --

MR. SAVAGE: We own it.
THE COURT: -- they have to own it.
MR. TATE: Okay.
THE COURT: And, you know, it is -- you know, did the defendant say that he was going over to the -- to --
MR. SAVAGE: Did he discuss?
THE COURT: Did he -- well, fighting for ISIS. Did he say that on that? And there's another one about the ticket. But on that particular one, you all can argue about whether or not -- because it's what's in the indictment.
MR. SAVAGE: Yes, sir.
THE COURT: Very good.
MR. TATE: Here's what I want to say, Your Honor, real quickly. I don't know when the appropriate time is. Our position is that the transcripts are not evidence. Normally the transcripts don't go back. The recordings go back. So we would object to transcripts.
We would object to the speaking indictment, but particularly for the indictment if it goes back.
THE COURT: Transcripts will go back with the recordings because they are an aid, but they're not the evidence.
MR. TATE: All right.
THE COURT: And I'll tell them again.
MR. TATE: You can give them an instruction on that.

THE COURT: With the indictment, if there's no evidence -- if there's a paragraph in the indictment but there's no evidence about it, I'll redact it before it goes back. I'll look at it and see.

Okay. Let's go.

(End of sidebar conference.)

THE COURT: We're going to finish for the night. We're going to let you go. I think we can get the case to you tomorrow by lunch. And what we will do is we'll order lunch for you and then you can have as long as you want. You can have all day -- all the time tomorrow. You can have Friday. As long as you all are making progress and believe that you can reach a verdict in the case, you can have as long as you want. So I'm not going to rush you all up.

I never like a jury to go out on a Friday afternoon because I don't want anybody -- anybody on the jury -- most juries there's no problem with that, but I don't want anybody on the jury rushing because it's a Friday afternoon. But tomorrow we should have this in plenty of time for you all to give good consideration tomorrow. And if you need more, we'll give it to you.

Okay. So be safe going home and coming back. Don't talk about it. Now, there may be a little bit of press about this and there may be something on television. If it pops up and you see anything, don't look at it. I mean, really don't.

Because I have no idea what they're going to say, and they may not have heard what you have heard. I mean, I haven't seen anybody in here from the press to say anything about it so -- but that doesn't mean that they will not make some comment. So what I want you to do is ignore any kind of news media, internet stuff or anything about this case. Just get it away from yourselves.

Also, the folks at home, tell them to please not talk to you right now about the case and anything they might have heard or anything like that because you've got to give both sides a fair trial and only by you hearing the evidence here, you'll hear the arguments of counsel -- we may have some evidence tomorrow, you'll hear the arguments of counsel, you'll hear my charge to you, and then you can make the decision. You'll have what the law says you're supposed to have and make the decision one way or another. And it's your call on the facts.

So be safe going and coming. We're going to remain here until you all are out of the building. See you tomorrow morning at 9:00.

THE JURY: 9:00?

THE COURT: 9:00. Thank you.

(Jury exited the courtroom.)

THE COURT: Okay. Mr. Savage, does the government rest having checked into it?

MR. SAVAGE: Yes, Your Honor, the government will rest and then we'll release -- I think we'll release our witnesses, Mr. -- remaining witnesses, Mr. Assad, Ms. Palak or Ms. Sheth, and Mrs. Williams.

THE COURT: Yeah, whoever Mr. Tate -- it's okay with him to be released can be released. Whoever cannot be released -- he doesn't want to release yet is not to be released.

And you may come down, Agent. You may come down.

THE WITNESS: Thank you, sir.

(Witness stepped down.)

MR. SAVAGE: And to be clear, we're going to release the CHS named Bilal; is that correct?

THE COURT: Yeah. Just check -- if Mr. Tate says yes, they are released.

MR. TATE: That's correct. The only one we want is Kareem.

THE COURT: All right. Now, motions -- I know what the motions are going to be. We can do those first thing in the morning when we do the other if you want to do that, Mr. Tate, if you want to argue that.

MR. TATE: I'd rather do it in the morning.

THE COURT: Okay. We'll let you put it on the record in the morning.

Anything for the Court tonight?

MR. SAVAGE: No, Your Honor.
THE COURT: All right. We'll be in recess until 8:30 tomorrow morning.
(Evening recess at 6:17 p.m.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of July 2019.

s/Cheryl A. Nuccio
Cheryl A. Nuccio, RMR-CRR
Official Court Reporter