UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:17-cr-182 |
| vs. | ) | VOLUME III |
| ALEXANDER SAMUEL SMITH, | ) | |
| Defendant. | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
MARCH 21, 2019

APPEARANCES:

On Behalf of the Government:

MICHAEL E. SAVAGE, ESQ.
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina

On Behalf of the Defendant:

KEVIN TATE, ESQ.
MYRA CAUSE, ESQ.
Federal Public Defender's Office
129 West Trade Street, Suite 300
Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

# I N D E X


| DEFENDANT'S WITNESSES | PAGE |
|---|---|
| RONALD GODFREY | |
| Direct Examination By Mr. Tate | 552 |
| Cross Examination By Mr. Savage | 556 |
| Redirect Examination By Mr. Tate | 556 |


# E X H I B I T S

DEFENDANT'S EXHIBITS


| NUMBER | ADMITTED |
|---|---|
| 7A | 553 |
| 7B | 553 |
| 7C | 553 |

P R O C E E D I N G S

THURSDAY MORNING, MARCH 21, 2019

(Court called to order at 8:32 a.m.)

(Defendant not present.)

(Jury not present.)

THE COURT: Where are we on further evidence?

MR. TATE: Waiting on talking to Mr. Smith. I just think we need to get on the record -- we're on the record now. He's not here. He's coming in.

THE COURT: Okay. That will be fine.

Anything on instructions?

MR. TATE: Yes.

THE COURT: We'll do motions in a few minutes. We'll wait until the defendant is here for that.

On the instructions where are we?

MR. TATE: Your Honor, we have a few objections to the instructions that were handed out yesterday. Let me get to it.

Introductory remarks is okay.

Indictment but accusation, defendant denies charges, separate crime.

Page 4 is fine.

Five is fine.

Six. Six is fine.

And we have no objection to the classified

information instruction because that was based on the Court's order which we objected to in some fashion, but that is the instruction that was consistent.

(Defendant entered the courtroom.)

THE COURT: Which specific ones are you objecting to? Which numbers?

MR. TATE: Okay. The one we're objecting to is -- in part, is page 9, absence of witness. It reads there, "If it is peculiarly within the power of either the government or the defense." Defense has no obligation or burden to produce evidence so that kind of shifts the burden to the defense.

THE COURT: Let me see.

David, do you have a copy of the instructions down there? I'm not sure what I did with mine. I've got a lot of stuff up here.

(Document tendered to the Court.)

MR. SAVAGE: May I, Your Honor?

THE COURT: Yes.

MR. SAVAGE: Your Honor, we think this is a fair instruction because in response to the defense's objection, it says, "The jury must always bear in mind the law never imposes on the defense in a criminal case the burden of calling any witness." But it's only fair and we want to preclude the type of argument where the defense comes up at closing and says, "Well, you didn't hear from Bilal. You didn't hear from

Kareem," if they decide not to call him, but we know they're all here.

THE COURT: Well, they are, but they're not necessarily in control -- I mean, it's one of those situations where those witnesses are not -- they're put in -- they're put in a sort of a difficult choice where the person doesn't talk to them so they don't know what they're going to say, so it's like -- it's like a Hail Mary, throwing -- trying to just throw it down the field. If you're that desperate they may put them up there and it may be a bad situation.

I understand, Mr. Savage. It's that way in every criminal case, but I've never liked the idea that there is information that is not available to one side.

MR. SAVAGE: But this particular instruction has nothing to do with that. I mean, it would be like if we went -- for instance, there were defense witnesses who wouldn't talk to the government. That's the way it goes. They're not required to. It's a free country.

All this says is both powers have -- both sides have the power of compulsory process, which is a fair comment and it is the law, and it's important, I think, to point out in fairness to both sides and it addresses the criminal burden. Why else wouldn't they want it there because it is a fair statement of the law.

THE COURT: No, no, they think it's unfair.

MR. SAVAGE: But why?

THE COURT: That's not why they don't want it in there. They don't want it in there because of what I just said. I mean, a person -- certainly the witnesses are available. You know what they're going to say. They have no idea. They're a little suspicious that there may be information that that witness is going to say, but it's probably just because that's a weak witness. That's usually the decision that I made as a prosecutor was the person had information, but putting them on the stand and watching them doing the "that's all folks" thing was not going to help my case, so I kept the weak ones off the stand.

I'll think about it.

Any others, Mr. Tate?

MR. TATE: Yeah. Just for the record here, where it reads, "If it is peculiarly within the power of either the government or the defense to produce a witness," where it says that is that if some witness didn't testify and we've got subpoena powers, we should have produced them. But we have no burden here and so that shifts the burden to the defense and I think that instruction is reversible error as it is written.

THE COURT: Can you give me a case?

MR. TATE: No, I don't have a case on hand.

THE COURT: I've given -- I've given an instruction somewhat like this before, but not -- not -- not specifically

in these words.

MR. TATE: I've never had an instruction like that, but -- I've never seen an instruction that kind of implied or -- implicitly or indirectly some burden of production on the defense and I think that's what that does.

MR. SAVAGE: Well, Your Honor, the government cites both O'Malley and it cites *United States v. Green*, Fourth Circuit case, at 69 Fed. Appx. at 612. And it states specifically that there is no burden on the defense, so it's fairly balanced.

MR. TATE: One paragraph vitiates the other.

THE COURT: All right. Okay. I'll think -- let me think about that one.

Are there any other objections -- any other instructions that you wish to object to?

MR. TATE: The consciousness of guilt statement of defendant on page 11.

THE COURT: I've given that one a lot.

MR. TATE: Here's what this reads. "Conduct of a defendant, including statements knowingly made and acts knowingly done, upon being informed of a crime that has been committed or upon being confronted with criminal charges may be considered." That's just not in play in this case.

MR. SAVAGE: Well, Your Honor, there's a 103-minute interview on the 16th of February 2016 in which the defendant

was asked numerous questions and presented with 1001 twice and made statements in response to that, specifically in response to the charge made in this case. And the government cites on page 24 of its submitted instructions at least three cases, including a Supreme Court case, that supports the instruction.

MR. TATE: But you have to look at the facts of those cases. In those cases those people were under arrest for one, and that wasn't the case here. They've said this was a voluntary thing. You're free to leave. Nobody is going to tackle you. Then they tell him about 1001. They don't tell him he's under investigation for false statements. They don't tell him --

THE COURT: It's a little bit different because this case is a 1001. In other words, the crime -- they didn't tell him, you know, we're investigating, you know -- but he does -- there are statements in there. Of course, you're going to argue that taken in its totality, that he did not lie there. But there are specific statements that belie the conversations that are on the tapes where he says that he never -- never planned or never talked about going to Syria. He did.

Now, the crimes as they are listed in here are -- and you all can argue about all that stuff during the course of that. Of course, that's one of the things -- you don't have to -- you just have to say they lied, but the -- you don't have to worry about how they did it as the evidence

comes out. But in this particular one he was -- by falsely stating to special agents when investigating a matter involving international terrorism he had never discussed his desire and plan to travel to Syria. This statement was false -- we can stop there -- because Smith then and there knew he discussed his desire and plan to travel to Syria in support of ISIS with the source. So y'all can fight about that.

And once again -- now, this one, number two, that's the ticket one. That's a little different. There is some evidence that he was -- that they were -- that the brother was going over there for nefarious purposes.

I'll think about the two instructions for the moment. I know you all want to be able to argue knowing what those are, but I'll think about it.

MR. TATE: Okay. So the next page --

THE COURT: I do think lying -- lying in an investigation does have consciousness of guilt. I've always -- my argument always was if the truth will set you free, why didn't you tell the truth?

MR. TATE: No problem on 12. No problem on 13.

THE COURT: I'm not worried about the ones you don't...

Mr. Savage, do you have any problem with the instructions at all?

MR. SAVAGE: There's a couple parts where I think that there -- depends on whether the defendant testifies. There's a couple things I'd point out --

THE COURT: Okay.

MR. SAVAGE: -- that aren't necessarily applicable. But no, we're good with the instructions.

THE COURT: Okay.

MR. TATE: On 15, Your Honor, under government's use of undercover techniques, it says "with whom the defendant was dealing with were ISIS sympathizers." I don't know where that term sympathizers comes from.

THE COURT: I think they were dealing with ISIS sympathizers. I don't think there's any question that he made it clear that he was working for ISIS, Daesh, different names and stuff. The undercover guy made it clear what he was working for. The only question is going to be what -- and I understand the defendant's position, that he was -- that he wasn't going over there to fight with ISIS; that he was going over there to protect the family and he would defend -- do whatever he had to do with whoever he had to do it with.

Again, all this goes back to the question of whether he lied about that. It's one of those things where you can turn into -- Martha Stewart went to jail for lying to the FBI about -- they didn't get her for the things that they were investigating her for. When they brought her in about it, she

lied to them and that's what she went to jail for.

MR. SAVAGE: Your Honor, I don't -- I think the word sympathizer, if that's the objection -- I mean, the government has -- if you want to -- if defense wants to substitute a word -- I thought sympathizer -- the Court used a pretty neutral word. I mean, you could call it supporter. You could call it, you know, member. You could call it brother. You could call it whatever you want. I think...

THE COURT: Well, is there any better word for that, Mr. Tate?

I'm going to leave that in there because, I mean, that is the evidence. The witness made it clear from the phone conversations that I heard that he was working for the ISIS group over there, Daesh, al-Baghdadi, that crowd that believes that God is so weak men have to kill for him and he's so corrupt he's got to give them pleasures in the afterlife to bribe them to do it. I don't understand that. There are sects that believe that. That is not Islam. That is that crowd, the killing crowd.

MR. TATE: You know, we're fine with that, Your Honor. When I look at it in totality, I think there's bigger fish to fry than that one.

THE COURT: I think that -- I'm more -- yeah, I'm more interested -- you know, I'm going to hear some -- something on the motions in a minute. I'll think about that.

Are there any others that you have, Mr. Tate?
MR. TATE: We just believe on 17, stipulation of facts -- no, that comes in because of the tapes, so...
THE COURT: Yeah. And I'll just -- I'll mention that they stipulated to the tapes and the authenticity of the tapes. You all agreed on that; is that right?
MR. SAVAGE: Yes, that's fine. I had taken it out, but that's fair.
THE COURT: Okay. I mean, that way I can put it in. It lets them know what's been stipulated to on both -- on both the tapes. I haven't heard any problem with any of the tapes or the transcripts so far. I worry about -- I always worry about transcripts. This is -- this is the first -- I really don't think I have heard any misstatements on the transcripts. There were some words that were not as clear as I would like. I've had transcripts before where I heard different words than what was on the transcripts.
MR. SAVAGE: Your Honor, at some point we'll need to address the transcripts and which ones -- I know the defense had said at one point they didn't want the transcripts. At another point they refer to them. So are the transcripts in or out?
THE COURT: The transcripts -- the transcripts as part of the tape are in.
MR. SAVAGE: Okay.

THE COURT: Because that's part -- but only as an aid. I have to instruct them again when it goes back that that's to aid them in hearing; that that transcript is not the evidence. They have to go with what they hear.

MR. SAVAGE: Okay. So there are -- in the government's exhibits, we don't have transcripts of the 16th, but the defense does. I've looked at them. It's a court reporter. We don't have an objection to those.

With respect to the government's tapes, the government played 1 through 10. There are two sets of transcripts. One is the ASCII or the actual transcript that is scrolled that can be converted into a Word document.

THE COURT: Right.

MR. SAVAGE: Or the defense -- because I don't know if the jury can look at it with the scroll. The other set, which is the set we gave to the defense ahead of time, is verbatim, but it also includes Arabic translations. So I don't -- whatever one they want, but if there's no Arabic translations in the ones that are in the thing --

THE COURT: No. Here's the thing. Here's -- here's the way it has to go. If the tape -- if the tape goes back as evidence, it goes back as it is --

MR. SAVAGE: Okay.

THE COURT: -- as evidence with that transcript without translation.

MR. SAVAGE: Okay. That's fine.

THE COURT: It has to be. There's no -- that was not part of that exhibit. It was explained and you can point out if there's any keywords --

MR. SAVAGE: Yeah.

THE COURT: In your argument you can point out that they should remember that because they can't have the translation. But the tape -- the transcript on the tape is only there to aid them hearing the tape and that's hearing the tape, not translating the tape.

MR. SAVAGE: Yes.

THE COURT: We're not going to translate it.

MR. SAVAGE: All right. That's fine. We'll make sure we get the right set.

THE COURT: Okay.

MR. SAVAGE: Okay.

MR. TATE: Your Honor, other than that, we don't have any objection. The Court has given a separate verdict on international terrorism, so we have no objection to the verdict form.

THE COURT: Okay. You don't have any -- you don't have any objection to it.

The -- let me ask -- okay. Let's hear -- let me hear the motions. Let me ask this question also when I'm listening to the motion. So assuming the jury goes back there

and assuming the jury -- assuming ahead of time that the jury were to find the defendant guilty and were to find out that this involved international terrorism since they don't know what all that means, is the government saying that its argument -- that the -- the person who was allowed to be out on bond and who was offered a three-year deal is now such an international terrorist, the government is going to ask me to give him 20-some years in prison? Is that the -- is that going to be what we're to hear?

MR. SAVAGE: Well, Your Honor, you know, I don't know what it is, but I think that that's pretty unfair.

THE COURT: This is not unfair. I'm asking you a specific question. What's unfair sometimes is the way the law operates. Now, if the government thought he was good enough to be out on -- I don't know who put him on bond.

MR. SAVAGE: Well, that was a magistrate judge who heard all the evidence and -- was provided all the evidence. And in that particular case, the government made some agreements with the defense. Now, on past times we've been criticized for not making agreements. But there are also very severe restrictions on this defendant and he was closely monitored by both the FBI and the probation officer.

THE COURT: Listen, I'm as -- I'm as frightened of anybody.

MR. SAVAGE: Right.

THE COURT: Anybody who -- people who -- people who are normal thinkers --

MR. SAVAGE: Right.

THE COURT: -- who are normal thinkers will make normal decisions on what they do --

MR. SAVAGE: Right.

THE COURT: -- on defending their country, defending their family, battling over certain things.

MR. SAVAGE: Right.

THE COURT: People who think that God is going to give them all these great prizes for killing people are very, very dangerous. Do not think that I don't think we've got a real problem with dangerous people in this country. They're sitting in there. They're being radicalized. They are -- it's a very, very big danger to this country. They're listening to a group of folks who are following old men who wanted to be able to subjugate everybody, including the women.

MR. SAVAGE: So, Your Honor, if we get to the point -- if we get to the point, which is a big if, we get to the point where the enhancement applies -- and I think the jury has to find that beyond a reasonable doubt because it's part of the statute. If we get to the point and the jury finds that the international enhancement applies as it does in the statute, then we'll come to the Court and under the guidelines we will make arguments on whether or not the

terrorism enhancement applies. We think it does apply. At that point the Court will consider the guidelines, much like Judge Ellis did in the *Manafort* case, much like whatever, on the particular and unique circumstances of this case.

Do we expect that the Court will give a 20-year sentence on a false statement case under these circumstances? No. But do we think it's more than just the average 1001 case because it involves ISIS? Yes.

THE COURT: I'm not -- I'm not talking -- I'm not saying that that's not -- that's not more than an average --

MR. SAVAGE: Right.

THE COURT: -- case. But I am saying that for -- in this particular fact situation where a young person comes in and is talking about going over there, there's a specific family that he wants to go to -- now, maybe the Kodaimatis have been radicalized and they've decided that, you know, it's their chance to get that. The leaders never strap themselves with the bombs and blow themselves to paradise. If they -- if they believed all that stuff -- that they were going to get all that stuff, you couldn't get to the bombs for the leaders. But they don't believe it. They just get young people like the defendant to believe it so they'll go over and sacrifice themselves for their benefit.

MR. SAVAGE: But, Your Honor, there is no nexus between the fact that a magistrate judge a year and a half ago

decided based on all the facts and the Bail Reform Act and with input that this defendant could be released under very strict circumstances and whether or not this enhancement applies. Those two are not connected.

THE COURT: And you didn't -- the government did not appeal that to the Court.

MR. SAVAGE: No, it didn't. And I think that in that particular circumstance, the probation office in this case and the unique circumstances -- if we had been in another place in another part of the world, maybe. But with this particular office, this probation officer, the fact that the probation officer maintained very close contact, the FBI has been in contact with the probation officer, we knew exactly where this defendant was, he was on a GPS tracker, we knew we had his passport, and a hundred different other things in this particular case, and the fact that it was not a material support charge, all factored into that. So for all those reasons, we think that the decision that the Court made was not totally unreasonable and was within the discretion of the magistrate judge.

THE COURT: Oh, I -- yeah, I mean, the magistrate judge can do that, but I'm just saying you all had the ability to appeal it. What I'm saying is then you put it in that -- it's all that old judge's fault. We did all we could to stop terrorism in the world.

I'm just saying this is a -- this case is more serious --

MR. SAVAGE: Right.

THE COURT: -- because of the nature of it, but it is not a terrorism case.

MR. SAVAGE: Yes, and that's exactly right.

And I think at the point -- and we've got a big if here because I don't know what this jury is going to do.

THE COURT: I don't know -- I don't know either.

MR. SAVAGE: Right.

THE COURT: But the -- because there was so much time spent --

MR. SAVAGE: Right.

THE COURT: -- on whether or not he was going over there to protect the Kodaimatis --

MR. SAVAGE: Right.

THE COURT: -- or whether or not he was -- whether or not he was a terrorist-in-training ready to go fight and die. He definitely was dead broke. He couldn't get over there.

MR. SAVAGE: Right.

THE COURT: I mean, he couldn't find any money to get over there.

MR. SAVAGE: Right. Now, if we --

THE COURT: And so then we get to the point -- I

know the withdrawal -- you all can argue whether he withdrew and decided not to go.

MR. SAVAGE: We don't know.

THE COURT: We don't know -- we don't know that.

MR. SAVAGE: We don't.

THE COURT: We really don't know whether he did or not.

MR. SAVAGE: But with respect to the Court's question --

THE COURT: But the question is, these are about lies and whether the lies were told.

MR. SAVAGE: Right. We think that the instruction is appropriate because it's part of the statute. The statute refers to 2331. The Court has properly instructed the jury that it should consider the enhancement. I think it's right that they consider whether it was a false statement and then the enhancement, so I think we've done it and the Court has fashioned a very fair verdict sheet and a very logical progression. And I think if we get to the end of this and the defendant is facing a 20-year sentence, then I think you might hear the government move to remand him immediately. You might. But I don't know. I'm not going to jinx our case by that, right?

THE COURT: No, but I -- that's not what I'm interested in, whether you remand him immediately. What I'm

interested in -- because I may remand him immediately whether there's a motion or not on this charge. I'm not sure on an appeal I would have allowed him out there on the seriousness of this matter, but it is where it is.

MR. SAVAGE: Right.

THE COURT: But then when we get to the sentencing, the government is going to sit up there and go, "This is the worst -- 20, yeah." And then, I mean, it gets ridiculous when the -- the government always argues the guidelines and never looks at it themselves.

MR. SAVAGE: Your Honor --

THE WITNESS: It's really not -- I really don't think the government is in any way helpful to the Court in fashioning a proper sentence.

MR. SAVAGE: Well, Your Honor, I regret the Court feels that way, but I've been a counselor before this Court and I know I've appeared before you many times and I think I know where you're -- I think I know this Court in the sense of what its priorities are and its feelings about using the guidelines as post -- I've always seen this Court follow the guidelines in the sense of it's considered them and then it's made very rational and particular exceptions to that. I would think this would be no different.

If we get -- and this is about the issue of multiplicity. I think that the jury should be able to find

between the two offenses because under the law they are two offenses. Now, whether or not, as the Court said at the beginning of the trial, those two offenses merge for the purposes of sentencing, the guidelines are very clear. They're going to merge because they're going to be considered together by the Court. But that's not the legal issue before us. The legal issue is whether or not there are separate elements of the offense here, and there very clearly are.

So for that reason --

THE COURT: I'm not arguing the difference. I'm just saying there are different elements of proof and the proof is different on both of them in this case.

MR. SAVAGE: Right. So when we get to --

THE COURT: The proof is different. One of them -- one of them there is -- you know, there certainly can be an argument made about -- and on the other one it's -- and that's just the Court's opinion --

MR. SAVAGE: Right.

THE COURT: -- with regard to that. I'm not going to jump into --

MR. SAVAGE: And this jury could split that verdict, we don't know. I mean, if the Court is faced with an acquittal on one and a conviction on the other --

THE COURT: But they really don't ever. They don't ever. I mean, I had one -- now, I've got to sentence -- I had

a fraud case. They found the primary guy guilty of all the counts. They found the secondary guy guilty of half the counts. They turned the wife loose. The jury made their decision on where it was.

Now, as a practical matter, the guy that's involved second probably is going to have a guideline virtually the same as the guy that they found all the counts against; but I know what the jury meant and I'll sentence accordingly.

MR. SAVAGE: Okay. I hope that answers the Court's question.

THE COURT: It does. It does. But it doesn't -- what doesn't help me is you bring a case that is a -- that on its face is he didn't tell the truth to the FBI, which is the case. And then on the other it has a -- it has this massive sentence and you bring it in and demand that sentence. And then you play to the press, "Oh, we did all we could do." And then the judge -- when in truth all of us know this is not the case that terrorism was made to enhance for 20 years.

MR. SAVAGE: Right.

THE COURT: There are other folks that this was meant to get.

MR. SAVAGE: Your Honor, there were many charging choices the government had here and the Court is aware of some of the equities and the reasons they weren't. This could have been a material support charge. It was not for reasons that

we can't discuss.

THE COURT: I understand. And I think the government's offer in the case was certainly a good offer in the case.

MR. SAVAGE: Thank you. And that's maybe where we wind up.

THE COURT: We'll see.

MR. SAVAGE: Yep.

THE COURT: All right. Mr. Tate, motions?

MR. TATE: Your Honor, we cannot move to a 29(a) motion because Mr. Smith wants to put on evidence. And after we put on -- we want, you know, the whole report in evidence and there's portions of it that Mr. Smith -- well, a portion he wants -- it's about 18 minutes long, that he wants to be played that was not played by the government.

THE COURT: Okay.

MR. TATE: I think he's entitled to have it played. I thought I covered some of it on cross.

THE COURT: We'll play it. We'll play it.

MR. TATE: After that I'd ask the Court to inquire of Mr. Smith about whether he has elected to testify. I've already advised him.

I can tell the Court that I believe Mr. Smith has accepted my advice and we will not be calling Kareem to the stand.

THE COURT: Okay.

MR. TATE: So that would -- you know, it would -- this recording would end our evidence. We'd like to recall Agent Godfrey just for the purpose of -- it's already been in -- playing this segment of the tape.

THE COURT: Okay. We can do that.

All right. Let's...

MR. TATE: And I can tell Mr. Savage -- we sent him our transcript.

MR. SAVAGE: Yes.

MR. TATE: It runs from page 102 to page 107.

MR. SAVAGE: Okay.

MR. TATE: Is that right, Lisa?

MS. OTTENS: Page 79.

MR. TATE: Page 79. I'm sorry, page 79.

MR. SAVAGE: Your Honor, can we release Mr. Kareem to return to --

THE COURT: Let's just wait until after the defense rests. It's not long. I mean, let's don't rush. It's about 30 minutes and we'll be done.

MR. SAVAGE: Okay.

THE COURT: I'm going to make the -- I think we ought to make the inquiry now. Although, I'm going to have to make a decision about these instructions. I'll take a look at them.

MR. SAVAGE: Your Honor, there's one instruction, I don't know if we mentioned, that I don't -- I don't think it is applicable, and that is --

MR. TATE: Oh, I'm -- okay. I'll let Mr. Savage finish.

THE COURT: Yeah.

MR. SAVAGE: I can't remember if it was mentioned or not, on page 14, government's failure to use specific investigative techniques. I think that has to do with, like, did we fingerprint the gun. I don't know if that -- I don't object to it, but I don't know if there's anything in here about that.

THE COURT: What do you say, Mr. Tate?

MR. TATE: I don't know of any gun that was fingerprinted.

THE COURT: No, do you want that one out also?

MR. TATE: What is it?

MR. SAVAGE: This one. I don't think there's anything in the evidence about that.

THE COURT: It says the government doesn't have to use --

MR. TATE: Yeah, we can take that out.

THE COURT: Okay. I'll take it out. If Mr. Savage wants it out and Mr. Tate wants it out, we'll take that out. That makes it easy. If you all don't want me to give any

instructions, I'll just send them back.

MR. TATE: Your Honor, we have a proposed entrapment instruction. I'm going to hand one to the government and one to the Court. We propose this instruction be given based on the evidence.

(Document tendered to the Court.)

THE COURT: What's the inducement?

MR. SAVAGE: Yeah, exactly.

THE COURT: What's the -- what's the inducement?

MR. TATE: The inducement is the pressure on his wife at the time; the taping, the recording from Agent Godfrey where they talk about using her as a weak link. The fact that they had been out several times to try to interview him and couldn't. And then after all this went on with her, then all of a sudden he calls and comes in. I would mention visiting him at his job as well. No, that occurred after this. Strike that.

THE COURT: That wouldn't be an inducement anyway. They can go where they need to go to investigate cases.

What do you say, Mr. Savage?

MR. SAVAGE: Well, Your Honor, I think that there is no evidence. There is not even a prima facie case. Entrapment is the inducement of a person to commit a crime they otherwise weren't predisposed to. I don't know if entrapment can even apply to a false statement under 1001.

How can somebody be induced to tell a lie to a federal agent in an investigation?

What they're really saying is the red herring in this case is that they allege that he was induced to travel to Syria or to participate in ISIS or to make --

THE COURT: That's not what he's saying.

MR. SAVAGE: Right.

THE COURT: What he's saying is -- what he's saying is he was induced to come down there for -- I've heard these words before, but I've never -- I've never sat down and figured out what they're talking about when they say a perjury trap.

MR. SAVAGE: Right.

THE COURT: I mean, a perjury trap. I don't understand how you can set a perjury trap. You either tell the truth or you lie.

MR. SAVAGE: Right. Well, Your Honor, we address that in detail in our motion in limine because we thought this might come up. And if you look at page 4 of the motion in limine, which is government document number 68, the government sets out in great detail the law that applies to whether or not a perjury trap is there. There are certain elements to that.

THE COURT: Hold on a minute.

MR. SAVAGE: Okay.

THE COURT: Okay. What page?

MR. SAVAGE: It would be page 4 under the heading "Court Should Preclude Argument that the Defendant was a Victim of a Perjury Trap or Entrapment as a Defense to the False Statement Offenses in the Indictment."

So these are the -- this is a legal reason that we don't think that this is brought up. And it's even weaker now that the defense, unless they show something in their case, gives some kind of element that the defendant was somehow tricked or compelled in this case.

I would note that there are some very good cases in here. First of all, as the Court noted, many circuits in this country don't even recognize a perjury trap. There is some very old Fourth Circuit law that does in the context of a grand jury. But here's the difference between this situation and the grand jury. In a grand jury the witness or the alleged victim of the perjury trap receives a subpoena and is compelled to come to the government and testify. In that particular case the issue is whether or not a person can be alleged or forced into making a statement. The answer is that you cannot be entrapped in a situation where there isn't any kind of reason to compel.

It is undisputed in this case the defendant called the government and asked to drive down and make an interview. There's just no way that there was any compulsion here. If

the defendant felt pressure to come down because of some reason that is in his mind, that's not the government entrapping him. That's the defendant wondering whether or not he should give a statement.

In that case the defendant had some obvious choices. He could not -- he could have refused the interview, as he clearly did later on, or he could have come down and asked -- invoked the Fifth Amendment in response to specific questions, or he could have told the truth. But there's nothing to induce him to lie. Nothing whatsoever.

So this is a -- it's a bogus argument. It injects things that are not even part of the law in here and it's a complete distraction to the jury. And it's not a fair -- and there is no evidence, none whatsoever, that the defendant has raised to bring this entrapment defense. Perhaps they could have, but they did not.

MR. TATE: Your Honor, we'll reserve comment on that until after we play this excerpt of the statement.

And I will just point out that *Jacobson versus United States*, which is a Supreme Court case, and *Brogan versus United States*, and 18 U.S.C. 1001 confers authority on the government to manufacture crimes. And where an investigator asks questions about other elements to which she already knows the answer and seeks prosecution for the lie as a substitute for the crime she cannot prove, it is simply

government generating a crime. And we cited that down at the bottom of our...

THE COURT: David, pull that case. I'll read it.

MR. DAVIS: Can I get that cite again, Judge?

MR. TATE: The Court has it. The cite is on the bottom --

THE COURT: I'm going to read the case.

MR. SAVAGE: Yeah, and we have not had the benefit --

THE COURT: You can look at it too.

MR. DAVIS: Cite, please.

THE COURT: Can you give him the cite, Mr. Tate.

MR. TATE: *Jacobson versus United States*, 503 U.S. 540, 548, 1992. *Brogan v. United States*, 522 U.S. 398, 408 --

THE COURT: David, go to Mr. Tate and get it from him, please.

(Document tendered to the law clerk.)

MR. DAVIS: Thank you.

THE COURT: What I want to do while we're in here, I think, having heard there's going to be 18 minutes of this tape that's going to be played, is going to be the only evidence, let me go ahead and do the advice of rights now, Mr. Tate, to your client. He certainly can change his mind if he wishes to change his mind before evidence closes in the case, but I want to go ahead and advise him.

So, Mr. Smith, if you would please stand for a moment.

I want to advise you you have a constitutional right to testify on your own behalf at this trial. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You are the one who retains the ultimate authority to decide whether or not you're to testify, not your attorney, but you have the ultimate authority. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that your right to give testimony in your own behalf is constitutional in this country?

THE DEFENDANT: Yes, sir.

THE COURT: Have you discussed these rights with your attorneys and are you satisfied you understand that right?

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone threatened you or made any promise to you of any kind that has influenced your decision not to testify?

THE DEFENDANT: No, sir.

THE COURT: Okay. Is your mind clear as to your constitutional right that you alone have the authority to

determine whether you're going to testify; and that if you decide not to testify, there will be no later opportunity for you to provide your own testimony to this jury?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And your decision is you do not want to testify; is that correct?

THE DEFENDANT: At this time, no, sir.

THE COURT: Okay. Having listened to the defendant and determined he has freely, knowingly, and voluntarily waived his right to testify, the Court accepts this waiver and notes that until the evidence is closed, the defendant does have the option to change that decision. But the Court believes that he clearly understands his rights and is operating in full knowledge of the -- of this right and the consequences.

Okay. Thank you very much.

I guess we'll bring the jury in for 18 minutes and possibly a little bit of testimony and then I'll have to send them out. So let's go ahead and bring them in. They're here.

MR. TATE: Mr. Smith has asked for five minutes with me. He wants to make sure the clip we are playing is -- includes everything that he wants.

THE COURT: Sure, go ahead. Go ahead and do that right now.

(Brief recess at 9:12 a.m.)

(Court back in session at 9:30 a.m.)

(Jury not present.)

MR. TATE: Apologize, Your Honor. I had to get some things squared away with Mr. Smith.

THE COURT: No, that's okay. I knew what you were doing, Mr. Tate.

Are you going to be able to cue those up and get those done fairly...

MR. TATE: Yeah, we're ready to proceed. We'd ask to recall Agent Godfrey.

THE COURT: Absolutely. We'll call him as soon as the jury is in here.

MR. TATE: Okay.

THE COURT: Do you want to do any Rule 29s to start with?

MR. TATE: I think based on Rule 29(a) of the Rules -- Criminal Rules of Criminal Procedure, we move for judgment of acquittal on both counts because the government has failed to articulate sufficient facts to allow a reasonable jury to conclude beyond a reasonable doubt that Mr. Smith, one, had, in fact, knowingly and willfully made a false, fictitious, and fraudulent statement. Number two, that the statement was material as defined by law. And fourth, that the representation pertained to a matter of jurisdiction of the government of the United States.

The most glaring defect is that there's no evidence that Mr. Smith knowingly and willfully did so. This is a case involving false statements where he was not told what false statements he was being questioned about. He came in under a ruse of talking about a buddy pass. It then turned into interactions he had with a confidential informant that he did not know was an informant.

Specifically, the indictment alleges that he made these statements to the source and he never was identified. The source was never identified to him. They talked about Abu Khalid, but they never specifically said, "Mr. Smith, did you talk to a guy name Abu Khalid about going to Syria?" And as the agent testified, they gave him broad questions that would allow him to talk and he said many times, "I talked to many, many Muslims about ISIS and everything else."

So we believe that that negates the knowingly and willful element and we move for judgment of acquittal based on Rule 29(a) on both counts.

THE COURT: Okay. Motion will be denied. I think the evidence is clear that the -- as to what was -- that the -- that there is evidence -- there is clear evidence. Whether the jury decides they've proved beyond a reasonable doubt that it was the defendant who wanted to travel to Syria and that there is some dispute about what the reasons were -- but this was a -- there was significant discussion about ISIS

under whatever its names are, Daesh, the people at that time who were fighting in Syria.

The Kodaimatis, there's some question as to whose side they were on. It seems from the testimony the Court gleaned that there was some evidence that they were not fighting on the side of the Free Syrian Army or anybody -- they were opposed to Assad, but just about everybody except the Russians and the Alawites were opposed to Assad.

So there is plenty of evidence concerning joining a terrorist organization that was against the United States. Based on that, the investigation they did, they certainly did call him down. They were entitled to find out as part of this investigation what he knew. Was he still radicalized? Was he -- had he -- had he decided that this was something he was not going to do or was he still part of the -- was he still hanging in there with those folks? Those questions were legitimate questions that they could ask to determine whether they had a potential terrorist in their midst or someone who had really seen the light and backed away from the -- from the terror aspects of this. Based on that, they had every right to call him down and question him.

And there's enough evidence to go to the jury that faced with this interrogation, that he did not give truthful testimony about his contacts with people that he believed at the time were -- or at one time he believed, whether he still

believed it or not is the question. But he was not willing to give up the people he had talked to about -- Mr. Khalid, or whatever, about his -- about going to Syria. He was not going to give information against him and was going to lie about his contacts therein. So I think there's evidence to go to the jury with regard to those, so that will be denied.

With regard to the instructions, where the Court is right now, the Court is thinking about -- and I haven't made a final decision -- is thinking about giving the instruction on witness use and that sort of thing with maybe a stronger -- a stronger pound to the jury that the defendant has no -- does not have to put on any evidence, and then -- and not giving the consciousness of guilt. Because what's the consciousness of guilt of? Of the lie? Well, of course he had -- if he's lying, he had consciousness of guilt if he lied. That's the crime. Normally what happens is you've robbed a bank and they say, "Were you in that area that day?" "No, not me," and he knew he was in the area. Why would he lie about it except that -- so it dealt with -- the lie is separate from the actual crime. And so the Court, I think, is going to not give the consciousness of guilt.

And with regard to the entrapment one, I do not believe that that applies in this case, and I'll talk more about that when the time comes.

But I'll make a final decision on these. I've read

the cases. And there were legitimate reasons for them to discuss this with the defendant and there were a number of opportunities the Court heard where the defendant had the opportunity to tell the truth when faced with that. Anybody, of course, who watches the news, or anything like that, knows you -- if the FBI is questioning you, you don't know what they know and you better tell them the truth.

Okay.

MR. TATE: So, Your Honor, just for the record, can we mark our proposed instruction and make it a part of the record?

THE COURT: Yes. You mean your proposed instruction on the...

MR. TATE: Entrapment.

THE COURT: Yeah, let me take a look at --

MR. TATE: We gave the Court a copy of it.

THE COURT: Yes, you can.

MR. TATE: So we --

THE COURT: You need to file it, Mr. Tate --

MR. TATE: We need to file it.

THE COURT: -- so we can get it on the screen and all that. But yeah, we'll let you file that and we'll send -- that certainly is going to be an issue for appeal, as it should be.

But the Court believes that in this factual

situation, that the government would still have legitimate interest in investigating these matters and finding out where the defendant was. They had a person who it appears, who it appears from the tapes and the ease and facility with which he talked about this, that he was motivated to go to Syria and motivated to go possibly, possibly to fight for ISIS. Certainly positively to join whatever thing the Kodaimatis were doing, but certainly possibly to fight for ISIS. Knowing who these people are and what their intent is is of utmost importance to the United States. And that investigation, calling him in to talk to him, whether it's a ruse for -- to talk about a buddy pass or whatever it is, is proper -- a proper investigation. And all he had to do was say, "Look, yeah, I was thinking about going. I talked to this guy and he tried to -- I didn't want to fool with that stuff. I was out of it." Tell the truth and he's out -- he has no problem. Instead, he protected what he believed was an ISIS recruiter, the Kodaimatis, with his lies.

MR. TATE: Your Honor, I would ask --

THE COURT: Not Kodaimati, I mean Khalid.

MR. TATE: Your Honor, I would ask the Court to -- the Court hasn't heard all the evidence and we're going to play some evidence --

THE COURT: I want to hear more, but I'm talking about right now.

MR. TATE: -- that might change the Court's perception.

THE COURT: That's what I said. I said I'm not making any final decisions on this until after I've heard everything, but I want you all to know where I'm leaning so you can sort of start planning.

But I'm pretty sure I'm going to give the one on witnesses and not give the one on consciousness of guilt because I do not believe it applies to -- consciousness of guilt of the crime of lying is you know the truth and you lie. That does not -- that -- usually -- that doesn't fit this particular fact situation.

So are we ready to play the tapes?

MR. SAVAGE: Yes, Your Honor.

THE COURT: Okay. Let's go ahead and play them. Let's get the jury in here.

MR. TATE: Your Honor, what's going to happen is we're going to admit Defendant's Exhibit 7A -- by stipulation 7A, B, and C, three clips. The government has the transcript. It's part of -- it's an excerpt of the entire recording that's already in.

THE COURT: Right.

MR. SAVAGE: So this is which exhibit? 7A?

THE COURT: 7A, B, and C. I think you noted those.

MR. SAVAGE: Okay. 7...

MR. TATE: Defense Exhibits 7A, B, and C.
MR. SAVAGE: Okay. What's 7A?
MR. TATE: 7A is a clip, 7B is a clip, and 7C is a clip.
MR. SAVAGE: Okay. So three clips and then the transcript.
MR. TATE: Right.
MR. SAVAGE: And the transcript is numbered what?
MR. TATE: It runs together.
THE COURT: It's part of -- he's putting part of the exhibit that's in. These are clips that he's doing --
MR. SAVAGE: Okay.
THE COURT: -- that runs the transcript just like you did.
MR. SAVAGE: I'm just trying to keep track of the --
THE COURT: It's not a separate transcript.
MR. SAVAGE: Okay. Thank you.
THE COURT: Yes, sir.
(Jury entered the courtroom.)
THE COURT: Good morning, members of the jury. Thank you for being here promptly. We can -- I'm sorry that we just find things to do where we have to keep you back there, but we seem to be able to do that, and we apologize that we had to make you wait. Thank you all for coming in here. The fact that you were here made us be here earlier and

we got things done. I just will tell you the things that we did were necessary as part of the case. It was also necessary to be done outside your presence.

All right. Mr. Tate, the government having rested, does the defense have evidence at this time?

MR. TATE: Yes, Your Honor. Defense recalls Agent Godfrey.

THE COURT: Okay. Agent, if you would take the stand, please.

RONALD GODFREY, DEFENSE WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. TATE:

Q. Good morning, Agent Godfrey.

I'm recalling you for the purpose of playing some excerpts of your interview with Mr. Smith on February 16, 2016, that were not played yesterday. The entire transcript was admitted into evidence. I think you previously testified that you reviewed that transcript.

A. Yes, I have.

Q. And was it accurate?

A. The trans -- I'm not sure exactly what you're going to have me to review. I reviewed some of what we think it is a moment ago. I see some, you know, misspellings in it and that kind of thing; nothing that I would say is particularly substantive.

Q. But the recording itself was something that you reviewed and you maintain, correct?
A. Yes, sir.
MR. TATE: Your Honor, at this time we'd move for admission of Defense Exhibits 7A, B, and C. It's three clips from --
THE COURT: These are clips from the government exhibit. What's the big exhibit?
MR. SAVAGE: Exhibit 16, Your Honor.
THE COURT: All right. These are portions of Exhibit 16 which is already in evidence before the jury.
MR. SAVAGE: Right.
THE COURT: And you want these specifically put into evidence and to -- by themselves.
MR. TATE: Yes.
THE COURT: Okay. Let those be admitted. Let those be played.
(Defendant's Exhibits Nos. 7A, 7B, and 7C were received into evidence.)
MR. TATE: Let me just ask before we play this, is it cued where it needs to be?
MS. OTTENS: (Affirmative nod.)
THE COURT: Can everyone see that?
THE JURY: Yes.
MR. SAVAGE: Yes.

MR. TATE: Go ahead.

(Defendant's Exhibit Number 7A was played.)

MR. TATE: Can you stop it right there.

BY MR. TATE:

Q. Agent Godfrey, that was part of your interview, that last part, where Mr. Smith said there was a point in his life where -- "when this first started, everything that I felt some type of way where I wanted to go and help and do something. And once I seen how serious the stuff got, I said there's nothing I can do."

Was that part of the interview?

A. Yes, it was.

Q. And when he made that statement, after you say okay, did you follow up on any line of questioning related to that comment?

A. I mean, I can't tell with the information that's here in front of me, you know, what exactly we may have continued to ask after that.

Q. Okay.

A. I know -- I mean, from the totality of the interview that's been presented, we asked him very specific questions about what his activities were that he planned to do in the interview. I don't know where it lies in the interview in relation to the end of this clip.

Q. Thank you.

MR. TATE: Can you play Defense Exhibit 7B.

Can we turn up the volume a little bit? Is that as loud as it will go?

(Defense Exhibit Number 7B was played.)

BY MR. TATE:

Q. Let me ask a couple follow-up questions, Agent Godfrey. In a portion of that excerpt -- this wasn't played yesterday, was it?

A. I don't believe so.

Q. And in a portion of this excerpt, he's asking you about whether there's anything wrong with him talking to Wael and Saeed, correct?

A. That's correct.

Q. And you don't tell him one way or the other, right?

A. That's correct.

Q. Then he said -- asked you if he had done anything wrong by talking to them, and I believe it was not you, but it was Agent Fallon that said, "Even if they were terrorists or something, you didn't do anything wrong by talking to them even if they were terrorists. We may come out and ask you some questions."

Was that part of the conversation?

A. Yes.

Q. And did you ever follow up with him or answer any questions that he asked about whether they were involved in

terrorism or whether he had committed any crimes by being in contact with them?

A. No, we didn't.

(Government's Exhibit Number 7C was played.)

BY MR. TATE:

Q. Agent Godfrey, let me ask you about this portion of the excerpt of the transcript. Was this concerning an inquiry about Abu Khalid?

A. Yes, I believe that's right.

MR. TATE: Thank you. No further questions.

THE COURT: All right. Is there any cross?

MR. SAVAGE: Just briefly.

CROSS EXAMINATION

BY MR. SAVAGE:

Q. Agent Godfrey, I think you testified yesterday that you did try and talk to the defendant again about various things that were in this interview.

A. We tried to. He declined to speak with us.

MR. SAVAGE: Thank you. No further questions.

MR. TATE: Just one further

REDIRECT EXAMINATION

BY MR. TATE:

Q. After he declined to speak with you -- that was when? When was the last time he declined to speak with you, if you recall?

A. I personally wasn't involved in the encounter, but it was sometime in December of 2016. I don't know the exact date. It was right before, like, the Christmastime holidays and all that, but I don't know the exact date.
Q. December 2016.
And then his fiancee, Ms. Sheth, was subpoenaed to the grand jury in January 2016?
A. That's correct, just before our -- the recorded interview that we've just seen clips from. I'm sorry, she was subpoenaed before that. She didn't appear until after, just to be clear.
Q. So when was she subpoenaed?
A. She was subpoenaed in -- probably the end of January 2016.
Q. Okay. But that was after you tried to interview him and he declined in December 2016.
A. No. We -- there's two different sets of circumstances.
Q. All right. Okay. I'm sorry. January 2016 you subpoenaed Sheth, correct?
A. Yes, that's right.
Q. And then later on that year, some 12 months later in December of 2016, you attempted to interview Mr. Smith.
A. That's true, yes.
Q. Okay. And he declined.
A. That's true.

Q. And during that time you and other agents showed up at the Food Lion where he was working security. What time frame was that?
A. That's what I was referring to a moment ago that was in December of 2016.
Q. All right.
A. I don't know the exact date.
Q. And did you -- did you inquire of him or did he speak to you when he was at --
A. He didn't speak to me. I was in the area as support for the other agents if there were any kind of incident. Two other agents -- an agent and a task force officer, rather, spoke with him.
Q. And that was while he was on the job.
A. It was actually as he was arriving for his shift at work. He hadn't actually started his shift yet.
Q. Did you give him an interview -- did he give you an interview?
A. He spoke with the agents for a few minutes in the parking lot, but basically -- the brief conversation that they had, they requested if we could speak with him further, but he declined to do that.
Q. So you wanted him to just leave his job and speak with you?
A. No, we weren't necessarily -- I think I testified to this

yesterday. They weren't necessarily asking for him to speak right then. They were asking him, "Look, we spoke to you before. You provided some information. We'd like to sit down and speak with you again to go over some of that. We have some information that we can share with you that may help us have a more productive conversation at this point."

Q. That's what you said to him?

A. I told you, sir, I didn't say anything to him. I wasn't -- I wasn't part of the interview.

Q. How do you know that was said to him, then?

A. Because I've seen the recording of it.

Q. Okay. And after -- was he asked to call the next day, or something like that, or what was it?

A. I believe he was given contact information. It's been a while since I reviewed that specific recording. But basically, he didn't want anything to do with it. He didn't want to provide any contact information to the agents. And I can't remember if he accepted their contact information, but it was certainly offered to him.

Q. And you said it's been a while since you reviewed that recording. Was the interaction recorded?

A. The interaction was recorded.

Q. And this was in December of 2016?

A. I've said that, yes.

Q. So between December of 2016 and June of 2017 you had no

contact with Mr. Smith.
A. I believe that's correct.
Q. And then he was arrested and indicted on this case in June of 2017.
A. That's correct.
Q. For false statements.
A. Yes.
Q. Based on his interview with you in February 2016.
A. That's correct.
Q. This occurred after he refused to interview with you further.
A. Right, in December of 2016.

MR. TATE: Thank you. No further questions.

MR. SAVAGE: Nothing further, Your Honor.

THE COURT: Thank you, sir. You may come down.

(Witness stepped down.)

THE COURT: Further evidence for the defense?

(Counsel and defendant conferred.)

MR. TATE: Your Honor, the defense rests.

THE COURT: Members of the jury, we need to -- you'll need to go out for a few minutes. We have some matters to take care of outside your presence. We'll get you back in here and start soon with closing arguments and those types of things. Thank you.

(Jury exited the courtroom.)

THE COURT: Okay. Any motions at this time?

MR. TATE: Your Honor, pursuant to Rule 29(b), after the defendant's presentation of evidence, I think many of the statements contained in Defense Exhibits 7A, B, and C addressed some of the Court's concerns and basis for denying the Rule 29(a) motion. We renew for the same grounds under Rule 29(b) for a motion of judgment of acquittal on all counts.

THE COURT: Okay. That motion will be denied. I do believe there's -- that there's a context. It doesn't come down to just one simple statement as to each of these counts. There is a full context of it. But a jury -- a jury hearing this evidence could find from the evidence that the defendant violated 1001 during the interview; and so the Court will -- the Court will deny the motions, although I understand what the clips said there and it adds some context to everything.

Okay. The -- with regard to the entrapment issue, Mr. Savage, what legitimate -- what legitimate matters were being investigated at the time, does the government say, when the interviews were conducted?

MR. SAVAGE: I think the record speaks for itself. Agent Godfrey testified at length about that.

THE COURT: It does, but I want to hear what you -- I want to hear any argument that you wish to make.

MR. SAVAGE: Well, the government was investigating

whether or not the defendant was still a sympathizer of ISIS; whether or not he was still prepared to travel to ISIS; whether or not any number of people that were mentioned by Agent Godfrey in his testimony were traveling to ISIS; whether he was assisting in ISIS; whether his girl Palak who had access to the secured areas of the airport knew that he was buying a buddy pass for a person purporting to be from ISIS; whether the defendant was telling the truth, and the baseline of that truth depended upon how much more of the information they would have gotten. Had he told the truth, it would have been a different interview and we probably wouldn't be here. So for all those reasons.

Your Honor, I looked at the two cases and I pulled them. I don't know if Mr. Tate misspoke, but *Jacobson* is not --

THE COURT: I read *Jacobson*. It doesn't -- it comes in the --

MR. SAVAGE: It's a porn case.

THE COURT: It's a porn case. It's a porn case. But it does come in the -- the portion concerning the perjury entrapment in that does come in during the concurring opinion which was written in that case; and in that it's noted that, you know, you can't -- if you can't get a crime, you can't just then try to come up with some -- try to get them in and have them commit perjury. However, in that case -- in that

case they had gone for months and months trying to get this person to engage in the pornography stuff and he was -- he was staying out of it, until finally they got him in it. And then they -- it's a completely different matter there. I don't think *Jacobson* applies here.

MR. SAVAGE: Right. And *Brogan* is the "exculpatory no" case which has no applicability to this.

THE COURT: I understand that.

And there's another -- you know, there's some Fourth Circuit law involving -- *United States versus Kennedy*. In that case the district court rejected Kennedy's request for a jury instruction on perjury entrapment and found that Mott had engaged in a legitimate purpose in bringing Kennedy before the grand jury. It also noted that Mott made every effort in the March 19th proceeding to get Kennedy to tell the truth, and he repeatedly warned Kennedy throughout both appearances of the consequences of perjury. Accordingly, the district court concluded there was no evidence on which to predicate an entrapment instruction. That's from 2004, Fourth Circuit.

In looking at this case, Mr. Tate, the Court finds that this -- there's just not the inducement and the -- to come. The fact that they -- that they -- there was some comments that were made, and you've got that on the record, where the agents were -- had recorded themselves without intent to do so in which they were talking about they would

try to put some pressure on the -- on the girlfriend or wife, or whatever, of the defendant and that she was the weak link and maybe they could get her to crack, using some language that was a little bit over the top. But they're talking together. As long as they weren't using that to her.

But with that said, subpoenaing her to the grand jury and causing the defendant to call down and say, "Look, I want to come down there," is not what you talk about in an inducement to commit perjury. The -- they subpoenaed her. There's no -- there's nothing in there that shows that's exactly why they subpoenaed her, to get him to come down, but he ended up coming down and made that decision, and the interview speaks for itself. The portions that are in front of the jury, the jury can hear.

I note -- I've read the instruction that the defense has and it will be made part of the record so the Fourth Circuit can review this Court's decision with regard to that. The Court makes that decision believing that in this particular case, the facts do not show such an inducement and such a situation in which a perjury entrapment can -- instruction should be given to the jury and the Court will decline to do so. Exception noted.

MR. TATE: Thank you, Your Honor.

THE COURT: Yes, sir. All right.

MR. SAVAGE: Your Honor, one last point with the

instructions. Now that the defense has rested, if I can just inquire as to whether the defense would request the instruction concerning the defendant's right to not testify?

THE COURT: Yeah, I think we need to put that in. If that's not in there, we need to put it in there. The defendant has not testified and that can't be held against him. They need to be reminded of that every chance that the Court can do that.

MR. SAVAGE: The last thing, Your Honor, can we release our Memphis witness and agents?

THE COURT: You may. The defense has rested. They may be released.

MR. SAVAGE: Thank you.

And if I could just have about five to ten minutes to set up the closing. We're going to have a very organized and slick PowerPoint that I think will be --

THE COURT: Well, that will be --

MR. SAVAGE: -- exciting.

THE COURT: -- a novel event.

MR. SAVAGE: Yes.

THE COURT: All right.

MR. DAVIS: Judge, I have jury instructions consistent with all your rulings that I can give the parties.

THE COURT: Okay. Yeah.

MR. SAVAGE: One last thing, Your Honor. Will the

instructions go back to the jury?

THE COURT: Yes.

MR. SAVAGE: Okay.

(The Court and the clerk conferred.)

THE COURT: We'll delay this while we try to get these exhibits, but go ahead, Angela, talk to Mr. Tate and see if we can get the exhibits. We're going to take a brief recess while we try to do this.

Anything else that needs to be done while we're in recess?

MR. SAVAGE: No, Your Honor.

(Brief recess at 10:30 a.m.)

(Court back in session at 10:55 a.m.)

MR. SAVAGE: Forty-five minutes, Your Honor?

THE COURT: I'm going to give you 45 minutes, but just remember there are not many souls saved after 10 minutes.

MR. SAVAGE: Yes, sir.

THE COURT: They're tired of hearing from you, I think.

MR. SAVAGE: Okay.

THE COURT: I'll give you 45.

Mr. Tate, you get 45.

MR. TATE: I'm not going to use that, but thank you.

THE COURT: I know. Anyway, I know you've got to go through some things, Mr. Savage.

MR. SAVAGE: Yes.

THE COURT: But just one time through, please.

MR. SAVAGE: Yes, sir.

THE COURT: Okay. All right. Anything before we bring in the jury?

MR. SAVAGE: No, Your Honor.

THE COURT: All right. Let's bring them in.

(Jury entered the courtroom.)

THE COURT: All right. Members of the jury, we're now ready to begin closing arguments which will be followed by the charge to the jury where I will give you the law. Just remember that you're not to make any decisions until you know the law as well as the facts of the case. You are the judges of the facts. What you find about the facts is totally within your purview, but you have to follow the law as I give it to you whether you agree with it or not. I don't think there's going to be any law you're going to disagree with; but if you do, you still have to follow the law that I give.

So the way this will proceed is the government having the burden of proof -- and they always have the burden of proof -- they are going to get the first argument and the last argument. Both sides are going to have the same amount of maximum time that they can argue and -- but it's divided up so that the government argues first and the defense argues and the government has a chance at a rebuttal argument after the

defense finishes.

Listen to these arguments. Listen to their contentions. But also, remember that what they say is not evidence. They are merely arguing what they say they believe you should find from the evidence and, although that's proper, what you find is up to you. It's up to you. There are two nonpartisans in here, you and me. And we're just -- we're to listen and make our decisions based only on a non-biased look at the facts of the case by you and me the law.

With that said, following those arguments I'll give you the instructions and you'll go out and then you'll begin your deliberations. Listen to what they say. If they state any law to you -- there's nothing wrong with them saying that. But if the law I give you differs from what they say the law is, you have to take my statement of the law. And if I hear anything really out there, I'll stop and correct it on the spot.

So all right. The jury is with the government for argument.

MR. SAVAGE: Thank you very much.

Ladies and gentlemen, I want to thank you very much for your patience over the last three days. I would say thank you for being here, but I know you're required to be here. But you're not required to pay attention and I was watching you and you gave this case your full attention; and on behalf

of the people of the United States, we want to thank you for that.

But let me get right down to it. So this case, as the judge has repeatedly said, is about whether or not the defendant, Alexander Samuel Smith, who everybody knew as Amir Alexander, made false statements to the FBI. But it's not just enough to make a false statement. There are certain elements that go with this, so we spent a lot of time, at least on the first day, giving you the context. If you just simply come in and somebody says something to you and you know nothing about it, then you might believe it or you might not. It might be false. It depends. But in order to make a false statement, it has to be knowing and willing. So you have to understand the context. And there was a lot of back and forth about this and I think I began the case with saying the government didn't necessarily have a perfect investigation; but as you can see from the testimony of Agent Godfrey, it had a fair investigation and it had a meaningful investigation because the case involved ISIS.

Now, all throughout the transcripts in this case -- and you're going to have an opportunity to go back, as the judge said, and listen to every word that was said. There's not going to be a lot of doubt about this because all the information in this case was recorded. You don't have to worry about somebody's memory. You're not going to have to

worry about what context it was. You're going to have the tapes and you're going to have the transcripts. If you want to listen to all three or four hours of it, you can do it. That's for you to decide.

But when you look at those transcripts -- and there was a lot of talk on the other side about, well, what does brothers mean? Does that mean just brothers in Islam? Does it mean the brothers at the mosque? Does it mean brothers here? Let's be clear about this context -- and you weren't required to check your common sense when you came in the door. We want you to use your common sense and look at the way this occurred and how it transpired when you apply your reason because when you get to Government's Exhibit 16, which is the false statement, some of these terms are going to be important.

So in the indictment it says the defendant in various ways knew or wanted to know or discuss ISIS. Well, ISIS has many names. So in the indictment it might not say Dawla Islam, it might not say Daesh, it might not say ISIL, but you can remember the testimony of Dr. Hoffman and the testimony of Abu Khalid of how many different ways there are to refer to the Caliphate, the brothers, the Jihad, the Mujahideen, all of those things. Just keep this in mind.

And you saw the government's exhibit with regard to the Hijrah. About how ISIS in 2014 was at the peak of its

power. How it had occupied vast territories. It was not like any other terrorist organization. It had set up governments and it was using social media to solicit fighters all over the world. That's the context in which our FBI was investigating.

And they were putting out pamphlets like this on here's the backpacker's guide to going to the Hijrah, to going to the Jihad, to how to evade government surveillance, how to sneak from Canada into Turkey or into different countries because everybody knew that it was a war zone in 2014 and 2015. Everybody knew it was dangerous. And everybody knew that there were different factions there. What we wanted to know was which of these did the defendant Amir sympathize with? Was he going to go, when is he going to go, and how is he going to go? But let's get down to it.

You know, 1001, it's not the first time this defendant has seen this statement. He saw it twice when Agent Godfrey showed it to him. In the interview as he was interviewing him, twice in that interview, look at it, he said, I'm going to show you what is marked as -- giving him what is 18 U.S.C. 1001 and had him read it. And he said he understood it. But this is what it is. This is what we have to prove to you.

Now, the judge is going to give you instructions and he's going to tell you that there are elements of this offense, and they're pretty simple.

They're simply that the defendant made some statements, and we're going to talk about those.

The statements were false.

They're material. The reason why all of this business about ISIS and what Agent Godfrey thought, what they were looking for, why these statements were important even though they might have known some of them were untrue, all that goes to materiality.

The statements were made to an agency within -- something within the jurisdiction of the government of the United States. The Court is going to instruct you that the FBI is an agency of the United States. Not to worry about that one.

Here's one you should be concerned about. Were these statements made knowingly and willfully? And when you consider that, keep your eye on the ball. Look at the statements that are in the indictment.

And finally, did they involve -- if you find those things, you need to find whether or not the investigation involved international terrorism.

Here's Count One. There's a lot of information in Count One. You'll have the indictment back there. You can look at it. It has a preamble to it. It cites very certain statements, but you can find all of those in the exhibits. Here is the statement on Count One. Here's really the crux of

the matter.

Did the defendant falsely state to Agents Fallon and Godfrey, who were then investigating a matter involving international terrorism, and here's the key, that he had never discussed his desires or plans to travel to Syria?

Now, when the defense opened, they said, "Oh, he was induced to go; they were trying to get him to go; they were trying to get him to do this; he was never going to go," all of this throughout the case, that's not the issue. They asked him this question: "Did you discuss your desires or plans to go to Syria?" And in fact, all you got to do is listen to the question.

If you can play the tape.

(Government's Exhibit Number 16 was played.)

MR. SAVAGE: Okay. That's the statement. "I never had any plans or any reason or anything to go there."

And we know he had plans. How do we know? Because he discussed them. Beginning on August 7th, 2014, you'll find in Government's Exhibit Number 4, both Agent Godfrey and Abu Khalid testified about this, this is what the defendant said in his own words.

(Government's Exhibit Number 4 was played.)

MR. SAVAGE: There you go. One of the very, very first meetings.

Mr. Abu Khalid didn't just simply say, aha, or give

him $2,000 and see if he was going to go and book a flight to Turkey. What he did was he asked him, "What do you know about him?" The defendant knows who the leader of ISIS is. Knows who he is.

Mr. Abu Khalid asks him, "Would you swear bay'at? Would you swear allegiance to this terrorist, to this leader of a terrorist killer organization?"

And he says, "Na'am."

And you heard the discussion. Does na'am mean okay? Does it mean yes? Does it mean, oh, all right, and just like going along with it? What does it mean? Well, it doesn't mean uh-huh because we heard Abu Khalid say that uh-huh in Arabic means uh-huh. He said yes. That's the translation.

And just to make sure, he says, "Are you good with it? That's good with you?"

He doesn't say, "No, no, no." He doesn't say -- he says, "Yes."

But we didn't leave it there. The government didn't stop there. They approached him again. This is on November 11th, 2014, in the hotel. Again, you can hear the words of the defendant on Government's Exhibit 6.

(Government's Exhibit Number 6 was played.)

MR. SAVAGE: So the defense when they opened said all the defendant wanted to do was play along with Abu Khalid to see if he could get some money. He never intended on

going. He was just simply talking about it. Well, when we get back to the transcript, which is Government's Exhibit Number 16, don't you think this would have been a different story if he said, "Yeah, I said those things to Abu Khalid. I said I was going to go to Syria, but I was just playing along." You didn't hear any of those things. Those are the movies. The defense said this was a movie. That's the movie. That's the movie that never happened. It's one of those deals where you wish you could select an ending. Well, they selected an ending that never occurred.

Look at this. "Tell me what your plans are."

"I need to get the money to get there, inshallah, God willing." If that's not a plan, what is?

But that's not enough. At the same time, just to be sure, he asked him in his own words, "What you want to do and this is no joke."

And these were the defendant's words.

(Government's Exhibit Number 6 was played.)

MR. SAVAGE: This one is hard to hear, but you can get the tape and you can see the transcripts. And it's hard to hear this on this particular tape. Go to Government's Exhibit Number 6 and if you look at the top there, those are the time stamps if you want to look through it. Depending on what transcript you use, it might be 3:25 or it might be 14:36, but you can find this. And in it it will say, "Is this

for the Jihad?"

"Yes, it's for Jihad."

"Do you mind killing people?"

"Well, if you have to, you have to. It's the Jihad. It's what you do at Jihad."

So there's no doubt that the defendant knew exactly what he was getting into. But it doesn't stop there, and I won't spend a lot of time going back over that because you've got all that evidence. You don't have to rely on a thing that was said here because you have the tapes. Look at them.

So let's go to Count Two. What about Count Two? Again, Count Two, and you'll have the indictment, states in legal language basically the very same thing I talked to you about the elements, and in this case the lie is this. That the FBI agents -- that defendant falsely stated to FBI agents, Agent Fallon and Agent Godfrey, then investigating ISIS, that he did not know that individual A, who is Mohamed Hilal, intended to use the buddy pass procured by Smith to travel and support ISIS.

Now, the defense made a big deal about the fact that Mohamed Hilal does not exist, that it was a ruse. Look at the instructions from the Court. Don't be misled. Don't get off the trail. Don't lose sight of the fence here. The government is allowed to use deception in certain cases, and this was a good chance for them to use it. You heard Agent

Godfrey say why it is that he couldn't go out and say to the defendant, "Jeez, I'm an agent of the U.S. Could you please tell me truthfully whether or not you're an ISIS sympathizer." You heard about the various tactics they use. You heard about how they are secretive about their communications. Is it really logical to suspect the FBI was going to get the truth if they didn't send somebody in who was posing as an ISIS agent? And did you really want the FBI to actually send an ISIS sympathizer to the war? Obviously not.

But here is what the defendant said.

(Government's Exhibit Number 16 was played.)

MR. SAVAGE: So I have no idea what this guy intended to do. And he says, "I did not assist him." We know that's a lie. We knew that was a lie before this tape was played. How do we know? Because Abu Khalid on the 20th of March in a direct meeting with the defendant tells him about who this guy is. Who is Mohamed Hilal?

(Government's Exhibit Number 10 was played.)

MR. SAVAGE: God willing.

So we know -- it doesn't say ISIS there, but it says, "This guy, Mohamed Hilal, wants to serve his deen. He wants to go where Shari'a is." Where is Shari'a? It's in Dawla Islam. We know from Dr. Hoffman Dawla Islam is ISIS. You know from all of the evidence in this case that the only thing that Abu Khalid was talking about as brothers was ISIS.

"So we went back to the brothers and I told them about him and they said, 'We want him. We want him.'" So ISIS wants this guy there. And what are they asking the defendant to do? They're asking him to fund -- to facilitate the travel.

Here's another example. Not just once -- and that tape was long and I think I might have tried Judge Cogburn's patience on that one, but it was several minutes long. But the reason why I wanted you to hear that whole thing was at least three separate times he describes in ever greater detail who that person is who's going to travel.

(Government's Exhibit Number 10 was played.)

MR. SAVAGE: So he doesn't know anything about him. He doesn't know he's going to Turkey. Abu Khalid told him at least three times, "Yeah, he's going to go to Canada. He's going to go from Tampa to Buffalo. We're going to sneak him into Canada and then he's going to Europe and he's going from Turkey to Syria." And you heard from Dr. Hoffman that's a common route. Canada was used all the time in those days to facilitate travel. Completely plausible, and the defendant knew it. That's what he knew about this guy.

And what did he do? Did he say -- he could have said anything. He could have said, Oh, I can't get the pass. "Oh, it's not available. I'm sorry, my person is not at the airport." He could have made up any excuse in the world, but

he didn't. What did he do? He said this.

(Government's Exhibit Number 10 resumed.)

MR. SAVAGE: What you're listening to there is the exact minute when the defendant got the name of a person he knew was going to travel to Syria to fight with an enemy of the United States. He gave him the exact name and he took $80 and he went to buy the ticket and he didn't say anything. He said, "I'll go to the airport right now and do it." And what did he do? He went right there. That email is within an hour or two of the time of that meeting.

And how do we know that the defendant lied about whether he intended to use the buddy pass? How do we know he lied about whether or not he did anything to help that guy? Because we have the irrefutable evidence of the ticket. The ticket.

And then you ask yourself why is it, why is it that we're here? This is the reason we're here. And why is it you should find this defendant guilty? Because he made the two statements that were in Count One and Two. Look at those statements. Don't be misguided. Look at those statements. Did he discuss his plans to travel to Syria himself and did he help -- or did he lie about what he knew about Mohamad Hilal and his -- and the intent?

The statements were false. And you don't have to rely on what somebody else said. You know the statements are

false because you heard his own words and you heard what he said. Now, during the voir dire everyone -- I think the defense asked you and Mr. Tate made a good show of asking all the witnesses, "You know, you just can't remember everything." You know, I just -- you know, I forgot.

Well, ladies and gentlemen, use your common sense. Is it plausible that a year before you would have bought a ticket for a guy that was going to ISIS, your girlfriend has just been subpoenaed because she bought the ticket. And then all of a sudden you forgot, "Oh, that guy. Oh, yeah, yeah, yeah, yeah, I did send a ticket to the guy to go to ISIS." Is it reasonable that he forgot about it? Absolutely not.

Was it material? I'm not going to go over that. A lot of what you heard on the first day of the testimony was why this case was material, why it's important. And the defense in their own questions -- Agent Godfrey listed five different reasons why this was important to the United States, why they needed to know. And why even if the defendant was lying at that time, they needed to know what the truth was.

The fact that he was lying is not the test here and you're going to see an instruction on that. All you've got to find here is did that statement have the capability to influence the FBI? Influence it. And you heard in the agent's own words how it influenced that investigation. The FBI is an executive agency. He knew his statements were false

without a doubt, and certainly beyond a reasonable doubt.

So, ladies and gentlemen, as you go through the deliberations here, my colleague is going to have a chance to address, as he ably has during his case, Mr. Smith's point of view, but keep your eye on the ball. And I think the Judge's -- Judge Cogburn's admonition throughout the trial was, I think, the best advice. This is about a false statement. Not about whether he was going to travel, not about whether or not he really believes in ISIS, not whether he changed his mind; whether he lied to the FBI about it and why it mattered to the FBI.

So for those reasons, Your Honor -- ladies and gentlemen of the jury, we think that the only reasonable conclusion beyond a reasonable doubt in this case is to find this defendant guilty as charged.

THE COURT: Mr. Tate.

MR. TATE: Thank you, Your Honor.

Counsel, the Smith family, ladies and gentlemen of the jury: I'm delighted to represent Alexander Smith.

I want you to walk with me through the evidence here. Walk with me through the courtroom. I've known Mr. Savage a long time. I respect him. I respect his mission. I respect the mission of the FBI. But this is a mission creep. There's all kinds of things the FBI should be stopping, including -- there should be a domestic terrorism

task force to stop real crimes and mass shootings that have gone on around here rather than making up crimes against the poor and the downtrodden, people like Alexander Smith.

See, there's only a small group of people that will talk to a guy like that and it's somebody like Alexander Smith. A young man struggling to support his family, no job, no education, not even a high school diploma. Take that into consideration when you consider his statements and things that he does because in our system of jurisprudence, it's not good enough for the FBI to point the finger at you and charge you after you refuse to talk to them. It's not good enough for a prosecutor to point his finger and say he did it. It requires 12 good, honest jurors like yourselves to decide. You're the arbitrator and you are the check and balance. And after this case I'm going to ask you to check them because this is a mission creep.

Let's start with this. Back on August 6 of 2014, Mr. Smith was unemployed. He was looking for a job. He contacted a friend of Wael's in Memphis. It turns out that this person in Memphis was a confidential informant according to Agent Godfrey. He put him in touch with Abu Khalid. They really didn't know each other. And he said they wanted to see if he was willing to really travel.

But let's talk about -- I'll try to point out what happened initially when we talk about him. The first meeting

was a discussion on August 6th. That's where he's asking him to come to Cary. He didn't say, "Hey, you know, I'm looking to travel to support ISIS. I heard you can help me."

Then on August 7th when they meet, there is no reference to ISIS by Mr. Smith. There's no reference of wanting to travel to Syria to fight on behalf of ISIS. He tells him, "Hey, there's this family in Syria I'm concerned about." He wants to help and defend them. That's the Kodaimatis. As I told you in my opening statement, there is no crime of empathy because you feel sorry for someone even if they live in Syria. This is somebody that had been a lifeline, that had taken him in at the age of 16 and had given him work.

And so the context is he was used to getting work through the Muslim community. They would give him work. And each time you hear him talking about, "I just had this guy around for work."

And what does he say? He tells them that he's unemployed. "I've been unemployed for a month."

Then he asked him about his friends. Abu Khalid said, "Where are your friends at?"

He said, "They're in Kafr Hamrah."

And he says, "Who is the," whatever words he used, "the leader there?"

And he said, "It's split three ways." This is him

talking. He said the Assad, the government, which Assad was who the U.S. government opposes, the Free Syrian Army, who for some reason the United States supports and arms and funds. I really wish they'd do more here than somewhere else, but they supported them. Then he said the other brothers. They used the term brothers so much we don't know who really they're talking about. But he didn't say ISIS.

Smith needs financial help.

He also told him when he travels, he always has problems getting back ever since he went to Syria in 2006. Everybody else goes by in his group through security and they stop him. You hear him talking a couple times about that concern. He's asking more questions than he's giving answers. This is a man that is curious about Islam.

Then they have a meeting on August 20th. It's two weeks later. In that conversation Mr. Smith is baited into, "Hey, brother, have you been doing any training? Have you got any firearms?" And he told him no.

He mentions that he spoke with Saeed. He again complains about not having work. "Hey, man, I barely had gas money to drive over here to see you."

He asked him, "Why do you want to travel?"

He says, "I want to defend this family back home. If they're in peace, that's good." And remember the context. He is thinking at this point that Khalid is a friend of

Kareem's that's a friend of Wael's who has been -- who's a person that has connected him in the Muslim community with work. He's looking for work.

So what do they do next? He asked him, "Who do you know in Syria?"

He says -- he talks about Wael and Saeed. He says, "Do you know Wael?"

He says, "Who?"

"Do you know Wael?"

He said, "No, I don't know Wael."

He said, "He's a friend of Kareem's."

He said, "I don't know every friend Kareem has."

He's asking questions about Syria. He asks about different groups. One of the things you should recall is that he says -- if he's so anxious to get over there and fight, he's asking him, "Hey, brother, why is it that two -- they're all Muslims. Why are they fighting each other?" This isn't a guy that knows what's going on. He's asking him questions.

"Hey, have you ever met al-Baghdadi?" When he's talking, he's asking questions. The other guy is trying to force words into his mouth.

So then you look at when was the next time he had contact with Abu Khalid? And remember, this indictment charges false statements to the FBI on February 16, 2016. Not false statements to the informant, false statements to the FBI

some year and a half later from these conversations with Abu Khalid.

Yeah, I spent a lot of time asking people, including Agent Godfrey, about their recollection and what they had to do in order to come to this witness stand and testify under oath because they don't want to be charged with perjury. Lying is the same thing as false statements. And everyone was given an opportunity to review their prior statements, to review anything that they're going to be asked about.

Mr. Smith with his -- only went to the tenth grade and he wasn't -- maybe wasn't given that. If he was allowed -- if they would have even said to him, "Hey, we want to talk to you about some conversations you had with Abu Khalid," they maybe would have gotten all the details they wanted. But they didn't ask him that. They said, "Have you ever talked to anyone?"

And what does he say? "Man, I talk to all kinds of people in the Muslim community."

And we played some clips that they didn't play and they didn't play them for a reason because they answered the question. That's Defense Exhibits 7A, B, and C.

So the next thing we go to -- well, we know what happens. Shortly after -- in late August, September, they hook him up. They introduce a black man by the name of Bilal who, according to Agent Godfrey, his role was to be a newly

converted black Muslim. And this is who really spent most of the time with Mr. Smith, but we didn't hear from him. Bilal was the person that was working with him night and day. That was his -- introduced by Khalid. He recognizes that Bilal is a friend of Khalid's. They live in the same area. This is how I'm going to get work. He's working construction in Greensboro. He's doing plastering and he's working on drywall. They're buying and recycling cars. This guy is with him night and day. Don't you think he would know if he wanted to fly to Syria and support ISIS?

Well, what we do know is there's no evidence he was out there committing a crime. He worked a job. Whether it was low paying or not, he worked a job. And this guy, this character Khalid, tried to make him think it was -- "I'm so proud of you the way you support your family." So he's beholding to Khalid because this is a lifelong -- this is somebody -- his friend Bilal is helping him work.

So let's fast forward to March. Well, before we do that, there was some other discussions. There was a November 14, 22 -- November 14, 2016, meeting at a hotel that was recorded. And Smith is there. At no time during this conversation do you hear him say, "Hey, man, I'm ready." Every single time -- see, he's charged with lying about his plans to travel to Syria. Every time he met with Khalid he said, "Hey, what are your plans, Brother Smith? What are your

plans to travel?"

But he never had any plans. All he ever talked about was the work he was going to do. "I'm going to do this. We're investing in some money." He never had a plan. That's -- did he -- he's charged with making a statement about whether he had a plan to travel to Syria to fight on behalf of ISIS. It's just not there.

He tells him time and time again, "I don't have the money." You know, he still -- and guess who's right there next to him. Guess who brought him to that hotel room. Bilal. We don't see him, but we hear him in there. Bilal is bringing him there. Everybody is in on it. Everybody knows it's being recorded but him. And they bring him in there hoping to get some statements. But at the end of the day, he said, "Man, this brother, you know, we're just doing our best. I've got some family affairs to take care of. You know, I'll get with you, inshallah." God's will.

And as I said a couple times, God never willed it because if that was what he wanted to do, he could easily have said, "Hey, Brother Khalid, get me the money up. I'm ready. I'm ready to travel to Syria." He never did that. Every time he met with him, he said, "What are your plans?"

On November 11th in that hotel room he again reiterates he wants to protect the family back there if he can.

He also told him on November 11th, "The family is trying to escape Syria and go to Turkey." But they try to conflate it to now all of a sudden the family is part of ISIS. He's telling them, "I think they're trying to get to Turkey. He's trying to get his sisters. Everybody is trying to get to Turkey." Then they provide him with a laptop.

He never mentions wanting to travel to fight on behalf of Syria on that date.

The buddy pass. Well, you know, there was an offer months earlier to Khalid and he said, "Hey, man, if you ever need a buddy pass" -- this is around the time he's getting him work and stuff -- "just let me know." He didn't say, you know, if you ever want a buddy pass to travel or, you know, to fight -- go fight for ISIS or anything. He's trying to do something for this guy that has, you know, provided what he so desperately needed which was work.

Well, it wasn't until several months later, four months later, in March of '18 that he calls and says, "Hey, Brother Smith, I need a favor." He does tell him that this guy wants a buddy pass and he wants to go from Tampa to Buffalo, but what does he say about him? He says, "He speaks five languages. He's good with computers. And we're going to get him from Buffalo to Tampa." And he says, "We're going to sneak him from Canada to Turkey, Turkey into Syria." And he doesn't say he's going to be a killer for ISIS. I believe

what he says is, "This guy is going to be in a room or somewhere on a computer." That's all he told him, Mohamed Hilal and a date of birth.

See, they're careful not to use explicit language. "He's going to go over there and kill people, Mr. Smith." He's not going to say that because then they might not get the answer they want. See, this is slickness here.

So what he does is he does give him a buddy pass. Costs $80. That's what he charges him. He doesn't charge him any more money than that.

Then this guy's acting weird so -- he doesn't fly. Eventually he tells him that, "Look, I can't have anything to do with you. I really don't want -- intend to do any of that." Those were his words.

You've seen -- it was the email. You've seen that several times. We've highlighted where he tells him, "I can't have anything to do with you," and there was no contact with him anymore. So at least on March 21st of 2015 there never has been a plan. There still is no plan to travel to Syria and I'm done with you. Ironically, Bilal had disappeared around that time so the work dried up. Wasn't in a position to do anything anymore.

So let's fast forward to, I think it's 2016. It's January of 2016. Some six, seven months later there's an investigation about the buddy pass. They claim that this is

international terrorism and somehow they were obstructed, but it was their lie. It was their movie with their script and their fake actors, paid informants, pockets lined with money by the FBI.

You remember Mr. Khalid -- we'll come back to him in a second, but let me talk just for a second about this passage of time. This is from March 31st to some time in January of 2016. This is more than six months. And the girlfriend is brought in. They interview her about it. It's no secret. Nobody lied. Yeah, you know, it's a buddy pass for Mohamed Hilal. Then they show up at her job. There are subpoenas.

And then he comes in on February 16th. You hear him say in the video -- this is nearly a year or more later. Remember when they first met? Those first conversations were in August of 2014. Now we're in February of 2016. And so just like these professional witnesses, Agent Godfrey, Dr. Hoffman, the woman from US Airways, and even Khalid, they had to come in here to make sure they don't make a mistake, to make sure they don't accidentally tell a lie, make sure they got all the details, and they still couldn't get it correct reviewing all this stuff.

This man with a tenth grade education wasn't given that benefit. He's asking questions. That's why we played those other clips for you. He's asking questions, "Hey, man, is there anything wrong with me talking to the Kodaimatis?"

He didn't hide anything from them. He told them about Khalid. We'll talk about that in a minute. But this is 16 months later -- 18, and he's supposed to remember intricate details to provide to you on broad questions.

So one of the things I started off my presentation with yesterday was the old school notion that believe nothing you hear and only half of what you see. But what did I mean by that? And what it means is that people can tell you anything. "I love you, baby." A woman is going to say, "Well, you know, it's easy to tell me that, but show me. Show me that you love me. You might have said you loved me, but it's your actions that allows one to see."

So what do you see? How do you see Khalid? I see him as he is: A paid informant that's a person that's trained to entrap people so his monies can keep getting lined -- his pockets lined with money. He sat up there -- now, he spent how many hours -- five, six hours over a course of days reviewing transcripts and records so he can say he gave truthful information.

And I asked him, "What have you been paid, sir?"

He said, "I've only been paid -- I get reimbursed expenses."

"You sure about that?"

"I have a job. I" -- whatever he said. "I have a job. I work. I have family. I only get reimbursed

expenses." But he forgot about that -- what was it, a hundred and eighty-six-some thousand dollars that he was paid on top of the one hundred forty some thousand dollars in expenses that he's been paid as an informant. This is the same guy that says, "In my country I ran from the police when I seen them." I'm wondering why you're running from the police.

They asked him -- he started off his testimony, "Well, I was forced into being an informant."

And I asked him, "How were you forced?"

And he mentioned that he overstayed in the country. That wasn't very clear. There was an objection. Something about confidential classified protection. But he's a paid informant.

How do you see Hoffman? Hoffman helped us more than he helped him. As it turned out, Hoffman has never been to SyriaI asked him, I said, "Sir, do you speak Arabic?"

"Yes."

See, truth is -- it should be a constant. It doesn't change from one attorney's examination to another.

"Well, how fluent are you in Arabic?"

And as it turns out, he had a tutor in Arabic 40 years ago, then he had another tutor in 2015.

But that map, that showed that Aleppo was not even a territory covered by ISIS, and that's consistent with what he said about Saeed. That's consistent about them trying to flee

Aleppo or "I'm trying to get to Turkey." If they're part of ISIS, why are they trying to flee? It's in the record.

So going to Agent Hoffman -- Godfrey, I remember him. I respect his mission too. But how do you see Godfrey? How do you see him after that clip? They did so much recording of people, they even recorded themselves. And what that should show you is that people will say things if they think they're in private. Maybe things that might be embarrassing, things that they may not really mean.

Smith didn't know he was being recorded. He's talking to a guy that he thinks is helping him, that he thinks is proud of him.

How do you see him? I asked him on cross yesterday -- and granted, he had been up there a while, but he got confused a couple times about the facts and Mr. Savage had to bring him back and rehabilitate him. You know, he had to get his recollection refreshed. If only Alexander Smith would have been given that opportunity. He asked them in the interviews, "This is all I know."

So how do you see Smith? Remember, this man right here is the only person's words in this courtroom that were uncoached, that were unrehearsed, that was uncouched because he did not know he was being recorded. He didn't know he was being recorded on February 16th when he gave a statement to the FBI.

I think the evidence shows he told the truth as he knew it. One of the things that you're going to have to decide is whether or not Smith knowingly and intentionally, that means voluntarily, that he knew he was lying. How could you know you're lying about something that's fake? He didn't know there wasn't no real Mohamed Hilal. He didn't know Abu Khalid was an informant and was recording him. His boy Bilal that was going and pretending to pray with him at the mosque and was giving him all that work, he didn't know he was an informant.

So what did he -- what did he do when he was there? He identified Abu Khalid. He told them -- he told them about Abu Khalid. He can't give them any more information because Abu Khalid didn't tell him anything. He tried to describe about how old he was. He admitted to the buddy pass. He said, "Look, I got the guy a buddy pass. I didn't know what this guy was going to do. I wasn't in his brain. I didn't know his intentions." The last thing he knew is the guy did not use the buddy pass.

Then he says, "Well, he's safe. He got to Buffalo, then to Canada." That email from Abu Khalid doesn't say anything about Syria. Doesn't say anything about Turkey. Doesn't say anything about ISIS or anything else. That's the last time he spoke with him. He told them about that. He told them about Mohamed Hilal. This is ridiculous.

And the FBI keeps saying, "We're just looking for the truth." How are you looking for the truth when it's your movie? You know the truth already before you even interviewed him. It's your lie. But you don't let him in on it, but then ask him questions that you're looking for particular details from something that happened a year and a half ago. Didn't tell him he was under investigation.

He said he flew from Florida to New York. He said, "I think Abu Khalid lives in Greensboro." He said -- he identified Bilal. He said, "I don't know where he is now. It's been a while, but I can go up there and look for him if you need me to." This is not a person that's trying to give false statements. He told them.

"How many times did y'all ever meet together?"

"Yeah, we met together one time."

He identified the Kodaimatis. He asked them -- that's why we played that clip. "Hey, man, am I in trouble? Am I doing anything wrong? If there's something wrong with talking to the Kodaimatis, tell me now."

And they don't tell him. They say, "No, you're okay. You're good as long as you don't lie to us. We're just looking for the truth," which is a lie because you already had the truth. It was your movie.

He told them about how he stopped hearing from Bilal and how he broke it off.

He told them about Yahya Assad. He tried -- the guy from yesterday tried to say his investigation was influenced because he could have got more information on Yahya Assad. Well, on cross it turned out the FBI had already interviewed Yahya Assad. They knew everything about him. This guy was just an innocent bystander. He used his -- he had a debit card because Smith didn't have one to pay for the ticket that he had been given cash for. That was his role in it. And all that money was refunded.

He told them just about everything that they wanted to hear.

And Smith said this during the interview. He said, "Hey, man, I talk to a lot of Muslims." This was more than a year ago. He truthfully told them that he didn't know Hilal's intention. Do you remember how cryptic Abu Khalid was about Hilal? That's all he said about him. He told him, he said, "Look, the only reason I had this Abu Khalid guy around is because I needed work. I was looking for work." And they provided it. That's the only reason they were able to stay around. He told them -- he readily admitted that he gave him a buddy pass.

He said, "I don't know what this guy Hilal has done, but whatever he did, I had absolutely nothing to do with it in assisting him." And he was honest when he said that, although he didn't know there was no Mohamed Hilal. They never told

him that.

He told them that Abu Khalid was sketchy with his information.

He talked about Bilal at length. He said, "This is just an average black guy." He didn't know Bilal was an informant. He told them everything they already knew and he gave as much details as he could without being able to refresh his recollection.

So how did he end up here? How did he go from 2014 of August to being indicted in June of 2017 to going to trial in 2019? Well, I think, based on the evidence, he stopped talking to them. Wouldn't talk to them. Then they showed up on his job. Bilal was gone now so he found him another job as a security guard, and they showed up on that job, the FBI. You don't last on jobs too long when the FBI show up and talk to you on your job. But why go to that extent?

Play the clip.

See, just like Smith, Godfrey recorded himself. And if you listen carefully, you can hear the desperation that at all costs they're going to try to bring some charges against Mr. Smith. He can't charge him with nothing else so let's get him to come on in and talk to us. Don't tell him anything. Keep it all secret. Then if he makes a mistake, we can play a game of gotcha. Now we can say you made a false statement.

(Defendant's Exhibit Number _____ was played.)

MR. TATE: "He's a fucking shit bag."

Excuse my French, Judge, but it's in the evidence.

That's what he thought about him. Couldn't get him to travel, so now we're going to get him on something. We're going to break his girlfriend down and make him come in and talk to us.

So it comes down to this. The judge is going to give you some instructions to follow. And you should follow them all, but I'm going to just put up -- just so we're clear, this isn't a domestic terrorist case or he's an ISIS member. This is the charges. And what it says -- this is what he's charged with.

On February 16, 2016, some year and a half later, he's charged with making a statement or representation, a statement or representation that was false, fictitious, or fraudulent.

I didn't hear a single statement that he made during that -- during that interview that was false, fictitious, or fraudulent. Only thing that was false, fictitious, and fraudulent is this case is Abu Khalid, is Bilal.

That Mr. Smith stated that he never discussed his desire and plans to travel to Syria to support ISIS.

We put on that very last clip. He told them he traveled to Syria He gave them -- he had been there in 2006. He had wanted to go there again. "But the more I heard about

it in the news, the more I thought about it, I said, 'Hey, I like my life too much. I ain't going over there.'" He had his passport, but he never got himself a buddy pass to travel to Canada.

And remember Ms. Cause asked the woman from American Airlines, "Does American even fly to Syria and Turkey?" The answer was no. Couldn't possibly even get a buddy pass there.

Then he never ever said he wanted to travel to support ISIS or had a plan because if he had a plan, you would see it. It would be more than his words. You would see it. And he would have went. He had a passport through April of 2015. And it expired. Never renewed. And he never went to Syria. And you know why? Because there he is. He's still here supporting his family, working these low jobs if he can keep one without the FBI showing up.

And his actions speak louder than anything he said because he never said, hey, Brother Khalid, I'm ready." When he asked him what was his plans, he never had one. So did he remember every word that he said a year and a half later? No. But what is clear is, "I never had a plan. I never had a desire to travel to Syria again. I thought about it before, but then I said, 'Oh, well, I think'" -- they didn't play that part. We played it today.

He did not know the fictitious person intended to use the buddy pass to travel in support of ISIS. What you

have to -- again, a year and a half later. What you have to find is that it was knowing, intelligent, and willful. He remembered what a reasonable person would remember in a startling situation like that in a year and a half. Remember, he didn't have a whole lot of other facts to give them.

He asked them, "What is this about? Am I under investigation?" The only people that were deceiving and holding out information is right there.

His statements and representations pertained to a matter within the jurisdiction of the United States. Yeah. But that it was a matter within the jurisdiction of the government of the United States. The FBI is a government agency. But remember, this is a made up, manufactured case. There would be no international terrorism, there would be no ISIS, there would be no Abu Khalid, there would be no Bilal, there would be no Mohamed Hilal unless they scripted it.

Mr. Smith was committing no crime. He worked a job. And he needed money and he needed a job. He didn't ask for any money. He worked for it with his hands.

You know, he has almost the last two years been in my protection. Now I'm turning him over to you. I'm asking you to follow the evidence and the facts of this case, and there's absolutely no way that you can find he knowingly and willfully made false statements a year and a half later without being able to refresh his recollection beyond a

reasonable doubt.

Do your duty. You were chosen as jurors because you said you would judge this case on the evidence. It's hard to tell them no. It's the government. But this is not for the tepid or the weak. You've got to be able to rebuke the government when they're wrong, and they were wrong in this case. Do your duty. Find him not guilty.

THE COURT: The jury is with the government.

MR. SAVAGE: Thank you.

Thank you, Mr. Tate.

You know, ladies and gentlemen, think about your deliberations this way. Here you are in Charlotte and you've got to go up to Greensboro and you're going to take I-85. Now, you're going to be able to take the direct route just straight up 85 and just keep on going or you can take the defense route and get off at their exit. But you're never going to get there if you get off at the defense exit and here's why. You've got to keep your eye on the ball.

I'm not surprised that Mr. Tate said, "Believe nothing you hear and half of what you see," because you've got what you can see and hear right here. What he's telling you to do is ignore the facts. He starts his argument with this, not about Mr. Smith, about, "Well, the FBI should be investigating domestic terrorism and they should be investigating shootings in the United States and they

shouldn't have money in Syria." Those aren't policy arguments for you. You're not asked to make policy for the United States of America. And you're not here to bash the FBI.

So here's what we're going to do. We're going to look at the evidence one more time and the evidence is simply this.

Putting up on the screen -- it should be on, hopefully.

Look back at what the statements are in Counts One and Two. They're simply this.

Did he discuss his plans? Now, you can parse this any way you like. You can take -- next slide, please. You can take this into what the FBI investigation could be, whether it was mission creep, whether or not it was fair, but you're going to have instructions from the judge.

So before you get off at the defense exit, remember your oath. You're sworn to follow the law here and the judge is going to give you very specific instructions about what is lawful here. The FBI, contrary to what this defense counsel says, did nothing wrong. They followed the law. They're allowed to use subterfuge. And they're human beings and they're allowed to get upset.

First of all, listen to that tape carefully because it wasn't Agent Godfrey who used and called the defendant a bad name. That wasn't Agent Godfrey. That was somebody else.

But listen to what you hear.

So what is it about this? Count One.

Can we go to the thing?

What's the false statement? Did he discuss his plans? Well, you know, the defense makes a big deal about the fact that they didn't refresh his memory with the transcripts of his statements. Well, they couldn't. They were classified. But when they did go to talk to him, he didn't want to talk about it anymore.

But what really happened here? Why did the defendant wind up at the FBI's office? They approached him a number of times before and he avoided them. He evaded them. So what happens is his girlfriend, whose name is all over that ticket, got a subpoena to go down and talk to the FBI. And you've got the Government's Exhibit 24. She had already lied to them. So he, by buying a ticket for a person that he knew was going to go to ISIS and support them, had gotten his girlfriend in a lot of trouble so he needed to explain it. So he didn't go down to the FBI to tell them the truth. He didn't go by to clear things up. He didn't go by in a matter of innocence. He went down there to try and make a story to see if he could find out what they knew and how he could get them not to subpoena his girlfriend who knew the real deal, that he had ordered the ticket. That's what happened.

And when he went down there, wouldn't it be a

different story if all the things that Mr. Tate told you about his plans, and "I didn't really intend to do this" and, "Jeez, I wish -- I just wanted a job," all of those things, if he had said, yeah, I talked to Abu Khalid and I made him believe that I wanted to go to ISIS because I just was trying to get a job and he was giving me money or he gave me $50 for my phone." If he had just said all of that, wouldn't it be a different story? But believe half of what you hear -- or none of what you hear and half of what you see, right? So he didn't say those things. If he had said what Mr. Tate said, he wouldn't be here.

But here's the deal. Look at it. He didn't say what Mr. Tate said. That's the fiction here. You can go back and reconstruct it any way you want. Look at the tapes. And look at Count Two. When you look at those statements, he didn't ask him to remember details. It is simply unbelievable.

If you could pull up the thing.

If you could simply think in your mind if you had bought -- if I had bought a plane ticket for my cousin or my sister or somebody I didn't know, I'd remember buying a plane ticket even a year ago. You'd remember that. Especially since they weren't supposed to sell the plane tickets. Those tickets were supposed to be for people that Ms. Sheth knew. But instead, as you heard on the tapes, they would sell them

willy-nilly. They would just simply make money off of it. So they were doing something wrong right there. You'd remember that, wouldn't you? It would be her job at stake.

She had already been subpoenaed. He knew what was at stake. But he didn't tell them, "Oh, I asked my girlfriend to do this. I'm so sorry. I wish I hadn't gotten her into trouble. You know, this is all my fault." You didn't hear any of those things. You just heard him try and convince them for two hours about how wrong they were.

And, you know, it's a little bit unfair for Mr. Tate to say that Agent Godfrey didn't treat him fairly. Go back and look at that tape. You know, he got to the point where he was saying things that were deliberately false. Yeah, at that time he couldn't show him the actual transcript, but he said, "Didn't you do this?" Or "wasn't there a guy?" Or "what did you say?" I mean, there were direct, direct hints in there. Showed him the statute that we're talking about here today twice. Asked him to reconsider. Went back to him a few months later after they got the evidence declassified and wanted to talk to him again. He didn't want to tell the truth. What he wanted to do was hide the truth. That's how you know he was lying and that's how you know he knew he was lying because it was knowing and willful.

And this idea that there was no plan.

Go to the next slide, please.

Of course there was a plan. You know, the idea that there was a plan -- because he talks about a plan.

That's not the right slide. Go to the next one. No, you've got the wrong slide.

So how do we know that there was a plan? Because he says to him in the hotel on November 11th or November -- yeah, November 11th, "Okay. So what's your plan? What's your plan?"

"Well, my plan is I'm going to work with Bilal," who's sitting right there. "I'm going to earn some money. And then I'm going to go to Syria."

So that's a plan. And would you forget that? I mean, he's saying, "Okay. You knew Bilal." He talked about Bilal. He talked about Khalid. He talked about all various things. He talked about he had been to Syria. But he forgot that he made a plan that he was earning money to go to Syria to fight for the guy that he thought was ISIS? Come on, use your common sense. You're not required to check it at the door.

Professional witnesses. You know, you have a chance using your own common sense to evaluate the demeanor of these people. Abu Khalid gets nothing from seeing the conviction of this defendant. He doesn't get anything. The FBI asked him and he was very honest about what he earned. He went over his immigration status from, like, 30 years ago. He talked about

his past. You know, you can evaluate his demeanor. You know, what is it about this that Abu Khalid wanted to get this guy for? He -- and if you look at the way that this was structured, the way that it happened, even though it wasn't -- it was a ruse, which the judge will tell you is allowed, he gave him every opportunity to disavow it.

When did he finally say to Abu Khalid that he didn't want anything to do with him? When he knew his cover was blown, after Kodaimati was arrested, after his girlfriend -- after the guy -- after the no-show and he finally figured out that this could be a problem and I'm in big trouble because the government may have discovered it.

You'll see in the investigation that he knew the FBI was asking questions about the Kodaimatis. He said the Kodaimatis are under the power of Dawla Islam. So this idea that the Kodaimatis somehow are just innocent freedom fighters is not -- it doesn't ring true. Look at what he knew at that time. Of course he knew it was blown -- the cover was blown. And then his girlfriend is subpoenaed. He knows he's even in more trouble and so he comes down, and that is what we call consciousness of guilt. He lies and lies and lies because he knows that the gig is up and he's trying to talk his way out of it. Look at his demeanor. Look at what he says. Look at the way he acts.

And how in the end, how do we know he was? So

you -- Mr. Tate at the very end says, "Okay. Don't believe what you see. Don't tell me you love me; show me you love me." Look at Exhibit Number 11. That's the evidence that the defendant in this case really knew what was going on. That's the action. He didn't wait. He didn't do it. He didn't say, "Oh, no." He didn't make up an excuse. He didn't do any of the things that his lawyer said.

What he did was he bought a ticket for a person he knew was traveling to Syria to be with the brothers, Dawla Islam, in Shari'a and he's a computer guy. And what the charge says is whether he's going to fight or not, he was going to support them.

And you heard Dr. Hoffman talk about Junaid Hussain. Junaid Hussain, one of the most notorious ISIS members ever, his job was he was a computer guy who had hacked into Tony Blair's computer, went to Syria and used his power over the internet to recruit Westerners and Americans to go to Syria where they died.

And this defendant knew that. He knew it because even if he hadn't watched the news, he knew who al-Baghdadi was. He knew when Abu Khalid said they're fighting Americans, he knew what they were talking about.

So this idea that this whole fiction is something that is unfair or untoward, you ask yourself what do you want your government to do? If this is such an unfair thing, do

you want us to wait until it happens or do you want us to send somebody like Abu Khalid who's carefully controlled, who's monitored, who's taped, who's watched to ask these people if they're going to do something bad? Isn't that a fair use of the government's power?

And if all of this had occurred, all of this, if he had said one time, one time, he said, "I don't want anything to do with this" -- he didn't do it until the very end after it was all over, and then he lied repeatedly about it. If he had said, "Agent Godfrey, yes, I made a mistake, I didn't want to do it, I had no plans, I had no intention, I didn't do it, I couldn't get the money, but I said these things," wouldn't it be a different story? But no, he didn't.

So go back and look at those elements that the defense wants you to do and forget about getting off at the defense exit with all of this other nonsense and look at whether or not the statements were made. We played them for you. They're in the evidence. Ask yourself whether or not they were false, undeniably false in his own words. Ask yourselves whether they were material. We talked more about materiality than the actual statements in this trial.

The FBI is an agency of the United States and undoubtedly, undoubtedly the defendant knew what he was doing. He knew it because he knew he was caught and he was looking for a way out. He could have told the truth and he didn't,

and that's the simple crux of this matter. And if he had, we wouldn't be here. But he didn't and here we are. And 1001 in 2016 is the same as 1001 in 2019 and that's why we're here.

For all these reasons, ladies and gentlemen, you should find the defendant guilty as charged.

THE COURT: All right. Ladies and gentlemen of the jury, you have heard the evidence and the arguments of counsel and the Court will now instruct you as to the law applying in this case. The Court will first instruct you on some rules for matters of a criminal nature, including how to assess the credibility of the witnesses. The Court will then discuss the offenses charged in this particular case and then give you some concluding instructions.

It is your duty and your responsibility in this trial to find the facts. You may find those facts from the evidence that has been presented during this trial. The evidence consists only of the testimony of the various witnesses who have been called, sworn and have testified in your presence, the exhibits the Court has admitted into evidence, and any stipulations of fact made by the parties.

You are to take the law as it applies to this case from the Court as given to you during these instructions. You will then apply that law given to you by the Court to the facts that you find from the evidence and reach a verdict in this case. You're not to single out one instruction alone as

stating the law but must consider all of the instructions as a whole.

You're not to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would violate your sworn duty to base any part of your verdict upon any view or opinion of the law other than given in these instructions.

Counsel have quite properly referred to some of the governing rules of law in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you, of course, are to be governed by these instructions.

You are required to perform these duties without bias, prejudice, or sympathy for any party. The law does not permit jurors to decide cases on the basis of bias, prejudice, sympathy, or any other basis other than solely upon the basis of the facts and the law arising in the particular case.

The case involves two charges brought by bill of indictment against the defendant and I will explain those charges to you shortly. You're instructed that an indictment is but a formal method of accusing a defendant of a crime. It is used to inform defendants of the charges against them and to bring them to trial. It is not evidence of any kind against a defendant or anyone else, nor does it permit any presumption or inference of guilt. It simply puts the

question at issue for your decision.

At arraignment the defendant entered a plea of not guilty to these charges and thereby made a general denial of all the accusations contained in the bill of indictment. It is therefore up to you, the jury, to decide if, in fact, the defendant is guilty or not guilty of the charges outlined in the bill of indictment.

A separate crime or offense is charged in each of the counts in the indictment. Each charge, the evidence pertaining to it, and the defendant that it refers to should be considered separately. The fact you may find the defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged against the defendant.

Now, the government has the burden of proving to you each element of the offenses charged beyond a reasonable doubt.

At the outset the law presumes a defendant to be innocent of a crime and this presumption continues throughout the course of the trial. It could come to an end only if you, the jury, reach the jury room and arrive unanimously at the conclusion that the government has shown to your satisfaction that the defendant is guilty beyond a reasonable doubt as to a particular charge contained in the indictment.

The government is not required to prove the

defendant guilty beyond all possible doubt. The test is one of reasonable doubt. If the evidence is sufficient to overcome the presumption of innocence and to convince you beyond a reasonable doubt of the guilt of the defendant as to any of the charges, then it would become your duty to find the defendant guilty of that charge. But if you have a reasonable doubt as to the guilt of the defendant on any particular charge, it will be your duty to give the defendant the benefit of that doubt and acquit him of that charge.

The term "reasonable doubt" means just what it says. It is a doubt based upon reason and common sense. Its meaning is no doubt self-evident and understood by you and the Court will not attempt to define the term further.

The defendant is not on trial for any act or conduct not specifically charged in the indictment. Nor should you draw any inference concerning guilt or lack of guilt of the crimes charged in this case based on evidence, if there was any, of the defendant's involvement with any other offense not charged in the bill of indictment, except to the extent that such other offense or conduct provides evidence of motive, knowledge, intent, or willfulness, which I will define for you further later in these instructions.

Now, there are two types of evidence that are generally presented at a trial, direct evidence and circumstantial evidence. Direct evidence is the testimony of

a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact. The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than that of direct evidence. You should weigh all of the evidence in the case.

Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the evidence received in the case.

This case involves certain classified information. Classified information is information or material that has been determined by the United States government pursuant to an executive order, statute, or regulation to require protection against unauthorized disclosure. The witnesses in this case as well as the attorneys are prohibited from disclosing classified information and, in the case of the attorneys, are prohibited from asking questions to any witness which, if answered, would disclose classified information. Defendants may not cross examine a particular witness regarding the underlying classified matters set forth in these admissions. You must decide what weight, if any, to give to these admissions.

The government has offered evidence in the form of

tape recordings of conversations with the defendant. These recordings were made without the knowledge of the defendant but with the consent and agreement of one of the other parties to the conversations. The use of this procedure to gather evidence is perfectly lawful and the government is entitled to use the tape recordings in this case.

The government has been permitted to hand out, or to use in this case on the screen, a transcript containing the government's interpretation of what appears on the tape recordings that are received in evidence. Those were given to you as an aid or guide to assist you in listening to the tapes. However, the transcripts are not in and of themselves evidence. Therefore, when the tapes were played, I advised you to listen very carefully to the tapes themselves. You alone should make your own interpretation of what appears on the tapes based on what you heard. If you think you heard something differently than what appeared on the transcript, then what you heard is controlling. Let me say again, you, the jury, are the sole judges of the facts.

Some of the recordings and documents admitted into evidence included words in the Arabic language, of which you were also provided with English translations. The translations were provided so that you could consider the content of the conversations on the recordings. You may consider the knowledge, training, and experience of the

translator as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case. You should not rely in any way on any knowledge you may have of the language spoken on the recording. Your consideration of the transcript should be based on the evidence introduced at trial.

You, as the jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case and only you can determine the importance or weight that their testimony deserves. After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only a portion of it, or none of it.

In making your assessment of that witness, you should carefully scrutinize all of the testimony given by that witness, the circumstances under which the witness has testified, and all of the other evidence which tends to show whether a witness in your opinion is worthy of belief. Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the stand. Consider the witness's ability to observe the matters as to which he or she has testified and consider whether he or she would impress you as having an accurate memory or recollection of these matters. Consider also any relation a witness may bear to either side of the case, the manner in which each

witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony. Two or more persons witnessing the same incident or a transaction may simply see or hear it differently. Innocent misrecollection, like failure of recollection, is not an uncommon human experience. In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or to an insignificant detail and consider whether the discrepancy results from innocent error or from intentional falsehood.

After making your own judgment or assessment concerning the believability of a witness, you can then attach such importance or weight to that testimony, if any, that you feel it deserves. You will then be in a position to decide whether the government has proven the charges beyond a reasonable doubt.

The testimony of a witness may be discredited or impeached by showing that he or she previously made statements that are inconsistent with his or her present testimony. The earlier contradictory statements are admissible only to impeach the credibility of the witness and not to establish

the truth of these statements. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached.

It is particularly within the power -- if it is peculiarly within the power of the government or the defense to produce a witness who could give relevant testimony on an issue in a case, failure to call that witness may give rise to an inference that this testimony would have been unfavorable to that party. No such conclusion should be drawn by you, however, with regard to a witness who is equally available to either of the parties or where the testimony of that witness would merely be repetitive or cumulative.

The jury must always bear in mind the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Now, the defendant, Alexander Smith, has elected not to testify in this case. The Court instructs you the defendant has a constitutional right not to take the stand and testify and not to speak at all or offer any evidence, the burden of proof being entirely upon the government. You must draw no adverse inference of any kind from this exercise of the privilege not to testify.

Evidence relating to any alleged statement, confession, admission, or act alleged to have been made or done by a defendant outside of court and after a crime has

been committed should always be considered by the jury with caution and weighed with great care. All such alleged statements, confessions, or admissions should be disregarded entirely unless you're convinced that the statement, confession, admission, or act was made or done knowingly and voluntarily.

In determining whether any alleged statement, confession, admission, or act alleged to have been made by a defendant outside of court and after a crime has been committed was knowingly and voluntarily made or done, you should consider the age, training, education, occupation, and the physical and mental condition of the defendant. Also consider all other circumstances in the evidence surrounding the making of the alleged statement, confession, admission, or act.

If, after considering the evidence, you determine a statement, confession, admission, or act was made or done knowingly and voluntarily, then you may give it such weight as you feel it deserves under the circumstances.

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all of the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find the testimony of a smaller number of witnesses on one side is more

credible than the testimony of a greater number of witnesses on the other side.

You're not required to accept testimony even though that testimony is uncontradicted and the witness is not impeached. You may decide because of the witness's bearing and demeanor or because of the inherent improbability of his or her testimony or for other reasons sufficient to you that such testimony is not worthy of belief.

On the other hand, the government is not required to prove the essential elements of the offense as defined in these instructions by a particular number of witnesses. The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of an essential element of the offense charged if you believe the witness has truthfully and accurately related what, in fact, occurred.

Now, during the trial I instructed you to exclude from consideration certain statements made from the witness stand. I think there were just a couple of times. I remind you it's your duty to follow that instruction and consider only evidence that was allowed from the witness stand and presented to you.

The rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions at the trial. An exception to this rule exists for those persons who are

described as expert witnesses. An expert witness is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence in the case or determining a fact, an expert witness in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight, if any, as you feel -- as you think it deserves. You may consider the testimony of an expert witness just as you consider the other evidence in this case. If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude the opinion is outweighed by other evidence, you may disregard the opinion in part or in its entirety. As I have told you several times, you, the jury, are the sole judges of the facts of this case.

There has been evidence introduced at trial that the government used an informer in this case. I instruct you that there is nothing improper in the government's use of informers and, indeed, certain criminal conduct would never be detected without the use of informers. You, therefore, should not

concern yourselves with how you personally feel about the use of informers because that is really beside the point. Put another way, your concern is to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt regardless of whether the evidence was obtained by the use of an informer.

On the other hand, when an informer testifies, as he did here, his testimony must be examined with greater scrutiny than the testimony of an ordinary witness. You should consider whether he received any benefits or promises from the government that would motivate him to testify falsely against the defendant. For example, he may believe that he will only continue to receive these benefits if he produces evidence of criminal conduct.

If you decide to accept his testimony after considering it in light of all the evidence in this case, then you may give it whatever weight, if any, you find it deserves.

Now, you have heard the evidence that law enforcement officers in this case used a deception or ruse that the informants with whom the defendant was dealing were ISIS sympathizers when, in fact, they were not. You're instructed the government is lawfully permitted to use decoys and deception to conceal the identity of its informants in this case.

Charts and summaries prepared by various witnesses

were admitted into evidence and were shown to you during the trial for the purpose of explaining facts that are allegedly contained in records or other documents that may or may not have been in evidence in the case. You may consider the charts and summaries as you would any other evidence admitted during the trial and give them such weight or importance, if any, you feel they deserve.

In certain instances evidence may have been admitted only for -- concerning a particular party or only for a particular purpose and not generally against all parties for all purposes.

An example of that is when I allowed evidence to be admitted not for the truth of the matter, but for the reaction the witness took to the information.

For the limited purpose for which this evidence is received you may give it such weight as you feel it deserves. You may not, however, use this evidence for any other purpose against any party not specifically mentioned.

A separate crime is alleged against the defendant in each count of the indictment. Each alleged offense and any evidence pertaining to it should be considered separately by the jury. The fact that you find the defendant guilty or not guilty of one or more of the offenses charged should not control your verdict as to any other offense charged.

It is the duty of the attorney on each side of a

case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. You should not show prejudice against an attorney or his client because the attorney has made objections.

Upon allowing testimony or other evidence to be introduced over the objection of an attorney, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence. You, the jury, are the sole judges of the credibility of all of the witnesses and the weight and effect of all the evidence.

When the Court has sustained an objection to a question addressed to a witness, the jury must disregard the question entirely and may draw no inference from the wording of it or speculate as to what the witness would have said if he or she had been permitted to answer those questions.

If a lawyer asks a witness a question which contains an assertion of fact, you may not consider the assertion as evidence of the fact. The lawyer's statements are not evidence.

While we were hearing evidence, you were told that the parties had agreed or stipulated to certain facts, such as authenticity of the tapes so that we didn't get into a battling 16nbby 5 tapes. Specifically, they stipulated to that matter. A stipulation by parties simply means that both of the parties accept those particular facts as true. There

is no disagreement over those facts so there was no need for the evidence beyond the stipulation itself by the parties on those points. When the attorneys on both sides stipulate or agree as to the existence of a fact, you may accept the stipulation as evidence and regard that fact as proved. You're not required to do so, however, since you're the sole judges of the facts.

Punishment provided by law for the offenses charged in the indictment, should there be a verdict of guilty on the offense, is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the defendant.

You'll note the indictment charges that the offenses were committed in or around or on or about a certain date or dates. The proof need not establish with certainty the exact date of the alleged offenses. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offenses in question were committed on a date reasonably near the date alleged.

The Court will now read or summarize portions of the indictment, the statutes the defendant is charged with violating, and the essential elements of these offenses. You should keep in mind as I review and summarize the charges that when you go into the jury room to decide this case, you will

have a copy of the bill of indictment with you so it will not be necessary for you to try to memorize while I speak exactly how the charges are laid out. My summaries given here will help you, I hope, when you do sit down to a careful consideration of all of the issues before you.

Although the indictment may charge the defendant with committing an offense in several ways, using the conjunctive language, it is not necessary for the government to prove that the defendant did each of those things. It is sufficient if the government proves beyond a reasonable doubt that the defendant did any one of the alternative acts charged.

Count One charges a violation of false statement to an agency of the United States in violation of 18, United States Code, Section 1001(a)(2).

Defendant, Alexander Smith, is charged in Count One of the bill of indictment as follows:

On or about February 16, 2016, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, Alexander Smith, also known as Amir Alexander, the defendant herein, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, by stating -- by falsely stating to FBI special agents then

investigating a matter involving international terrorism that he had never discussed his desire or plans to travel to Syria. This statement was false because, as Smith then and there knew, he had discussed his desire and plans to travel to Syria in support of ISIS with the source.

All in violation of 18, United States Code, Section 1001(a)(2).

Count Two charges a violation of the same statute, stating that defendant, Alexander Smith, is charged in Count Two of the bill of indictment as follows:

On or about February 16, 2016, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, Alexander Smith, also known as Amir Alexander, defendant herein, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, by falsely stating to FBI special agents then investigating a matter involving international terrorism that he did not know that individual A intended to use the buddy pass procured by Smith to travel and support ISIS. This statement was false because, as Smith then and there knew, he had discussed with the source the travel plans of a person he, Smith, believed to be a person who wanted to travel and assist ISIS.

All in violation of 18, United States Code, Section

1001(a)(2).

Now, Title 18, United States Code, Section 1001(a)(2) provides in pertinent part as follows:

Whoever, in a matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States, knowingly and willfully makes a materially false, fictitious, or fraudulent statement or representation shall be guilty of a crime.

While the defendant is charged with two separate offenses, both offenses involve the same statute and therefore have the same elements.

For you to find the defendant guilty of making a false statement to an agency of the United States as charged in Counts One and Two of the bill of indictment, the government must prove the following elements beyond a reasonable doubt:

First, that on or about the date specified, the defendant made a statement or representation;

Two, the statement or representation was false, fictitious, or fraudulent;

Three, the statement or representation was material;

Four, the statement or representation pertained to a matter within the jurisdiction of the government of the United States; and

Five, the false, fictitious, or fraudulent statement

or representation was made knowingly and willfully.

I will now define certain terms used in these elements. You are to apply these definitions as you consider the evidence. If I do not define certain concepts or words, you will assign to them their ordinary, everyday meaning.

To establish that a statement was false, the government must negate any reasonable interpretation that would make the defendant's statement factually correct.

A statement is material if it has a natural tendency to influence or is capable of influencing the decisions or activities of the government agency to which it is addressed, in this case the FBI. It is irrelevant whether the false statement actually influenced or affected the FBI's decision-making process. The FBI need not have been actually deceived by the false statement. A false statement may be material even if the FBI knew the statements were false when they were given. It is enough if the defendant's statements were aimed at misdirecting the agents.

Within the jurisdiction of the government of the United States. To be within the jurisdiction of the government of the United States means that the statement or representation must concern an authorized function of a government agency or department. The government does not need to prove the defendant had actual knowledge that the matter was within the jurisdiction of the government of the United

States.

The FBI is, as a matter of law, an agency of the United States government.

An act is done knowingly if it is done purposefully and voluntarily and not mistakenly or accidentally. It is done willfully if it is done with knowledge that the conduct was unlawful.

If you find the defendant guilty of making a false statement charged in Counts One or Two of the bill of indictment, there is a separate issue for you to determine. This issue asks whether the false statement involved international terrorism.

An offense involves international terrorism if:

First, the offense involves a violent act -- involves a violent act or acts dangerous to human life that are a violation of the United States or of any state, or that would have been a criminal violation if committed within the United States or any state.

Second, that it appears to be intended to intimidate or coerce a civilian population, or to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination, or kidnapping.

Third, if it occurs primarily outside the territorial jurisdiction of the United States or transcends

national boundaries in terms of the means by which the acts are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which the perpetrators operate or seek asylum.

In sum, you're asked to consider whether the offense of making false statements, if it occurred, occurred in a context that involved international terrorism. That is a separate consideration that you must consider if you have made a determination that the defendant made a false statement as charged in Counts One or Two of the bill of indictment.

Upon retiring to the jury room to begin your deliberations, you must elect one of your members to be your foreperson. The foreperson will preside over your deliberations and be your spokesperson here in court.

Your verdict must represent the collective judgment of the jury. In order to return a verdict, it is necessary each juror agree to it. Your verdict, in other words, must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with one another with a view toward reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for himself and herself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate

to re-examine your own views and change your own opinions if convinced it is erroneous. Do not surrender your honest conviction, however, solely because of the opinion of your fellow jurors or for the mere purpose of thereby being able to return a unanimous verdict.

Remember at all times you are not partisans. You are the judges of the facts in this case. Your sole interest is to seek the truth from the evidence received during the trial.

Your verdict must be based solely upon the evidence received in the case. Nothing you have seen or read outside of court may be considered. Nothing that I have said or done during the course of this trial is intended in any way to somehow suggest to you what I think your verdict should be. Nothing said in these instructions and nothing in any form of verdict is to suggest or convey to you in any way or manner any intimation as to what verdict I think you should return. What the verdict shall be is the exclusive duty and responsibility of the jury. As I have told you many times, you are the sole judges of the facts.

Again, the punishment provided by law for the offenses charged in the indictment is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict.

Now, a verdict form has been prepared for your convenience and it reads as follows:

As to Count One of the bill of indictment, we find the defendant, Alexander Samuel Smith, and there are blanks for guilty or not guilty.

If you answer guilty, then you would go to 1(a) which is, Did the offense involve international terrorism? Yes or no.

Two, as to Count Two of the bill of indictment, we find the defendant, Alexander Smith, guilty or not guilty.

If you answer the verdict on that count guilty, you then go to count 2(a) which says, Did the offense involve international terrorism? And there is a question yes or no, blanks for that.

You will take this form to the jury room and when you reach your unanimous agreement as to your verdict, you will have the foreperson write your verdict on this form, date and sign the form, and return your verdict to the courtroom.

If it becomes necessary during your deliberations to communicate with the Court, you may send a note signed by your foreperson or by one or more members of the jury through the bailiff. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing, and the Court will never communicate with any member of the jury concerning the evidence, your opinions, or

deliberations other than in writing or orally here in open court.

Bear in mind that you are never to reveal to any person, not even the Court, how the jury stands numerically or otherwise on the question of whether or not the government has sustained its burden of proof until you have reached a unanimous verdict.

Members of the jury, before you go out I've got to have a meeting with the lawyers over here about these instructions.

(Sidebar conference as follows:)

THE COURT: Okay. We never have a bailiff take an oath so I left that part out of the instructions. David, I think, has taken out a few places where I put some stuff in, so we can get those added to the instructions and send them back.

So any objections to the instructions as given from the defense?

MR. TATE: No objections to the instructions.

The one thing that we did -- we're not clear if the indictment is going back in its entirety or whether they're going to strike the --

THE COURT: We'll go through those before we send it back. We'll go through those and see if -- if there's evidence to show all of them, then it's just for argument. It

will all go back.

MR. TATE: We would then request a special instruction to the jury that the indictment is not evidence. I'm not sure if the Court gave that in the beginning.

MR. SAVAGE: He gave that.

THE COURT: I think I did, but I'll make absolutely certain of it. Okay. That's not evidence. It's merely a charging document. I'll do that again.

MS. CAUSE: Your Honor, we wanted to go ahead and renew our motion to dismiss Count Two of the indictment for multiplicity, and we would like to rely on document 71 as well as the final arguments that were provided by Attorney Tate.

THE COURT: Yes, and they will be denied.

MS. CAUSE: Thank you, Your Honor.

THE COURT: And you're on the record.

Let me say this before -- right here on the record. The defense's motion for Rule 29, I think it was renewed, but if for whatever reason it was not, the jury has not gone out yet, that motion is deemed to have been renewed and it is denied; so both times, both at the end of the government's evidence and at the end of their evidence, so it's on the record so you're all clear. I want to make sure that's done.

Any objections?

MR. SAVAGE: No, Your Honor.

THE COURT: Any requests from either side for

additional instructions?

MR. SAVAGE: Not from the government.

MR. TATE: No.

THE COURT: Other than the one you said and I will remind them again it's not evidence.

MR. TATE: All right.

(End of sidebar conference.)

THE COURT: All right. Members of the jury, I just want to remind you once again that although we'll send the indictment back with you, the indictment is not evidence. It's merely a charging document and so it's not to be considered by you. The only thing that's to be considered by you is evidence in the case.

Okay. You may go back at this point and deliberate.

Yes, sir.

JUROR NO. 13: Can I ask a question, sir?

THE COURT: Yes, sir, go ahead.

JUROR NO. 13: Alternate jurors?

THE COURT: Yeah, that's it. We're going to excuse the alterate jurors. You'll get your lunch.

Is the lunch here yet?

THE CLERK: It's on its way.

THE COURT: Stay around. We ordered lunch for you so you'll have lunch, but the alternates will be excused if the other members of the jury can go to the end of

deliberations.

Everybody here feel like you can deliberate on this case and make a call?

THE JURY: (Affirmative nods.)

THE COURT: Okay. Very good. So you all can be excused.

What's going to happen is go back, get your stuff so they can begin deliberation, then come out and you can go ahead and wait in the back of the courtroom, you can wait while they deliberate, you can go home about your business, but wait on your lunch because we're providing that for you so you don't want to miss your lunch. Take it with you, eat it here, whatever you want to do.

You may retire to the jury room. No deliberations until the alternates have left the jury room because it should just be between the 12 that are going to decide.

And I appreciate your service too as alternates. It's very important.

JUROR NO. 13: Thank you, Your Honor.

THE COURT: Thank you.

We're going to make copies of these instructions and get those back to you too.

(Jury exited the courtroom at 12:52 p.m.)

THE COURT: Anything for the Court while the door is closed because it's going to open up in a minute to get those

folks out? Anything for the Court that we haven't done already?

MR. SAVAGE: (No response.)

THE COURT: Okay.

THE CLERK: They left out the back. They're going to sit out in the front on the benches.

THE COURT: Yeah, make sure they've got a place where everybody is not going to bump into them out there. I prefer them to sit -- take them to the grand jury room because they're not going to be bothered by anybody.

Okay. We will be at ease and await the verdict of the jury.

Yes, sir, Mr. Savage.

MR. SAVAGE: Your Honor, shall we deal with this indictment issue?

THE COURT: Oh, yeah, let's do that. Let's look at it.

MR. SAVAGE: And I wrote notes on my indictment if everyone will follow along.

THE COURT: Let's see. I've got to find that. David has taken my notebook.

(Pause.)

MR. SAVAGE: Your Honor, did you find one, the indictment? Do you need a copy?

THE COURT: I've got one.

MR. SAVAGE: Okay.

THE COURT: I'm looking through it.

Mr. Tate, have you had a chance to look at all of that?

MR. TATE: Yes, Your Honor. My client had asked me a question and I had to address it, so give me one second.

THE COURT: Okay.

MR. TATE: Part of the objection is it contains an argument like, for instance, in paragraph 5 where it says, "From Buffalo, Individual A would travel to Canada and then to Europe 'so I can send him to you know where.'" That came up during Mr. Abu Khalid's testimony. Then the government has a parenthetical, "(referring to Syria)." That's argument.

MR. SAVAGE: Pull up slide 15.

MR. TATE: In paragraph 8 there is no evidence on that. It did not come into evidence that statement regarding, "Just don't let him appear on no video or nothing." I don't believe that came into evidence.

MR. SAVAGE: Yes, it did. Exhibit 10.

THE COURT: Here's the only -- here's the problem I got -- the only problem I've got with it in looking at it, I've told them they're to consider the tapes as the evidence and the transcript as the evidence, and this has got lots of quotes in it. I understand the government is using speaking indictments, but it's almost like you're getting more evidence

in by putting that back. I think I'm going to send the charge -- the charges themselves back. This is not a conspiracy case. This is a case where you've offered evidence, put plenty of evidence in, and they've got all of that back there and they can play these tapes.

But I don't think you -- I think that in this particular case where the -- all these quotes are in there, it's as if they've been taken out of even context of what you played. In other words, they're not just -- it's not just the charge in here, it's the context out of what you played.

MR. SAVAGE: Your Honor, with all due respect to the Court, if you slice up this indictment, it's not what the grand jury returned. If you look at paragraph 21 and paragraph 23, each of those counts specifically incorporates specific paragraphs that relate to them. Each of those statements are in the matter of a context and those contexts are set out in the paragraphs.

THE COURT: What's happening here, though, Mr. Savage, in the case is the government doesn't get to make -- by saying "incorporated in those counts," doesn't get to say, "Oh, we get more evidence in that way" on these speaking indictments. This has gotten to be the rule rather than the exception. Let's put as much in there and sneak it back there -- not sneak it, but send it back there to the grand jury [sic] and have them read that stuff back there when

this might be in direct contravention of some of the evidence that's in the case. The evidence in the case is very clear from those documents.

If I was one of the jurors, Mr. Savage, I would have to say that the defendant lied to the FBI in a material manner, if I was one of the jurors back there, based on the evidence I've heard. I'm not one of the jurors. They may not say that, but I've heard the same evidence they've heard.

MR. SAVAGE: Well, Your Honor, we understand the Court's ruling. We think that this is really a motion to strike surplusage. I understand the Court's ruling, but with respect to this motion, the government meets all the elements of the law. This is really, as far as a speaking indictment, I think, pretty conservative. It's a four-page indictment -- or actually, it's a six-page indictment.

THE COURT: It is. It's a short indictment compared to a lot of the ones the government has, and certainly much shorter than Mr. Bowne has when he comes down from Washington. But with that said, with that said, in --

MR. SAVAGE: I understand.

THE COURT: -- this particular case -- I'm not saying I won't send every indictment back, every speaking indictment. This one contains direct quotes from tapes which are in evidence. Now, I agree with you. I don't remember specifically what Mr. Tate is saying is not in there, but if

you tell me it's in there and was said, I believe you. The problem I have is I have told the jury listening to the tapes is the evidence.

MR. SAVAGE: Yes, sir.

THE COURT: Now I'm going to send them back a transcript --

MR. SAVAGE: I understand.

THE COURT: -- of some of those tapes. And because some of these are in quotations and are like transcripts instead of statements of fact, I think in this case --

MR. SAVAGE: I understand.

THE COURT: In this case I'm going to only send the counts back there.

MR. SAVAGE: We don't disagree. The Court has that discretion. We made our case.

THE COURT: I understand. I understand what you're saying. I think in this case I'm going to send Count One -- copies of Count One and Count Two back.

MR. SAVAGE: I understand.

THE COURT: Okay. If the jury makes -- if the jury makes a request, I'll bring them out. If they say, "Where is this coming from," I'll bring them out and I'll read that to them and send them back out there.

MR. SAVAGE: All right.

THE COURT: But I'm not going to have something done

back there -- I'll make sure they understand that those are the charges and that's not it. But the fact that there are direct quotes -- I remember some of those --

MR. SAVAGE: Right.

THE COURT: -- from the tapes and it's pretty clear --

MR. SAVAGE: Okay.

THE COURT: -- to me with regard to what's there.

MR. SAVAGE: Yes, sir. Okay. I understand.

THE COURT: But in looking at the whole context of the crime, the things we've talked about before are still clear to me too.

MR. SAVAGE: Okay.

THE COURT: Okay.

MR. SAVAGE: I understand.

THE COURT: All right. So we'll get copies made of Count One and Count Two and send it back.

I guess what we'll do is send -- just send the whole count back.

MR. SAVAGE: It will be pages 4 and 5, Your Honor.

THE COURT: Yes, it is. Got it. So we'll get copies of that made. I don't know if David can hear me wherever he is. I think he's making copies of the instructions. We'll get those together and get those back there.

Okay. Anything else for the Court? We know what we're going to do. You don't have to sit here while we do it unless anybody has anything to say.

MR. SAVAGE: No, Your Honor, we'll be in the government's room.

THE COURT: All right. Very good. Thank you.

(Recess pending a verdict at 1:05 p.m.)

*****

(Court back in session at 4:25 p.m.)

(Jury not present.)

THE COURT: Okay. We've got some jurors that want to smoke so they need a smoke break, so what I need to tell them in the most -- I'd like to do it in the most expeditious way, that they can't deliberate while the smokers are out of the jury room.

MR. TATE: Right.

MR. SAVAGE: Yeah, until they're all together.

THE COURT: Until they're all together.

MR. SAVAGE: Perfect.

THE COURT: Any problem with how I communicate that to them?

MR. SAVAGE: No, Judge.

MR. TATE: No, it can just be a note. I just wanted to make sure that the Court told them that so they are aware of that.

THE COURT: Yeah. Let me have something quick and I'll write a quick note to them.

(Pause.)

THE COURT: Okay. And the answer is yes, they can take one.

(Note was tendered to the jury.)

THE COURT: We're in recess.

(Recess pending a verdict at 4:29 p.m.)

*****

(Court back in session at 4:54 p.m.)

(Jury not present.)

THE COURT: Okay. I understand we have a verdict. I want everybody to remain calm depending -- however it turns out.

So all right. Anything before I bring in the jury?

MR. SAVAGE: No, Your Honor.

MR. TATE: No, Your Honor.

THE COURT: Okay. Bring in the jury.

(Jury entered the courtroom.)

THE COURT: All right. Members of the jury, I understand that you have a verdict; is that correct?

JUROR NO. 11: We do.

THE COURT: And you're the foreperson? Would you pass the verdict sheet, please, to the clerk. Thank you.

(Verdict sheet tendered to the Court.)

THE COURT: Thank you.

Madam Clerk, would you publish the verdict, please.

THE CLERK: In the case of United States of America versus Alexander Samuel Smith, a/k/a Amir Alexander, case number 3:17-cr-182, the verdict is as follows:

As to Count One of the bill of indictment, we find the defendant, Alexander Samuel Smith, guilty.

Did the offense involve international terrorism? Yes.

As to Count Two of the bill of indictment, we find the defendant, Alexander Samuel Smith, guilty.

Did the offense involve international terrorism? Yes.

THE COURT: All right. Thank you.

Is there a request to poll the jury?

MR. TATE: Yes, Your Honor.

THE COURT: All right. Madam Clerk, if you would poll the jury, please.

THE CLERK: Ladies and gentlemen of the jury, you have returned a verdict in the case now before this Court as published.

Juror number 1, was this your verdict; is this still your verdict?

JUROR NO. 1: Yes.

THE CLERK: Juror number 2, was this your verdict;

is this still your verdict?
JUROR NO. 2: Yes.
THE CLERK: Juror number 3, was this your verdict; is this still your verdict?
JUROR NO. 3: Yes.
THE CLERK: Juror number 4, was this your verdict; is this still your verdict?
JUROR NO. 4: Yes.
THE CLERK: Juror number 5, was this your verdict; is this still your verdict?
JUROR NO. 5: Yes.
THE CLERK: Juror number 6, was this your verdict; is this still your verdict?
JUROR NO. 6: Yes.
THE CLERK: Juror number 7, was this your verdict; is this still your verdict?
JUROR NO. 7: Yes.
THE CLERK: Juror number 8, was this your verdict; is this still your verdict?
JUROR NO. 8: Yes.
THE CLERK: Juror number 9, was this your verdict; is this still your verdict?
JUROR NO. 9: Yes.
THE CLERK: Juror number 10, was this your verdict; is this still your verdict?

JUROR NO. 10: Yes.

THE CLERK: Juror number 11, was this your verdict; is this still your verdict?

JUROR NO. 11: Yes.

THE CLERK: Juror number 12, was this your verdict; is this still your verdict?

JUROR NO. 12: Yes.

THE CLERK: Thank you.

THE COURT: All right. Members of the jury, thank you very much for taking your time and being so attentive to this case. I hope this experience has caused you to feel good about the system of justice that we have and if anyone you know is charged with a crime, that they would get a fair trial by a jury of their peers who listen to the evidence and the jury makes the call. That's what makes our country special. When the government charges somebody, nothing happens until the people, the citizens, decide guilt or innocence in the case.

So thank you very much. You are -- we've got some other cases coming up, but I'm going to go ahead and release you all from this term so you all are free to go and thank you very much for your attention in this matter. Appreciate it very much. Okay.

(Jury exited the courtroom.)

THE COURT: Okay. Mr. Smith, you'll need to be --

there will be a need for an interview. Mr. Tate will be able to talk to you about that, about an interview with the -- for preparation of a presentence report with regard to this case.

Is that door closed right now?

COURT SECURITY OFFICER: Sorry?

THE COURT: Is the door closed?

COURT SECURITY OFFICER: Yes, sir.

THE COURT: Okay. So we'll do that.

With regard to -- any motions from the -- Mr. Tate, following the verdict?

MR. TATE: Yes, Your Honor. Pursuant to Rule 29(c), based on the record previously articulated in our Rule 29(a) and (b) motions, we would request a verdict of not guilty based on the reasons previously discussed.

THE COURT: Yes, sir. Thank you. And that will be denied at this time. Thank you.

Mr. Savage, you're standing up. Does that mean you have a motion?

MR. SAVAGE: Yes, Your Honor.

The United States' motion is to remand at this time. The presumption has changed dramatically. As the Court is aware, there is a very serious and substantial punishment involved in this case. We think under these circumstances the circumstances have changed dramatically as a result of this verdict and that the Court should consider taking the

defendant into custody at this time.

MR. TATE: Your Honor, as the Court knows, this case started nearly five years ago. Mr. Smith knew about the case. He was not indicted until June of 2017. He had not fled anywhere at that time. He's made every court appearance. He's made every office visit. Not aware of any problems he's had on pretrial services. He's been on supervision now nearly a year and a half. I think that overcomes any presumption that he's a risk of flight. He has significant family ties here. He has a small child. He works. And he has not had any incidents that would indicate he's a danger to the community.

We believe, with that being said, that conditions can be fashioned for his release pending sentencing and we would ask the Court to continue him on bond.

THE COURT: Well, it is -- it is a serious matter. The Court's already spoken about what may well be the guideline enhancement as a result of it being tied into a terror case.

MR. SAVAGE: Your Honor, if I might add to the record just briefly.

If the characteristics apply here, it would be a 14-level increase, in addition to a 4-level increase for the 8-year statutory maximum. The offense level -- we're not saying the Court will give this -- is offense level 32. And

the guideline if the terrorism enhancement applies moves the defendant to category history -- criminal history category VI.

THE COURT: Right. In the garden variety case, I think that would be -- you know, I'm just going to have to try to figure that out when sentencing time comes along.

But the facts of this case, which are different than the garden variety case, are -- number one is that the defendant, although over a period of time and given the opportunity, was unable to come up with any money to travel, that the defendant did the acts. I don't doubt the facts of the case. I think there's plenty of evidence to support a conviction in this case. But that following all of that and following all of this, these things that occurred, for a year and a half the United States allowed this person to be free and out in the public to do whatever they wanted to do. Nothing was done. Then when they were brought down to talk about the matter, he chose to make the statements that he made. Following that, the defendant was given bond and the government did not appeal it to me. So he was -- and then, of course, we'll talk about the rest of that, offers and things like that as to where it was.

So this is not -- I mean, I see terrorism stuff all the time. I see it on the news. It's something that the American people are very much afraid of, as they should be. It is something that the government has to protect us from, as

they need to do, and I do not fault this case at all. But the penalty in this case of a 32, level VI, does not fit the facts of this case. If that -- what I'm going to do with it I don't know.

MR. SAVAGE: Right.

THE COURT: But with all of that said, it's serious. I think to just go ahead and have someone who was in contact about going overseas to do this and after a conviction with this kind of sentence hanging over them, to allow them to have a bond at this time and not remand them would be wrong.

Mr. Tate, if they'd appealed that particular magistrate judge's -- I mean, because of the seriousness of the crime, I probably well would have overruled the magistrate judge, but they didn't do that. I'm going to list all of these things plus a couple more when I'm trying to figure out what my sentence is going to be in this case because if this was as dangerous a case as the government will probably be arguing that it is, then what the heck were they letting him be out for a year and a half and why didn't they appeal the bond?

So with that said, I've got to do my job and my job is to have him remanded into custody at this time. Bond is revoked and defendant is in the custody of the United States Marshal.

UNIDENTIFIED SPEAKER: We love you. Sorry you

didn't get a fair trial.

THE COURT: Okay. Anything else for the Court?

MR. TATE: Nothing at this time, Your Honor. Thank you.

THE COURT: Thank you.

MR. SAVAGE: Thank you, Your Honor.

THE COURT: Thank you, Mr. Savage.

(End of proceedings at 5:09 p.m.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of July 2019.

s/Cheryl A. Nuccio

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter