UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:17-CR-182
)
vs. )
)
ALEXANDER SAMUEL SMITH, )
)
Defendant. )
______________________________)

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
JULY 29, 2020

APPEARANCES:

On Behalf of the Government:

MICHAEL E. SAVAGE
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina

On Behalf of the Defendant:

KEVIN TATE, ESQ.
MYRA CAUSE, ESQ.
MELISSA BALDWIN, ESQ.
Federal Public Defenders Office
129 West Trade Street, Suite 300
Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

# I N D E X


| GOVERNMENT'S WITNESSES | PAGE |
|---|---|
| ROD GODFREY | |
| Direct Examination By Mr. Savage | 50 |
| Cross Examination By Mr. Tate | 52 |
| Redirect Examination By Mr. Savage | 54 |

| DEFENDANT'S WITNESSES | PAGE |
|---|---|
| STEVAN WEINE | |
| Direct Examination By Mr. Tate | 6 |
| Cross Examination By Mr. Savage | 13 |
| Cross Examination By Mr. Savage | 56 |
| Redirect Examination By Mr. Tate | 72 |


# E X H I B I T S

GOVERNMENT'S EXHIBITS


| NUMBER | ADMITTED |
|---|---|
| S1 | 54 |
| S2 | 55 |

P R O C E E D I N G S

(Court called to order at 1:08 PM.)

(Due to COVID-19, the courtroom has been reconfigured to allow for social distancing. The proceedings were reported to the best of my ability to hear and understand what was being said from my position in the back of the well behind counsel. The witness appeared via Zoom. Many participants wore masks.)

THE COURT: United States versus Alexander Samuel Smith. On March 21, 2019, a jury returned a verdict of guilty as to counts one and two.

Mr. Smith, your case was referred to the United States Probation Office for a presentence investigation and report and the Court has now received that report. Have you read that report?

THE DEFENDANT: Yes, sir.

THE COURT: Do you believe you understand that report?

THE DEFENDANT: Yes, sir.

THE COURT: Have you gone over that report with your attorney?

MR. TATE: Your Honor, do you want him to stand?

THE COURT: Yeah, let him stand.

Have you gone over that report with your attorney?

THE DEFENDANT: The draft, yes, sir.

THE COURT: The draft of it. Is there any change in the final report from the report that was done?

THE DEFENDANT: Yes, sir.

THE COURT: Have you gone over that?

THE DEFENDANT: Briefly, yes, sir.

THE COURT: So you have gone over everything.

THE DEFENDANT: Briefly.

THE COURT: Do you understand what the contents of the report say?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Counsel, have you gone over that report with your client and do you believe he understands the contents of that report?

MR. TATE: Yes, Your Honor. One of the things that I would note since he mentioned the draft, the draft report did not apply the terrorism adjustment.

THE COURT: Right.

MR. TATE: Then the government filed objections and subsequently the final report encompassed the objections of the government.

THE COURT: Right. So we've got a terrorism expert that you're bringing in.

MR. TATE: Right. And what I'm saying is once a final report is filed -- it should have been an amended draft PSI, but they filed a final report so there was no mechanism

to file an objection to something that comes up in a final report. We did file a response opposing that and all the reasons. And we also detailed it in our sentencing memorandum, all of which Mr. Smith has so he understands what the legal arguments are we're making.

THE COURT: All right. Thank you, sir.

All right. So there are objections to the presentence report from the defense as in the final, and that's really what, I guess, most of this hearing today is about. So I will -- any comment from the government before I begin?

MR. SAVAGE: No, Your Honor. I think the other legal issue that we'll have to deal with is the -- I think the multiplicity argument motion is still outstanding. The Court didn't rule on that in the trial. We have some legal argument about that.

THE COURT: All right. Well, let's go ahead and do the multiplicity argument and then we'll go forward with the --

MR. TATE: Your Honor, before we do that, as I mentioned to the Court, Dr. Weine is on a family vacation. I promised him that we would get to him first.

THE COURT: Okay. Do you want to go ahead and get that evidence in?

MR. TATE: Yes.

THE COURT: All right. Let's do that.

MR. SAVAGE: No objection.

THE COURT: Yes, sir. We'll get the evidence in and then we'll argue the issues after that. You may proceed.

MR. TATE: Dr. Weine, are you there?

THE COURT: We can see him, but we can't hear him.

THE WITNESS: I'm here. Can you hear me all right?

MR. TATE: Yes. This is Kevin Tate speaking. Can you see me or hear me?

THE WITNESS: I can see you and I can hear you.

MR. TATE: All right. First of all, Dr. Weine, I'd just like --

THE CLERK: Mr. Tate, I'm sorry to interrupt. I need to swear the witness.

MR. TATE: Okay. I'm sorry.

THE COURT: Good. Thank you.

STEVAN WEINE, DEFENSE WITNESS, AFFIRMED ,

THE COURT: All right. Mr. Tate, you may proceed with questioning.

MR. TATE: Thank you.

DIRECT EXAMINATION

BY MR. TATE:

Q. Dr. Weine, can you briefly describe your background and education and what you do for a living.

A. Okay. I'm a psychiatrist. I went to undergraduate at

the University of Michigan. I went to medical school at Columbia University. I did my residency in psychiatry at Yale University. I was on faculty at Yale University for several years. And then I've been at the University of Illinois at Chicago for the last 25 years where I'm an academic psychiatrist.

I have expertise in the area of global mental health and in the area of what we would call violent extremism.

I also have an independent practice in forensic psychiatry, and that's the context in which I'm here today which is outside of my university responsibilities.

Q. Okay. Could you briefly describe what the difference is between a psychologist and a psychiatrist.

A. Well, they're both mental health professionals. A psychiatrist is an MD so I went to medical school. A psychologist is a Ph.D. who goes to graduate school. Maybe the easiest -- the most -- the biggest distinction would be that psychiatrists can prescribe medication, psychologists cannot. Psychologists can do a certain kind of psychological testing that psychiatrists can't do. But a lot of what they do is similar.

Q. Okay. But you're able to prescribe medicine as well.

A. Yes.

Q. Okay. Now, do you have just a brief overview of what your expertise is in the area of extremism and terrorism and

risk assessment.
A. Sure. Well, for about the past 11, 12 years, I've been involved in work in the area of violent extremism which includes working with multiple government agencies, including the Department of Justice, the FBI, Department of Homeland Security, local law enforcement like the Los Angeles Police Department, and state departments -- let's see -- other governments like the government of Kosovo, the government of Kazakhstan. In all these cases I was helping to advise, to do training, to develop programs regarding how to assess, prevent, or rehabilitate persons who have been involved in violent extremism.
As a psychiatrist, you might ask why a psychiatrist? Because psychiatrists are involved in the area of risk assessment, like what is the likelihood a person (inaudible, audio stopped) and --
THE COURT REPORTER: I didn't get that.
Q. Hold on one second, Dr. Weine.
A. -- different risk factors that can explain --
Q. Let me stop you for a second, Dr. Weine.
A. -- someone's involvement in --
Q. Dr. Weine, can you hear me?
A. Hold on, I just lost you. Hold on.
I hear you now.
Q. Okay. At a certain point of your last, I would say, 45

seconds of your dissertation we lost audio, so can I have you back up a little bit where you began discussing risk assessment so the court reporter can capture all of that.

A. Okay. I apologize.

I think what I was saying is, I was trying to explain why it is that a psychiatrist would get involved in this kind of work and that's because psychiatrists are involved in the area of risk assessment; risk assessment for violence, risk assessment for other (inaudible), including terrorism and violent extremism, and also because for some -- in some cases, not necessarily in all cases, there are persons who have been exposed to adversity or trauma or a mental health problem which can, in part, explain some of the risks that they have for -- for violent (inaudible), and I just want to emphasize not in all cases or maybe only in a small minority of cases.

Q. Okay. I'm going to pose a question to you. Have you ever -- you mentioned risk assessments. Have you ever evaluated someone and found that they were actually at risk for extremism or terrorism?

A. Yes.

Q. Okay. Can you explain -- did you do such an evaluation in this case regarding Alexander Smith?

A. Yes, I conducted a risk assessment evaluation of Mr. Smith.

Q. As part of that evaluation, did you review the indictment

in this case?
A. Yes.
Q. Did you review certain reports that were part of the evidence in this case?
A. Yes, I did.
Q. Did you review recordings of transcripts between Mr. Smith and a person that was identified as Abu Khalid?
A. Yes, I did.
Q. Did you review Mr. Smith's criminal history?
A. Yes.
Q. Did you review his presentence report?
A. Yes.
Q. And did you review a forensic evaluation performed by Dr. Hilkey?
A. Yes.
Q. And finally, were you able to ever meet with Mr. Smith personally?
A. Yes, I did.
Q. And explain how that took place and how much time you spent with him.
A. I met Mr. Smith in the Mecklenburg County jail on October 22nd, 2019. I spent about (inaudible) hours with him --
THE COURT REPORTER: I didn't hear how many hours.
THE WITNESS: -- one on one.

Q. Okay. Can you repeat how many hours you spent with him.
A. Three.
Q. Thank you.
THE COURT REPORTER: And then I didn't hear what he said after the three hours.
Q. After you spent three hours, what else did you do?
A. Well, I think what I said is that I spent three hours doing a one-on-one interview with him at the jail. After that I -- you know, I reviewed the records and I prepared and submitted my report.
Q. Okay. And as far as you know, that report was submitted to the Court.
A. Yes. Well, I submitted it to you.
Q. Okay.
A. And you submitted it to the Court.
Q. Did I subsequently provide you what is styled as a "Notice of Expert Testimony" that included your report attached as an exhibit?
A. Yes.
Q. Did you review that?
A. Yes.
Q. And was it accurate as far as you were able to discern?
A. Yes, it was.
Q. Now, let me ask you, I just want to -- I just want to get you back to what you were doing. But can you tell the Court

what conclusions you reached after conducting the risk assessment on Mr. Smith.
A.    Yes.  I concluded that Mr. Smith presents no to low risk for violence related to extremism.
Q.    Did you conclude regarding any past or present indicators for violence, especially related to extremism in the areas of beliefs?
A.    Yes.
Q.    Can you --
A.    I'm not sure how you want me to answer.  I reviewed -- so my overall conclusion was no to low risk for violence involving extremism, and that was supported by no -- no indicators, either past or present, in multiple different areas, including belief, attitudes, ideology, intent and motivation, and history, action and capacity.
Q.    Did you discern any particular vulnerabilities associated with Mr. Smith?
A.    Yes, I did.
Q.    And what were those?
A.    Well, Mr. Smith came from a very difficult upbringing: Abuse in his family, (inaudible) with his father, and some -- some mental health problems like depression, anger issues, but -- so there are these vulnerabilities.  But these don't pose any specific kind of risk for violence related to extremism.

Q. Would that include acts of terrorism?
A. Yes.

MR. TATE: Thank you. Nothing further.

MR. SAVAGE: Is it possible that I can see the doctor or --

THE COURT: If you'll come up here, you can.

THE CLERK: You should be able to.

THE COURT: Well, it's going on and off, like some of these are working and some aren't. He's gone off again on the screen that you have, Angela.

THE CLERK: Right, for some reason it's not showing you.

(Pause.)

MR. SAVAGE: May I have just a moment, Your Honor?

THE COURT: Yes, take your time, Mr. Savage.

MR. SAVAGE: Just going to get myself organized here just a little bit.

CROSS EXAMINATION

BY MR. SAVAGE:

Q. Dr. Weine, can you hear me?
A. I can hear you. I can see you from the side.
Q. All right. There we go. I'll try and be a little more polite, but this will be difficult.

So if you would, sometimes -- I don't want to talk over you, but because of the medium, if you could just answer and

then wait a minute, and then if there's an objection or another question, we can interject, okay?

A. Sounds good.

Q. All right. Doctor, you talked a little bit about your expertise, and I reviewed your 34-page curriculum vitae. It seems that your -- to be a little more precise, your expertise is with refugee trauma and mental health; is that correct?

A. I have expertise in that area, but I definitely have expertise in violent extremism, but I can say more about that if you like.

Q. Right. But of the 34 pages of different articles, publications, and studies you've done, would it be fair to say -- let me quote you. I think I'm quoting you from your own words. Your interests are "researching issues concerning refugees and migrants and issues surrounding migration and trauma to families or communities from migration."

Would that be accurate to say that's, like, kind of the bulk of your work?

A. I'd say that that's two-thirds of my work, and the other third of the work which is described somewhere else is on -- I characterize it as more broadly violence prevention or more specifically prevention of violent extremism, and that's manifest in lots of publications, multiple grants from the Department of Homeland Security and from the National Institute of Justice, part of the Department of Justice,

contract work with the State Department, FBI. All of those things don't translate as much into academic papers that you'd put on a CV because it's kind of of a different nature so that's why it maybe doesn't appear to you as being --

Q. Right.

A. -- quantitatively as much as the other stuff.

Q. Well, there are people who are -- who are exclusively published, for instance Dr. Meloy and Dr. Gill, in areas of risk assessment, such as the TRAP-18, correct?

A. I know Dr. Meloy and I know about that work.

Q. Okay.

A. And, yeah, that's --

Q. Okay.

A. And he's one of the very respected people in our field.

Q. Right. And you're published in refugee mental health services, Bosnian survivor families, Kosovo refugees, HIV/AIDS prevention in Tajikistan, and terrorism recruitment of Somali Americans. Those are some of your topics, right?

A. There are other topics, but my latest article is about the child returnees from the Islamic State and the rehabilitation and reintegration of them which is published in the Annals of Global Health. And there are other articles published in terrorism journals too.

Q. Well, certainly you would agree as a professor, a scientist, a published professor that peer review and, you

know, some kind of objective evaluation of methods and means is a key part of doing this kind of work. Peer review of your methods and means would be important, right?

A. Yes, I believe in peer review. Peer review is the bedrock of what all of us do. But what exactly that looks like in this area is a question.

Q. Right. So -- and part of what's important is how you collect information: The way in which you handle it, where it comes from, how you process that information. Would that be an important part?

A. Absolutely, but I'm not sure when you're saying that, are you referring to, like, the act of conducting an individual assessment like of Mr. Smith, for example, or are you referring to the act of conducting scientific or scholarly research on these issues?

Q. Either one.

A. I do both of those, yeah.

Q. Okay.

A. It's important in both cases, but it's different.

Q. Okay. Well, has your technique in regards to the latter, the collection of information for scholar review, has that ever been criticized or questioned?

A. Not -- not in any -- I'm not sure what you're getting at, but not in any serious way. I mean, there's always academic arguments and people taking different positions and things

like that. But no one has ever questioned the scientific integrity of my work --

Q. Well, how about the ethical or the manner in which -- the means in which interviews were conducted in your research?

A. I'm not familiar with -- not that I'm aware of.

Q. Let me draw your attention back to 2011. Were you conducting a review of the impact of trauma on Somali children in Minneapolis and St. Paul?

A. That's not exactly what I did. But do you want to say more and I could respond to it?

Q. Well, I mean, were you, in fact, engaged in conducting research in Minneapolis and St. Paul with regards to interviews of Somali children or the children of Somali refugees in St. Paul in 2011?

A. No.

Q. No?

A. I didn't -- no. I can explain to you what I did --

Q. Okay.

A. -- if you'd like.

Q. Well, let me ask you another question. Are you familiar with a person by the name of Osman Ahmed?

A. Osman Ahmed --

Q. Yes.

A. -- O-s-m-a-n, A-h-m-e-d --

Q. Yes.

A. -- you're referring to?
Q. Yes.
A. Yes.
Q. Okay. Well, he was working as a coordinator with you and the University of Chicago in interviewing Somali children in 2011?
A. Not exactly. We didn't interview children. I could again explain if you'd like.
Q. Okay.
A. First, I'm at the University of Illinois at Chicago, not the University of Chicago. Some people mix those up.
Second thing, that was a project that was funded by the U.S. Department of Homeland Security through the University of Maryland Start Center, and it was about building resilience to violent extremism in the Somali American community. And so we interviewed all adult (inaudible) children. And we were trying to understand what were the -- what were the risks and what were the protective factors at the level of the community that mitigated for or against violent extremism, because as you probably are aware, some -- almost between 25 and 30 Somali Americans had radicalized Al-Shabab and went to Somalia to fight it, and later some also joined ISIS (inaudible) to fight.
And so the interest of the -- or the focus of the project was trying to understand what were the factors that were, you

know, in families, in communities, in schools, in mosques, in law enforcement (inaudible) to protect against radicalization and recruitment.

So we were obviously concerned about children, but we didn't have -- but we didn't interview children because it was not a project where we had the consent -- the consent to interview children. We had an IRB, if you know what that is, institutional review board, human subject approval by the university to interview the subjects that we did. That report is published. You can find it on the web. It's been shared a lot. It's been talked about a lot.

I'm not sure what kind of critique you're getting at, but if you want to explain, I'll respond to it.

Q. Sure. Are you done? Are you finished?

A. I tried to answer your question.

Q. I don't want to interrupt you.

A. Go ahead.

Q. Well, you say it didn't involve children, but isn't it a fact that the parents of Somali children were taken -- or Somali teenagers were taken out of school and to Mr. Ahmed's house with the promise of a payment of $40 and pizza if they answered a questionnaire and that the parents of these children weren't aware that they were being interviewed for a study or a survey at all?

A. So we had -- what I think you're referring to, Osman

Ahmed was my local community partner. He's like a community advocate (inaudible) in the Somali community and he was one of the persons that was in charge -- not in charge, working with me to identify persons who might want to be interviewed -- interviewed and to get their informed consent and to do an interview. So this was a difficult project because one of the things that was going on is that there was (inaudible) Al-Shabab active in the community in Minnesota and so Al-Shabab -- you know, it's hard for me to talk. You're flipping those pages. It's really loud.

Q. Sorry about that. Didn't realize that was disturbing you.

A. Al-Shabab was active in the community and made lots of threats against our project, including Osman, including several other people who did interviews, and including myself. And I'm talking about death threats for which I ended up speaking with the FBI and CIA about those things. We were very concerned. So they -- in that context, they made allegations. Some people in the community made allegations about Osman's -- how he was recruiting -- recruiting is the word we use in research. Like, that means finding a person who could be a subject in research and asking them to do it.

It was never 100 percent clear to me that Osman was doing what you just alleged he was doing. I received that report from somebody in the community saying that that was happening,

and when that -- when I received that report, I was alarmed because that kind of practice would not be -- would depart in many ways from the kind of research that we do and it would not be accepted.

So what I did is I immediately notified the University of Illinois at Chicago IRB. I immediately notified the people who are a part of my study to cease all of the research. And the IRB, that's the institutional review board at UIC, conducted what they always do in these kinds of cases, is they conducted their own investigation to try to understand what was going on. And so they spoke with Osman. They spoke with people in the community.

At the end of the day, if I remember correctly -- this is I don't know how many years ago. This is probably seven or eight years ago. I don't think that it was ever determined that Osman did that. I think that that was more of a threat that people made to try to shut down our research. We ended up getting our research restarted. The investigation didn't reveal any problems. And we completed the research.

That kind of -- as I said, that kind of alleged behavior would have been completely unacceptable. One, children were not supposed to be subjects. I can't remember exactly, but I think that this was a study in which we only interviewed people who were 18 and above.

And then you would not ever do something like -- you're

not supposed to be too kind of enticing or in a way that's coercive to any kind of subject to get them to be part of a research study.

In this case it was a very, I would say, low intensity study. All we were doing was having conversations with people for about an hour. It's not like we were conducting an experiment with them or anything like that.

Q. So --

A. But nonetheless, that's -- so I hope I answered your question.

Q. Well, not quite. I mean, let me just -- this is a yes or no question. But you were interviewed by the St. Paul Police Department in regard to these allegations, correct? Yes?

A. Well, I think I first reached out to them and I reported it to them and the Minnesota/St. Paul Police and the FBI to tell -- as soon as this came out, I told them of this.

Q. Right. And you're aware that the Indianapolis -- the St. Paul Police Department interviewed the children who said they were picked up at school and driven to Mr. Osman's house.

A. I don't recall that exactly. (Inaudible) but --

Q. Let's move on. You would agree that there are ethical considerations in the collection of information with any kind of study, either a social study such as you were discussing or in the collection of information for a report such as you're conducting here in court today. Yes?

A. Absolutely.
Q. All right. Now, we talked about peer review. In your report and in the defense's submission, you said that you relied on state of the science models; is that accurate?
A. Yes.
Q. Okay. The models that you referred to in your report were RTI International, the VERA-2, V-E-R-A-2, and Radar. Are those the models that you used?
A. Those are the ones I cited in my report, yes.
Q. Right. But you really didn't use those models. You picked pieces of them and used parts of them, correct?
A. I tried to -- I'm trying to (inaudible). I tried to explain what I did. The -- I did not use any one system because I felt like it would be too limiting and I feel that they're all flawed, in effect. This field is so new. The situation like the situation Mr. Smith presents or others present, we don't -- unfortunately, the state of the science hasn't caught up and we don't yet have really excellent scientifically validated tools. And so I used what's called the structured professional judgment approach which is an approach, you know, that's used by many -- shared by many of these, such as Dr. Meloy you mentioned before, as well as the Radar approach and the VERA approach.
Q. Well, so you -- the answer is yes, you took pieces of these different -- you didn't use these models. You just took

pieces of them and made up your own.
A. I think that's what we're all doing when we're doing assessments. I don't -- you make it sound kind of random.
A structured professional judgment approach means that you are looking at certain fixed categories, for example the person's belief, beliefs and ideology, or the person's prior criminal experience. And then within that -- within each of those categories, you're identifying what risks are present -- or what factors are present that would constitute a risk on the one hand or a protection on the other hand with respect to violent extremism.
And so I was pretty rigorous in taking those categories and those items from the VERA tool and from the Radar and from the RTI International and taking what I thought was the ones that were very comprehensive and most relevant to assessing someone like Mr. Smith.
Q. So there were some --
A. I don't think that there's anything in any of those tools that they would ask about that I left out of my report. But what's different in my case is that, you see the VERA and the Radar and what Dr. Meloy does is they create a numerical system. They'll say, you know, if you answer yes to this one, you get a 1. If you answer yes to this other one, you get another 1. And you add them up and you come up with a score of 27, and everybody who's 25 and above is at a certain level

of risk.

And I am -- as a person who understands the construction of scales and the analysis of scales, I share in the -- with many of my colleagues in the critique of those numerical systems. I don't think that there's any scientific basis for creating a numerical system that allows you to say that if Mr. Smith scores a 32, that he's at medium risk for terrorism.

And so that's why I didn't use the numerical system that some of them propose and -- because I think it holds no scientific validity. And I frankly think that some people are doing a very good job selling their scales to different law enforcement and criminal justice organizations, but they're really not valid. So I used the items, but I didn't use them in the quantitative numerical way.

Q. So --

A. I hope that --

Q. So basically, you picked some, you left out others, and you made up your own tests.

A. Absolutely not. I didn't leave out any. I picked -- I -- every -- every category that's described there is included.

Q. Okay.

A. And I didn't create a test. You know, I conducted an assessment using the structured professional judgment approach.

By the way, I would also add that I -- before I agreed to do this assessment, I spoke with a number of my colleagues who are experts in the field who have -- who have conducted assessments and done testimony like this for federal court and I -- and I tried to understand what do you think is the state of the science in terms of sound testimony? Because I could certainly have done the VERA or the Radar. I know how to do those. I could have done that. But I didn't because I felt like I would -- I felt like that would not be ethically sound behavior, honestly. So I made my choice and I think that it falls within the standard of practice.

Q. Okay. Doctor, let me get back to this because I guess I'm a little confused now because when I read your report, it seems to say you're relying on state of the science models which you now say are not reliable so you didn't use them as designed.

A. I think that they're reliable -- so I understand your point. What's reliable about them is what we call a structured professional judgment approach. I'll explain that again. Let's just say you have --

Q. Doctor, please don't --

THE COURT: Let him -- let him answer the question.

MR. SAVAGE: All right.

THE COURT: But go ahead and briefly answer the question, please.

THE WITNESS: Sure.

The -- I think what you're not understanding or maybe I'm not explaining clear enough is that in a structured professional judgment approach, you take these different categories and items. The categories and items are part of a scientific model.

So we understand ideology is very important in determining if someone is at risk for terrorism. Would you agree? So is -- so is their history of prior criminal involvement. So is their mental health vulnerability. Those scientific models tell us that the categories and specific indicators within them are valid.

When I say I based it on those models, that's what I'm basing it on. Those (inaudible) models that say if you're going to think about what can explain why someone becomes a violent extremist, you better pay attention to these things. And so I'm very familiar with that literature. I've conducted research on that and I've used that in doing assessments. That's very much standard practice.

The part that I'm rejecting is the part that says we can create a numerical model, a quantitative model out of that so that we can give everybody a score. And as I said before, you'll get, you know, 3 points for this and 5 points for this and if it adds up to 27, then you're at moderate risk for violent extremism. So I rejected that part, as do most people

that -- most experts that I know in the field because we believe that there are not -- there have not yet been adequate studies of the VERA, of the Radar, and of these other instruments to be able to say with certainty that those numbers really mean something.

Otherwise, you know, if I do a blood test of you or if I test -- if I do a scale of you assessing your level of depression, I would know if you're above a certain number, that that's reliable and I could make a decision based on that. But we have no such reliability in the field of violent extremism assessment. So that's why I did it. I hope that helps you.

Q. And just for our record here, I don't know if you can see it on the screen, but I -- I copied a snippet of the TRAP-18, and that's the Terrorist Radicalization Assessment Protocol by Drs. Meloy and Gill. You're familiar with that study, correct?

A. Yes.

Q. Okay. And this is the one you criticized it has numerical values, right? This is the one you said is flawed because of its numerical computations.

A. I'm not seeing a screen so I can't -- I'm not sure what you're referring to.

Q. Can you see it now?

THE CLERK: Hang on.

Q. There we go.
A. It's all black here.
THE CLERK: Hang on.
Q. Better?
A. I can see it, but it's -- can you, like, zoom in a little bit more because it's really, really small.
Q. Let me see here if I can.
Better?
A. Yes, that's good.
Q. So I just want to be clear because we mentioned it a couple of times that the TRAP-18 is a study that has been written about and peer reviewed by Drs. Meloy and Gill; is that correct? Dr. Gill out of the University of London, Dr. Meloy, University of California at San Diego, right?
A. I know that -- yeah, I believe so.
Q. So in this particular case, you were saying this is not a good study because it assigns numbers to different values that are in this table, which I moved up here. In other words, there are 18 different warning behaviors and characteristics. You're familiar with those, right?
A. I'm familiar with those, yes.
Q. But in this study sample, they used 111 known terrorists over a period of 25 years. I mean, that's some sort of data -- some sort of standard. I mean, it's anything from Dylann Roof to, you know, lone terrorists to ISIS. They

looked at many, many different people.
A. I'm not -- I'm not -- I'd have to -- you know, I'd have to refresh my memory to look at what the sample was. But one of the things that I can see is lone terrorists. So people make a distinction between lone actors --
Q. Okay.
A. -- (inaudible) versus persons who are engaged more in group-based or organization-based terrorism. And if I'm remembering correctly, this is -- this is a sample that looked at the lone terrorist group.
Q. Okay.
A. And that's one of the concerns that people like myself have in the field. So if you did a study with a group of lone terrorists, would that same -- would the measure be as valid in those people who, say, were (inaudible) terrorist fighters (inaudible). And that's where we get into lots of questions and problems because the studies haven't been done to -- to necessarily merit generalizability.
But I want to say that what Dr. Meloy did was use the structured professional judgment approach. And I think that all of the items that he -- I looked at it quickly, what showed before. All of those items are items that I've (inaudible) about.
Q. Okay.
A. Go ahead.

Q. In your report you cite this particular, I guess, literature review as kind of a footnote or the basis of your structural peer review analysis. You're familiar with this?
A. Yeah, that's a review of the literature done by the RTI, Research Triangle International Group, for the Department of Homeland Security that kind of looked at the state of the field --
Q. Right.
A. -- in this -- in this area that we're talking about.
Q. Right. But that particular -- that's just a review -- that's like the *Reader's Digest* of articles in this area. That is not a scientific analysis of the factors that you discuss in your report, is it?
A. I think -- I think what you're getting at is that it is a review of all the different instruments and all the different approaches to understanding risk. So it's not like Dr. Meloy's study was, here, we have an instrument. We're going to give it to 111 people and see how it works. This was a kind of, say, at 30,000 feet, looking at what are all the different, you know, approaches to risk assessment.
Q. Okay.
A. So I think it's -- I think it is -- I think it's very rigorous and well done. I wouldn't call it a *Reader's Digest*, but it's of a different nature than a -- what we would call an original research study which is like collecting data from

patients or from subjects versus a rigorous systematic literature review, is what this was.
Q. Okay. Now, you're -- going back to your structured professional judgment approach, it's hard to get peer review of that approach if you don't use the same standards every time, isn't it? I mean, how do you -- how do you validate your approach as scientifically reliable if it changes every time you do an interview?
A. It doesn't change every time.
Q. So -- so who else has used --
A. The structured professional judgment approach is exactly what Dr. Meloy was advocating for, and it's exactly what VERA is advocating for, and Radar is advocating for, and it's what the RTI funded by the Department of Homeland Security says is the most reliable approach. But what you're -- what you're seeing is that it's up to the discretion of the interviewer to make sure that you cover all those different areas and come up with a believable and systematic comprehensible overview.
So in this case I showed you exactly all of the areas that I asked about in my interview and I have a transcript, you know, in which I show all the questions and answers, and you can see that -- it's transparent. You can see all the things that I asked about, and I don't think that I missed anything of any importance. But if you -- if you can identify something to me you think I missed, I'm happy to respond to

that.

Q. Well, we don't know because the VERA here, if you look on page 14 of the document I just put up, says there are 28 different items categorized into 5 sections, including attitude, contextual, historical, protective, and demographic items. So I don't know which of the -- these 5 categories you used, I mean, how do they fit into the 28 items in the VERA? I mean, which ones did you pick and which ones didn't you --

A. Well, they're all -- so if you look on my report, you can see where I identify, but I'd say it in terms of Mr. Smith. Like Mr. -- I'll give you an example.

Under intent and motivation, the last bullet point, I said, "Mr. Smith showed no signs of motivation related to perceived religious obligation, glorification, criminal opportunism, (inaudible), moral obligation, moral superiority, excitement and adventure, or being forced. So that's 1, 2, 3, 4, 5, 6, 7, 8, 9 -- that's like 11 different items right there. Every other bullet point is -- comes from either the VERA or the -- or the Radar.

And if you looked at any of these, and I've studied them extensively, there's -- you know, there's a huge amount of overlap between them. Like I'd say 9 -- 90 to 95 percent of what's asked in one is also asked in another. They're more similar than they are different. The only way that they're different is some of them just go into more detail on certain

areas.
So I think that I showed you all -- you know, I think that if you put the VERA -- I have the VERA manual. I've looked at it, studied it extensively. You would see that it's all here.
Q. So all 28 points of VERA are in this report?
A. I believe so. I'd have to double check, but I believe so.
Q. Well, Doctor, getting to the last point of this, and I don't want to drag this on any longer than we have to. What you basically said was what's reported in this, and that is that there isn't a lot of scientific validation of this risk assessment model because it hasn't been done yet. I mean, you're still working on it, right, in your area of expertise. It's somewhat subjective.
A. I wouldn't say that it's subjective. I would say that it's -- it is as objective as it can be given the limitations of the nature of what we're talking about.
Q. Because there's no scientific way to look into somebody's head and see if they're going to commit a crime in the future. Yes? Can we agree on that?
A. (Inaudible) true. We are -- we can agree that the whole field of risk assessment is not about predicting the future.
Q. Okay.
A. It's about systematically evaluating what are the

indicators that could explain why some people are at more risk than others.
Q. But a system -- let me interrupt here. A systematic review requires you to use the system. A review where you pick parts of the system is more subjective, is it not? If you're picking parts of these different studies, you're not applying them as designed, then you're -- you're injecting, as you might in your field, somewhat of a subjective analysis. That's what psychiatrists do, right?
A. Oh, I think absolutely not. That's not the kind of psychiatry I practice and I don't think that's what we do. I mean, we're using evidence-based practice as much as possible. In this case I'm adhering to the structured professional judgment --
Q. Okay.
A. -- approach. And, you know, I think that if you -- I think that --
Q. Let's go through some of those.
A. If you look at any of the items that I mentioned and you feel like I missed something or you feel I twisted something, then -- then I'd like to hear it. But I think that I've been very comprehensive and systematic (inaudible) in just using my opinion.
Q. Okay. How much time did you take reviewing the transcripts of the testimony -- of the various undercover

meetings and interviews in this case? How much time did you spend doing that?
A. I read them all. I read them all very carefully multiple times and then I saw also there were many quotations from them in the various --
Q. Good.
A. -- (inaudible) that I also reviewed.
Q. So how much time? How much time did you spend on that?
THE COURT: I mean, he said that he's reviewed them multiple times, so let's just leave it at that.
MR. SAVAGE: All right.
Q. Okay. Let's go to the first point here about Mr. Smith has no perceived grievance or injustice and does not dehumanize those associated with injustice.
So perceived grievance would be somebody picking on him, right? Like the police.
A. Perceived grievance might be that -- it could be like my boss is -- has it out for me or a bully has it out for me. It could be local law enforcement. It could be the U.S. government. It could be all white people. You know, it could be -- you know, there are many people in -- many persons that go on to be involved in violent extremism have such a perceived grievance, either at a personal level or at a more social political level.
Q. Well, in your report you said when you interviewed

Mr. Smith, he reported that the first time he was arrested for disturbing the police -- I guess, that means peace. That was a typo?
A. Sorry, yes.
Q. "They scan my eyes." Every time he flew he would be selected for screening. He was denied military service in 2012. Are those not perceived grievances?
A. I think those are facts.
Q. Are they perceived grievances?
A. Those are facts.
Well, a perceived grievance would have been like developing a kind of anti-American, anti-law enforcement attitude.
Q. Okay.
A. That, you know, they have -- they have a strong bias against me and I don't trust them and they're the problem. I mean, this is what we hear from -- many times from extremists is they identify some entity outside of them as an enemy and then it's their job to oppose that.
Q. So a grievance can be real or perceived --
A. (Inaudible.)
Q. A grievance can be real or perceived, correct?
A. Yes.
Q. Okay. Here's another one you write. He reported that after he returned from Syria in 2006, the attitude of the U.S.

government dramatically changed towards him. "I was brought in, interrogated. They kept asking me did I have any military training, anything about explosives. Did I have Arabic in my bloodline."

Is that not a perceived or actual grievance?

A. Well, this is exactly the kind of stuff that I asked Mr. Smith about in our interview and I ultimately thought that it wasn't a grievance. I mean, he's describing factual experiences. And what I was exploring when I talked with him is an anti-American attitude, anti-law enforcement, feeling of (inaudible), feeling like there was no hope for him in this country, feeling like, you know, somehow the government had gotten carried away and was ruining the country and he needed to take action. And I didn't hear any of that stuff.

What I heard, on the other hand, was a guy who still believed in America, believed in the system. I think even with respect to the issues around this -- the current legal situation that he's in, he also doesn't feel imbittered or anti-American. So I don't think it's a grievance. I think that he's disappointed, he's unhappy about that, but it's not a grievance in the sense of a political grievance that drives involvement in violent extremism.

Q. Well, you also wrote, "He was hoping the Obama administration would stop this barbaric stuff from happening; but when the redline was crossed, nothing happened. 'I felt

powerless and helpless. The very people who took me and showed me hospitality were being killed for no reason.'" And that he was involved in raising money in the local community to support refugees.

He did have a political grievance, did he not, real or perceived?

A. Well, he had the same one that millions of Americans did about the situation in Syria --

Q. So is that the standard?

A. -- which was (inaudible) civil war and human right abominations with chemical warfare and all this kind of stuff. I mean, many Americans were horrified by that. Mr. Smith -- Mr. Smith, what he expressed to me about that was this family that he became close with, this family had been affected. Their home had been bombed. I mean, he was really saying it more through the lens of a person who was essentially a second father to him, who was a Syrian man, and his family were being victimized in this war.

Q. Well, we'll get back to that.

A. So I didn't -- so I think he was frustrated like many Americans that there was nothing that could be done to stop the civil war.

Q. So --

A. That's not a grievance in the -- that's not -- that's not a grievance like I need to take up arms and join ISIS in order

to fight the enemy. I never heard him say anything like that.
Q. Okay. Well, you reviewed the tapes. Let me show you -- and, Your Honor, I'm going to -- I have little snippets of these which were government exhibits. I'm going to mark them as sentencing exhibits just for the record.
THE COURT: All right. Let's mark them, offer them in, and let me -- make sure that they're marked and it's clear as to what the witness is being shown.
Q. Okay. So this is an excerpt from Government's Exhibit Number 5 which was the meeting of the defendant and Khalid on the 20th of August 2014 in Pineville. I marked it as S1. It was Government's Exhibit 5.
A. I'm sorry to interrupt. My screen is still black.
THE COURT: Hold on a minute. Let's get him back so he's comfortable for a moment.
The reason the screen is black is because they're going to try to put a document up.
MR. SAVAGE: I'm sorry, did I do that?
THE COURT: They're going to try to put a document up, so when that happens the screen will go black.
Mr. Savage, was this exhibit at the trial -- offered at the trial?
MR. SAVAGE: Yes, Your Honor. I took it directly --
THE COURT: Is this something that's going to be available?

And this is going to be a portion of that; is that correct?

MR. SAVAGE: Yes, just a --

THE COURT: Of the exhibit.

All right. And that trial exhibit was Exhibit 5; is that correct?

MR. SAVAGE: That's correct, Your Honor.

THE COURT: Let's call this 5A, then --

MR. SAVAGE: I'm sorry, I called it S1.

THE COURT: -- for sentencing purposes so we can see that 5A is a portion of Exhibit 5 from the trial. Okay. That way we're clear where it's coming from.

All right. You may proceed to show that to the witness.

BY MR. SAVAGE:

Q. Can you see that transcript?

A. Yes, I see it now.

Q. Okay. And this is -- you knew that Khalid, from reading the transcripts, was the undercover informant who was talking to Smith during the investigation. You knew that, right?

A. Yes.

Q. And this is Khalid asking him, "Did you see what happened to that journalist?"

And he said, "I didn't see the video."

"What do you think about that?"

"My opinion is in Islam if you're going to do something, you should do it in the best manner. That means even if you're going to kill someone, you should do it in the best manner. That means if you choose to behead a person, then I don't believe it's right to saw off their neck. You should chop their head off, a fast chop painless to the person."

Did you consider that statement at all as part of his grievances or his views of violence or extremism?

A. Yes.

Q. Okay. But that didn't figure anywhere into your analysis.

A. (No response.)

Q. I mean, the defendant thinks it's okay to chop off somebody's head as long as you do it fast.

A. Is that what he's saying?

Q. I don't know. What do you think he's saying?

MR. TATE: Objection at this point, Your Honor. He can't put the context into that. This is an informant feeding him information, asking him what he thought about it.

MR. SAVAGE: But he said it.

MR. TATE: But it's not -- Mr. Smith is not saying this is what I'm going to do.

THE COURT: This -- it's cross examination. I'm going to let him -- I'm going to let him ask it. The statement is there and the question is, did this particular

expert consider the statement and to what degree? That's really what the questions are.

Q. So you did consider that, but you didn't think it was important.

MR. TATE: Objection, leading as to whether he thought it was important.

MR. SAVAGE: It's cross examination.

THE COURT: Cross examination. He can lead him. He can lead him.

Q. So, Doctor, you did consider it, but you didn't think it was important.

A. Can I answer?

Q. Yes.

THE COURT: Yes, sir, please.

THE WITNESS: I don't -- you know, to me it -- you know, what I understood many of these conversations -- the FBI informant was making all kinds of suggestions to Mr. Smith to kind of see what he was interested in and how far he was going to go to commit himself. And Mr. Smith a lot of times, I thought, was answering him in a way that wouldn't -- wouldn't totally reject what Khalid was saying but nor would he endorse it. So he would -- he would answer in a kind of indirect way because I think that for some reason he was trying to stay engaged with him. He was trying to -- for some point at least, he was trying to rebuff his invitations but not in a

way that was a total rejection. And so, like, what he's saying here is the kind of --
Q. Okay.
A. -- statement a Muslim person would make about butchering an animal.
I think it is disturbing what he says, if you choose to behead a person. In a way it's disturbing that he doesn't object to that premise of it, but he's also not saying, I'm going to do it. I think he's involved in a kind of dance with --
Q. Okay.
A. -- the informant.
Q. And what --
A. And I think that --
Q. And how did you --
A. -- that's different from saying that he's focused on violence, committed to violence, obsessed with violence and feels that violence is a means -- a justifiable means to the end.
Q. Okay.
A. Those things I --
Q. So the basis of your opinion that Mr. Smith was trying to maneuver or manipulate the informant, you didn't ask Mr. Smith about this statement, did you?
A. I did not ask him about this specific statement.

Q. Okay.
A. But I -- but I asked him a lot about -- about -- I asked him about violence. I asked him -- I believe I asked him about beheadings. I asked him about --
Q. Okay.
A. -- (inaudible).
Q. You're saying that in this case the question from the informant was, "So what do you think?" And he answers in his own words. And you're saying that that was manipulating?
A. Did I -- can you go back to what I say about manipulation.
Q. Okay. Well, you said that you thought that he was trying to accommodate or somehow manipulate or -- and please the informant.
A. I think -- I think manipulate was your word, not my word.
Q. Okay.
A. I think that -- I think that for a period of time, Mr. Smith stayed engaged with Khalid in these very awkward conversations in which Khalid was pushing him. You know, Are you interested in this? Are you interested in that? And honestly, I myself wondered why -- why didn't Mr. Smith just not shut it down completely?

But I think Mr. Smith, what he said was -- to me was, Look, I wanted to go to Syria to be with my family, to show my support to them. I want -- I had no money. I couldn't afford

a plane ticket. And I thought maybe -- maybe this -- you know, he was -- he got associated with Khalid through Waeed -- I think I said his name correctly -- indirectly and he thought that this could somehow lead to a plane ticket to go over there to be with the family. But this --
Q. So, Doctor, what do you know about this family? What do you know about the family he wanted to be with?
A. I know --
Q. What objective standpoint -- other than the defendant's words, what do you know about the family?
A. I know what -- I know certain things from what I learned from Mr. Smith. I know other things that I read in the various pleadings and reports. I have not independently talked with the family, if that's what you're getting at.
Q. Okay. Well, do you know if they were associated with a known terrorist group? Were they fighting for al-Nusra or ISIS?
A. I understand that, like many families, it's a large family. And that there was -- some of the family was fighting for the Free Syrian Army, but as you know, the Free Syrian Army also had relationships with al-Nusra and with ISIS, and so I think that there was concern by the FBI that some of the family might have been involved with those entities.
Q. So the answer is you don't know.
A. Their extended family. What?

Q. You don't know.

A. Well, I know -- I believe I know what law enforcement has reported and pled in this case. I also know that Mr. Smith wasn't convicted of terrorism or material support to terrorism, so I thought that -- I thought that that part was done, but I don't know what -- what (inaudible).

Q. Well, there are many reasons the government may or may not charge a particular offense.

But let me show you -- this was -- this has not been previously admitted, Your Honor. I'm going to mark it Sentencing Exhibit 1. And it is an extract from the Facebook warrant that the government served on the defendant's Facebook account, and the defense has this in discovery. I'm happy to show it to the parties first.

We're going to black the screen here a minute. I'll put the document cam on. And if we can show that to the defense and the judge.

MR. TATE: I'm going to object at this point, Your Honor, because it misconstrues and it says Smith was typing. There's nothing here to verify that Mr. Smith was actually typing that versus Wael. I don't know who characterized this. There's no foundation for it as well.

MR. SAVAGE: Well, it's a -- it's an inter -- it's Smith's account. In other words, Smith's account, not Wael's. Wael is typed as verbal so the words are Smith's in response

to Wael.

MR. TATE: We have no way to independently verify that. And this is far afield from his testimony. This is conjecture. It's just a blanket document produced by the government, not Facebook, that says Mr. Smith said something. This is our first time seeing it. We object. And there's no way that Dr. Weine could opine on anything that's in here.

THE COURT: Who got -- who collected this?

MR. SAVAGE: It was collected by Facebook and it was produced -- this is not obviously the original document. It was collected by Facebook, the originals of which were produced in discovery. Facebook would have produced the raw data, the meta data with it.

And the reason why we point out in the -- above the quotes is -- the reason why there isn't two ways to the conversation is that only Smith was typing.

MR. TATE: It's only a snippet of an entire conversation. We don't know whether it's taken out of context. We don't know what he's responding to. It's just not evidentiary at all --

MR. SAVAGE: They had the entire --

MR. TATE: -- and it has nothing to do with Dr. Weine's testimony.

MR. SAVAGE: It goes directly to the point. It's relevant because the doctor was saying that whether or not

these people -- if the Kodaimatis are involved in Jihad on behalf of ISIS or al-Nusra, then what we're talking about here is providing material support to a designated terrorist group.

MR. TATE: But this document doesn't say ISIS or al-Nusra. It doesn't say that. Mr. Savage just added that.

MR. SAVAGE: I'm saying that's why it's relevant. It's saying what kind of work he wants to go -- they're not going just to visit the family. They're going to engage in Jihad.

MR. TATE: It doesn't say that at all. It doesn't say the word al-Nusra in there. It doesn't say ISIS. It doesn't say what they're talking about.

THE COURT: Where did this -- this came from discovery. Can you put somebody -- can you get some testimony from somebody that says it's from discovery?

MR. SAVAGE: I can call somebody. Yes, I can call the special agent.

THE COURT: Just briefly just for this one document.

MR. SAVAGE: The United States calls Special Agent Godfrey.

THE COURT: All right. We're stepping out of this cross examination to get this information. This is just about this. Anybody can certainly call the agent back if they want to. I specifically want this point decided before I get there as to where this document came from.

MR. SAVAGE: Yes, Your Honor.

ROD GODFREY, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SAVAGE:

Q. Please -- you can take off your mask so that we can make sure that we can hear you.

Please state your name.

A. Rod Godfrey.

Q. Are you the same Mr. Godfrey, Special Agent Godfrey, who testified in the trial in this matter?

A. I am.

Q. Are you familiar with the document that I marked as Government Sentencing Exhibit Number 1, particularly the words that are in quotations?

A. I can't see it right now.

Q. Oh, I'm sorry.

A. But what was on your screen, I'm familiar with it.

Q. There we go.

A. Yes.

Q. Are you familiar with those words?

A. Yes.

Q. And are those quotations accurately taken from a search warrant that was served on Facebook back in 2013?

A. The Facebook was -- the warrant to Facebook was actually served, I believe, in 2015.

Q. Okay.
A. But this conversation occurred in 2013 and is represented in the records that Facebook provided.
Q. Okay.
A. Those records also indicate whose account is typing or speaking. But in this case Wael appeared to be speaking because there was no text that showed in the data in the warrant.
Q. Yeah.
A. And then it showed that Mr. Smith typed the words that are highlighted here.
Q. After a pause then there would be more typing?
A. Correct. We believe that what was happening is that Wael was speaking and that Smith, possibly because he didn't have a microphone, was typing his responses back to Wael. Wael was speaking verbally out loud to Smith over Facebook Messenger and Smith was typing his responses back to Wael.
Q. So we know for a fact this document -- this is a product of Facebook Messenger and there was a connection between Smith and Wael?
A. That's correct.
Q. And we were able to verify that how?
A. It indicates that in the data provided in response to the search warrant from Facebook, it shows these statements and it also shows who -- which account -- whose Facebook account

is -- these statements are attributed to. And in this case all of the highlighted statements were attributed to Mr. Smith's account on Facebook.

Q. So we don't know what Wael said or how he was doing it. We just know that during this communication, these words were typed on Smith's account?

A. That's correct.

Q. Of which he had the password and the access to.

A. That's correct.

THE COURT: All right. Cross examination about this document.

MR. TATE: Okay.

CROSS EXAMINATION

BY MR. TATE:

Q. So this is not the exact text that came from Facebook, is it?

A. No, sir. Can I explain?

Q. Yes.

A. I believe this was paraphrased -- or this is an excerpt because the amount of data that Facebook sent in response to the search warrant was a massive file so for brevity we pulled this out, but it's not taken out of order and it's not misattributed. It's just condensed for the purpose of being able to display it like this.

Q. And when you condense it, that's something that you

prepared, correct?
A. Essentially, I think that Mr. Savage used what I prepared to prepare this document.
Q. So Mr. Savage prepared this document?
A. I'm not sure if this is -- I don't think this is the exact document that I sent him. Maybe it is. But I --
THE COURT: Let me ask this. Are the quotations in there accurate?
THE WITNESS: Yes. I prepared this information from -- directly from the Facebook search warrant.
Q. Okay. And you prepared this information and Mr. Savage prepared this excerpt here.
A. I don't know that. I know that I sent the information to Mr. Savage, but I'm not sure if he provided it exactly as I provided it to him or if he may have added a title or something like that. But I don't believe he changed anything about the highlighted text.
Q. But you don't know, do you?
A. I wouldn't say I know, but I'm confident that he didn't change anything about the highlighted text. If Mr. Savage would have added anything, it would have been the title at the top of the page or something like that.
Q. And you don't know what, if anything -- when he has these quotes, you don't have the full context of it because you don't know what Wael was saying, correct?

A. We don't know what Wael was saying, correct.

MR. TATE: Nothing further. Our objection stands, Your Honor. This is pure conjecture.

THE COURT: It goes to the weight. I'm going to allow it. It's being used to cross examine the witness and the witness's opinion, so I'm going to allow it into evidence for that purpose.

(Government's Exhibit No. S1 was received into evidence.)

MR. SAVAGE: Your Honor, I have one more exhibit that I want to save some time. May I show this to the witness as well?

THE COURT: All right.

MR. SAVAGE: I'll mark this as Sentencing Exhibit 2, S2.

REDIRECT EXAMINATION

BY MR. SAVAGE:

Q. And let me -- can you see that, Agent Godfrey?
A. Yes, I can.
Q. Do you recognize this document which is S2?
A. Yes.
Q. And what is that?
A. This is, similarly to the last statement, an excerpt that I prepared from information that we received from Facebook in response to a search warrant.

Q. Okay.
A. And it's a conversation between the defendant, Alex Smith, and Saeed Kodaimati that occurred on Facebook or Facebook Messenger.
Q. Okay. And did you take this directly from the data in the response from Facebook to the search warrant issued by this Court?
A. Yes.
MR. SAVAGE: Your Honor, we're going to move for admission of Government's Exhibit S2.
MR. TATE: Same objection.
THE COURT: Overruled. Let it be admitted for purposes of cross examining this witness -- or the expert witness.
(Government's Exhibit No. S2 was received into evidence.)
THE COURT: You may come down, sir.
THE WITNESS: Thank you.
(Witness stepped down.)
THE COURT: How much longer, Mr. Savage, on your cross?
MR. SAVAGE: I think I've got about 15, 20 minutes.
THE COURT: Okay. Let's move to it and then get to the arguments.
MR. SAVAGE: Okay. Thank you, Your Honor.

STEVAN WEINE

CROSS EXAMINATION (Cont'd.)

BY MR. SAVAGE:

Q. Dr. Weine, are you still there?

A. I'm here.

Q. Can you see what has been admitted as Government's Exhibit S1 which is an extract from Mr. Smith's Facebook back in 2013?

A. I see it, but could you just make it a little bigger? Then I can read it.

Q. Sure. Hang on a second.

Better?

A. Yeah, that's better. Good.

Q. It's like an eye exam. Great.

Okay. So did you talk to Mr. Smith about whether or not he and Wael had conversations about Jihad?

A. I don't think -- I didn't specifically ask that, but I asked him about his relationship with them and about his interest in Jihad.

Q. Okay.

A. But I didn't ask specifically about their conversations.

Q. Well, did he say to you that anyone who dies without going to Jihad is lacking in his faith?

A. He didn't say that to me, but do you want me to look at this -- do you want me to read this first?

Q. Sure, go ahead.
A. Because I haven't had a chance to read it.
(Witness peruses document.)
THE WITNESS: Okay. I see it. You know, what's your -- would you like to ask me the question again?
Q. Yeah. Did you talk to him about Jihad and the Muslim faith?
A. Yes, but, you know, there's lots of different ways to understand Jihad.
Q. Okay.
A. Jihad -- Jihad does not necessarily mean like a lot of non-Muslim Americans understand Jihad to mean, you know, military, violent conflict against non -- non-Muslims.
Q. Okay.
A. Jihad has peaceful definitions too.
Q. But not in Syria in 2013 it didn't.
A. Who's saying -- who was -- those quotes are Smith's quotes?
Q. Correct.
A. Well, I think that it's not -- you know, these are quotes taken out of context of a conversation so it's hard for me to understand.
I think that Mr. Smith, it was clear to me, does not have a militaristic violent notion of Islam. In fact, his Islam was an Islam of peace and justice. It was something that he

came to that was a kind of respite from the violent family and gang violence that had killed his best friend when he was 15. It was a different kind of philosophy. And so there are people who see Islam in a very violent way and -- but I didn't really get that from Mr. Smith, if that's what --

Q. So you're thinking he meant Jihad in the sense of a spiritual journey, a conflict against sin. That's the way you interpreted it, right?

A. A spiritual journey or a different kind of quest for (inaudible).

Q. Okay. Got it.

Let me show you what's been admitted as Government's Exhibit S2. And this is a conversation between Mr. Smith and Saeed Kodaimati in December of 2013. I'm going to let -- I want you to read the whole thing, but there's a piece of it that's highlighted that I think I want to get to, but you tell me if you want to -- if you can see it.

A. Make it a little bigger and I'll ask you to scroll up.

Q. You tell me when you're ready for me to scroll it up.

A. Okay. Thank you.

(Witness peruses document.)

THE WITNESS: Okay. Can you move it up, please.

Q. Good enough?

A. Yes.

Q. Okay.

(Witness peruses document.)

THE WITNESS: Okay. I got it.

Q. There is the end of it. There's a little bit on the next page, but tell me when you're ready.

(Witness peruses document.)

THE WITNESS: Okay. Go ahead.

(Witness peruses document.)

THE WITNESS: Okay. I'm finished.

Q. So in your interview with Mr. Smith, did he tell you that the Kodaimatis -- or Saeed Kodaimati in particular was fighting with al-Nusra?

A. No, he didn't.

Q. Okay. Well, that would be a consideration, wouldn't it?

A. I think that it's an important fact.

Q. Yeah. And in his own words he says, "Well, we consider them one of the best fighting groups in Syria. But we consider them a terrorist group, though."

So he clearly knows who al-Nusra is, right?

A. He appears to be familiar with them, yep.

Q. Yeah. Now let's get back to the Jihad, the peaceful --

A. That was what year again? That was like 2000...

Q. 2013 before this investigation began -- or at the beginning of this investigation.

Let me show you what I'm going to mark as Government's Exhibit 6A. It was admitted at trial as Government's Exhibit

Number 6 and it was part of the conversation that the defendant had with Khalid with Mr. Bilal present in a hotel in Charlotte on November 11, 2014. I'll do the same, I'll let you read it and then tell me when to scroll up.
A. Okay.
(Witness peruses document.)
THE WITNESS: Go ahead, move it up.
(Witness peruses document.)
THE WITNESS: Okay. Do you want to go further up?
Q. And that's the end of it.
(Witness peruses document.)
Q. Okay?
A. Okay. I got it.
Q. So going back to -- and I'll make this a little bigger now.
So we talked about Jihad. In here Khalid says, "How do you feel about killing people and being killed?" And this is his own words. "What do you think about this?"
And Smith says, "Jihad." Nobody is putting words in his mouth there, are they?
A. Well, you're right, he's clearly referring to Jihad as in fighting.
Q. Right.
A. And he's -- this is tying in with the prior conversation that you showed me too.

Q. Well, Jihad's about --
A. (Inaudible) --
Q. Let me ask. "Jihad is about killing people and being killed." I mean, can't be any clearer, could you, Doctor?
A. In this case it's -- that's exactly what they're talking about, yep.
Q. Right. So on the other case, that was a different Jihad he was talking about when he was talking about Wael in Syria. That's your -- your opinion.
A. Well, I -- again, you showed me fragments from a conversation, but -- and so it's hard to make that determination based on a fragment. But now given these other -- these are two other conversations with two other people at two other different points in time, I can see that he's referring to Jihad in this more militaristic sense. It doesn't mean -- what I don't see yet is that he's committed to doing it, that he wants to do it. And I'm not aware that he -- that he did it in terms of, like, since 2013, '14, '15 when these conversations were had over the subsequent six or seven years that he actually went to Syria or provided material support. He certainly had the opportunity to, even had the opportunity to do that after he was --
Q. Well --
A. -- after he was -- when he was on bond. So these are conversations and he's expressing some interest in it,

absolutely, but --

Q. Interest. He says, "I'm down with Jihad and fighting, you know, the way we're supposed to fight." He's down with it. He's good with it.

So did you talk to him about what he meant by that? Does he -- is he still down with Jihad when the FBI is not surveilling him, when the Court is not watching him under a bond, when he's not using cocaine and marijuana while on release? You know, is he okay with Jihad?

A. So I think that his explanation for (inaudible), this -- I wanted to go to Syria to be with the family, not -- not for purposes of fighting. That's -- and -- but what happened here is Khalid is pushing him, testing him. "Are you in? Do you want to do this?"

And so, again, he's involved in some kind of a dance with him where -- I think it's disturbing to me that he let it go on as long as he let it go on, but he's, again, you know, not -- not shutting it down, not rejecting it. He's kind of, like, trying to keep a door open in terms of preserving a relationship that he thinks might facilitate his travel to Syria, but at some point he shuts it down. He says, you know, "You have an agenda here. I'm not with that agenda. That's not my agenda. That's not my purpose so don't keep talking to me."

Q. Let's --

A. And so I think in looking here at this conversation and you're seeing that he's allowing the conversation to continue in a way that, you know, I find unsettling, but I don't -- I don't think it reflects an overall commitment to militaristic Jihad. I don't think it reflects his involvement in extremist ideology. I don't think it reflects that he actually planned to travel, that he got training on how to fight, and so I think there's still these kind of degrees of separation are why I didn't -- I didn't rate this as a person who's likely to be involved in extremism.
Q. Okay. Well, Doctor, let me get back to this here. So first of all, did you read the part -- I'm not going to pull it up because I want to get to the end of this. But did you read the part about where he said, "Am I going to be trained when I get there? Are they going to show me how to use a gun?" Are they going to -- the fact that he has guns already at this time, did any of that factor into your opinion?
MR. TATE: Objection. None of that is in evidence. I mean, none of that is even in the document.
THE COURT: Overruled. Overruled.
MR. SAVAGE: It is in the transcripts where he asked about being trained in Syria. He asked Khalid specifically and Khalid says, "We'll train you when you get there."
Q. Did you discuss what kind of training he might have received when he got to the Jihad in Syria? Did you talk

about that doctor?

A. If you want to -- if you're referring to things -- a conversation, if you would just show it to me before --

Q. Well, let's move on. Let's move on.

THE COURT: And, Mr. Savage, are these in the transcripts that would have been reviewed --

MR. SAVAGE: Yes.

THE COURT: -- multiple times by the witness?

MR. SAVAGE: Yes. These are all in there.

THE COURT: All right. Go ahead.

MR. SAVAGE: The transcripts.

THE COURT: Okay.

MR. SAVAGE: But I'm not going to belabor this anymore.

Q. So intent and motivation, you don't -- well, let me kind of cut to the chase here. So you would -- your opinion, Doctor, would have been different if he actually did it, completed a task, like traveling to Syria or providing material support to somebody he believed in ISIS. That would change your opinion in this report. Is that the bottom line, he didn't actually -- he didn't do anything?

A. Or even -- or even make plans to train. Some people who I'm familiar with -- I mean, excuse me, make plans to travel. Other people have certain types of training, weapons training, things like that. And he didn't -- he -- I think he had that

intent to travel to Syria. I think he had -- he was motivated to go there, but not for purposes of militaristic Jihad. He was talking with people who clearly were involved in that.

Q. How about --

A. I don't -- I don't see that that is the same thing as reflecting his intent. I know lots of people who talk with people in Syria about what's going on over there.

Q. Uh-huh.

A. So I think it doesn't mean that they're committed to doing it or they've taken actions which manifest their commitment.

Q. Right. So --

A. And also, it was Mr. Khalid who was again driving these conversations more so than Smith. Smith --

Q. But you don't know that. You don't know that. How do you -- how would you possibly know that? Did you interview Khalid, the FBI agent?

A. Khalid had a job. He was doing his job.

Q. Well, you have a job. That doesn't mean -- that doesn't mean you're going to do it badly, does it? You're doing a job right now. Aren't you being paid?

A. All I'm saying is that Mr. Khalid --

Q. Doctor, are you being paid?

A. -- based on the -- excuse me, you're interrupting me. Based upon my reading of the documents from the FBI,

Mr. Khalid was trying to understand the degree and intensity of Mr. Smith's engagement with violent extremism and his willingness to provide material support.

Q. Isn't that what you're doing?

A. That was the purpose of his mission. And I respect that. I know that that's an important technique of law enforcement in this area. I'm not -- I'm not disparaging it, but that's what it was. And he was -- and he was doing his job and he was --

Q. Well, isn't that what you're doing?

MR. TATE: Objection, Your Honor.

THE COURT: Overruled.

Q. Isn't that your job, to determine whether or not -- and the depth and extent and the seriousness of his commitment to extremism. That's what you're doing here today, isn't it?

A. Through different methods for -- at the request of a different organization for a different purpose, but yes.

Q. Doctor, how much did the defense pay you for your report, opinion, and time?

A. I am going to submit an invoice after I finish today.

Q. How much will that be?

A. I believe the total -- the total will be $8,000.

Q. $8,000. Okay.

Now, the final thing I have here, so if Smith had done something in furtherance or executed some part of the plan,

then your opinion would be different, yes or no?

A. Well, actions do speak louder than words in that sense. So it depends on what you're talking about, but usually, you know, with persons who get involved in violent extremism, it's not like they willy-nilly one day just decide to do something. They usually leave a trail of actions and words which suggest that they're getting more and more and more into it and getting ready to do something, and that's what we talk about the pathway to -- pathway to violent (inaudible). In this case I don't see evidence of that pathway of communication or action.

Q. One thing I wanted to touch on before we finish and that's Dr. Hilkey's report. You read Dr. Hilkey's report. He interviewed the defendant for twice as long as you did and conducted a number of psychological tests. You read that report?

A. Yeah. I think that his tests are what took so long, not his interviewing.

Q. Right.

A. Those tests take hours, pencil and paper tests. And I read that and I know what his conclusions were.

Q. Okay. So he's extremely sensitive in his interactions with others, quick to feel that he is being treated inequitably, and tends to hold a grudge against others. Isn't that a grievance?

A. I think that he is referring to some kind of general personality styles that could be said about many, many, many people. A grievance is something that's more, let's say, focused and developed, like against a person who is bullying you, against -- as I said before, against a boss, against the government. It is usually wrapped up in some kind of belief system.

He's talking about a personality style that like, you know, some people kind of like -- they have a chip on their shoulder a little bit. They've been -- they've been wounded and they carry that with them. And I think that -- I think that he relates it to his experience of exposure to abuse as a child.

Q. Did you interview the defendant's mother, his sister --

A. No.

Q. -- his wife?

Do you know what they had to say about his interactions with Khalid at this time?

A. I do not.

Q. You don't? Wouldn't that have been an independent source?

A. If you have something to share with me, I'd be happy to hear it.

Q. Sure. At one point his mother, when she was interviewed by the Waxhaw Police Department, said, "Smith was angry

because his people were being killed over there. All Muslims were his people and he wanted to go over there and fight with his people." This is from his mother.

Did you do anything to investigate whether Smith was telling you -- was trying to influence your opinion or your results?

A. I'm not sure the question. Can you say the question again.

Q. Well, if you had interviewed Smith's mother or his wife and they had told you that Smith was angry because his people were being killed over there and all Muslims were his people and he wanted to go over there and fight, that would be independent, objective evidence in which you could evaluate Smith's own statements.

MR. TATE: Objection. Calls for speculation. Assumes facts not in evidence.

THE COURT: Overruled. Expert witness.

Let me just ask -- clear it up first. Did you talk to the mother?

THE WITNESS: No.

THE COURT: Would that information have changed your opinion in any way?

THE WITNESS: You mean the statement that Mr. Savage just read?

THE COURT: Yes.

THE WITNESS: It would not -- I'm glad to consider any and all sources of evidence. Unfortunately, I didn't. I mean, the more people you talk to the better.

I don't -- I think that the statement that you read from the mother is a -- that Mr. Smith apparently said is a very general statement that I think a lot of Americans and American Muslims felt in relation to the horrific situation in Syria where they wanted to do something.

Q. Okay.

A. And whether that means -- I think it comes short of Mr. Smith saying, I'm committed to taking violent action myself.

Q. Finally on the issue, he did, in fact, buy a plane ticket for an individual he thought was traveling on behalf of ISIS. There's no dispute about that, is there? You knew that.

A. I knew that. And I also know the -- I know the -- that he wasn't convicted for material support.

Q. Oh, so if it isn't a conviction, then it doesn't figure into the analysis?

A. Well, I didn't know that a -- well, it is...

Q. You know he lied about it.

A. Well, again, I think that there -- you're talking -- can you -- I just got confused for a second. Can you go back to what you said about buying a ticket.

Q. The question is, there's no doubt, there's no dispute that the defendant bought a ticket, a plane ticket, for a

person he thought was traveling on behalf of ISIS.

MR. TATE: Objection.

Q. And you said, "Well, he wasn't convicted of it."

MR. TATE: Objection.

THE COURT: Overruled.

MR. TATE: Assumes a fact not in evidence. He never bought a ticket. It was a buddy pass he got for somebody. Big difference.

THE COURT: Ask the question about the buddy pass, Mr. Savage.

MR. SAVAGE: Okay.

THE COURT: I know it's -- I know the evidence in this case and it was a buddy pass was the way --

MR. SAVAGE: Okay.

Q. Well, Doctor, that he bought a buddy pass, which is a discounted airline ticket available only to airline employees, that he persuaded his girlfriend to buy without telling her who it was. He actually did that. He did it within hours of the time that he received money from Khalid with a request to do it.

MR. TATE: Objection.

THE WITNESS: I'm aware of that.

MR. TATE: He never got the money from Khalid.

THE COURT: Overruled.

Q. You're aware of that.

That's an action, isn't it?
A. That is an action, yes.
MR. SAVAGE: Thank you. I have no further questions, Your Honor.
THE COURT: Redirect.
MR. TATE: Real quickly.

REDIRECT EXAMINATION

BY MR. TATE:
Q. Doctor, I'm going to be short and I'm just going to get to the meat of this, okay?
The structured professional judgment protocol that you used, has that been peer reviewed?
A. It is widely accepted, peer reviewed, yes.
Q. Okay. Now, with respect to this work you did with the Somalians and you mentioned Al-Shabab; is that right?
A. Yes.
Q. Is Al-Shabab a terrorist organization?
A. Yes.
Q. And so you -- that's a different terrorist organization that you have done extensive research about, correct?
A. Yes.
Q. All right. Now, you looked at something that said TRAP-18 by Dr., I believe it was Wilkey or Mallow.
A. Reid Meloy.
Q. Reid Meloy. But that study concerned lone active

terrorists, correct?
A. Correct.
Q. And this case did not -- at least what you reviewed and what you know about this case, did not involve lone activists, did it?
A. No.
Q. And that would apply a totally different analysis and protocol than what you did, correct?
A. That was my concern, yes.
Q. Okay. Now, there was also a discussion about the Free Syrian Army. Are you aware of whether or not they were supported by the United States?
A. Yes, I think they were.
Q. And in 2013 when you -- there's some reference to al-Nusra. Do you know whether in 2013 al-Nusra was supported by the United States and was actually in opposition to ISIS?
A. I believe that they were for some time, yes.
Q. Including in 2013?
A. I can't remember the year exactly.
Q. But you do know that al-Nusra was at some point supported by the United States.
A. Yes. Strange bedfellows.
Q. And in opposition to ISIS.
A. Yes.
Q. Now --

A. Al-Nusra is an al-Qaida affiliate.
Q. There was a document in 2013 that was an excerpt prepared by either Mr. Savage or the FBI that just had quotes around things purportedly said by Mr. Smith. But one of the words in there was Hadith or Hadith. Are you familiar with that term?
A. Yes, but maybe you could refamiliarize me.
Q. Do you know Hadith means the same thing as the Bible or the Quran?
A. I don't want to misspeak right now.
Q. Okay.
A. So maybe you can define it for me.
Q. Okay. If you don't know, that's fine. Is your answer you don't know?
A. I don't know.
Q. Okay. And along those same transcripts, did you see words attributed to Saeed where he says, "Trying to help people save lives"?
A. Yes.
Q. And the word Jihad, there was a lot of discussion about that, but another word for Jihad in Islam is holy war; is that correct?
A. Yes.
Q. And is that rooted in the scripture of the Quran?
A. Yes.
MR. TATE: Thank you. No further questions.

THE COURT: Any redirect -- any recross?

MR. SAVAGE: No, Your Honor, but I'd like you to take judicial notice that the al-Nusra was designated a foreign terrorist organization by the Department of State on the 10th of December 2012, according to Google.

THE COURT: Well, I can't -- I'm not going to take judicial notice off of Google, but I will certainly --

MR. SAVAGE: Thank you.

THE COURT: -- listen to arguments.

MR. SAVAGE: No further questions. Thank you, Doctor.

THE COURT: But I'm not going to take judicial notice off of that.

All right. Any further evidence?

MR. TATE: Not from Dr. Weine, Your Honor. Thank you.

THE COURT: Doctor, thank you very much for taking your time.

THE WITNESS: Thank you, everybody.

THE COURT: Yes, sir.

THE WITNESS: Bye bye.

THE COURT: Yes, sir.

All right.

MR. TATE: Your Honor, can we take a brief restroom break?

THE COURT: Yeah, we'll take a brief break.

Now, we're not going to argue until the ends of the earth. We know -- I know what the arguments are. We have two things we're going to talk about. First of all is whether the counts are duplicative and then we're going to talk about sentencing in this case. And I've now heard the testimony.

There is also a motion as part of sentencing -- I imagine the government is not making any motions for departure or variance, but the defense has made motions for a variance and there are -- there are a number of reasons for that and I want to make sure that each one of these is covered during sentencing so I want to address every single one of those. I think there's, like, four of them. I'll find them. But the government may want to look those up. They're at the front of the defense memorandum.

MR. SAVAGE: Right.

THE COURT: I want to hear the arguments as to why they don't apply and I'll hear certainly from the defense. And I want to hear if there are any other -- any other reasons to be stated clearly and on the record that the Court must address today so that we address everything today.

MR. SAVAGE: Just to maybe focus things a little more, the government, depending on where we come out on the statutory maximum, the government is not opposed to a variance in this case. So I think we can maybe agree on some of these

variance -- we don't agree with all their variance factors, but we're not suggesting that 16 years is the appropriate sentence in this case.

THE COURT: Well, it looks like -- as I understand it, is the guideline -- is the guideline range 121 to 100 and --

MR. SAVAGE: No, it's like 210. It caps at 210.

THE COURT: Okay.

MR. SAVAGE: It caps at 16 years depending on the Court's ruling on the multiplicity motion.

THE COURT: All right.

MR. SAVAGE: But I just want to say that we're not going there. I think we're going to be talking more along the lines of the defense has argued that convictions that have ended by trial, in this case the prison sentences in their own memorandum, run somewhere between 67 and 96 months. That's where we are.

THE COURT: Okay. I'll listen to everybody when we get back from break.

(Brief recess at 2:58 PM.)

(Court back in session at 3:10 PM.)

THE COURT: Okay. We've got everybody here. Let's go ahead and proceed.

Mr. Tate, do you want to argue about the...

MR. TATE: Yes, Your Honor.

First I'm -- I'm going to talk first and then Ms. Baldwin is going to discuss the terrorism adjustment and some of the sentencing disparities and...

THE COURT: Okay.

MR. TATE: Have you met her? Have you met Ms. Cause?

THE COURT: Yes.

MR. TATE: She's going to speak last here.

But, Your Honor, first of all, we believe the statutory maximum here is 96 months, although we disagree on the guidelines. We believe the guidelines are appropriately 63 to 78 months. That's because it's multiplicitous.

THE COURT: You believe the guidelines are what, now?

MR. TATE: Sixty-three to 78 months.

THE COURT: Because you don't think the terrorist stuff applies.

MR. TATE: The terrorist adjustment does not apply, yeah, that's our position.

THE COURT: Now, if the terrorism adjustment does apply, what is the guideline range?

MR. TATE: The guideline range caps at 96 months.

MS. BALDWIN: Depending on the multiplicity claim, it's either 96 months or 192 months.

THE COURT: Okay.

MR. TATE: So in the case of 1001, I've tried several of these just by experience and I thought it was odd in the beginning. That's why I moved pretrial to dismiss based on multiplicity. But I think the Court can see from the practice even in this district that the 1001 is a continuing offense. Otherwise they could charge ten different offenses in one interview. There is one interview here, February 16th of 2016. And by example, the U.S. Attorney's Office charged multiple false statements arising from a single continuous encounter, and vigorously opposed in those instances duplicity challenges. And those cases are *United States versus Sullivan*, 16-cr-005, superseding indictment, docket 44. And this is all on page 15 of our memorandum. *United States versus Struthers*, 3:16-cr-212. Again, a superseding indictment with a combined multiple alleged false statements into a single count. And the related case, *Saeed Kodaimati*. We've heard a lot about him in this case. He was charged in the Southern District of California with a single violation, making multiple false statements during one interview. And that case is 3:15-cr-1298. That's just an example.

Basically, this is just a single interview. They allege two different false statements. It's not duplicitous for it to be in one count, but it is multiplicitous. It does raise the issues of double jeopardy and overcharging for it to be in more than one count. We raised that issue at the

Rule 29 stage, we raised it pretrial, and we think we are correct on that issue. So that's all I really have to say about multiplicity.

THE COURT: Thank you.

Mr. Savage, what says the government?

MR. SAVAGE: Your Honor, first of all, multiplicity is not a continuing offense and there's direct authority on that. I'll find it in just a moment.

Your Honor, we cited the *Blockburger* test when we first briefed this back on March 15th, 2019, and our papers are on the record. And I was surprised when the defense came back and said, Oh, you're crazy, *Blockburger* doesn't apply. That's when you have two different statutes. So it occurred to me that I should go back and actually read the case, which is way back from 1932. And sure enough, *Blockburger* has two prongs. There were three counts. The first two counts were exactly the same statute, similar facts, like a drug deal like one after the other. The third statute -- the third count was a different statute but charged the identical same offense. And the Court held in both of these -- and I have a copy of *Blockburger* here where I've conveniently highlighted the two in red, yellow, and green -- that it's proof of a fact of which the other one does not occur.

Now, in this area of 1001, there is an Eighth Circuit and Ninth Circuit trend that is really not

multiplicity, but it's more like it ain't fair to charge the same identical conversation or the same identical false statements that are closely made together. So if you fill out two, like, claim forms and you put exactly the same answer in both of them, then under the Ninth and Eighth Circuit you would not charge -- they would not approve that both of those be charged.

But that has never been adopted in the Fourth Circuit. And it's pretty darn clear that there are several cases -- as the defense said, there are several cases where if you do put them together, there are duplicity motions. So it's kind of like you're damned if you do and you're damned if you don't. If you put them both together, then the defense would be saying, Oh, that's duplicitous. You can't possibly defend against both of those. And if you put them both together, then they're multiplicitous.

In this particular case we thought it was important to put them separately because they addressed two separate elements, really, of the FBI's investigation was, and we had argument on both of them. One of them could have involved an international terrorist, the other one did not.

In this case you had the jury decide independently on the facts after instructions on two independent offenses, and they returned verdicts. And there was -- the statements were made in a 112-minute interview some time apart. They

weren't made one after another. They concerned different fact matters. And they required different facts to prove whether or not, in fact, it was false. One involved whether he was going to travel. The other involved whether he was going to buy the ticket. They're two different things. One is material support in the sense of he's actually providing transportation. The other one is he's providing himself. So those two different facts require different things.

I have a copy of *Blockburger* here.

I think that regardless of whether or not this is going -- the government's not asking for a 16-year sentence in this case. But regardless, I think it's important to get it right. I mean, this case is going to be reviewed on appeal and I know the Court wants to get the law right, and for that reason I think it's like relying on what might have happened in this district as far as I probably could go through and find as many duplicitous arguments on appeal as I could multiplicitous arguments.

But the fact of the matter is, we cited good law. *Jamison* is good law. Even though it's an unreported decision, it cites reported decisions. It cites *Blockburger*. The Court was here and it can make its own independent determination on whether or not count one and count two require proof of a fact that the other one did not.

So the idea that these simply merge together because

they're in the same interview is not the law and there's no law to say that. And I don't think the defense has pulled up a case that says it's multiplicitous to put up two different lies in the same interview or on the same day or in concert with others. I think it's a fact-driven decision.

For that reason, Your Honor, we would stand on our brief. And I have a copy of *Blockburger* here if you want to see it.

THE COURT: I don't need to see it.

MR. TATE: Your Honor, I have suffered a knee injury. I'm going to let Ms. Baldwin do the honors of responding, if you don't mind.

THE COURT: Absolutely. And if you need to be seated due to an injury or something, you stay seated. We're not going to stand on ceremony here, Mr. Tate.

MR. TATE: Thank you, Your Honor.

MS. BALDWIN: So just in response to the government's argument, we're not saying *Blockburger* doesn't require proof of a different fact. It does. We're saying *Blockburger* is not the right test. So it has nothing to do with the Supreme Court's opinion in *Blockburger*. It has to do with subsequent Fourth Circuit binding precedent that says when you're looking at a violation of the same statute, so 1001, you look for the unit -- the allowable unit of prosecution, what Congress intended. So that's why in felon

in possession cases, we do not charge a defendant for possessing a gun at 9:01 AM, 9:02 AM, 9:03 AM, 9:04 AM because the unit of prosecution didn't support that.

So -- and the government has never responded to any of our -- they've only supplied you with an unbinding, unpublished, per curiam, 20-year-old Fourth Circuit case. We provided you with Fourth Circuit published opinions in the last decade that says the question is the allowable unit of prosecution.

Now, the government's never even told you what they think the unit of prosecution is for the false statement. I couldn't find any cases saying what Congress's intended unit of prosecution is for a 1001 offense. So we're saying it should be the defendant's course of conduct. But even if the Court were to disagree, it's ambiguous and the rule of lenity requires you to find in the defendant's favor and deem them multiplicitous supporting only one violation.

THE COURT: Mr. Savage, any response?

MR. SAVAGE: Well, Your Honor, the defense cites a lot of gun possession cases where possession is a -- can be a continuing offense. You can possess a gun -- you possess a gun over a period of time. I mean, possession is one of those things. A lie is a lie. And the statute says any false statement. Any. Any. Any doesn't mean like any false statement made over a period of time. A false statement is

something that you make. It's made in a document. It's made orally. It's made once. And once it's done, it's done. It's an offense. And then if you go on and make the same false statement repeatedly, the identical false statement, there are other reasons why you shouldn't charge that. But when you go on to make a completely different false statement with different facts and different proof, then it's not multiplicitous even if it's made in the same day.

And there is -- you're right, they can't cite a case that says that 1001 is a continuing offense because it's not. The statute says any false statement.

THE COURT: Okay. All right. I'm going to -- I'm not going to find that it's multiplicitous, but I am going to sentence the defendant as if it is because I think -- you know, it's in the same interview. But we're talking about technical correct decisions that have to be made. Correct decisions that have to be made technically. It's not what this Court thinks the sentence ought to be and let's have it fit there. It's what I believe is the correct thing. Now, maybe we'll get a ruling one way or another from the Court.

But it's not going -- the Court is going to come up with a sentence that it believes, considering the 3553(a) factors in this case, that is, to promote respect for the law, provide just punishment for this offense, to protect the public from further crimes of this defendant, and, very

importantly, to deter others who might think this is a good thing to do, then this sentence will be -- and, of course, I will certainly want to avoid unwarranted sentencing disparity. But the Court will sentence and listen -- will listen to arguments as to what that sentence ought to be with regard to this particular case.

All right. Let's first hear about the terrorism because that's going to impact whether the guideline is 63 to 78 months or 96 months.

MR. TATE: Go ahead, Ms. Baldwin.

THE COURT: Who's going to argue that?

MS. BALDWIN: I am, Your Honor.

So here the terrorism adjustment does not apply. And so it doesn't apply because this case involves neither a federal crime of terrorism nor an actual obstruction into such an investigation.

So the government's relying -- relies on the theory that Mr. Smith attempted to materially support terrorists and that this qualifies as a federal crime of terrorism. So there are two problems with that argument.

First is that the conduct they claim provides that other offense is not relevant conduct under the guidelines, and only conduct that satisfies 1B1.3 can trigger a Chapter 3 adjustment.

Here, Mr. Smith's discussions, procurement of a

buddy pass, whatever he did between 2014 and 2015 was not done during his 2016 false statement. They were not done in preparation for his 2016 statements nor to avoid detection of his 2016 false statements.

And furthermore, the government hasn't even proved attempted material support in this case by a preponderance of the evidence. But even putting that aside, they definitely haven't established the political motivation that's necessary to render something a federal crime of terrorism. So under 2332b, a federal crime of terrorism is a specifically enumerated violation that was committed -- that was committed with -- excuse me one second. Sorry. That was committed -- was calculated to influence or affect the conduct of the government by intimidation or coercion or to retaliate against the government conduct.

Here, the government absolutely hasn't presented evidence by a preponderance standard that Mr. Smith had this necessary political motivation.

Now, they talk about political grievances during the cross examination of the expert, but we all have political grievances, whether it be taxes, should the Department of Education exist, should we get involved with this humanitarian crisis, should we not. It's not about political grievances. It is about whether or not his actions that were a violation of one of the specifically enumerated statutory prohibitions

that can be a federal crime of terrorism was done to influence government conduct.

And so here, you know, the closest they have is the procurement of an unguaranteed reservation on the first flight of a four-leg journey that he provided to, you know, this older man that helped him get a job and money. So it clearly was not done with the necessary intent to be a federal crime of terrorism.

And one of the cases we think supports this is in the District of Colorado and it too was an attempted material support case, *Jumaev*, J-u-m-a-e-v. And there the guy gave to his cash-strapped friend 300 bucks to give to a terrorist organization. The friend didn't know even how they would get it to the Uzbeki terrorist organization. And the district court said, Listen, it comes down to common sense. If they gave this 300 bucks to a terrorist organization to influence government conduct, he would have done more. He would have maybe made sure he knew how to get it to the terrorist organization.

And the same thing here. This was a buddy pass. The airline employee testified, like, He might not even get on the flight. It just depends on how booked we are and if that reservation happens to clear our priority list of the standby passengers.

So that means that the guideline itself at 3A1.4(a)

does not apply and nor does Application Note 2 which has to do with an obstruction of an investigation into a federal crime of terrorism can qualify under Application Note 2. And here we rely on two Eastern District of Virginia cases that went through the guideline provisions and determined that based on the guidelines' text, scope, that the obstruction there required actual obstruction into a specific terrorism offense. So general -- a general terrorism investigation or intelligence gathering isn't enough nor is an attempted obstruction enough.

And so here, Mr. Smith did not actually obstruct anything. And so the case was *Biheri*, B-i-h-e-r-i, an Eastern District of Virginia case, where the Court said, like, there was no actual obstruction. Like, yeah, he lied to the FBI, but the FBI knew everything he was lying about already so the FBI could not reasonably have relied on these falsehoods they knew to be falsehoods at the time. And so that's the same situation here. So there's no actual obstruction.

And indeed, in the cases where the terrorism adjustment was applied on that basis was *Benkahla*, and that was where the FBI -- not only did he lie about the false statement, the FBI didn't know. So to this day the FBI still doesn't know the extent of the defendant's communications with terrorists at a Jihadi training camp.

And the same thing where one was applied -- it's in

our chart. It was an Arizona case, *Waeed*. There, the FBI wasn't able to recover evidence because of their lies and witness tampering. So they knew there was evidence that they could have gotten, but the lies prevented them from doing so before it was destroyed.

So those are the types of cases, actual obstruction -- actual obstruction is where the application note will come into play.

And then just as an aside to that, like we said, we don't think that there was an obstruction to qualify under Application Note 2, but we would also note we think Application Note 2 is null and void in and of itself as being inconsistent with the guideline.

So both the application notes expand unambiguous language by adding an obstruction related count and it is an unreasonable interpretation because by adding false statements, obstructing proceedings, and harboring or concealing terrorists, it is -- it is imposing a minimum recommended sentence of over 200 months on an offense that carries a statutory maximum of 10 years or less.

So that, we think, shows that -- the application note with unreasonable interpretation and under the Supreme Court's recent opinion *Kisor versus Wilkie*, that renders it inconsistent with the guideline. The guideline itself controls so you can't get in the terrorism adjustment through

Application Note 2.

THE COURT: All right. Thank you.

MR. TATE: And, Your Honor, just to add on what she said. Even if the Court agreed and said the Court believes the application note is okay, it still doesn't meet the threshold because they just weren't obstructed at all. This was their movie. This was their show. They scripted it. He was the only one who didn't know he was in it. So there's nothing he could have said in that interview that misled them. This went on over a period of years so they knew everything that happened. They knew -- there was nothing that he said -- he was the only one that didn't know that the guy that was supposed to get the buddy pass wasn't really real. And he actually told them about that in the interview. So I would just add that to what Ms. Baldwin said.

THE COURT: All right. Mr. Savage.

MR. SAVAGE: Yes, Your Honor.

First of all, let me hit the last point first and that is it was material. The defense argued the point that Mr. Tate made to the jury. Twelve people unanimously agreed that it was material. And here's why it was material. There were a lot of things that the government didn't know. And you'll recall the moment when Mr. Tate was asking -- cross examining Agent Godfrey and he said, "Why did it make any difference what he said?" And it made a lot of difference

because here's the things they didn't know.

They didn't know exactly what the Kodaimatis were up to. They didn't know if they had all the conversations between Smith and the Kodaimatis. They didn't know exactly where they were in Syria and Turkey. What did the girlfriend know? What did Ms. Palak know? She worked in an airline office with access to all of that. They didn't know that. They didn't --

THE COURT: What he's arguing is that the questions that they knew the answers to, the questions that are the subject of the indictment.

MR. SAVAGE: Right.

THE COURT: The specific questions that were the subject of the indictment. And I've been around a long time and that is not an element of anything.

MR. SAVAGE: It's still an obstruction.

THE COURT: It's still obstruction even if they --

MR. SAVAGE: It's still obstruction.

THE COURT: Even if they -- if the defendant was lying in a legitimate --

MR. SAVAGE: Exactly.

THE COURT: -- investigation and it's material, then he is.

MR. SAVAGE: Right. And in this case --

THE COURT: It doesn't matter whether they knew it

or not.

MR. SAVAGE: Right.

THE COURT: Okay.

MR. SAVAGE: And in this case it's an international terrorism investigation, hence, as the jury found, the enhancement applies on the statute.

So going to 1001(a)(3), it defines international terrorism as 2331 and it has two elements. It has three elements, actually. It involves a violent act; intended to intimidate or coerce a population; or the policy of a government.

The defense is isolating this to the policy of the U.S. government. There is also the Syrian government. He certainly was interested in removing Assad. He said so. So when you're having Americans, whether you agree with their political views or not, involved in terrorist activities in other countries because they don't like what other governments are going to do, one day you might hate Assad, the next day you might not, right? Look what happened now, right? And the idea that it occurred primarily within the territorial jurisdiction -- outside the jurisdiction of the United States. So all three of the elements of 2331 are met.

The next thing is the application note, 3A1.4. Is this -- if the offense is a conviction that involves. Does it require that involves. And, Your Honor, you want to go to

3A1.4, a federal crime of terrorism. That also has a specific meaning and the meaning it has is that in 2332B(g)(5), and attempted material support under 2339B is one such felony. And is that offense calculated to influence the conduct or intimidation -- by intimidation or coercion or to retaliate against government conduct, whether it be U.S. conduct or Syrian conduct? We clearly meet both of those.

And the intend to promote element is met by if you look at *U.S. v. Stewart*, the Second Circuit, 2009, the enhancement is not limited to whether the offenses themselves involve federal crimes of terrorism. The intended to promote prong and the involved prong are both looked at separately, and we meet both of those in this case.

An offense that involves obstructing an investigation of a federal crime of terrorism shall be considered to have involved or intended to promote the federal crime of terrorism. That's comment two that they don't like. So since they don't like comment two, they say, well, we need to exclude that because we don't like it. But look at what they've done. Did the case here and did the defendant try and impede the investigation? He clearly lied about both of those two key questions: Did you intend to travel and did you -- and did you intend to help anybody?

And there are a number of cases we cite in our brief, including Kodaimati himself which is probably the most

closely related case here. Kodaimati in his indictment in the Southern District of California was convicted of lying about talking to AS about al-Nusra, which was the very crime we talked about here today with the doctor. So Kodaimati pled guilty to the very thing that they covered up, and that is was he going there to help somebody and why was he traveling there?

And I have a series of these other examples. Do the facts support involves? We have the Facebook extracts we talked about with Dr. Weine. We have the business about him communicating in Government's Exhibit 5. He said throughout the investigation he was still in contact with the Kodaimatis. If Smith wasn't willing to fight with them even if he didn't go to -- even if he went to Syria and the Kodaimatis didn't need him, he told Khalid he was still willing to fight for Jihad. He was willing to fight and swear allegiance to al-Baghdadi. Clearly he was willing to support ISIS.

You heard from Dr. Hoffman who explained and showed you the brochure about how during this time in 2014 -- put ourselves back there -- Westerners from all sorts of different countries were going over there. We had Americans being killed in Iraq because you had Westerners fighting with ISIS. And they were fighting not just with weapons, but the cyber wars too. Junaid Hussain was one, Al-Wadani [phonetic]. They were using various clever uses of the internet and the

international communications to recruit people.

Then you get to the undercover investigation. Sergeant -- Agent Godfrey testified that Smith told Wael that he wanted to travel to Syria.

You know, they say in their motion -- we'll get to this later on -- this was some sort of entrapment; that this was a -- a devil's bargain. Well, look who did all the acting here. You know, Smith went and found the Memphis source. He goes down to Memphis after Wael tells him to and says, "This guy can help you get some money."

And then the guy says, "Well, you need to talk to this other guy up in Cary."

He calls him and he goes three hours to meet with him, right? I mean, clearly --

THE COURT: The testimony was all there.

MR. SAVAGE: Yeah.

THE COURT: This case was tried.

MR. SAVAGE: But it's important to this terrorism thing because there are various reasons why the government could have, should have, or couldn't charge material support in this case and there are equities that we cannot discuss; but material support, the elements were there. They weren't charged but it doesn't make any difference because the law says it just has to involve it. And where we get after this guideline is a different story, as the Court pointed out.

And I just covered that Smith initiated the contact. Here's the other thing, and this was a big deal. Smith says he knew people who were willing to travel as well. Now, if you're an FBI agent, don't you want the FBI to investigate that? Is that true? What happened to those people? Who were they? We kind of got around to it. After the fact we figured out who they might be. But were they the people that Smith was talking about? Twice he mentions that.

Smith knows that ISIS is an enemy of the U.S. and seeks to alter its policy. We just quoted that business about the beheading. That was an American journalist. He says, "That's okay. They just should have done it a little cleaner."

He was prepared to kill for Jihad. You heard that segment that we talked to him. Another example of supporting -- of intending to support or promote terrorism even if he didn't do it himself.

And then here is -- this is attempted material support. He had serious plans to travel. Now, if this were really a complete setup, as the defense would have it, Agent Godfrey would have been there, met him in a back room, gave him $3,000 and said, Go buy a ticket to Turkey.

They didn't do that. They wanted to know how serious was he? Was he willing to work for it? What was he going to do? They gave him opportunities, but they didn't

force his hand. Nowhere in this operation or in this investigation did they force his hand.

You know, on the 20th of August Khalid said to him, "We're getting serious now. The first time I met you you were just talking. You know, are you serious?"

"Yes, I am."

"You're sure?"

The hotel meeting on November 11th, "Tell me your plans."

"The money. I need to get the money to get there, inshallah, and that's what we're working on so I can have the money."

"Right now, like I said, me and the brother, we're working. As soon as we get the first project done, we'll be ready."

And here's some additional facts that support attempted material support. Khalid reminded Smith of his earlier offer. Remember, this buddy pass thing -- a buddy pass is an airline ticket, first of all. The idea that -- it's just a discounted ticket. It's transportation of a material -- of a person.

THE COURT: I heard the testimony.

MR. SAVAGE: Right. So he brings it up -- Khalid brings it up again on March 18th and he reminds him of the earlier offer. And I prepared little snippets here, but I

don't want to delay this. But here's the thing. "This brother is very important to us."

"Okay. I can work with that. I can get this done in three days."

And then there is a series, you recall, of texts, which was Government's Exhibit Number 9 -- you can go back and look at those -- where they text the information back and forth. It's Mohamed Hilal. It's this, it's that, it's the other thing.

And then they meet again on the 20th of March in person in Charlotte. Khalid brings $80 in cash because Smith wants the money to get the ticket, which he gives to another guy, but they talk about it. He gives him yet another chance to pull out of it. He tells him how important this guy is to the brothers, the Jihad. And remember, we had a big discussion here about what brothers meant, and I remember Khalid testifying -- you know, defense said, "Oh, brothers can mean anything."

He goes, "No, no, no, no, no, no, no. Brothers means ISIS."

So he buys a ticket for a guy he thinks is an ISIS terrorist. He goes out and does -- he does it the same day. He actually, if you look at the tape, he leaves that meeting, goes directly to the airport, finds Yahya Asaad, gets him to give him his credit card, gives a credit card number to his

now wife. His wife, who works in the airport, buys him a ticket. And on the very same day, that night at 10:30, Government's Exhibit 11, he texts the information back to --

THE COURT: All this is in the record.

MR. SAVAGE: Right. That's all material support. All of it. All material support. It all meets the criteria. So it's in the record, but I think it's important to note that that itself is a violation of 18 U.S.C. 2332b.

THE COURT: I agree.

MR. SAVAGE: Right. End of story.

THE COURT: I agree. All right.

MR. TATE: Your Honor...

THE COURT: Yes, sir.

MR. TATE: One thing I want to say is that Mr. Smith provided a buddy pass, there's no dispute, from Florida to Buffalo, a long way from Syria. So he's got to find his way to Syria from Buffalo on this cheap buddy pass. That's if he gets on the plane.

THE COURT: He doesn't have to complete it. He just has to intend to offer the material support. The Court finds that that has occurred and that the obstruction was an obstruction involving that and that the terrorism guideline does apply. And apparently that puts the guidelines at, based on the Court finding that it was not -- there was no multiplicity, the guidelines then are 210 to 262.

But the Court intends to sentence the case as if there was one false statement because although there are two false statements, this particular interview was of such a nature and over the period of time of that interview that the Court believes that fairness in that would put this -- that we start our argument at 96 months. So the Court's already going to vary to do that in order to be able to sentence there. And I will hear from you on where I ought to sentence with regard to that.

This is a serious matter. This is a very serious matter. The Court worries about deterring other people. Man seldom does evil so cheerfully as in the name of religion. You can look at throughout all of the major religions and you will find leaders who have inspired their followers to get them power, land, money, women, everything, by telling them that God has to have -- God can't do his own killing. You got to kill for him. And he's so bad he's going to give you physical rewards in the afterlife. And they get these young men to go out. And they've been doing it for thousands of years and it continues today. This is serious stuff. The United States of America has got a serious, serious problem with people who would like to see this country destroyed. So we've got to deter this thing.

So tell me, though, why this particular defendant -- you put on some evidence from your doctor -- as to why this

defendant -- how we're going to deter people who think that this is a good idea to go over there and get together with a group of folks who are essentially killing people, killing people in the name of the Lord.

MR. TATE: Thank you, Your Honor, for the opportunity to respond to that.

Briefly I'd just like to say that all the things that Mr. Savage outlined that support the terrorism adjustment, none of those questions were asked of Mr. Smith during his interview. He was asked about Mohamed Hilal and he told them. He told them the truth. He said, "I got the buddy pass." He told the truth about that. All that other speculative stuff he wasn't asked so he couldn't possibly respond to it. But I'll move on from there.

THE COURT: Yes, sir.

MR. TATE: The Court should sentence him to time served, and I don't say that lightly. He's served 17 months. But not only that, Your Honor, this offense occurred back in 2014 through 2015. That's some five years ago now. In between that time -- he was not indicted until 2017. So between 2014 and 2017, all the things that the Court says needs to be deterred, Mr. Smith had ample opportunity to do. Nothing blew up. He didn't go. He never attempted to go to Syria. He never even attempted to get a passport. Nonetheless, they charge him three years later in 2017. All

this time he's been living a law-abiding life. He's working various jobs. He is poor.

Then he gets to 2019, he goes to trial. Now we're five years later. He's been on house arrest at that time with electronic monitoring about 20 months.

THE COURT: He's had some violations.

MR. TATE: He had a few violations.

THE COURT: He's had some violations, some drug use.

MR. TATE: Yes, he did. He did, Your Honor. But I've never had a person on an ankle bracelet and electronic monitoring for 20 months that survived. I mean, they don't routinely violate people for one drug test, two drug tests. There's no new law crime violations. There's no cutting off the bracelet. He's working a job. He's driving as a chauffeur. He's driving a forklift. He's working as a security guard.

THE COURT: They said he left when he wanted to and came back. There was a lot of -- lot of sort of doing it on his own.

MR. TATE: Right.

THE COURT: That was the problem they had with regard to how he --

MR. TATE: I know they had a problem with him and I wish they didn't. Maybe he could have stayed out. But Mr. Smith deserves some credit for that. And it is punitive

in nature, although he doesn't get credit for that. I think the Court from a common sense perspective can see that there's a punitive aspect. He got taken into custody after trial. He's now been in custody about 17 months.

He's got children. So I think there's ample deterrence here for a crime that he did not go out and initiate. He wanted to check on this family that had taken him in. He was concerned about them. And it's no crime about loving someone. There's Syrian conflict over there and I think the evidence showed that -- you know, ISIS -- he never -- you know, it's not clear that Saeed, the Kodaimatis were fighting -- they were fighting against ISIS. Al-Nusra, Free Syrian Army, there's conflict. The government was fueling some of these groups with money and weapons. And it's very confusing.

Then you see what you see on the news. You see people being bombed, homes being bombed. What they didn't show was where -- the excerpts of the Facebook texts where the Kodaimatis' homes were bombed, where people they knew were afflicted by the Syrian regime with chemical weapons. And at a certain point ISIS was even against Assad. So, you know, you've got two enemies over there. You've got Assad, you've got ISIS. And some of the people are joining with ISIS to fight Assad. It's chaos.

But one of the things he said --

THE COURT: There's a lot of chaos --

MR. TATE: -- he wasn't going over there to be a martyr. They didn't show that either. He told Abu Khalid that: "I'm not going over there to be a martyr for anybody." And all along he was provided with a computer -- he's unemployed -- a cell phone. They're helping him buy and sell cars. This is his lifeblood. He's got a family.

And so had they not been doing any of that -- what Dr. Weine didn't know -- I think he probably would have kicked him to the curb. But they're inducing him with -- because of his poverty.

I think Dr. Weine is right. I think he has a low risk of recidivism. I think that's the primary concern for the Court. Is this guy actually an extremist? And past is prologue. I've heard the Court say that. The past is prologue. And what we do know is that he never did it before they investigated him. He didn't do it when they tried to get him into it. He never agreed to go in 2014 and '15. He didn't do it before he was indicted in 2017. He didn't do it before he went to trial in 2019. He couldn't do anything now; he's been in jail. That's a long time to have this over your head.

THE COURT: What kind of sentences have been given in this case?

MR. TATE: Let me tell you, Your Honor, and then

I'll let Mr. Savage go.

THE COURT: And what jurisdiction too?

MR. TATE: Okay. I'll talk about it.

There is a case called *U.S. versus Greene*. It's 14:230 out of the DC circuit. It is a false statements case involving international terrorism. False travel form indicating that she was going to Germany to visit family when she actually was traveling to Syria. This is someone who is actually traveling. And married an ISIS member who the investigation found she was working with. She received no terrorism adjustment. She did receive a 5K. But she got 24 months.

THE COURT: She got a 5K because she cooperated against somebody.

MR. TATE: Right. But then there's other cases here. There is *United States versus Soufian*. Guilty following trial. This is out of the Eastern District of Virginia. I believe Ms. Baldwin discussed it. This is a 2017 case. False statements to the FBI about a friend supporting ISIS and attempting to travel overseas. Also convicted of conspiracy and substantive counts for trying to persuade another witness to refrain from disclosing the friend's ISIS affiliation. That's clearly material there. Terrorism adjustment applied. Downward departure to 24 months in that case.

The second one --

THE COURT: What was the departure for? It had to be for some reason.

MS. BALDWIN: Your Honor, the Court said the terrorism adjustment is a draconian sledgehammer and sentenced him within the obstruction sentencing guideline.

MR. TATE: So then there's *United States versus Michael Queen*. That's a 2017 case also out of the very conservative Eastern District of Virginia. Guilty following trial. False statements to FBI about friends supporting ISIS and attempting to travel overseas. Terrorism adjustment was applied again in that case, but there was a departure down to 24 months.

So we've listed a couple of things. This whole exhibit talks about the range of sentences. But we think the ones that are most analogous to Mr. Smith are trials in the Eastern District of Virginia, Soufian and Michael Queen, that were sentenced to 24 months.

And I'm going to ask Ms. Cause to just say a few brief words at this time about why a departure is warranted in this case.

THE COURT: Yes, sir. And the reasons that are given in here, and I want to -- I want to address each one of them at some point. Criminal history zero. It's actually I but zero points. Low risk to commit acts of extremism or

affiliate with terrorist groups. That's the number two argument. Three, the sentencing disparity a suggested guideline sentence would create compared to other similarly situated defendants. And Mr. Smith's nearly six-year post-offense rehabilitation.

Those are the ones that are in here. Now, there may be -- I haven't heard any others today, but if there are they need to be articulated so they can be addressed on the record.

MS. CAUSE: Good afternoon, Your Honor.

THE COURT: Yes, ma'am, good afternoon.

MS. CAUSE: Without repeating what you've already heard this afternoon and what you've already read in our materials, we did submit a lengthy and very informative sentencing memorandum at document 105 --

THE COURT: You did.

MS. CAUSE: -- along with some letters of support in document 106, so I'll try not to be too repetitive for Your Honor.

But I would like to highlight the fact that this is a gentleman who he's constantly worked. It's actually laid out in the PSR on page 14 the different jobs that he has been employed at within the span of a few years: Peak Limousine, Forward Air, Guard One, Empire Security, Security and Police Academy, self-employed with auto sales, and DHL. This is someone who has the value of working hard and he has

demonstrated that through his actions.

In addition to that, Your Honor, he has -- Your Honor has noted that he has not had the perfect pretrial service behavior, but I would like to highlight the fact that this is someone who has responded even to the corrections provided at that time. So for example, in response to corrections with any substance abuse, he successfully completed the 40-hour outpatient treatment with McLeod Center. He does show respect to correcting and to the probation officer who supervised him at that time, and to taking seriously what it is that this case is and what it represents not just to himself, his family, to the Court system, but to the community at large.

Dovetailing off of conversations about his family, I won't go into it very deeply, but I will say that one of the main differences from before this trial until now is that he has once again -- he's been a father. He has essentially missed the entire life of his second child who is not a year old yet. His first child is now two years old and he's missed the bulk of that person's life. Family means quite a bit to him. I know it has significant meaning to anyone who comes before you, but I think it's especially important to note the background where he's from. Protection was not provided to his mother. Protection was not provided to his sister. And he essentially felt defenseless and humiliated having to

witness the abuse that was laid upon them and feeling helpless in being able to respond. So the idea of being able to protect his family, to be present with his family is something that is acutely important to Mr. Smith and is something that is a newer development in his life since the offense conduct.

And, in fact, Your Honor, on page 19 of our sentencing memorandum, he provides a quote where he basically -- and I'm paraphrasing, but he essentially says his entire focus has changed. He really doesn't have any use for, any interest in -- at all into anything other than being able to be present, not just as a husband, but really as a father. And I think that he has shown that in the six years that it's been since the -- five to six years since the offense conduct.

In addition to that, Your Honor has already noticed his little criminal history. He's a category I, zero criminal history points.

And lastly, I simply want to mention that as Your Honor is aware, there are collateral consequences that affect every person who is found guilty of or pleads guilty to a felony charge. That is certainly not lacking on Mr. Smith's shoulder and it offers a deterrence to him going forward, as I believe it would for anyone who asks him about his experience. He's a felon. Being able to go forward, to provide for his family, which he is acutely interested in doing, is going to be more challenging than it would be otherwise. Being able to

move forward with the stigma of it regardless of the actual financial consequences, just the stigma of having this on his shoulders, it's a real collateral consequence that perhaps may not be as important to other parties, but it is a real -- it's a reality for this gentleman sitting before you.

Additionally, Your Honor, his wife also lost her job as a part of this case. She had been working with the airlines for 13 years. That's a collateral consequence that's also real and affecting his family.

So there has been some real impact on this gentleman so that he can understand, certainly anyone who would ask him about this case would understand, impacts him. He has no reason to want to go down the same path. And it is our position that he has actively made sure that he starts on and continues on the correct path so that he never has to be before another judge or negatively interacting with law enforcement going forward, and that shows with his extensive work history, his commitment to successfully completing rehabilitation through outpatient treatment, through his statements about family and his seriousness about it, his responsibility and his role within his family.

And I would also note the letters of support from the people who have known him who also have stated for Your Honor to be aware of the changes, the black and white changes that they've seen in him since the inception of this case.

And so we respectfully ask Your Honor to keep that in mind when drafting a sentence for Mr. Smith.

THE COURT: All right. Thank you.

MS. CAUSE: May I have one moment, Your Honor, please?

THE COURT: Yes, you may.

(Defense counsel conferred.)

MR. TATE: I'm asking Ms. Cause to just -- I know his mother is here and his wife and I just want to give them the opportunity to say something if it's appropriate at this time, Your Honor.

THE COURT: They can. And Mr. Savage can ask any questions he wants to if they do, but they can.

(Pause.)

MS. CAUSE: Your Honor, I assume you want her to stay over here.

THE COURT: Yes, please.

MS. ADAMS: Yes, Your Honor. This is my son and I am speaking on his behalf that since these things have happened in his life, he has gave birth to two children, one that's going to be one year old Sunday and another one that's two years old. I know that he's focused more on trying to help the family. He's the only male figure in our family right now. So with that being said, we have five other -- I have five other grandchildren in my home so it's a total of

seven grandchildren that we're trying to provide for as a family, and him being the only male in the home.

He is missed and I know that he's ready to come home and help the family out and get on the right path and do what's right for us.

THE COURT: Okay. Mr. Savage, any questions at all?

MR. SAVAGE: No, Your Honor.

THE COURT: All right. Thank you, ma'am.

MS. CAUSE: I apologize, Your Honor. I'm trying to locate his wife.

MR. TATE: He has small children. I think they were making noise so she had to go outside.

THE COURT: Okay. Let me go ahead while we're waiting for her and let the defendant allocute if he wishes to.

What would you like to say?

THE DEFENDANT: Thank you, Your Honor, for the opportunity to speak here today. I'm in agreement with you, these are serious issues for our country. I just want to let the Court know the effect this case (inaudible).

THE COURT REPORTER: I'm sorry, I'm having a hard time understanding you with your mask on.

THE DEFENDANT: There are factors to this case that have been blindsided by a lot of other things, Your Honor. This informant Kareem that I contacted lied to the Court in

trial saying that he had to get back surgery by a pediatrician. He didn't want to come to trial and be present. He also lied to me, Your Honor. He told me the person that Abu Khalid was was a person who worked with Doctors Without Borders. I had no prior knowledge before I ever got to this guy that he was an ISIS recruiter, an ISIS facilitator. I was never told any of this information, Your Honor.

Moving forward from that to after the interview in 2016, Your Honor, I went into private security, armed private security. During the process of training for that job, there was an officer -- security officer killed in Greensboro, North Carolina, showing me the dangerousness of this job, the low pay, the less benefits. I still took the job. I did my duties. I protected the public. I worked in some of the most roughest areas in Charlotte, often without backup, often alongside law enforcement.

So this whole notion that I'm some crazy menace to society just isn't true, you know. I've responded to this situation as best as I could. I went through this whole process of trial. I went through the whole process of home confinement for 21 months. I'm trying to get this behind me and get back to my two children, my mother, my wife.

My mother had to take a third shift job at a fast food restaurant, almost near 60 years old now, because I've been away.

My wife doesn't have time to work because of my two children. I have seven kids including my nieces and nephews that depend on me. Even after I lost my job with the security and I was on pretrial, I found work. Even though I was limited to the type of work, limited to the hours I could work, I still found work and I provided for my family.

My whole thing is justice and being right, do you understand me? And this is where I am now. I'm here for my family. I want to be there for my family. I have no intentions -- never have I ever supported terrorism. This was something that was thrust upon me, not something that I actively sought, Your Honor. It's clear as day. Any time they asked, "What are your intentions," I never said I intended to do anything for ISIS. This was always a prompting by the informant, Your Honor.

So I just want the Court to know that I don't support terrorism. I don't support ISIS. I'm for people in this country and abroad for justice and peace. I want to be there for my family. I want to love them. I want to take care of them, especially during this pandemic with corona and stuff going on where they are susceptible, Your Honor. I would just ask the Court to take everything into consideration before sentencing me, Your Honor.

THE COURT: All right. Thank you.

MS. CAUSE: Thank you for your patience, Your Honor.

THE COURT: Yes, ma'am.

MRS. SMITH: I'm his wife. Throughout the time that he's been incarcerated, I had our daughter. He has never met my daughter. Me and his mom are the only two women at home that run the household. Two women, seven children. It's really difficult not having a man at home. So we would like to have him home if possible. Thank you.

THE COURT: Thank you.

All right. Mr. Savage, what says the government?

MR. SAVAGE: Your Honor, we think an appropriate sentence would be something between -- something closer to what Saeed Kodaimati got. He was sentenced to 96 months. We think maybe that's too high. But certainly if you look at the chart that was provided by the defense, minus the outliers which I think are the 24 months. We don't know the facts of why those cases were departed. Clearly this Court has respect for the guidelines and for the terrorism enhancement so that has to be a factor.

So we would suggest that a sentence somewhere between 60 and 96 months given the Court's discretion would be an appropriate sentence. Certainly time served does not address the seriousness of this, and I'm not going to go all over that. I mean, the Court articulated --

THE COURT: So you think the sentence should be where, now?

MR. SAVAGE: Somewhere between, I think, 60 and 96 months. I think 60, 5 years, would be the floor. That would -- that would be -- that would be the statutory sentence of a false statement without international terrorism.

THE COURT: Be 63 months, wouldn't it?

MR. SAVAGE: Yes, Your Honor. Well, in this particular case if you applied the guidelines -- I mean, the statutory maximum, if the international enhancement wouldn't apply, would be 60 months, 5 years --

THE COURT: Okay.

MR. SAVAGE: -- is what I'm trying to say.

But you add on the eight years -- and Congress did that for a reason. I don't think the Court has to take every inch of that, but a couple of different things.

First of all, there is no criminal history here, but you can look at the presentence report as well as I can. There are zero points, but there is a lot of cause for concern, particularly the incident with the firearm at a gas station. Now, he wasn't prosecuted for that, but they certainly took away the gun.

One of the things he had is he had a gun and he used it in the -- I guess, the private security business. We researched that. And I think that there was an allegation, and I talked with the probation office about that. Nobody knew that he was using -- at least the probation office wasn't

aware and the State of North Carolina wasn't aware that he was acting while on bond as a security guard with a gun. In fact, we interviewed one of his employers. I think that that was not as rosy a situation as he painted. We interviewed a Charles McCurry with Guard One who's a district manager here in North Carolina and he talks about him being fired at the Food Lion at one point because he got into a bunch of arguments with some gang members at a Food Lion about whether -- whether or not -- and they were making fun of him because he was a security guard. The defendant didn't use his cool and respond to that. Instead, he caused an altercation and as a result of that, Food Lion didn't want him around anymore.

So I think there is contrary -- and I think maybe Dr. Hilkey is the better source of information than Dr. Weine. The defendant has a short fuse and he certainly acts on impulse more than he does on thought. And if that occurred here, then I think that there is some need for additional time in order to take that into consideration.

There are a lot of things the defense says, but I'm not going to go through all of them.

On the risk of recidivism, I think you have -- he was incarcerated after he was convicted by a jury. You haven't heard any expression of remorse or regret. Not that that's required, but certainly if you're looking at these

other cases where there's guilty pleas, there's acceptance of responsibility, there's cooperation, there was none of that here. There are still questions that are unanswered, I think, as a result of that.

He does express concern for his family here, but where was that concern when he was planning to go off to Syria to fight with the Kodaimatis? I mean, he was engaged to the same person. He had the same fiancee. His mother was still there. She didn't have two additional grandchildren, but his sister and the grandchildren were there. All of those factors were present when this was going on, but he took no consideration at that time for them. And I regret that this has occurred and there is always collateral damage here, but we didn't cause that. This is the defendant's making.

He was -- he knew that this was an egregious offense. And I think the best thing you can do is when Agent Godfrey talked to him -- first of all, he came on his own. Agent Godfrey during the course of this 112-minute interview, which you can all watch on tape, gave him a copy of the very statute he was convicted of violating. Read it to him. Said, "Do you understand it?" And gave him a copy to take home. Nowhere in there -- and then he tried to approach them at other times. And one of the main problems here, Your Honor, just is getting through the morass that it takes -- to bring a national security case takes a lot of time.

THE COURT: Right, but in the end this is a false statement case. In other words, I understand that a national security case --

MR. SAVAGE: Right.

THE COURT: -- takes a lot of time to get through.

MR. SAVAGE: Right. But the --

THE COURT: But you got to do the heavy lifting.

MR. SAVAGE: Right. But there's a lot of coordination. We are not allowed -- as you well know from your time in our office, the U.S. attorney in the Western District of North Carolina is not allowed to bring this case. This case has to be approved by the National Security Division. The evidence that's used in the case has to be cleared and declassified by the FBI in not just the Charlotte office but higher offices. So all of that -- and the Court is aware from the Classified Information Procedures Act motions that we filed that there was a lot of background that went into this. So we weren't just sitting around, like, wondering whether the defendant was going to commit another offense. And he was under very close supervision or surveillance during the time that he was on bond. So the idea that we just sat around for two years waiting for this defendant to do something is not -- is not true.

But I think that we get down to the answer, is a serious sentence necessary to deter him? I think so. I mean,

listen to his allocution here. I mean, so what if Kareem lied back in Memphis. And by the way, he was here ready to testify and they could have called him. He was right there. They didn't. If they thought he had something important to say -- we brought him here. We made sure he was here. And this was probably the fairest trial it could have ever been. Everybody had a good shot. You were there. You saw what happened. So the idea that he was somehow cheated or not treated fairly is not true.

THE COURT: Have you got some sentences for me in these kind of cases?

MR. SAVAGE: Right. So I think that -- I would agree with the defendant's --

THE COURT: Do you have some sentences on false statement cases that are similar to this?

MR. SAVAGE: Well, the biggest one and the closest one is Saeed Kodaimati. He pled guilty to three counts in the Southern District of California and he got 96 months.

THE COURT: Who else you got? Anybody else?

MR. SAVAGE: Not in -- not that meets these facts.

You know, I've done a lot of bank fraud cases that we had 1001s involving false statements to banks. That usually depends upon the loss amount. There are a lot of intangibles here. I suggest we probably didn't need to spend $8,000 of taxpayer money to point out to you what parts of

this are important or not. But there we go.

MR. TATE: I can't believe he said that when he spent $300,000 on those informants. I can't believe he said that.

THE COURT: Go ahead, Mr. Tate.

MR. TATE: I can't believe he said that.

Kodaimati is so different. Kodaimati had a body piercing, count two --

MS. BALDWIN: No, no, no.

MR. TATE: That was the other guy?

MS. BALDWIN: Kodaimati was convicted of actually lying about fighting with terrorist organizations and the other organizations. Indeed, it was the connection with the Kodaimatis that even got Mr. Smith on the FBI's radar. If it was just Mr. Smith on Facebook talking about, like, Oh, the Syrian revolution is bad, like, we should go over and do something, they wouldn't have done anything. It was because the Kodaimatis were fighting with terrorist organizations.

THE COURT: So Kodaimati was in Syria?

MS. BALDWIN: Yes.

MR. SAVAGE: Right.

MS. BALDWIN: He was in Syria and he participated. He admitted to lying and participating in attacks with al-Nusra which is the al-Qaida arm in Syria. And indeed, al-Nusra still holds some of those buildings today,

apparently, in part because of Saeed's help in a diversionary attack.

THE COURT: Mr. Savage.

MR. SAVAGE: Well, I think you've got to be careful about the facts here because what he lied about was posting -- what he lied about was posting information with -- with their client.

MS. BALDWIN: Excuse me, that --

THE COURT: Right. But the thing the Court is looking at --

MR. SAVAGE: Right. He was actually --

THE COURT: -- it's looking at the statute and all of the facts that are here because what we've got is we've got a situation where there are people who -- I don't know where they think all these other great countries are, but who want to destroy this country for whatever reason, religious, political, or whatever. Lot of times it's political people who convince people under the guise of religion to do these things. And it's been done for a long, long time --

MR. SAVAGE: Yes.

THE COURT: -- where somebody tells -- somebody said, God said to go in and kill every man, woman, child, and animal, and that happens. You know, if God is there, and I believe he is, he's there -- he wants you to live for him, not to kill for him. If he wants you dead, you're dead. He

doesn't need somebody to run over there to Syria and kill anybody. But these people -- these people think that's why it's to happen and they absolutely do politically. And it's a political danger to the United States. Their religious fervor is a danger to the political United States of America.

MR. SAVAGE: Even if we agree with everything the defense just said about Kodaimati, that's the ceiling. This person attempted to materially support Kodaimati. So as wrong as Kodaimati is, that's as wrong as Smith is. The only difference is Kodaimati actually went --

THE COURT: Well, I'm not going to give him 96 months. I've got to decide what to give him. I'm going to give him something under that.

MR. SAVAGE: It ought to be at least 60 months. I mean, that's the floor under the statute.

THE COURT: Yeah, it's at least that. I'm not going to -- I'm not going to --

MR. SAVAGE: So beyond that, Your Honor, I don't think it's the government's position. I think the Court's always been very independent about evaluating these factors. All we ask for is a clear record. We think 60 months is the minimum. We think 96 months is obviously the ceiling, not because it's the statute -- well, it isn't the statute, but because Kodaimati received that.

THE COURT: Yeah, I could give him -- I could stack

them and I could give him -- and I could go to the 210 months.

MR. SAVAGE: We're not suggesting that.

THE COURT: But that would not be, under these facts and under this defendant's personal information, and such, that in and of itself would not be the correct sentence in this case.

The Court is very concerned because people don't give up their religious beliefs very easily. If they believe that they've got to kill for whatever reason, they will kill for whatever reason. I'm very disturbed by some of the things that came out in this case about beheadings and all of those types of things that occurred. Normal, kind-thinking people could never ever do such a thing, and the talking about that is very, very concerning considering how serious this matter was.

MR. TATE: Your Honor, if the Court recalls, we had this discussion mid-trial with Mr. Savage and the Court was talking about the plea offer that had been offered to Mr. Smith of 36 months, and the Court said it thought that was very fair. And Mr. Savage commented at that time, "I think we might end up there." And I don't think because he went to trial --

THE COURT: I don't penalize somebody for going to trial, but the problem with trials is I hear everything.

MR. TATE: Right.

THE COURT: If you don't go to trial, I get a limited amount of facts that I hear.

MR. TATE: Right.

THE COURT: When you go to trial, I hear a lot of stuff, and this case truly and honestly bothers the Court. It's a very, very serious matter. It is -- I'm going to treat it as a false statement, which is what it is. I believe that it is a -- it dealt with -- the terrorism guideline is appropriately applied. And I'm not bound by any other district in terms of what sentence that I give. I'm not really bound by any other judge necessarily here. But I do want to be fair because the guidelines do say that we have to avoid unwarranted sentencing disparity.

But if I did -- if I had to do banking cases here like they do in the Southern District of New York, just don't even bring them because they're giving them probation up there. I had a case here where the guy -- I had to give the guy the same sentence they gave the guy up in New York because it was in the same case that was here. And I'm going what are they doing? Now, guns and drugs, they might send those folks off forever, but they were letting the banking folks go.

But this is a bad thing, Mr. Tate. This is a very bad thing. It's a -- it's what the false statement is in the nature of. And this defendant was ready to help a terrorist organization and ready, willing, and able. He may have

changed; he may not.

But the things that I have to look at are to promote respect for the law, provide just punishment for the offense, to protect the public from further crimes of this defendant, and to deter other people who are being told to go over there by people who would never do this. You know, sometimes you ought to just sit down and think, you know, if this leader believed that if I -- if he went in there and sacrificed himself, he would go immediately to heaven and get all this stuff. Why, you couldn't get -- you couldn't get in front of him. He'd be racing to the top. They don't believe it, but they tell these people to believe it. They believe it and then they go and do the work for them because they have a political agenda that they're trying to use God to complete. That's what's happening.

MR. TATE: Do you remember his statements in the recordings where he told Abu Khalid, "I'm no martyr. I'm not going over there."

THE COURT: Yeah, but what he was talking about there is he said, "I'll fight, but I'm not going to" -- in other words, "I'm not going to strap myself with explosives and go in there. I'll fight, but I want to fight to live to the next day." What he means is he'll fight in a battle, but he is not going to put explosives and charge and be an automatic martyr. That's not what he -- if you look at it, he

said, "I'll fight, but I'm going to fight to live for the next day. I'm not going to be a martyr. I'm not going to stand up and say, 'Take me up now.'" You know, I think that's going to be a bad day. I think they've got a big surprise coming on that one.

MR. TATE: I would ask the Court please don't lose track of the fact that he never went. He never made it.

THE COURT: I do. I'm looking at everything, Mr. Tate. I'm looking at absolutely everything in this case. If he tried to go over there, 96 months might not be enough.

MR. TATE: And from a deterrent standpoint, this whole thing with -- and I had to explain to him the difference in 1001 with General Flynn and his case. He pleads guilty and all of a sudden --

THE COURT: Listen, I can't get started on politics and what happens in all that mess. I got my own opinions about that and they're going to stay my own opinions about that. I can only handle the cases that are in front of me.

No, I think -- I think this is a serious matter that the Court needs to take care of. In looking at these, the Court has taken into consideration that this is a criminal history category I. I've read the things that Mr. Savage says about the defendant. I don't think that they overcome the fact that he is a low criminal history category.

I do not -- I am not persuaded that he is a low risk

to commit acts of extremism or affiliate with terrorist groups. I do believe the doctor is not a shield for the defense. I think he's got a method that works. But he can only -- only spit out what is put in and I don't think he had all of the information about the defendant such as the mother saying -- mother saying that he wanted to go over there and help his brothers over there, help his fellow folks. So I'm not sure about -- I'm not sure about that. But I'm certainly considering that -- I don't know that he is a high risk at this point, so I will say that. I'm taking that into consideration.

The sentencing disparity is certainly something the Court takes into consideration even if it comes from another district, although the Court is not bound by that. In some districts -- you go to some districts in the country and sentences are high and some they're low. More so than sentencing disparity in the country is charging disparity in the country. That is, a crime that might be big in New York or California might be different somewhere else. A crime that's little in California might be important here.

I can remember back in the days when as a prosecutor if we had 5 kilograms of cocaine, Miami laughed at us because they never prosecuted anything around 5 kilograms of cocaine, but that was a big deal here. So if I was going to sentence people based on Miami on cocaine, then I would have to go a

different way. So --

MR. SAVAGE: Your Honor --

THE COURT: And then Mr. Smith's nearly six-year post-rehabilitation is spotty since August 2014 to 2015, but it's not as bad as a lot of them I've seen, and, Mr. Tate, you're right about that.

So taking all that into consideration --

MR. SAVAGE: Your Honor, one thing. The criminal history -- I'm sure you meant to say this, but the criminal history category in the PSR is actually criminal history category VI.

THE COURT: Right, VI. I mean -- yeah, he would be -- his criminal history points are zero.

MR. SAVAGE: Yes, right.

THE COURT: Which would be criminal history I. And you're right, because of the terrorism guideline, it goes from criminal history category I --

MR. SAVAGE: To VI.

THE COURT: -- to VI and that makes it -- and since it's a 32, it makes him -- the guideline is 210 to, I believe, 262 months.

MR. SAVAGE: Right. I just want to make sure for the Fourth Circuit --

THE COURT: You're right. Yeah, we don't -- yeah, we don't want any mistakes on the record.

So the criminal history category is VI, but the criminal history points are zero.

MR. SAVAGE: Yes, Your Honor.

THE COURT: And that's important to the Court. And that's one of the reasons for the variance.

The other reason for the variance is the fact that this is a -- although it's related to and involves terrorism -- and thanks to the folks who are protecting us from terrorism. This is a very, very serious thing. There are people who, for reasons that I cannot wrap my mind around sometimes, wish us harm and would destroy our country if they could. So that needs to be protected.

But it is a case of false statement which occurred during one interview. Two false statements, different false statements. Two false statements which each must be punished. But in looking at everything, the Court is going to run those particular sentences concurrent under these facts.

And so what the Court is going to do, it's going to vary. And a lot of this variance has to do with sentencing disparity on these cases. And also taking a look at the fact that the Court has applied the terrorism guideline and where it fits in terrorism in the pantheon of terrorist activity is not at the high end of that.

So with all of those things into consideration, the Court is going to vary downward to -- he's still got a

criminal history category of VI, so I'm going to have to go with an offense level -- so I guess I'll go down to level 17, criminal history category VI -- excuse me, level 18, criminal history category VI, 57 to 71 months, 57 to 71 months. The Court is going to sentence the defendant at the 60-month level in this case for the reasons it has given and spoken here in open court and the 3553(a) factors that the Court has identified here in this case.

All right. Please stand, sir. Please stand.

THE DEFENDANT: Yes, sir.

THE COURT: Pursuant to the Sentencing Reform Act of 1984 and *U.S. v. Booker*, it is the judgment of the Court, having considered the factors noted in 18, United States Code, Section 3553(a), the defendant, Alexander Samuel Smith, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 60 months on count one and a term of 60 months on count two to be run concurrently to the extent necessary to produce a total term of 60 months.

It is further ordered defendant be required to support all dependents from prison earnings while incarcerated as outlined in the presentence report.

The Court further recommends the defendant be allowed to participate in any educational and vocational opportunities while incarcerated.

The Court calls to the attention of the custodial

authorities that the defendant has a history of substance abuse and recommends the defendant be allowed to participate in any available substance abuse treatment program while incarcerated and, if eligible, receive the benefit of 18, United States Code, Section 3621(e)(2).

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of -- and what is the longest term of supervised release that I can give this defendant?

THE PROBATION OFFICER: Your Honor, the guideline range is one to three years.

THE COURT: Okay. Is that with the terrorist...

THE PROBATION OFFICER: It is. That doesn't change.

THE COURT: Doesn't change it at all?

THE PROBATION OFFICER: No, sir.

THE COURT: Okay. Then I'll go with the three-year level then. All right.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years on each count, to run concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another federal, state, or local crime, and shall

comply with the standard conditions of supervised release that have been adopted by the Court in the Western District of North Carolina and shall comply with the following additional conditions.

Defendant shall not communicate or otherwise interact with any known member of the Islamic State of Iraq and al-Sham (ISIS), a designated foreign terrorist organization, without first obtaining permission of the probation officer.

Any terrorist organization whatsoever that's listed, any known listed, I would ask that that be -- list be given to the -- that's been designated to the probation officer so they can tell the defendant he is not to contact them.

MR. SAVAGE: You want us to provide the State Department list to the probation office?

THE COURT: If you could, yes, unless there is some reason not to do that for security reasons.

MR. SAVAGE: No, no, no. That's a public record.

THE COURT: I'd like them to have it and be able to tell him he cannot associate with any of these organizations or any member of these organizations.

MR. SAVAGE: Yes, Your Honor.

THE COURT: It is further ordered defendant shall pay the United States a special assessment of $200.

The Court finds the defendant does not have the

ability to pay a fine or interest and, having considered the factors noted in 18, United States Code, Section 3572(a), will waive payment of a fine and interest in this case.

Payment of the $200 criminal monetary penalty is due and payable immediately.

The Court has considered the financial and other information contained in the presentence report and finds the following is feasible:

If the defendant is unable to pay the $200 monetary penalty immediately, during the period of imprisonment payments shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility Program.

Upon release from imprisonment, any remaining balance shall be paid in monthly installments of not less than $50 a month to commence within 60 days of going on supervision until paid in full.

Throughout the period of supervision, the probation officer shall monitor the defendant's economic circumstances and shall report to the Court, with recommendations as warranted, any material changes that affect the defendant's ability to pay any court-ordered penalties.

Any legal reason why this should not be the sentence?

MR. SAVAGE: No, Your Honor.

MR. TATE: No, Your Honor.

THE PROBATION OFFICER: Your Honor...

THE COURT: Yes, ma'am.

THE PROBATION OFFICER: Just as a technicality, the Court stated that the guideline range is 210 to 262 months.

THE COURT: Yeah.

THE PROBATION OFFICER: But based on the statute in 5G --

THE COURT: Right, it would -- it should be 190 -- yeah.

THE PROBATION OFFICER: Technically the guideline range is 192 months.

THE COURT: One hundred ninety-two months is the guideline range. Okay. Let me make that clear.

The guideline range that's listed in the manual is 210, but the statutory maximum is 96 on each, so the true guideline range is not a range but a fact and that is 192 months.

THE PROBATION OFFICER: Correct.

THE COURT: All right. Thank you for that correction. Thank you.

Anything from the defense with regard to that?

MR. TATE: Your Honor, we'd request the Court put comments on the record that he be recommended for the RDAP program. They mentioned some substance abuse usage while on pretrial supervision. He's got a 60-month sentence. There

should be time for him to get in that program. Ask the Court to make a recommendation for that.

And also that he be designated -- they're taking the actual Court's recommendations more favorably now, although the BOP still needs to make that determination -- that he be designated to the Butner prison camp so that he can facilitate visits with his young family.

THE COURT: Okay. I'm not going to designate him specifically to Butner. We've had a lot of problem with COVID down there, but they may end up deciding to put him down there if they want to.

I will recommend he be designated as close to Charlotte as possible to facilitate visitation with the family.

And I have asked that he be placed in a drug program as part of the sentence. I indicated that he should be placed -- he has some substance abuse problem and should be placed in such a program.

MR. TATE: Thank you, Your Honor.

THE COURT: Yes, sir.

Okay. Anything else that I need to cover?

MR. TATE: Not at this time.

MR. SAVAGE: No, Your Honor.

THE COURT: All right. Then that is the sentence in this case.

Sir, you may appeal this conviction and sentence to the Fourth Circuit Court of Appeals. Any appeal must be done -- let me say this. This five-month [sic] sentence covers the 3553(a) factors and this would be the sentence even if the terrorist guideline did not apply. Even if that did not apply, the Court's going to give him five years. This is a serious, serious matter. The people that are involved in terrorism are of a serious nature and this country has had much, much pain from that, and those who participate in that deserve a serious sentence.

The Court has taken into consideration that these are false statement cases and has taken into consideration all the factors that it has. But this in no way, no way is implicated by the application of any particular guideline. This is the 3553(a) factors under this sentence.

All right. That's the sentence in this case. And if there is -- you may appeal this sentence and conviction to the Fourth Circuit Court of Appeals. Any appeal must be done in writing and must be done within 14 calendar days from when I enter the written judgment in this case. If you wish to appeal and cannot afford to appeal, you may appeal at government expense.

I suggest you speak to your excellent attorneys -- and they are, they've done an excellent job I would say -- as to whether or not in this circumstance you wish to appeal.

But do you understand your right to appeal as I have just explained it to you?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Anything further from the defense?

MR. TATE: Nothing further.

THE COURT: Okay. Anything further from the government?

MR. SAVAGE: No, Your Honor.

THE COURT: All right. Thank you. This matter is concluded.

(End of proceedings at 4:33 PM.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 5th day of October 2020.

s/Cheryl A. Nuccio
_______________________
Cheryl A. Nuccio, RMR-CRR
Official Court Reporter