**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| v. | ) | **DOCKET NO: 3:17-CR-182-MOC-DSC-1** |
| **ALEXANDER SAMUEL SMITH,** Defendant | ) | |

**RE-SENTENCING MEMO**

COMES NOW, the Defendant herein, **ALEXANDER SAMUEL SMITH,** ("Mr. Smith"), by and through his undersigned counsel, and files this Re-Sentencing Memorandum supporting his position for a sentence of time served (approximately 51 BOP credited months) in this case.

### A. Summation

The Court should not impose the terrorism enhancement on Mr. Smith because the evidence does not show that he had the required specific intent -- that his lies to the FBI were calculated to promote

terrorism. As a result of this change and the vacation of the multiplicitous conviction, Mr. Smith should be sentenced to time served and released from further incarceration or supervised release.

**B. Original Sentencing**

A jury found Mr. Smith guilty of two counts of lying to the Federal Bureau of Investigation during an interview, in violation of 18 U.S.C. § 1001(a)(2) on March 21, 2019, after a multi-day trial. (Transcript, Doc #116, 117, 118).

The final Presentence Investigation Report applied the 2018 Guidelines Manual and determined that guidelines sentence for each count was found at USSG §2J1.2 and called for a base offense level of 14. (Doc #98, at 7, 8). The Probation Office also suggested that a Terrorism Enhancement should be applied to each count according to U.S.S.G. §3A1.4(a). The application of this guideline raised the proposed guidelines sentence to a level 32. Without the terrorism enhancement, the guidelines sentence base offense level of 14 and criminal history of I would be 15-21 months.

Mr. Smith had no criminal history points, but the application of the terrorism enhancement raised his criminal history from a category I to Category IV. The resulting total offense level of 32 and a criminal history category of VI yielded a guideline imprisonment range is 210 months to 262 months. This exceeded the statutorily authorized maximum sentences of eight years for violation of 18 U.S.C. § 1001(a)(2) ("Terrorism Maximum"),[1] so the statutory maximum became the proposed guidelines sentence.

During the sentencing process, the Defendant objected to several matters which were unchanged in the final Presentence Investigation Report. The Defendant objected (1) to characterization of his activity while under Pretrial Services supervision, (2) to the reliance on the Government's summary of the relevant conduct, which relied on facts set forth in the Indictment, not the facts adduced at trial, (3) to the government's "Statement of Facts and Relevant Conduct" contending it is not based on facts or evidence, but conjecture and argumentation, (4) the application of the Terrorism Enhancement, and (5) maximum

---

[1] The maximum sentence for violation of 18 U.S.C. § 1001(a)(2) is five years unless the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years. The Jury found that each offense involved international terrorism.

sentence of 192 months based on multiplicity. (Doc #93, 95) (Doc #150, at 10-16).

On July 29, 2020, this Court held an extensive sentencing hearing (Transcript, Doc #119) with multiple witnesses. Addressing the Defendant's argument on multiplicity, the Court determined "I'm not going to find that it's multiplicitous, but I am going to sentence the defendant as if it is because I think – you know, it's in the same interview." (Doc #119, at 85:13-15, 101:1-6) ("But the Court intends to sentence the case as if there was one false statement because although there are two false statements, this particular interview was of such a nature and over the period of time of that interview that the Court believes that fairness in that would put this -- that we start our argument at 96 months.").

The Court also determined that the Terrorism Enhancement and Terrorism Maximum applied to Mr. Smith because he intended to offer material support by providing a buddy pass for the fictional person Mohamed Hilal. (Doc #119, at 100:9). Ultimately, this Court sentenced Mr. Smith to Sixty (60) Months on each count to run concurrently, and a special assessment of $200. (Doc #107). The Court also imposed a

supervised release period of three years on each count to run concurrently. Mr. Smith filed a timely appeal. (Doc #109)

**C. Appeal**

On appeal, Smith challenged (1) this court's denial of his motion to dismiss Count Two of his indictment as multiplicitous, (2) the sufficiency of the evidence supporting the jury's verdict, (3) the District Court's allegedly prejudicial statements to the jury, (4) the District Court's refusal to give an entrapment instruction,[2] and (5) the District Court's application of a terrorism enhancement at sentencing. (Doc #122, at 2). The Court of Appeals for the Fourth Circuit reversed the district court's denial of the motion to dismiss Count Two, vacated the judgment, and remanded this for resentencing.

In reviewing the claims of multiplicity, the appeals court determined that "When previously confronted with similar statutory language [to Section 1001(a)(2)], we have found Congress's intent ambiguous." (Doc #122, at 9). They determined that "nothing in our case

[2] The Court dispensed with the Defendant's argument regarding the jury instructions under plain error review. (Doc #122, at 28-31).

law nor the relevant legislative history serves to clarify this ambiguity," and applied the rule of lenity and vacated the judgment as to Count Two. (Doc #122, at 13).

The Court also considered "Smith's challenge to the sufficiency of the evidence." (Doc #122, at 14-20). His conviction on Count One was based on his response to questions from Agent Godfrey. Agent Godfrey, during his two-hour interview of Mr. Smith, asked, "Did you ever talk to 'Abu Khalid' about possibly going over to Syria?" *see* S.J.A. 81 at 1:56. This statement was actually true because Mr. Smith never spoke to "Abu Khalid," but, instead, spoke to a contractor playing the role of a fictional character named "Abu Khalid." When Mr. Smith answered "No" to this imprecise question, he may have actually been saying that he had not talked to "Abu Khalid" about "Abu Khalid" going to Syria or that he had not talked to "Abu Khalid" about going to Syria *with* "Abu Khalid". He could have even been saying "I never talked to 'Abu Khalid' about possibly going to Syria but I did talk to 'Khalid' about definitely going over to Syria."

Agent Godfrey also asked, "[H]ave you ever talked with anyone that you expressed to someone that you wanted to go to Syria and fight?" (Doc

#117, at 161:14-16). This question is phrased in such a way that it inquires whether Smith talked with any person ("anyone") on the subject of "express[ing] to someone" (a third person) that he "wanted to go to Syria and fight." Smith answered, "No, I've told them that I wished there was something I could do for people, but I never had any plans to go there and do anything." *Id.* (ellipses omitted).

Finally, Agent Godfrey asked "Okay. I mean, we talked about -- I mean, have you ever talked with anyone that you wanted to go to Syria and join ISIS?" (Doc #117, at 162:1-3). Smith responded, "No, we've talked – I talk to numerous – you have to understand the Muslim community. There's so much stuff going on now in the Muslim community with everything." (Doc #117, at 162:6-9).

Mr. Smith relied upon the "literal truth defense" set forth in *Bronston v. United States*, 409 U.S. 352 (1973), and argued that questions were ambiguous, and these answers were non-responsive, evasive and non-material. The Court disagreed (Doc #122, at 18, 19, 20). On March 1, 2023, Mr. Smith filed a Petition for a Writ of Certiorari with the United States Supreme Court presenting the question of "Whether a statement made to FBI agents can be material and knowingly false under 18 U.S.C.

§1001(a) when the criminal enterprise underlying the statement was completely fabricated by those same agents?"

Finally, the Fourth Circuit declined to address Mr. Smith's argument that "the district court erroneously imposed the terrorism enhancement under U.S.S.G. § 3A1.4," determining that they "need not delve into this question given that we're remanding for resentencing because of the district court's error on multiplicity." (Doc #122, at 31-32).

**D. Remaining Issue-Terrorism Enhancement**

This Terrorism Enhancement guideline, U.S.S.G. §3A1.4(a), only applies "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism…." U.S.S.G. §3A1.4(a). According Note 1 of this guideline, a federal crime of terrorism is defined by 18 U.S.C. § 2332b(g)(5).

The process for determining the Terrorism Enhancement was outlined in a recent Fourth Circuit case: "A court deciding whether to impose the terrorism enhancement must resolve any factual disputes that it deems relevant to application of the enhancement, and then, if it finds the requisite intent, should identify the evidence in the record that

supports its determination." *United States v. Hasson*, 26 F.4th 610, 624-25 (4th Cir. 2022) quoting *United States v Hassan*, 742 F.3d 104, 148. The Government must prove by a preponderance of the evidence that the adjustment applies. *United States v. Kobito*, 994 F.3d 696, 701 (4th Cir. 2021).

A federal crime of terrorism consists of two elements: "(1) the commission of one of a list of specified felonies, which include material support offenses under 18 U.S.C.S. § 2339B, and (2) specific intent, namely, that the underlying felony was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Chandia*, 514 F.3d 365, 375-76 (4th Cir. 2008) (citing 18 U.S.C. § 2332b(g)(5)). Mr. Smith was not charged with an offense under 18 U.S.C.S. § 2339B.

The Second Circuit has explained that the disjunctive phrase from U.S.S.G. § 3A1.4 (if the offense involved, OR was intended to promote, a federal crime of terrorism) "makes clear that the predicate offense must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism, and that each clause has a separate meaning." *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010).

An offense is "intended to promote" a federal crime of terrorism "whenever the defendant commits a felony with a goal or purpose to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B), even if the defendant has not necessarily completed, attempted, or conspired to commit the crime." *Hasson*, 26 F.4th at 624-25, *quoting Kobito*, 994 F.3d at 702.

Similar to *Chandia*, 514 F.3d 365, and unlike most cases where the enhancement has been applied, the acts underlying the conviction in this case were not violent terrorist acts. There the Court held, "Therefore, these acts cannot, standing alone, support application of the terrorism enhancement. Because there has been no factual finding on the intent element, and because the basic facts supporting the conviction do not give rise to an automatic inference of the required intent," the enhancement could not be upheld. *Id.*, 514 F.3d at 376.

The terrorism enhancement cannot apply where there is no finding of specific intent to "influence or affect the conduct of government by intimidation or coercion." 18 U.S.C. § 2332b(g)(5)(A). The Ninth Circuit recently explained the standard in United States v. Amer Sinan Alhaggagi:

> In cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense. But, where the conduct underlying the conviction does not involve violent terrorist acts, as is true in many material support cases, those acts cannot, standing alone, support application of the terrorism enhancement. In such cases, evidence beyond the facts underlying the offense conduct must reflect that the defendant had the enhancement's requisite intent.

978 F.3d 693, 701-02 (9th Cir. 2020) (quoting *Chandia v. United States*, 514 F.3d 365, 376 (4th Cir. 2008)) (internal citations and quotation marks omitted). Similar to the nonviolent material support cases described in *Alhaggagi*, Smith's allegedly false statements alone do not support application of the terrorism enhancement.

At the initial sentencing, the District Court made no specific finding on required intent, and the record does not support a finding that Mr. Smith had the enhancement's required intent.

Based on the evidence presented in this case and at trial, Mr. Smith's sole motivation was to protect the Kodamaiti family whom he loved and that had once taken him in as a youth. He was greatly influenced by the kindness of the Kodaimati family, who took Mr. Smith in, giving him a job, and saving his life. Mr. Smith became part of the Kodaimati family and adopted their religion. About eighteen months

after meeting the Kodaimatis, Smith was invited to visit them in Syria as they were tending to a sick family member. In 2006, Mr. Smith spent a little less than a month in Syria with them. He most fondly remembers the people, feeling he was accepted. As Alex explained, “In Syria, they don’t see color. I was always judged for being biracial, but they saw me as a human.” When the Syrian Civil War broke out in 2011, Mr. Kodaimati’s wife and some of his family were trapped in the village of Kafr Hamrah, a suburb of Aleppo in an area contested by the Assad regime, the Free Syrian Army, and ISIS.

The situation in Syria was extraordinarily convoluted. In the summer of 2014, the war in Syria had been waging for more than three years. Forces loyal to President Bashar al-Assad were battling a myriad of rebel groups including the Free Syrian Army,[3] Kurdish separatists, the Salafist jihadist organization Al-Nusra Front, the Islamic State of Iraq and Syria (ISIS), and others. The United States opposed Assad’s government and provided aid to the Supreme Military Council, a coalition of rebels in opposition to Assad’s regime. In September 2013, a

---

[3] At that time, the Free Syrian Army was a member of the Syrian National Coalition, the recognized representative of the Syrian people by the United States government. See U.S. Dept. of State Press Release, Remarks to the Friends of the Syrian People (Dec. 12, 2012), https://goo.gl/QmjOc2 (archived Apr. 13, 2015).

number of Salafi jihadist and other Sunni Islamic fundamentalist groups left the Supreme Military Council to form the Islamic Coalition. Around the same time, ISIS began making gains in Syria from their strongholds in Iraq.

It was against this complex backdrop that the FBI began their investigation of Mr. Smith. Throughout his involvement with the FBI contractor known as "Abu Khalid", Mr. Smith reiterated his intention to help the Kodaimati family in Syria. After several conversations with "Abu Khalid", he cut off further communications saying, "I can't have anything to do with this. All I wanted was to go visit my friends to make sure he and his family was okay. You then started asking me to do things I had no intention of doing." (Doc. #117, at 359:4-8).

The guidelines do not support a finding of specific intent by Mr. Smith. United States Sentencing Guideline §1B1.3(a) defines relevant conduct as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant… that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. §1B1.3(a). This

means that the terrorism enhancement must be based on Mr. Smith's acts or omissions during the commission of his false statements, in preparation for those false statements, or in the course of attempting to avoid detection or responsibility for his false statements.

Mr. Smith's actions from June 2014 to April 2015 are not relevant conduct for his false statements conviction. As explained by Mr. Tate in his initial Sentencing Memorandum, "Mr. Smith's conversations and actions during 2014 to 2015 surely *did not occur "during" his purported lies at the 2016 FBI interview*." (Doc #105, at 11). He continues, "Nor could his actions taking place *before* uttering the false statements be an attempt to avoid detection of his false statements." *Id.* Finally, "Mr. Smith's discussions with Khalid and procurement of the buddy pass in 2014 and 2015 *were not done "in preparation"* for his false statements in 2016." *Id.* Ultimately, the evidence establishes that Mr. Smith did not possess the required intent to support a terrorism enhancement during the relevant period.

An application note does state that "obstruct[ing] an investigation of a federal crime of terrorism" constitutes promotion of a federal crime of terrorism triggering the adjustment. U.S.S.G. §3A1.4, n.2. But this

standard requires actual obstruction of a specific crime of terrorism. *United States v. Benkahla*, 501 F.Supp.2d 748, 751, 756 (E.D. Va. 2007). In this case, there can be no actual obstruction, because the government already knew the truth, and Mr. Smith's statements could not actually obstruct any investigation. This precludes the finding that the statements were an *actual obstruction* qualifying for the terrorism enhancement. *United States v. Biheiri*, 356 F.Supp.2d 589, 599-600 (E.D. Va. 2005) (terrorism enhancement did not apply because the government could not demonstrate that false statements of information already known by agents obstructed a federal crime of terrorism).

Further, Application Note 2 cannot support a Terrorism Enhancement, because it is plainly inconsistent with the Guidelines. If an application note is inconsistent with a guideline, the guideline controls. *Stinson v. United States*, 508 U.S. 36, 43, 113 S. Ct. 1913, 1918, 123 L.Ed.2d 598, 607 (1993). *See also United States v. Winstead*, 890 F.3d 1082, 1090-92 (D.C. Cir. 2018); *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc). The Guidelines' "commentary 'should be treated as an agency's interpretation of its own legislative rule.'" *United States v. Winstead*, 890 F.3d 1082, 1090 (D.C. Cir. 2018) (quoting *Stinson*, 508 U.S.

36, 44-45, 113 S. Ct. 1913, 1919, 123 L.Ed.2d 598, 608 (1993)). While the commentary may interpret ambiguous guidelines, but the Commission's reading must fall "within the bounds of reasonable interpretation." *Kisor v. Wilkie*, ___ U.S. ___, 139 S. Ct. 2400, 2416, 204 L.Ed.2d 841, 859 (2019). That is not the case of Note 2 of U.S.S.G. §3A1.4.

Mr. Tate explained the improper application of Note 2 in his initial sentencing memorandum:

> Application note 2 is not a reasonable interpretation of § 3A1.4, because it impermissibly expands the guideline's unambiguous language. The guideline clearly defines offenses that qualify for the terrorism adjustment as "felon[ies] that involved, or w[ere] intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. The commentary, however, expands upon this precisely enumerated category to add offenses that harbor/conceal a terrorist or obstruct an investigation of a federal crime of terrorism. U.S.S.G. § 3A.14, comment. (n.2). Such a substantive expansion of a guideline cannot be done via commentary. See *Winstead*, 890 F.3d at 1091-92 (Sentencing Commission cannot expand the definition of "controlled substances" via commentary, such an expansion is to be accomplished by amending the language of the guidelines and submitting the change for congressional view).

(Doc #105, at 13). Using Note 2 to apply U.S.S.G. §3A1.4 to Mr. Smith's behavior is not within the bounds of reasonable interpretation.[4]

---

[4] The Fourth Circuit previously found that Application Note 2 was not inconsistent with the language of USSG § 3A1.4. *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008). However, this decision did not apply the recently clarified deference

**E. Application of 3553 factors**

*1. The Nature and Circumstances of the Offense and the History and Characteristics of the Offender*

*(A) Nature and Circumstances of Offense*

There is little question that the Defendant's offense was serious, but there was no actual harm done by the offense. As discussed throughout, the Federal Bureau of Investigation was not misled; the agents knew all of the facts of the situation, because they had invented all of the characters.

*(B) History and Characteristics of Alexander Samuel Smith*

Mr. Smith's PSR reflects he has zero (0) criminal history points. Despite his present conviction, there is no evidence that he committed any act of violence or would have a propensity to commit violent or non-violent criminal acts in the future. After all, Mr. Smith was "set up" in a fake 2014-2015 pseudo-terrorist investigation that appropriately yielded no charges. A year and a half later, he submitted to an interview which led to § 1001 charges.

---

standard announced in *Kisor* and also been undermined by the subsequent decisions in *Winstead* and *Havis*.

One of the keys for the success of defendants after their release from custody is family and community support. At the original sentencing, Mr. Smith received letters of support from his uncle, his maternal aunt, his mother, and his wife. (Doc# 106). All still support Mr. Smith. An article published in August 2012 in Corrections Today, a publication of the American Correctional Association, titled "The Role of Family and Pro-Social Relationships in Reducing Recidivism," noted that "Family can be a critical component in assisting individuals transitioning from incarceration because family members provide both social control and social support, which inhibit criminal activity.... In contrast, those without positive supportive relationships are more likely to engage in criminal behavior." A Vera Institute report, published in 2011, stated: "Research shows that incarcerated people who maintain supportive relationships with family members have better outcomes – such as stable housing and employment – when they return to the community. Many corrections practitioners and policy makers intuitively understand the positive role families can play in the reentry process…." Likewise, a 2004 study by the Urban Institute stated, "Our analysis found that [released prisoners] with closer family relationships, stronger family support, and

fewer negative dynamics in relationships with intimate partners were more likely to have worked after release and were less likely to have used drugs." The Urban Institute's study's authors concluded, "It is evident that family support, when it exists, is a strong asset that can be brought to the table in the reentry planning process."

He has served 51 credited months in custody as a "terrorist." Carrying that label, his time in custody was especially hard. After serving his term, he has been released from custody since earlier this year. Since the inception of the FBI investigation in 2014, being charged in June of 2017, being tried in March of 2019, and being sentenced in July 2020, Mr. Smith has taken critical and tangible steps to ensure that he is on track to living a law-abiding and productive remainder of his life after release. He is the father of two young children and has a renewed commitment to a law-abiding family life.

*2. The Need for the Sentence Imposed to Promote Certain Statutory Objectives:*

*(A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense*

Mr. Smith has shown his respect for the law following his federal offense by filing an appeal through the appropriate process. He prevailed

on his appeal and resentencing Mr. Smith to the same sentence would erode respect for the law and would be an unjust punishment for the offense. In light of the factors supporting a potential departure or variance, it would be appropriate to impose less than the guidelines sentence for this offense.

*(B) to afford adequate deterrence to criminal conduct*

Deterrence is both an individual and a societal goal. The courts want to discourage further criminal activity by both this Defendant and other members of society. Upon release, Mr. Smith has begun to actively give back to society and his family. He can serve as an example and could assist in deterring others from future crimes.

*(C) to protect the public from further crimes of the Defendant*

The Defendant will not return to this Court or to the jail after his release.

*(D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

No training, medical care or treatment is necessary.

*3. The Kinds of Sentences Available*

*Booker* gives the Court broad discretion on sentences which satisfy the factors of 18 U.S.C. §3553. We encourage this Court to craft a sentence which recognizes the complex nature of the issues raised.

*4. The Sentencing Range Established by the Sentencing Commission*

Relying upon the arguments presented herein, the Defendant suggests that the Court impose a sentence below the guidelines range.

*5. Any Pertinent Policy Statement*

None applicable.

*6. The Need to Avoid Unwarranted Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

As explained during the original sentencing, from 2012 to 2017, there were eleven defendants convicted of an obstruction offense (18 U.S.C. § 1001 or 18 U.S.C. § 1505 for obstructing a proceeding) that received the terrorism adjustment. Of these, four had a Guideline recommendation of the 96-month statutory maximum and all but one received a sentence of 48 months or less. *See also Sentencing Memorandum* (Doc #105, at 22-24); Exh 105-A; and Exh. 105-B.

The Defendant would note for the record and for considerations of 18 U.S.C. §3553(a)(6) that the United States Sentencing Commission has determined that the average sentence for the 107 federal defendants

sentenced under U.S.S.G. §2J1.2 (Obstruction of Justice) regardless of enhancement in fiscal year 2020, was 10 months. Nearly 19% of the defendants were given probation and the average active sentence of the 76 imprisoned defendants was 12 months, with 68.4% of sentences under 24 months. Only 6.6% of the defendants received a sentence 60 months or over.

Over the last 6 years nationally, the average sentence was 17 months of incarceration and a median of 12 months. Less than 31% of the sentences for obstruction of justice are within the guidelines, with more non-governmental downward variances (33.5%) than sentences within the guidelines.[5]

*7. The Need to Provide Restitution to Any Victims of the Offense*

Restitution is not applicable in this case.

*8. Requested Variance*

If necessary, the Defendant requests a variance of a sufficient extent to allow for time served.

[5] https://ida.ussc.gov/analytics/saw.dll?Dashboard (reviewed 3/19/2023). There were too few obstruction cases in the Western District for a comparison.

## CONCLUSION

Mr. Smith respectfully argues that, in light of foregoing and considering the factors enumerated in 18 U.S.C. §3553, the sentence that is sufficient, but not greater than necessary, to comply with the provisions of law would be a sentence of time served.

Respectfully Submitted, this the 19th day of March 2023.

/s/ James W. Kilbourne, Jr.
James W. Kilbourne, Jr.
State Bar No. 24354

ALLEN STAHL & KILBOURNE, P.L.L.C.
Attorney for Defendant
20 Town Mountain Road, Suite 100
Asheville, NC 28801
(828) 254-4778
jamesk@asklawnc.com