UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:17-CR-182 |
| vs. | ) | |
| ALEXANDER SAMUEL SMITH, | ) | |
| Defendant. | ) | |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
MARCH 24, 2023

APPEARANCES:

On Behalf of the Government:

MICHAEL E. SAVAGE, ESQ.
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202

On Behalf of the Defendant:

JAMES W. KILBOURNE, JR., ESQ.
Allen Stahl & Kilbourne, PLLC
20 Town Mountain Road, Suite 100
Asheville, North Carolina 28801

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

P R O C E E D I N G S

THE COURT: All right. One thing I made clear when I sentenced the defendant in this particular case was that I was sentencing him as if there was one, as if there was one. So now we've got one removed, there's still one.

MR. KILBOURNE: I understand that, Judge.

THE COURT: All right. So let's hear the argument as to why -- I gave him what, five years?

MR. KILBOURNE: Five years, Your Honor.

THE COURT: On a guideline of how big -- how big was the guideline?

MR. KILBOURNE: I think it was eight years. I believe that was the statutory max.

THE COURT: I understand the Court's job up there is to do technical things to make sure that we've got all the things correct, but let me hear why I should give a different sentence. How long has he been in?

MR. KILBOURNE: Your Honor, he has been in officially -- well, he's been in since you sentenced him, since the end of the trial, and he's been released since December -- October. He went to the halfway house and he's been out of custody since then, Your Honor. I think he was credited with 41 months, if I'm not mistaken, with good time and everything.

THE COURT: So far.

MR. KILBOURNE: So far. And of course, he's still on your supervised release at this point, Your Honor.

THE COURT: So has he finished the sentence or did they let him out based on this case?

MR. SAVAGE: No, Your Honor. I talked to the supervising probation officer. I think officially he finished his sentence in January of this year and they began supervision -- and probation can correct me, but they began supervision, I think, early in this year.

THE COURT: Okay.

MR. KILBOURNE: So he has done the five years of jail time Your Honor offered.

Your Honor, the one issue we believe -- and again, it may be parsing an issue without an effect in his particular case except whether you might give him credit for time served and allow him to be released from supervised release at this point -- was the question of the terrorism enhancement that the Fourth Circuit kicked back to you. As you remember from the terrorism enhancement, that without that, he's at a base offense level of 14 and a I because he had no -- zero history points. With that, of course, he goes to a 32 and a VI which gave a guidelines range of 210 to 262, which was then capped at 8 years by the statutory max that you found.

So, Your Honor, again, I think the issue here is the terrorism enhancement. I believe you based -- at least at the

time of the original sentencing, it appeared the terrorism enhancement was based only on his providing the ticket as part of the process. Obviously, that count is gone. That count is multiplicious and has disappeared.

There are two other problems, we believe, with the terrorism enhancement. One is that he lacks the specific intent to forward terrorism in the context of the charge of which he was charged which is 1001. You know more about the case than I do, Judge. You tried every single day of it. But we would argue that he lacks the specific intent to sustain the terrorism enhancement. And in addition, we believe that there is not evidence within that trial, within the sentencing to find that specific intent; that he specifically intended to forward terrorism and, you know, put people in fear of their lives as the terrorism law requires.

The other thing we think that's really important is that if you look at the offense of which he was convicted, lying to the FBI, whatever activity he did before that is not necessarily part of the 1B1.3(a) relevant conduct because it did not occur during the offense of conviction. It was not done in preparation for that offense. He had very little preparation for the offense of lying to the FBI. And it was not done in the course of attempting to avoid deception -- to avoid detection of that lie because it happened before the lie. So we believe because of the very technical

ramifications of 1B1.3, as well as the very technical requirement for specific intent, we don't believe that those two things apply here and that there should not be a terrorism enhancement.

And of course, we believe that's really important even if it -- all it would do is release him now from supervised release because we believe without a terrorism enhancement, then here's a man here who just lied to the FBI. He's not carrying that big T around for the rest of his life, and that's really important to him as a human being, as an individual, that he doesn't believe that he did anything to forward terrorism. He didn't do anything that moved terrorism forward. And of course, the unique facts of this case, it's hard to argue that he did anything to move terrorism forward. Now, he might have under a different set of facts; but under these facts, as you well know, the FBI knew everything that was happening. That all the characters here are FBI individuals who they themselves are created by the FBI and he was kept inside that bubble; and inside that bubble he couldn't do anything to plausibly effect terrorism.

THE COURT: But that's the intent. That's the whole thing on these sting operations. In other words, you find somebody who's been radicalized and then they -- before -- before they go out and actually in the mistaken idea that God is so weak he has to get them to kill for him and that he's so

corrupt he's going to bribe them with sex in the afterlife or some other reward, that these people become radicalized and they're a danger. And so that when they get caught inside a bubble before they do something stupid, then that is a crime. It becomes a crime. It doesn't have to be -- it doesn't become not a crime because it was a sting operation or we'd never convict any drug dealers in sting operations.

MR. KILBOURNE: Well, Your Honor, the difference between a drug dealer is obviously the drug dealer actually is involved in the movement of drugs, not in the false movement of drugs that don't exist.

THE COURT: In the sting operation they're not involved in -- in the sting operation the drugs aren't there. They're being faked. It's all fake. The whole thing is a fake. And they're doing it in order to catch the person because they know they're really doing it and they can't catch them on the real thing.

There's a lot of this stuff that's going on in this country. I don't understand how somebody can be that. I don't understand anybody -- any idea about Joshua and the Bible. I do not understand why people in Jericho couldn't just leave and go away; they had to all be slaughtered. Do I believe God told Joshua that? No. Do I believe Joshua said that's what he told him? Yeah. These old men always get young men to do their killing for them by saying God is going

to give you something for it.

MR. KILBOURNE: I think one of the key distinctions here is how this particular sting ended. It ended with my client saying, "I don't want to do this. I don't want to be involved in this." He walked away from the sting before there was a criminal action that they would charge.

I think, you know, when you're looking at specific intent, mens rea, and you go back to the, you know, can you shoot a fake deer case from our first year of law school, when you go back to what the criminal law requires, that mens rea, in this case the terrorism enhancement requires that specific intent to move forward this process, and we just don't think it's here.

Now, again, we're quibbling over something that -- obviously, he's done his time. He has done, if we're correct, more than his time in satisfaction of the sentence that you originally imposed. The issue we're taking, obviously, up on cert is can this even be a crime under those circumstances? And they'll probably tell us on Monday that they don't want to hear from us.

But in the meantime, we would argue that the unique nature of this particular offense with this particular defendant and whether he was truly radicalized in the way that you're concerned about -- he's got a family. He's got seven kids. He never left the country. He never bought a plane

ticket. He wanted to help people he thought were his family in a place where I doubt you or I could figure out who the good guys are and the bad guys are in Syria at any given time. It is a muddled place with muddled facts and we would argue, Your Honor, that there's not sufficient evidence for the terrorism enhancement and we would ask for time served and for him to be released from supervised release.

THE COURT: Let me hear from the government. And then, Mr. Kilbourne, I'll let you respond to what they say.

MR. SAVAGE: Your Honor, we're not asking for a different sentence. We think that the Court made a pretty reasoned decision the first time.

I first want to correct one thing Mr. Kilbourne said. The guideline here without the terrorism enhancement is 26 because he was convicted under the eight-year plan in a matter relating to international terrorism. So whether or not you apply the terrorism enhancement, which would raise the guideline to 96 months, if you impose the same sentence, even under the original calculation, the guideline range is 63 to 78 months. You varied from the guideline that didn't include terrorism.

Now, if you do include terrorism, Judge, we think we were right when we asked you to do that.

THE COURT: And that's what I want you to go through chapter and verse on that aspect. What I sentenced this

defendant on was what he did.

MR. SAVAGE: Yeah.

THE COURT: In other words, I looked at what he did. You know, the enhancements -- doing the enhancements and doing -- coming up with what the guideline is is an academic activity of the Court. The Court is not supposed to do anything which is -- which comes up with a guideline that the Court wants to find so it can sentence somebody to something. The Court is supposed to find and do its best job to find an accurate guideline. Then what Congress has said is look at the 3553(a) factors and look at all of these which include the crime itself. The Court looked at the facts of the crime and did a couple of things.

Number one, it decided, although it believed that there were two correct charges in there, two counts of separate lies, that it -- because it all occurred in relation to that one, the Court was going to treat it as one, and did.

MR. SAVAGE: Yes.

THE COURT: And also looked at what this defendant did and the potential for what was being done there and what crime was committed. And based on that the Court gave the sentence that it gave.

So I agree with you in terms of what I -- in other words, I set -- the guideline is there and I look at that guideline because I'm told I need to look at that guideline.

But in the end, Congress has said it's the 3553(a) factors that determine the sentence in this case, and that's what the Court looked at.

Now, I do want to hear, though -- this is an academic exercise. If I'm going to leave the terrorism enhancement in there, I need to know chapter and verse -- the Court of Appeals wants to know what I was looking at and what I need to say if it applies. If it doesn't apply, then it doesn't apply. Give me the reason it applies, chapter and verse.

MR. SAVAGE: Well, first of all, Your Honor, on the relevant conduct issue, I think that's a red herring. I think that all acts and omissions committed, aided, abetted, counseled, procured, induced, or willfully caused by the defendant during the commission, in preparation of the offense, in the course of attempting it or responsibility for that --

THE COURT: I agree with that.

MR. SAVAGE: That applies.

THE COURT: I agree with that.

MR. SAVAGE: So then you go to 3A1.4, and we can all agree that 1001 in this circumstance is not a crime -- is not a terrorism crime because a terrorism crime has to be one that's enumerated under 18 U.S.C. 2332b(g)(5)(B). And that lists the crime -- if you look in the code, that lists all the

different crimes of terrorism. However, you can obstruct a crime -- you can obstruct a terrorism investigation and in that case the terrorism enhancement would apply.

In this particular case, Your Honor, you applied the terrorism enhancement based on a material support theory in that the defendant, even though he didn't do it -- you don't have to -- in order to do material support, the statute doesn't say it has to be completed. You can conspire, intend, prepare, solicit, all sorts of different things. You don't have to actually complete the material support in order to do it.

Based on the facts of this case, the fact that the defendant was preparing to travel to Syria to contribute himself, and that he had agreed to purchase and did in fact take an act in furtherance of the purchase of the buddy pass for a person he believed to be a terrorist, that he was preparing to provide material support to ISIS. ISIS, I think you took judicial notice or we heard evidence during the trial that ISIS was designated by the State Department as a terrorist organization.

THE COURT: There's no question they are in that group that believes they have to kill --

MR. SAVAGE: The only thing I think that you would have to do that you didn't do last time is that you didn't explicitly say -- and you know how the Fourth Circuit is very

big on explicit judicial findings -- that Smith intended to influence or affect the conduct of a government by intimidation, coercion, or retaliation against government conduct. We think we satisfied that element of material support in that there were numerous times with the different -- where Smith would say, for instance, there was --

THE COURT: Go to the evidence in the -- from the trial.

MR. SAVAGE: Okay.

THE COURT: If you can point that out to me because this -- I mean, this is going to be -- I want to give the -- and what's the guideline again?

MR. SAVAGE: The guideline would raise it to offense level 32, criminal history category VI.

THE COURT: Mr. Kilbourne, you're arguing what guideline again?

MR. KILBOURNE: We would argue without the terrorism enhancement, we saw it as a 14/I.

THE COURT: Okay. Now, the terrorism enhancement is covered where in the -- in these?

MR. KILBOURNE: It's 3A1.4(a).

THE COURT: Okay. 3A1.4(a). Let me turn there.

And the wording here is if the offense is a felony that involved or was intended to promote a federal crime of terrorism, increase by 12 years [sic]. But if the resulting

level is less than 32, increase to 32.

Then they give commentary, which the commentary can't be opposite of what the statute says. In other words, the commentary has to -- can explain the guideline, but it cannot contradict the guideline and be used instead of the guideline. So just give me chapter and verse.

MR. SAVAGE: Sure, Your Honor.

So what occurred in this case is originally the probation office, I think it was a matter of just oversight, did not apply the terrorism enhancement. The government objected and we filed an objection to the presentence report. I don't believe we filed that with the Court, but in it I list all the different reasons, the different transcripts. So I'll go through a few of those.

THE COURT: Please do.

MR. SAVAGE: So the first thing would be is when Smith first met with Khalid on August 7, 2014, Khalid told the defendant that he was only helping brothers go to Syria to be with Dawla Al-Islam, which translates into the Islamic State.

To that point Smith said na'am, which we heard from the evidence -- there was some dispute of that -- but from Khalid that that meant yes. It's an affirmation. And the Fourth Circuit took notice of that.

And then the following conversation on August 7, Smith -- establishes Smith's knowledge of ISIS. He says to

Khalid -- Khalid says, You know what that means? You have to swear bay'at, meaning oath of allegiance, to Khalifa.

THE COURT: Where's that in the transcript? You're going to have to give them chapter and verse so that when they're looking at it up there, they can go right to the transcript.

MR. SAVAGE: This is Government Trial Exhibit, it was admitted as Exhibit Number 4.

And at that point he said, You know what that means?

He said, Yes.

Who is Khalifa now?

And the defendant answered, It is Abu Bakr al-Baghdadi.

He said, If you give bay'at, that means that you'll be in the power of ISIS, Dawla Al-Islam, and you're going to fight for Allah. God, may He be praised and uplifted.

And he says, Na'am.

Another part of that was the FBI instructed Khalid to find out from Smith whether he was associated with other persons, and Khalid says in Government Trial Exhibit Number 5, which was a statement on August 20, 2014, Khalid says, We're getting serious now. For the first time when I meet you, I want to meet you and know what's going on. He says, Are you -- do you want to travel?

And he says, Yes, if God wills it.

You're sure?

He says -- Smith said he understood that ISIS was an enemy of the United States.

We are fighting a bigger enemy. We're not following the news.

And he says, I don't pay much attention to that, but I hear some things.

You know we've been hit by the American Air Force?

Yes.

So we have a bigger enemy. We're fighting not only Syria and Iraqi armies, we are fighting the States.

And he says, Inshallah, which means God willing or yes. Affirmation.

So we have a bigger enemy. The brothers are looking. It doesn't matter. We can train you so you don't have to start with training people.

But in any event, that series of conversation indicates that the defendant knew that by joining ISIS, he would be intending to affect the foreign policy of the United States, which he objected to because at that time the United States was bombing ISIS in Syria and that was causing -- and that would be to change that policy through violence by joining ISIS.

In addition, Smith told Khalid he was still in communication with the Kodaimatis in the Kafr Hamrah, which

was the village they lived in near Aleppo. It was under different control but at one point it became under ISIS control.

Smith said in that same Exhibit Number 5 that he knew other Americans were willing to travel to Syria to fight with ISIS.

Okay -- and Khalid says, Okay. Are there any other brothers they want to travel?

And he says, There might be two more brothers. They might come with me, I don't know. And he says, Yes, I know them well.

So he intimated that there were other people that were willing to come and fight with ISIS. Again, ISIS was aiming to change the policy of the United States.

And as you remember, at that time there was a great deal of angst among Western countries because people were traveling to Syria from England, Germany, different places, and joining the fight. And at the same time as American servicemen were in the area, other countries were there, and people were getting killed.

So --

THE COURT: Not only that, kidnapped.

MR. SAVAGE: Kidnapped, yes, Your Honor.

THE COURT: It's awful.

MR. SAVAGE: Smith was also aware in this tape of

some of the brutal methods of ISIS, such as the beheading. This is also in Exhibit Number 5.

He goes, Did you see what happened to the journalist?

And at that time you remember there were several journalists that were kidnapped by ISIS.

And he goes, Yes, I heard.

He goes, Did you see the video?

And the video was published on the internet of the journalist being beheaded by ISIS terrorists.

He goes, I didn't see the video.

And he goes -- so Khalid asks Smith, the defendant, What do you think about that?

Well, I think -- I mean, my opinion is in Islam, if you're going to do something, you should do it in the best manner. And that means if you're going to kill someone, you should kill them in the best manner. That means if you choose to behead a person, then I don't believe it's right to saw at a person's neck. I believe if you behead a person, it should be one fast chop, painless to the person.

So I think that with respect to the knowledge of ISIS, the brutal methods, their intentions to alter the policy -- foreign policy of the United States, that would be evident.

So on or about November 11, 2014, Khalid, Smith, and

another FBI undercover source, Bilal, met at a Charlotte hotel to discuss Smith's plans to travel to Syria. And that is Government Trial Exhibit Number 6. And again, the FBI could have just given him $3,000 and said go buy a ticket, but they didn't. They wanted to know if Smith was really serious about this so there were a series of meetings, and this was the third or fourth of those.

Again, Smith confirmed his plans to travel to Syria.

And Khalid says, Well, tell me what's your plan for Syria?

The money. I need to get the money to get there, Inshallah, and that's what we're working on so I can have money to get there.

So that clearly shows his intent to travel and contribute himself which would be material support to ISIS and to change the policy of the United States.

Smith says, There are some things going on where they were talking about the FBI and stuff. They're looking for Kodaimati in Turkey.

So he knew that Kodaimati was a source of interest to the United States.

I don't know what's the situation with him in Turkey and what's going on there. I'm getting information more slowly now, but I know right now him and his brother are in Turkey.

From what I understand, his father is in close ties with that group that I told you about.

And in that context we believe it referred to ISIS.

And that's the group that I told you about as part of -- they have already bay'at, or sworn allegiance.

So he intimates the Kodaimatis have sworn allegiance. He's there to fight with them. And that he's intending to go and he just needs the money and he's working on the money with Bilal by preparing cars.

In that same Government Exhibit Number 6, Smith said he was prepared to kill for jihad.

Khalid says to him, When you get there, referring to Syria, and you give bay'at to Dawla Islam, it's no joke, no play.

Smith says, Yes, I understand.

It's two things. You can kill people and you can be killed. So tell me what you think about this first.

About killing people and being killed?

Yes.

It's jihad. This is for jihad. This is what you do in jihad.

Now, I think that there was some discussion in the appellate briefs, and certainly during the trial, Your Honor will recall, that there was a dispute about what jihad meant. Jihad in some -- the Muslim religion can mean a spiritual

journey. It can also refer to violence and a fight. In this particular context, they weren't talking spiritual journey. They were talking about killing or being killed.

So he says, We had some problems with some people getting there. They're scared.

Smith says, Of what?

Of getting killed.

And I think this is one of the more important statements:

I mean, listen, I'm no hardened soldier in that respect on the battlefield, but at the same time, though, I'm not a coward. If there's disgruntlement around me, I don't really take much BS and stuff. And if there's a situation that arises, if something needs to be done, that needs to be done, then that's what needs to be done.

Then he goes, Then that's what needs to be done. The only concern I have is I'm down with jihad and fighting, you know, the way we're supposed to fight, but as far as some martyrdom thing, I'm not -- I'm not into that.

In other words, he's willing to fight, but he's not willing to strap a bomb to himself and go into a suicide attack.

And then Smith talked about finding enough money to travel to Syria.

And then on November 19, 2014, Government's Exhibit

Number 7, Khalid talks about the person was coming from Dubai. Actually, he talks about the fact that he was traveling. And at that point Smith says, If you need a buddy pass or something like that to be cheaper on the flight, let me know.

That's also material support. He believed at that time that Khalid was a recruiter for ISIS in the United States and Canada and that he was traveling around and offered him a buddy pass in order to complete that travel.

And then the communications between Khalid and Smith stopped for a while.

Then on March 18, 2015, in Government's Number 8, Khalid asks whether he can still get the buddy passes you talked about because he has a situation where they need to get a brother to Syria and they're going to do that -- from Tampa to Syria and they're going to do that by getting him a ticket from Tampa to Buffalo. From there he's going to cross into Canada and Europe. So can you get me a cheap ticket from Tampa to Buffalo?

And within hours, basically -- or within days Smith contacts his girlfriend, now his wife, who works for the airlines. She has the ability to do it. He doesn't have a credit card so he gets another friend to give his credit card. Arranges all that and basically gives -- sends the ticket and information by text to Khalid. And that is shown in Government Trial Exhibit Number 9.

Government's Exhibit Number 10, there's a meeting between Smith and Khalid in Matthews to collect money for the buddy pass. And there they talk about the fact that who this person is, a person by the name of Mohammed Hilal, which we would concede is not a real person, but, again, it's the intent.

And that -- he told me -- anyway, the price of the ticket is about $80. Khalid gives him money. He goes and gets more details about Hilal, Government's Exhibit Number 10, about how important this brother is going to be because of his computer expertise.

On March 20 Smith and Khalid had the following conversation that shows that Smith knew the plan was for Hilal to use the buddy pass. In that particular conversation he says, But when we got to the ticket, he was broke.

Smith says, Oh, okay.

So give me a few days. Let me see if I can do something. I'm going to get him tickets from Tampa, Florida, to Buffalo. Two or three brothers are going to meet him there and sneak him into Canada and then he's going from Europe going to Turkey and from Turkey to Syria.

He says, Amin, a-m-i-n, which translation is so be it.

They both say inshallah.

And this has to be done in two to three days.

And Smith says, Yes, I trust him. I trust him. I just want to make sure that whatever you're doing is on the low, that whenever he gets -- just don't let him appear in no video or nothing like that. I don't need to see this guy and then they link it back or something like that.

And they promise him it's going to be.

So it's clear that he knows what he's doing is wrong. He's trying to keep it a secret. And that he's doing this, in effect, to provide material support both not only himself but also the travel of another potential ISIS recruit to Syria.

And then on Trial Exhibit Number 11, the ticket was booked.

Shortly after that, on Trial Exhibit Number 13, there's an email message in which Khalid says, I'm emailing you to make sure that you got the info I sent you two days ago.

And then on March 31, nine days later, after the flight when Hilal didn't show up, the defendant caught on and said, I don't want anything to do with this, after it all occurred. So he attempts to retract it after it all occurred.

So the material support here, Your Honor, we believe, is the defendant through a series of conversations exhibited an intent to contribute himself and an intent to contribute material support by providing travel for not only

the person who was Hilal, a fictitious person, but for Khalid who he believed was an ISIS person.

So for those reasons, Your Honor, we think that the defendant intended to commit the crime of material support in connection with the false statement to the FBI. And he made the false statement in order to cover up and obstruct the FBI's investigation into the material support that they were investigating at the time. And I think Your Honor can recall the conversation from Agent Godfrey about why this was material to the FBI's investigation so I won't repeat that.

But again, Your Honor, we would ask that the Court, if it's going to apply the terrorism enhancement, to specifically find that Smith intended to, quote, influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct based on these statements and also based on his willingness to help ISIS.

THE COURT: All right. And argue for me, then -- the statute says that it is -- the term "federal crime of terrorism" means an offense that is calculated to influence or affect the conduct of the government by intimidation or coercion and to retaliate against government conduct and is a violation of...

MR. SAVAGE: Yes, so it would be a violation of the -- I don't have the material support statute, but I think

the material support statute is --

THE COURT: I can pass this to you. I want to hear what your argument with regard to 32 -- 2332b --

MR. SAVAGE: B.

THE COURT: -- (g)(5), which is the terrorism -- that's the terrorism and that's what they're arguing against.

MR. SAVAGE: Right.

THE COURT: It's pretty clear that this was -- that he had the intent to do this particular crime. I want to hear specifically again what's here on this. The great religions of the world, and Islam is one of those, as is Christianity and Buddhism, and a number of others, are often perverted by men who want to turn those religions into a reason to gain power, influence, property, and that's what's happened with this ISIS group.

MR. SAVAGE: So, Your Honor, again, this is in our objection that we filed with the probation office. So we first -- in applying this statute, we would go to the term "international terrorism," which is defined by 18 U.S.C. 2331(1). And that says, "The term 'international terrorism' means activities that involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State."

The second thing is they have to "appear to be intended to intimidate or coerce the civilian population; to influence the policy of a government by intimidation or coercion," which I think we just discussed; "to affect the conduct of a government by mass destruction, assassination, or kidnapping."

So clearly -- and it's one of those. So to influence the policy of a government by intimidation or coercion we think applies here.

And the third thing is it has to "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

In this case the acts of international terrorism were to be conducted in Syria. But also at that time there were statements by ISIS that if you couldn't travel, you could also create an offense or -- and in fact there was a number of terrorist acts in Western countries throughout the world.

But in any event, I don't think you need to go to that second prong because clearly these acts were intended to occur in Syria. Al-Baghdadi was in Syria or in Iran at the time probably. But anyway, in any event, al-Baghdadi was still alive at that time.

So we looked at the guideline for obstruction of justice, which is 2J1.2, and that provides for a 12-level increase if the defendant is subject to 1001's eight-year statutory maximum. So whatever you decide on the terrorism enhancement, the regular guidelines without the terrorism enhancement is 63 months.

But going back to the --

THE COURT: But again, the guideline calculation has to be an academic exercise.

MR. SAVAGE: Correct.

THE COURT: The easy thing for me to do is say just give him five years and don't do the terrorism thing. The terrorism thing applies here and the Court would be closing its eyes to not put that in here.

MR. SAVAGE: Right. But, Your Honor, I think in the analysis you have to go to 2J1.1, apply those guidelines. In this particular case you would apply the 12 -- the enhancement for the eight-year.

But now you have to go to Chapter 3. So once you do the analysis on Chapter 2, you're going to go to Chapter 3 and that's where you're going to apply Section 3A1.4. And that provides if the conviction is a felony that involves or was intended to promote a federal crime of terrorism, the resulting offense level is increased by 12 levels and the criminal history category automatically becomes category VI.

If after the increase of 12 levels the resulting offense is less than 32, then it's 32. So it's going to be 32 and VI.

The federal crime of terrorism is a key term under 3A1.4. The case will be *Chandia*. I think that was cited by the defense in their appellate briefs. And there's two *Chandias*, but this is *Chandia* one at 514 F.3d 365. And it gives -- the application note gives the term "federal terrorism" definition the same meaning as in 18 U.S.C. 2332b(g)(5).

In that case "a federal crime of terrorism" consists of two components. First, the offense must constitute the violation of one or more felonies. The felonies included in 2339B include material support of resources to a designated terrorism organization. The second thing in addition to that, you have to find there was a specific intent requirement, which means that you have to find that he intended to do and was violating 2332b, the -- and he was -- intended to influence the conduct of the government as we just discussed.

THE COURT: All right.

MR. SAVAGE: So under -- so those are the things. We can go into an analysis, I think, of -- there's a number of different cases where the intend to promote application was applied and I mentioned those in the government's objection on page 27. And then we talk about the intend to promote and the -- and I've already gone through the elements of, I think,

material support.

THE COURT: You have.

All right. Let me hear from Mr. Kilbourne, then, for a minute.

Mr. Kilbourne, now, I understand that you say this isn't a crime and you're trying to get that -- the Court to do that. They may -- they may do that. I mean, they've sort of -- they're trying not to have politicians convicted for taking bribes and stuff sometimes and they -- so we've got to sort of see what they'll do with this. But if this is a crime --

MR. KILBOURNE: Yes, sir.

THE COURT: -- then I think the terrorism applies. Now, tell me why it doesn't apply in this because it sounds like he had the specific intent to do -- everything that they -- in that evidence shows he had the specific intent. I see you argue he can't have the specific intent if there really wasn't a crime to be committed there because there was a sting operation going on. But that can't be the way it is or else attempts and sting operations and all those things go by the boards. And if you're right, it does away with a lot of crimes that people have been convicted of and you'll have quite a little side thing trying to get convictions overturned. But I don't think they're going to say that sting operations are wrong. And he had the intent to do this at the

time. Maybe he has reformed. Maybe he's gotten that. But he is one of those people who was believing in this malevolent organization which was trying to pervert a great religion into making its leaders powerful, allowing him to get a caliphate, allowing him to take property and possession of things.

MR. KILBOURNE: Judge, I don't want to differ with the facts to the extent the jury found them. You know, the jury determined that --

THE COURT: They determined it.

MR. KILBOURNE: They determined -- they had to have determined that na'am means yes, that inshallah means yes, that these things --

THE COURT: And they heard all of these things here.

MR. KILBOURNE: They did.

THE COURT: Everything he went through, and I wanted him to go through it, was in that trial. And if we ignore all of that, then we can find your way. But if we don't ignore that, it's apparent he had the specific intent to do it. If it had been there, it would have been done. The key to the thing is that they got him in this, as you say, bubble of a sting operation and so they took someone who was ready, willing, and able to attack the government of the United States from at least another country, its interest in another country, ready, willing, and able, and got him off track before there was a real opportunity for him to hurt the United

States.

MR. KILBOURNE: Of course, my client and myself have a different view. The Fourth Circuit has told us -- surprisingly after oral argument, the Fourth Circuit told us that our view had no merit.

THE COURT: Right.

MR. KILBOURNE: And so we accept that for the purpose of sentencing.

You obviously have papered very well the issue of specific intent. You know, I'm not admitting there's specific intent, but you certainly have brought out the items in trial that deal with specific intent.

The thing that really bothers me here is that the crime happened at the end of the operation, not at the beginning. In other words, the crime of conviction was not providing material support, was not attempted provision of material support, it was lying to the FBI, telling a fib to the FBI. And the FBI -- that fib had to be material, which meant that it -- the jury had to find that it was an important lie that somehow affected their investigation.

So that point of the offense of conviction is the point at which we start reading back 1B1.3. I encourage you to read that very carefully because it only allows three time periods to be considered as relevant conduct. Occurring during the offense -- not the offense of material support --

during the offense of lying to the FBI. And that offense of lying to the FBI only occurred after he spoke to the FBI. He didn't lie to the FBI before he was interviewed by the FBI. He lied when he was interviewed. So it couldn't have happened during the offense of conviction.

In preparation for that offense. That means that he did all this material support so that he could later lie to the FBI? If it were reversed, it would make sense. If it said done -- you know, this offense was done after preparation or something. But it says in preparation for the offense. I don't think there's any way you could argue he prepared to lie to the FBI by committing material support. He didn't. He prepared to lie to the FBI by calling and saying, Hey, can I come talk to you? You know, you've subpoenaed my wife -- girlfriend and I need to talk to you. That was the preparation for the offense.

And during the course of attempting to avoid detection for that offense. So was it during the course of him avoiding detection from lying to the FBI? If this had happened after he lied to the FBI, then, yes, it's obviously part of relevant conduct. But because of the way this particular sting occurred with all of this nefarious activity happening and then he lies to the FBI and then nothing happens for four years until he's convicted in this court.

So we don't have anything happening after or in

preparation. It's not a robbery where he went and got tools to -- or guns or something to prepare for the robbery. It's not a drug deal where he calls and arranges things. It's lying to the FBI. So it has to be confined to during the offense of conviction, in preparation for that offense -- and I can't imagine how -- again, how, you know, committing these near criminal acts in preparation for lying --

THE COURT: Yeah, you're going only to the lying and the lie relates to what the interrogation was about; and the interrogation was about all this other stuff, all this preparation for going. And because if you just -- if you do that, you'll never do anything. It will just be a lie and don't do anything else. He lied. Well, what did he lie about? Well, it really doesn't matter. He lied to the FBI. There will be one guideline.

It relates -- all this relates to what the examination of him on that date was and the examination on that date was about all this other stuff. And when he lied to them, all that relevant conduct comes in as to what it was about. It doesn't mean -- now, when I sentenced him, I took into consideration the fact that he wasn't -- that this was a sting operation. I took into consideration his criminal history. I took all sorts of things into consideration in making a sentence that was not at the eight-year maximum sentence which I could have given him. Whereas, if he had --

if he had been going over there and on the plane to head over there to blow people up, we'd have had at least eight years and my guess is there would have been other charges.

I looked at exactly what this offense was about. The danger of this situation, the danger of this defendant who had been radicalized to the point where he was willing to go over and fight for ISIS. Still had a little bit of common sense in that he wasn't willing to strap it on and blow himself up. He hadn't figured out he needed to do that. It's also interesting to me the leaders don't ever do that. They're not ready to go to paradise. They want some poor young guy to strap it on and go in there and blow himself up. That's because they know this is being done not for God; it's being done for them.

But the -- but I considered all of that information there and cut his sentence down to what I believed was the correct sentence for him, which was five years in prison, considering it was one lie, not multiple lies like -- I think the conviction was there, but I think they went together. Now the Fourth Circuit has said no, you can't do that. So in the future I imagine the government will only bring -- will bring me stuff that's not multiplicious.

MR. SAVAGE: I want to say that Judge Diaz agreed with us.

THE COURT: He did. It was two to one. And Judge

Diaz and I agree on a lot of things and he's -- yeah, it's true. You know, some of it depends on the panel. It was -- on the *Lindberg* case, I thought that one might go up because Judge Niemeyer on that one agreed with me on a two to one and said the Supreme Court of the United States tells us not to do this, so I thought maybe the Supreme Court would take that. Never went up so we're going to try Mr. Lindberg again.

MR. SAVAGE: Your Honor, if I might reply just briefly to the defense's argument.

I think that there's plenty of case law, and we cite it again in our objection, that this was really -- the offense of which he was convicted of was essentially obstruction. That's why we're under the obstruction guideline. The obstruction in this case was the FBI's investigation into material support. So to disconnect the two is really -- is to isolate the statement.

THE COURT: It's obvious that -- it's obvious to me this thing applies. And then the Court has to -- this is an academic exercise of application of the guidelines. Regardless of whether the terrorism thing applies, the Court looked at -- regardless of whether it was one crime or two crimes, the Court looked at the 3553(a) factors as I look at it now and sentenced this defendant to what it believed based on the facts was the correct sentence under the 3553(a) factors. I understand -- I mean, you make -- your

arguments -- your arguments are intelligent. Your briefs are very well done. There's not a -- I mean, I get briefs all the time that are not very good, and yours are very good and you make intelligent arguments.

But in the end it comes down to the facts of this particular case and whether the guidelines apply, and I believe they do. And so I'm going to -- I'm going to find the -- that the terrorism does apply, the enhancement. That it -- that the Court is moved by the facts of the case and not by the terrorism itself beyond the fact that -- not the terrorism enhancement. Terrorism, yeah. What was intended here, the Court did look at that. What this defendant was ready to do, the Court did look at that. But the terrorism -- this particular case the Court felt like that the terrorism guideline, that the eight years was too high in this case and on the facts of this case sentenced this defendant to five years.

So let me get to the --

MR. SAVAGE: Your Honor, can we ask the Court to make some specific findings?

THE COURT: Yeah, I am. I was going to do that. Go ahead.

MR. SAVAGE: First with regard to -- I think there are two things.

One, there has to be an intention to commit a crime

of material support, which is why we're here. The elements of material support under 2339B(a)(1) are:

The defendant knowingly provided material support or resources to a foreign terrorist organization;

Two, the defendant knew that the organization was a designated terrorist organization, or that the organization engaged in or was engaging in a terrorist activity or terrorism; and

Three, that one of the jurisdictional requirements under that series of statutes is met. In this case the defendant is a national of the United States.

So we would ask the Court to make specific findings that the defendant intended the elements of that material support in his obstruction.

THE COURT: He intended, yes. His intent was to do that, to provide material support with those elements. And those have been proven. You've gone through the facts again, the exhibits, and gone back through this showing that he did that. I think even Mr. Kilbourne would say that there is evidence there that if the Court wants to believe it and take it after the trial, that it's there.

MR. SAVAGE: Yeah.

The second thing the Court needs to find is in connection with that, that the defendant specifically intended to influence or affect the conduct of the government by

intimidation or coercion or to retaliate against government conduct.

THE COURT: Yes, that's what I just went over here, which is 2332b(g)(5), which the Court finds that the elements of that statute, 18, United States Code, Section 2332b, are met.

MR. SAVAGE: Thank you. Thank you, Your Honor.

THE COURT: Yes, sir.

All right. That means that we have a base offense level of 14.

The victim-related adjustment in paragraph 4.

The offense is a felony that involved or was intended to promote a federal crime of terrorism, therefore 12 levels are added which would bring it to 26. But if the resulting offense level is less than 32, increase to 32, and that's based on United States Sentencing Guideline 3A1.4(a).

That leaves an adjusted offense level of 32. Criminal history category goes to VI because it involved a federal crime of terrorism. And therefore, the guideline range is level 32/VI and -- criminal history category VI, which brings about a guideline range of 121 to 151 months, but statutorily 96 months is the maximum sentence in the case.

MR. SAVAGE: Actually, Your Honor, it would be 210 to 262, but it's capped.

THE COURT: Right. Did I get it wrong? Yeah, I

went with I, didn't I?

MR. SAVAGE: Right. But it makes no difference.

THE COURT: Yeah, it is capped, you're right. I went with 32/I which is 121 to 151 and it's 210 to 262, but it's still 96 months is the maximum.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Which means the guideline is not very helpful in this particular case except to talk about the seriousness of the offense, which is very serious and the Court took that as very serious.

I'll hear from the defense on sentencing at this time.

MR. KILBOURNE: Yes, sir, Your Honor.

THE COURT: The Court notes that one of the counts has been -- is gone; but also notes that when it sentenced the defendant, it treated that as one violation.

MR. KILBOURNE: You were very clear. You were very clear in your statement, Your Honor. And understand, when we appeal, especially a case that I was not at trial on, you know, it's not a sign of my disrespect for Your Honor.

THE COURT: No, I know that.

MR. KILBOURNE: We've known each other for many, many years.

And I think this particular case provides a lot of guidance in this particular district regarding multiplicious

offenses. And I think from that standpoint, other judges will be aided in the future not to be in this situation.

THE COURT: It could matter. In other words, if the Court were to say -- take that into consideration in sentencing, then that would certainly matter and it would matter whether or not those counts were duplicated.

MR. KILBOURNE: If you sentenced him to 16 years, for example, that would have been an example where the multiplicious would have --

THE COURT: Would have been -- would have applied. But I treated it as one even though -- again, what the Court tries to do, sometimes fails to do but does its best, is to do an academic exercise on the guidelines; to not try to make a finding so I can sentence at a certain place, but make a finding on what the facts of the case show the guidelines should be. Once I do that, now I get to sentence pretty much where I want to sentence.

MR. KILBOURNE: Yeah, I think you have almost --

THE COURT: I've got a full range of stuff. I can turn him loose. I can send him off for a long way. I've got to explain those kinds of things, but the Court is able to do that. So that -- but I try to academically come up with the right answer.

MR. KILBOURNE: Right.

THE COURT: And in this case I believe -- and I

understand your arguments there. You believe that this should not -- first of all, it shouldn't be a crime, this particular thing shouldn't be, and that may get taken care of by the Supreme Court.

MR. KILBOURNE: I doubt it, but it's possible.

THE COURT: The Fourth Circuit disagrees, but you're going to at least have a -- you know, I've had cert denied too before. It's just one of those things they don't seem to want to hear a lot of stuff that I used to bring up there.

MR. KILBOURNE: This morning, as I understand it, they're reading our brief. It could be Monday that they tell us that they're not interested in talking to us.

THE COURT: You write good briefs so you've got a shot.

MR. KILBOURNE: I appreciate that.

THE COURT: You at least write good stuff.

And if they do that, that changes the whole concept of everything. But if they don't do that and your argument is that you believe that I need to look at the -- lying to the FBI just sort of around that particular incident that occurred and only facts that occurred right around that incident that day apply. I'm saying that what occurred up to that and what they were interviewing about is important information and is relevant conduct to the offense of lying, and that's why I'm finding what I did.

And I understand that there's a difference of opinion there and I do not fault you for doing that. I just -- the whole -- the idea of this whole thing just -- it upsets me that people get caught up in these kinds of things and young people are brought into things that they really never would have been brought into by these old guys that are just -- they need to quit listening to these old guys. Me too. I'm getting there.

MR. KILBOURNE: Your Honor, we appreciate that.

And we wanted to also indicate that we understand your ruling and we appreciate the clarity with which you've provided that. But again, you have absolute discretion now to sentence anywhere you would so choose with explanation. And we believe that the decision you made when you first sentenced Mr. Smith was correct, that he did not deserve a sentence within the guidelines; that he deserved a below-the-guideline sentence.

At that time it was critically important that he had no criminal history. It was critically important, I believe, at that time that the amount of time from 2015 until 2019 that he was out in the public not, you know, doing jihad, if you want to call it that, that he was a law-abiding citizen with the exception of lying to the FBI from that point forward. And of course, I'm sure the FBI was watching him so if something had happened, if he had purchased a ticket to Syria,

if he had been involved in some sort of activity, the FBI had him on that list and they were keeping an eye on him, I'm sure, until they interviewed him, and then even after they interviewed him until they convicted him. So I believe you made the right bet, Your Honor, that this was a person who deserved a sentence below the guidelines.

I believe that what's happened over the last, you know, two, three years further demonstrates that you made the right call and could even make a stronger call, is what we're articulating, that you release him today from further supervised release.

The key to us is he's got strong family ties. And you know, I gave you the quotes from the correction institute that one of the key indicators of success out of prison is strong family and community ties. He's got a strong community that he's part of. He's got a strong family that he's the leader of. And that family supported him throughout his incarceration. It was very difficult for them. Seven kids, and his wife managed to survive to get to the other side.

And now he's out. He is on supervised release. He is doing good. There's no violations. He's taking care of his family. He's doing the things -- you know, I quoted from the original memorandum that basically once he's released, he's going to be a law-abiding citizen that does good; and I think we can already see that in the last three months that

that's already happened.

We thought we were going to have to go to Your Honor and ask for him to be released because we thought that his -- the end of his sentence was going to coincide with the cert period in such a way that the Bureau of Prisons was not even going to let him out. So, you know, we got a good set of situations where he went to the halfway house, did well there. And now he's out on supervised release and he is continuing to do well.

And we believe, Your Honor, that that bet you made was a good bet. And we would argue -- we would ask you to double down and go ahead and release him today, but we believe that that bet for an under-the-guideline sentence was the right choice because of the community ties, because of the family, because of the lack of criminal history, because -- and in a sense, Your Honor, because of the unique situation that he found himself in. If he had not had friends, basically, family to him, that were in Syria, I would argue he never would have gotten involved in this in the first place. That because of having family involved in the incredibly complex dynamics of Syria in 2013 and '14, it put him in a position where this crime was committed, that the specific intent that you previously found was done.

If his family was -- instead of being in Syria, if his family had been Malaysian, you wouldn't see him here

today. But, you know, we've already sentenced some members of that family. That's all water under the bridge now.

And so in this particular case, the defendant has demonstrated that he -- he is a religious, but not fundamentalist religious person that you would be worried about. That he has a strong religious community and strong family --

THE COURT: You can be fundamentalist without taking part -- I mean, there are --

MR. KILBOURNE: I'll change the word to jihadist.

THE COURT: Jihadist. Because that's -- you know, the Christians had the crusades and they went down and attacked in the name of God and the -- so every -- all these big religions have had people who do things. There are fundamentalists in this country who don't want to attack anybody and they believe in fundamental Christian religion. There are fundamentalist Islamic people who don't believe in killing other people. And there -- you know, if you look at the -- I mean, you have to really hunt pretty hard for bad stuff. You can find it in any of these -- any of these -- whether it's the Quran or the Bible, you can find violence being done against people if you want to or you can find some other stuff in there about the way people ought to live.

MR. KILBOURNE: In fact, I am stunned by the violence perpetrated by the Buddhists in Berma. I mean, you

know, you can find it twisted anywhere.

THE COURT: In the end we all came from one place in creation, either from the Garden of Eden or some other place like that of creation. Or as the scientists tell us, we all came out of Africa, which interestingly makes all of us African-Americans.

MR. KILBOURNE: Yes, sir.

THE COURT: In other words, it -- scientists tell us that they're spread around the world and mutations cause people to change color. But we're the human race. We're not all these different groups that were formed in different spots. We started in one place and spread out across the world. And if people would start treating people like they're fellow human beings, we wouldn't have all this stuff going on.

MR. KILBOURNE: I think that's what you'll find if you look under the cover of what his life is today, what Mr. Smith's life is today, is that he's got loving family. He's got people who love him and people he loves and those people are way more important to him than anything else and that he is acting as a law-abiding citizen. He is acting as the person that he is for the love of that family, for the love of that community.

So we would argue, Your Honor, that in this particular case that you made the right bet. We would ask you to double down and go ahead and release him today and go ahead

and get supervised release over with, but we understand. We do believe you made the right choice before and we would ask that you make it again.

Thank you, Your Honor.

THE COURT: Thank you.

Yes, sir. What would you like to say, if anything, sir, today?

THE DEFENDANT: Your Honor, I just want to make a couple things clear for the Court and yourself. I'm not a fundamentalist. I'm not a radical. The stuff that we see going on in Ukraine today, I feel the same sympathy and I feel the same empathy for them that I did for what's happening in Syria. I wish things like this did not occur in our world. I truly do.

At the end of the day, my intentions was not to support ISIS, to be a member of ISIS, or anything like that. This was something that was thrust upon me. This was something that was brought to me. Anyone can go out and seek this by themselves. They don't need help with that. So for the FBI to be fancying these things along or trying to propagate these things along, it's not necessary. If someone wants to be a bad person, Your Honor, they're going to be a bad person. They don't need any help doing it.

And like my attorney said, had these circumstances not arised in my life where certain people I cared about were

in different parts of the world and these terrible things were going on, I probably wouldn't be sitting here right today in front of you, Your Honor.

At the end of the day, I have two children of my own. My sister passed away while I was in prison. She left me with five of her kids. I'm the sole guardian of seven kids, a wife, and a mother. I want this part of my life to be done and over with. I want to live the rest of my life in peace. And I want to support my family. That's all I want, your Honor.

Thank you.

THE COURT: Yes, sir. Thank you.

MR. SAVAGE: Just briefly, Your Honor.

The only thing I would say, where I would dispute the defendant's allocution, is that he sought out the FBI or the informants, not the other way around. It was he who initiated the contact even at the very beginning. But for the rest of it, I have no dispute.

I would say this, Your Honor. The -- I think the Court got it right. We're not asking for a sentence greater than 60 months. We think that that's adequate. We think it also accounts for the sentencing disparity. Mr. Kodaimati, who was actually in Syria, was convicted in the Southern District of California. He got 96 months, but he actually was there which I think is a difference. So certainly a lower

sentence for Mr. Smith in this particular case is appropriate.

Mr. Smith doesn't have any criminal history points, but if you look at the PSR, there's a litany of some serious misconduct. Some of it was simply -- some of it was simply consolidated or a suspended sentence, but some of it was dismissed. We're not going to get into it. But we think, based on that, a period of supervised release of three years would be appropriate in this case for a number of different reasons.

First of all, if he has seven kids and he's getting back into the work force, I think that the probation office has a lot of resources they can use to help. In the PSR before -- perhaps the defendant attended -- I know he attended the drug and alcohol abuse program at the Mecklenburg County jail. The fact that he was released so early from Bureau of Prisons tells me that he took advantage of the very good programs that the BOP has. I talked to his probation officer, supervising probation officer, who says since January that he has had no problem whatsoever with Mr. Smith. That he contributes -- he contributes around the house and that he's been a good citizen and that we intend that he do so.

As a felon he shouldn't possess a weapon, which I think is a very big thing, but also I think supervision and an occasional inspection by the probation office will help him in that regard.

There are some indications of domestic abuse. I think, again, probation can help with that. They have various programs that can help with that.

So for all those reasons, Your Honor, we think that the sentence of 60 months, 3 years' supervised release, and a $100 special assessment as opposed to $200 is a sentence that's adequate but not greater than necessary to achieve the goals of 3553.

THE COURT: Do we have a copy of the judgment that I entered before?

THE CLERK: I can get you one.

THE PROBATION OFFICER: Angela, I have one right here.

THE COURT: Oh, you do have one.

(Document tendered to the Court.)

THE COURT: I mean, I think the facts are the same here. I think it's good that he's finished his sentence and he's doing well.

You make a good argument for him; but when I sentenced the defendant, I sentenced him based on the exact facts that are in front of me today. He hadn't done -- he hadn't been in prison to be -- to do well in prison and he has done well in prison. But I think the -- it's only three years of supervised release here, so I think that can be beneficial to a defendant.

All right. I think the Court is going to -- is going to impose the same sentence. This is not the first time -- thankfully, there's not a lot of them, that I've had things that have come back. And when they have I've always in the past given a different sentence because usually there's -- something has gone out of the case or not in the case, and I don't want people to think the Court is just going to go -- is one of those people who says if you want a second opinion, ask me again kind of thing. I don't want to be influenced by it.

But I don't see anything in here that should change it. If the defendant was still in prison, the Court might consider the possibility of a time-served sentence, but apparently he has finished that and is on supervised release so -- and that would be because he's done well in jail. So I think the Court is going to at this time sentence the defendant to the exact same sentence it did before.

So please, if you would, stand up, sir. I've got to pronounce the sentence again.

Pursuant to the Sentencing Reform Act of 1984 and *U.S. versus Booker*, it's the judgment of the Court, having considered the factors noted in 18, United States Code, Section 3553(a), that is, to promote respect for the law, provide just punishment for the offense, to protect the public from further crimes of this defendant -- which at this point I'm hopeful it's not a problem, but to deter other people who

might think this is a good thing to do is another very, very important thing -- to avoid unwarranted sentencing disparity -- and the Court has tried to do that in this case -- and to look at the personal factors of the defendant who is a criminal history category I defendant, based thereon the defendant, Alexander Samuel Smith, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 60 months.

It's further ordered that the -- well, I don't need to put that in there because he's already out. He's finished the vocational opportunity stuff that he could do.

Upon release from imprisonment, defendant shall be placed on supervised release for a term of three years. Defendant is currently on that so he does not need to report since he's currently serving -- he's been on supervised release awaiting this resentencing so he will continue on supervised release and get credit for all the time that he has spent on supervised release.

And of course, there's always the opportunity on supervised release that defendants -- we do get recommendations from the probation where defendants are doing very, very well, for an early termination after two-thirds. So there's the possibility after a couple of years of supervised release he could get released early. And he can make that -- at some point he certainly can make that request.

I always talk to probation about it. So you've got to be in a good place with probation before you make a request for early release of supervised release.

While on supervised release, the defendant shall not commit another federal, state, or local crime, and shall comply with the standard conditions of supervised release that have been adopted by the Court in the Western District of North Carolina, and shall comply with the following additional conditions:

Defendant shall not communicate or otherwise interact with any known member of the Islamic State of Iraq and al-Sham (ISIS), a designated Foreign Terrorist Organization, without first obtaining permission of the probation officer.

It is further ordered defendant shall pay the United States a special assessment of $100.

The Court finds defendant does not have the ability to pay a fine or interest and, having considered the factors noted in 18, United States Code, Section 3572(a), will waive payment of a fine and interest in this case.

The $100 monetary penalty may already have been paid. Has it been paid?

THE DEFENDANT: Yes, sir.

THE COURT: Then I don't need to go into that. It's due and payable immediately.

Anything else that I'm leaving out?

MR. SAVAGE: No, Your Honor. Of course, he knows he has the right to appeal. But I think we owe the defendant a hundred dollars because he previously paid 200, so I don't know how that happens.

THE COURT: Well, he's owed a hundred bucks, then, by the government.

MR. SAVAGE: Yes, Your Honor.

THE COURT: It seems to me he should be refunded a hundred dollars for the $200 that he paid in that that no longer applies. I'm not sure exactly how he asks for that.

THE CLERK: We'll figure it out.

THE COURT: Let the clerk's office figure it out, but he's overpaid. We owe him a hundred dollars.

MR. SAVAGE: Correct.

THE COURT: Okay. It sounds like you're doing well. You've got seven kids and you can either hopefully -- hopefully you'll lead them down the right path. I mean, there's plenty of stuff -- plenty of good stuff in the Islamic religion that -- and just like any other religion, there's not so good stuff; and if you follow the path of the folks who are promoting the bad stuff, it leads to destruction not only to other people, but also to the human being that's doing it. We're really all one race in this world. We're the human race. And we've got to figure out a way to live together in

this world. Somehow as we've wandered around the world out of where we started, we've split up and we've lost our way in some regards and I don't know how we can get it back, but we've got to try and do that.

You've got seven human beings that you can either lead into good or bad. They're going to look up to you. And you're to be congratulated having taken these kids on. And I hope somebody gives you a good job somewhere you can support these kids and I hope that it works out for you. So -- and stay away from the poison that some of these old guys are doing because they want something. They want power. And they need people to help give them power. And they're -- and that's -- it's true in all -- there's people in every religion today that will do that, that will spew poison, and you've got to avoid that.

Okay. You may appeal this conviction and sentence, this resentencing, to the Fourth Circuit Court of Appeals. Any appeal must be done in writing and must be done within 14 calendar days from when I enter the written judgment in this case. If you wish to appeal and can't afford to appeal, as you well know, you can appeal at government expense.

You've got an excellent attorney. I suggest you speak with him about these rights and whether or not you wish to continue on once this cert comes down one way or the other. But do you understand your right to appeal as I just explained

it to you?

THE DEFENDANT: I do.

THE COURT: Thank you.

Anything further from the defense?

MR. KILBOURNE: The only thing I would ask is that you indicate in the judgment that he's got credit for the time he's already served in custody.

THE COURT: He gets full credit for the time he served. He has served -- the Court notes he has served his active sentence. He has no more active sentence to serve unless he violates supervised release and we have to figure that out, but hopefully that will not occur.

MR. KILBOURNE: I just worry about the BOP and I want to make sure that it's clear to them.

THE COURT: Yeah. He has no more sentence to serve. I'll sign that judgment. He is done with his sentence.

MR. KILBOURNE: Thank you.

THE COURT: He's finished the active sentence. He's complied with all of that.

MR. KILBOURNE: Your Honor, we'd also like to note for the record the assistance of Charles Swift who's an attorney with the Center for Muslims in America who provided amazing assistance, he and Ally Hallmark, on the appeal, right down to the resentencing memo, right down to the cert petition. So he's been very involved in assisting Mr. Smith

and others like Mr. Smith.

THE COURT: There's a lot of good work that's been done on that and all of that stuff is fine. That's good. That's the lawful way that you do things. This fighting and dying and killing people to accomplish ends is wrong, pure and simple. And he's right, what's going on in Ukraine is a terrible thing too.

MR. KILBOURNE: Yes, sir.

THE COURT: But the people in Syria are really having a hard time over there. Their government is fighting against a large part of their population and it's a pretty tough thing to undergo right now.

MR. KILBOURNE: Thank you, Your Honor.

THE COURT: Yes, sir.

Anything further from the government?

MR. SAVAGE: Nothing, Your Honor.

THE COURT: All right. Thank you. This matter is concluded.

(End of proceedings at 10:41 AM.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 3rd day of June 2023.

s/Cheryl A. Nuccio

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter